Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

STATE OF MISSOURI        )
                         )        SS
CITY OF ST. LOUIS        )

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


JOYCE SMITH; JULIE HANCE AND            )
JONATHAN KENT HANCE; TEREASA            )
CAGLEY AND JEFF CAGLEY; KAREN           )
ALBERS AND PATRICK ALBERS; HELEN        )        Division No.
ALCALA AND PATRICK ALCALA JR.;          )
ALPHONZA AULTMAN AND BEVERLY            )
AULTMAN; DENNIS AYCOCK AND SUSAN        )
AYCOCK; KEDDIE BEVIS AND RANDY          )
BEVIS; RANDY BLACK; COURTNEY BLUNT      )        JURY TRIAL DEMAND
AND ZALEKIA BLUNT; MATTHEW              )
BRODZINSKI; HARLAN BRYSON AND CINDY     )
BRYSON; CHRISTINE CENTERS AND           )
THOMAS CENTERS; TONYA DAVIS; MARK       )
DUNN; LINDA EICHORN; MARK EVANS;        )
LUKAS GAYER AND ERICA GAYER; ALBERT     )
GILLEO III AND TARA GALLAGHER GILLEO;   )
MARY HAINES; DANIEL HASLEY; WILLIAM     )
HELMUTH; LINDA HYDE AND NEIL HYDE;      )
GERALD JACKSON AND RUTH ANNE            )
JACKSON; FAITH JONES AND DONALD         )
JONES; ELLA KINSEY; PIERE LOUIS AND     )
SUZETTE LOUIS; WILLIAM MALENFANT JR.;   )
THOMAS LEE MANIGAULT; RONALD            )
MARINO AND LINDA MARINO; JOSEPH         )
MARIOTTI AND LORA MARIOTTI; TROY        )
MASON; TROY MCGOWAN; TIMMY              )
MCGREGOR AND CATHY MCGREGOR;            )
GABRIEL MICHAEL AND BERNADETTE          )
MICHAEL; SAINT MILES JR.; MAJOR         )
MOSLEY AND MARGARET A. MOSLEY;          )
JEFFREY MULLOY AND PAMELA MULLOY;       )
HELENA MUSE; MICHAEL NEWKIRK;           )
HAROLD OGG JR.; MINNIE OLINGER;         )
VERONICA PALACIO; CAROLINE PAYNE        )
AND CLETUS LEE PAYNE; CYNTHIA PFEIL;    )
MICHAEL RIVERS; YVONNE RUSSELL;         )
MAURICE SAMAI AND PRETEEDERSANEE        )

1

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

SAMAI; DANNY SANDERS AND CANDRA )
SANDERS; LAURA SAUDE; TONYA SMITH; )
DARRYL SPARLIN  AND JOANNA RUTH )
SPARLIN; JASON ST. PIERRE; APRIL )
STERLING; JAMES  STRONG AND DEBORAH )
STRONG; PHYLLIS STUIBER AND NORMAN )
STUIBER; ROGER SVARE AND JOAN )
ELIZABETH SVARE; MARILYN SWINGER; )
DEANNA RUTH THOMAS; JOHANNA )
WALLACE AND PAUL WALLACE; MELANIE )
WEATHERALL; RICHARD WEST AND )
KAREN WEST; JOHN WILLIAMS SR.; )
CYNTHIA WILLINGHAM AND JAMES )
WILLINGHAM; MARK WILLIS AND DONNA )
WILLIS )
  )
     Plaintiffs )
  )
-vs- )
  )
MEDTRONIC, INC. )
(Serve: )
Registered Agent )
The Corporation Company )
120 South Central )
Clayton, Missouri 63105) )
  )
and )
  )
MEDTRONIC SOFAMOR DANEK USA, INC. )
(Serve: )
Registered Agent )
CT Corporation Systems )
120 South Central )
Clayton, Missouri 63105) )
  )
and )
  )
DOES 1 – 100 )
  )
     Defendants )
  )
  )

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## TABLE OF CONTENTS

I.  **INTRODUCTION**...................................................................................10

II.  **PARTIES**.........................................................................................12

III. **JURISDICTION AND VENUE**.............................................................17

IV. **SUMMARY OF THE ALLEGATIONS**.....................................................18

V.  **FACTS** ...............................................................................................27

    A.  THE INFUSE® BONE GRAFT DEVICE..............................................27

    B.  BACKGROUND ON BONE MORPHOGENETIC PROTEIN IN THE INFUSE®
       BONE GRAFT.................................................................................28

    C.  BACKGROUND INFORMATION ON THE CORPORATE OWNERSHIP OF
       INFUSE®.......................................................................................29

    D.  REGULATORY FRAMEWORK...........................................................30

        1.  The Premarket Approval (PMA) Application Process For Class III Medical
           Devices.....................................................................................31

        2.  The Food And Drug Administration (FDA) Applications Are Limited By
           The Applicants' Claimed "Intended Use".................................34

        3.  The Premarket Application Process Includes Not Only The Medical Device
           Itself But Also The Product Labeling.......................................35

        4.  The FDA, By Its Regulations And PMA Process, Restricts Manufacturers
           From Promoting "Off-Label" Non-Intended Uses.....................36

        5.  The FDA, By Its Regulations And PMA Process, Restricts Manufacturers
           From Distributing Products For "Off-Label" Non-Intended Uses.............40

        6.  The FDA Regulations And PMA Requires A Manufacturer To File A
           Supplemental Application For "Off-Label" Non-Intended Uses..............41

        7.  The FDA, By Its Regulations And PMA Process, Prohibits Misleading Or
           False Promotion And Marketing Activities...............................43

        8.  After A Medical Device Is Approved, The Manufacturer Still Has
           Requirements Including General Reporting Requirements To The FDA,
           Mandated By FDA Regulations And the PMA Approval Process.................45

        9.  Post Approval, The FDA, By Its Regulations And PMA Process, Requires
           A Manufacturer To Follow Good Manufacturing Practices.......................47

        10. If A Manufacturer Markets A Medical Device For Off-Label Uses
           That Have Not Been Approved By the FDA, Then The Manufacturer
           Does Not Get The Protection Afforded To FDA Approved Medical
           Devices By The Medical Device Amendment (MDA) Of 1996 (i.e. If It's

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

    Not Approved, It's Not Protected) ........................................................49

E.  THE FDA'S LIMITED APPROVAL HISTORY OF INFUSE® ............................…...…53

   1.  The FDA Advisory Committee Hearing Prior To Approval Expressed
    Serious Concerns Regarding Unapproved Uses Of Infuse® ........................ 53

   2.  As A Result Of Those Serious Concerns, The FDA Narrowly Tailored
    The Approval Of Infuse® ...…......................................................................57

   3.  After The Limited FDA Approval Of Infuse®, Medtronic Published A
    "Fact Sheet" About Infuse® ......................................................................61

F.  ANY INFUSE® USES THAT WAS NOT SET FORTH IN MEDTRONIC'S
PREMARKET APPLICATION AS THE "INTENDED USE" HAVE NOT
BEEN APPROVED BY THE FDA AND ARE "OFF-LABEL" USES ..................62

   1.  Description Of "Off-Label" Infuse® Uses..............................…...…63

   2.  Medtronic Deliberately Breached Its Duties Imposed By The FDA
    Regulations And PMA Process, To Seek Supplemental FDA Approval
    For Non-Intended Off-Label Uses.....................................…..........66

   3.  Medtronic Failed To Satisfy Its Duties Imposed By The FDA
    Regulations And PMA Process, To Adequately Warn Physicians And
    Patients Of The Increased Risks, Dangers, And Adverse Events
    Associated With The "Off-Label" Use Of Infuse® ...................…...…68

G.  WYETH WARNED OF SERIOUS ADVERSE EVENTS RELATED TO
INDUCTOS® IN EUROPE (INFUSE® IS MARKETED IN EUROPE AS A
DRUG – NOT A MEDICAL DEVICE -UNDER THE NAME INDUCTOS®),
BUT MEDTRONIC AND WYETH FAILED TO TAKE SIMILAR ACTION
IN THE UNITED STATES.....................................................................…...…68

H.  IN JULY 2008 THE FDA SENT A "DEAR DOCTOR" LETTER WARNING
OF LIFE-THREATENING RISKS ASSOCIATED WITH THE "OFF-LABEL"
USE OF INFUSE® WHEN USED IN THE CERVICAL SPINE.........................…...70

I.  THE "OFF-LABEL" SALE OF INFUSE® IS A VERY PROFITABLE PART
OF MEDTRONIC'S BUSINESS AND PROVIDES LUCRATIVE
COMPENSATION TO WYETH/PFIZER..............................................…...…72

J.  MEDTRONIC PAYS THE UNITED STATES GOVERNMENT $40 MILLION
TO SETTLE WHISTLEBLOWER SUITS REGARDING ILLEGAL KICKBACKS
TO DOCTORS TO INDUCE THE "OFF-LABEL" USE OF INFUSE® .................73

   1.  Despite Medtronic's Settlement With The Department Of Justice ("DOJ"),
    Medtronic's Secret Agent Colonel Timothy Kuklo, M.D. Was Found To
    Have Published A Falsified Study On The Experimental Use Of Infuse®
    On War Veterans Without Their Knowledge Or Consent Nor The
    Knowledge Or Consent Of The United States Army Regarding Infuse®

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

While Secretly Consulting For Medtronic And Without The Knowledge Of Walter Reed National Military Medical Center...................................76

K. MEDTRONIC PAYS $85 MILLION TO SETTLE A LAWSUIT BROUGHT BY ITS SHAREHOLDERS REGARDING ALLEGATIONS OF AGGRESSIVE MARKETING AND PROMOTION OF THE "OFF-LABEL" USE OF INFUSE®..........81

   1. Medtronic Engaged In Active, Systematic "Off-Label" Over-Promotion Through Its Employees And Agents Without Seeking Prior Approval From The FDA Or In Furtherance Of The Safe Harbor Provisions............................83

      a. Medtronic sponsored physician meetings and corporate visits focused on "off-label" training................................................83

      b. Medtronic instructed its sales representatives on particular dosage requirements for various "off-label" uses of Infuse®..................84

      c. Medtronic sales representatives would cite data from Medtronic-sponsored published literature promoting "off-label" use and provide techniques for "off-label" procedures...........................................84

      d. Medtronic sales representatives routinely directed doctors inquiring about the "off-label" use of Infuse® to surgeons who had previously used Infuse® "off-label".......................................85

      e. Medtronic routinely informed surgeons regarding the dosage of Infuse® for "off-label" procedures in the cervical spine........................85

      f. Medtronic representatives showed doctors how to roll the absorbable collagen sponge (ACS) "like a burrito" or "like a taco" to be placed in the spine for "off-label" procedures.............................87

      g. The vast majority of Infuse® sales (over 85-90%) were from "off-label" uses.......................................................................87

      h. Medtronic packaged, sold, and distributed Infuse® and the LT-Cage separately, therefore knowing that Infuse® far out-sold the FDA required LT-Cage.......................................................88

      i. Medtronic set Infuse® sales quotas for its representatives that could not have been achieved without an aggressive, illegal "off-label" promotional campaign..........................................88

      j. Medtronic trained its sales representatives to provide step-by-step instructions to doctors conducting "off-label" surgeries using Infuse® and in fact encouraged its representatives to attend "off-label" Infuse® surgeries in operating rooms across the country.........89

      k. Medtronic secret agents Defendant Lawrence G. Lenke, M.D. and Defendant Keith H. Bridwell, M.D. from Washington University St. Louis would train surgeons on the use of Infuse®, 85-90% of which was "off-label" uses.......................................90

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

   2.  U.S. District Court Judge Paul Magnuson Determined That Statements Made By Confidential Witnesses Supported Allegations Of Medtronic's "Off-Label" Promotion Activities.............................................91

L.  "OFF-LABEL" USE OF INFUSE® IN THE LUMBAR SPINE IS NEITHER SAFE NOR EFFECTIVE AND IS UNREASONABLY DANGEROUS AND DEFECTIVE.................................................................92

M.  DESPITE THE LACK OF SAFETY AND EFFECTIVENESS AND THE UNREASONABLY DANGEROUSNESS OF "OFF-LABEL" USE OF INFUSE®, MEDTRONIC PROMOTED AND MARKETED "OFF-LABEL" USE OF INFUSE® TO PHYSICIANS, INCLUDING THROUGH KEY OPINION LEADERS, WITHOUT OBTAINING FDA APPROVAL TO DO SO.....................................94

N.  MEDTRONIC DIRECTLY "OFF-LABEL" MARKETED, WARRANTED, AND MISREPRESENTED THE SAFETY AND EFFICACY OF "OFF-LABEL" USE OF INFUSE® ON MEDTRONIC-OWNED WEBSITES, WITHOUT OBTAINING FDA APPROVAL ..............................................................95

   1.  Medtronic Misrepresented The Efficacy Of Infuse® On Medtronic.com And Infusebonegraft.com, Which Was A Violation Of Federal Law And The PMA Received For Infuse®...........................................95

   2.  Medtronic Directly Marketed The "Off-Label" Use Of Infuse® On Back.com, Which Was A Violation Of Federal Law And The PMA Received For Infuse®.................................................96

   3.  Medtronic Directly Marketed And Misrepresented The Safety Of "Off-Label" Use Of Infuse® On Necksurgery.com, Another Medtronic-Owned Website, Which Was A Violation Of Federal Law And The PMA Received For Infuse®...................................99

O.  LEADING SPINE EXPERTS REPUDIATE MEDTRONIC STUDIES.....................100

   1.  *The Spine Journal* Identifies Financial Inducements Paid To Medtronic's Secret Agent Physicians Who Acted As Ostensibly as "Research Physicians" But Collectively Received Hundreds Of Millions Of Dollars From Medtronic For Their "Opinions"................................103

   2.  Medtronic-Sponsored Studies Exaggerated The Morbidity Of Traditional Auto-Graft Harvesting Fusion, Thereby Exaggerating The Relative Benefits Of Infuse®.............................................104

   3.  Medtronic, In Their Sponsored Studies, Engaged in Various Activities That Resulted In The Published Studies Failing To Disclose The Actual Serious, Sometimes Life-Threatening Or Life-Altering Side-Effects Actually Observed In Those Medtronic-Funded "Studies".............................104

P.  MEDTRONIC, IN VIOLATION OF FEDERAL LAW AND THE INFUSE® PMA, CONCEALED AND/OR FAILED TO ADEQUATELY WARN OF THE SERIOUS

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

ADVERSE EVENTS, DANGERS, AND INCREASED RISKS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE®...................................................................106

    1. In Fact, A Subsequent Review Demonstrated The "Off-Label" Use Of Infuse® In Posterior Approaches Creates A 500% Increase In Inflammatory Reactions And At Least Three Times The Back And Leg Pain Compared To Iliac Crest Bone Graft (ICBG)...........................................................................106

    2. Medtronic-Sponsored Studies Failed To Report Catastrophic Ectopic Bone Growth, Reoperation, Radiculitis, Osteolysis, Resorption, And Loss Of Alignment Related To The Use Of Infuse®...................................................107

    3. Medtronic-Sponsored Physicians Failed To Disclose Adverse Events Related To Osteolysis, Subsidence, And Reoperation Related To The Use Of Infuse®.....................................................................................................109

    4. Medtronic-Sponsored Physicians Failed To Disclose An Alarming Rate Of Retrograde Ejaculation Related To The Use Of Infuse®..........................110

    5. Medtronic-Sponsored Studies Failed To Report Urogenital Adverse Events Were Twice As Likely To Occur Using Infuse® Compared To ICBG.......111

    6. Medtronic-Sponsored Physician/Authors Failed To Report Adverse Events That Occurred During A Clinical Trial For "Amplify", A Higher Dosed rhBMP-2 (Infuse®) Product.........................................................................112

Q. UNITED STATES SENATORS QUESTION MEDTRONIC ABOUT UNREPORTED SIDE EFFECTS, FINANCIAL TIES TO CLINICAL INVESTIGATORS, AND "OFF-LABEL" PROMOTION AND MARKETING OF INFUSE®.........................................................................................................113

    1. Medtronic's Payments To Doctors For The Promotion And Marketing Of Infuse® "Off-Label" Sales Prompts Individual Inquiries From United States Senators.....................................................................................114

    2. The U.S. Senate Committee On Finance Launched An Investigation, In June 2011, Into Medtronic's Influence Over Clinical Investigators' Failure To Disclose Adverse Events...........................................................................116

    3. The U.S. Senate Also Inquires Into Medtronic's Practices Regarding Recalls And Post-Market Surveillance Of Infuse® And Clinical Investigators' Failure To Disclose Adverse Events........................................117

R. UNITED STATES SENATORS BAUCUS AND GRASSLEY'S INVESTIGATION OF MEDTRONIC REVEALS IN A U.S. SENATE REPORT RELEASED OCTOBER 2012 THAT MEDTRONIC MANIPULATED SCIENTIFIC STUDIES RELATING TO INFUSE® AND DISCLOSED THE PAYMENTS OF HUNDREDS OF MILLIONS OF DOLLARS IN PAYMENTS TO THE "RESEARCHERS"............118

    1. High-Level Medtronic Employees Conspired With Medtronic's Secret Agent/Author J. Kenneth Burkus, M.D. To Intentionally Omit Serious

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Adverse Events From Medtronic-Funded Published "Studies"..........................127

2.  Medtronic's Vice-President Of Biologic Marketing Worked In Concert With Authoring Physicians To Over-Emphasize The Pain In Alternative Spinal Treatments From Medtronic-Funded Published "Studies"......................128

3.  Medtronic Employees (Including Its Director Of Marketing) Covertly Participated As "Peer-Reviewers" On Behalf Of The Physician Authors Named On The Paper And Secretly Instructed The Author To Remove All References To Adverse Events From Medtronic-Funded Published "Studies".........................................................................................131

S.  THE YALE STUDY, PUBLISHED IN JUNE 2013, FUNDED WITH MILLIONS OF DOLLARS FROM MEDTRONIC, CONFIRMS THE LACK OF SCIENTIFIC INTEGRITY OF PREVIOUS COMPANY SPONSORED "STUDIES" OF MEDTRONIC'S INFUSE®......................................................................135

T.  RECENT STUDIES, RELEASED SEPTEMBER 04, 2013, RECOGNIZED RHBMP-2 EXPOSURE LEADS TO A FIVE-FOLD INCREASE IN CANCER............145

U.  ARTICLES FROM THE RECENT SEPTEMBER 2013 ISSUE OF THE SPINE JOURNAL DISCUSSES THE LACK OF EFFICACY, INCREASED RISKS, SAFETY CONCERNS, AND THE CORRUPTED INFUSE® STUDIES......................146

V.  MEDTRONIC'S PARTICIPATION IN THE COVERING UP OF AND FAILURE TO ADEQUATELY WARN OF THE SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE® CAUSED PLAINTIFFS' INJURIES......................149

VI.   EQUITABLE TOLLING/FRAUDULENT CONCEALMENT..............................152

VII.  GENERAL ALLEGATIONS................................................................153

VIII. SPECIFIC PLAINTIFF ALLEGATIONS.................................................156

IX.   PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES..............................228

X.    CLAIMS FOR RELIEF.....................................................................228

A.  FIRST CAUSE OF ACTION – Negligence........................................228

B.  SECOND CAUSE OF ACTION - Negligence Per Se..............................234

C.  THIRD CAUSE OF ACTION - Negligence – Misrepresentation ............237

D.  FOURTH CAUSE OF ACTION - Strict Liability – Failure to Warn..........239

E.  FIFTH CAUSE OF ACTION - Strict Liability – Design Defect...............243

F.  SIXTH CAUSE OF ACTION - Strict Liability – Manufacturing Defect.......249

G.  SEVENTH CAUSE OF ACTION - Common Law Fraud............................257

H. EIGHTH CAUSE OF ACTION - Constructive Fraud.............................................259

I. NINTH CAUSE OF ACTION - Fraudulent Concealment......................................261

J. TENTH CAUSE OF ACTION - Breach of Express Warranty...............................262

K. ELEVENTH CAUSE OF ACTION - Breach of Implied Warranty..........................266

L. TWELFTH CAUSE OF ACTION - Violation of Consumer Protection Laws...............269

M. THIRTEENTH CAUSE OF ACTION - Violation of Missouri Merchandising
Practices Act.................................................................................273

N. FOURTEENTH CAUSE OF ACTION - Loss of Consortium...............................275

O. FIFTEENTH CAUSE OF ACTION - Gross Negligence/Punitive Damages.................276

**PRAYER FOR RELIEF**.................................................................279

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## PETITION FOR DAMAGES

COMES NOW, the above named Plaintiffs by and through their undersigned counsel, and states as their Petition for Damages against MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK USA, INC., and DOES 1-100 (collectively herein referred to as "Medtronic" or "Defendants") as follows:

### I. INTRODUCTION

1.    This is an action for product liability and fraud against Medtronic Inc. and its wholly owned subsidiary Medtronic Sofamor Danek, USA, Inc. ("Medtronic"). In 2002 Medtronic applied for and received a very narrow and limited Food and Drug Administration (FDA) approval for permission to sell Medtronic Infuse® Bone Graft LT-Cage® ("Infuse") for a specific intended use.  Recognizing that the strict limitations greatly reduced the potential market and ultimate sales of Infuse®, instead of seeking an expanded FDA approval through a supplemental Pre-Market Approval (PMA) as is required by the Federal Food, Drug, and Cosmetic Act (FDCA) and the Infuse® PMA, Medtronic embarked on an illegal, false and deceptive marketing scheme to promote the sale of Infuse® for unapproved uses ("off-label uses").

2.    In furtherance of this illegal promotional campaign, in 2002 Medtronic published a "Fact Sheet," that summarized and promoted the results of scientific studies that they sponsored, many of which were performed after the limited FDA approval of Infuse®.[1] However, it was only recently revealed that in the "Fact Sheet" as well as in the scientific studies themselves, Medtronic intentionally concealed important and material safety information in violation of federal law and the Infuse® PMA. First of all, Medtronic hid the fact that the studies that they were promoting as "outside objective reports" were in fact written or rewritten by their own secret agents that they paid hundreds of millions of dollars to write these studies.  Second, Medtronic hid the fact that Medtronic itself was actively involved in the writing and editing of the articles, including making the ultimate decisions on whether to include and/or exclude important health and safety information.  Third, Medtronic hid the fact that in these articles, Medtronic intentionally omitted and actively concealed material information about serious adverse events that were found in these studies.  All of the above activities of Medtronic are in violation

---

[1] Medtronic, Fact Sheet (2002) *available at http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf* (also attached hereto as Exhibit "A").

of federal law and the Infuse® PMA.

3.     Medtronic knew that the off-label non-intended uses of Infuse® were unreasonably dangerous and exposed patients to serious risks of increased injury and harm. Medtronic's false and deceptive marketing scheme was so effective, however, that 85-90% of all Infuse® sales were from off label non-intended uses.  An "off-label" use rate of 85-90% can never be realized without significant "off-label" promotion, all in violation of federal law and the PMA.  Medtronic received several billions of dollars of ill-gotten gains stemming from their false, deceptive, and illegal Infuse® marketing scheme.

4.     As a result of Medtronic's fraud and wrongful actions, non-Medtronic paid physicians were deprived of material information regarding what Medtronic, Medtronic's clinic trial physicians, Medtronic's paid authors, and Medtronic's Key Opinion Leaders (KOLs), knew concerning not only the lack of efficacy but the truth concerning the significant and serious adverse events posed by the off-label non-intended use of Infuse®. This deception precluded the non-Medtronic paid physicians from being learned or informed of the lack of efficacy or the significant dangerous risks and propensities stemming from the off-label use of Infuse®.  Medtronic concealed the increased risks of using Infuse® off-label by funding biased studies and articles by Key Opinion Leaders published in key medical journals that showed a lower incidence of adverse effects.

5.     Medtronic concealed critical safety information including adverse events and serious increased risks (estimated by the authors of a peer reviewed article published in *The Spine Journal* to be as high as 50 times more than Medtronic reported) from the use of Infuse®.  Further, evidence of Medtronic's illegal acts are well documented by many other highly respected sources including additional articles and editorials in *The Spine Journal*, the United States Senate Report of October, 2012 and the YODA studies published in June, 2013.  Medtronic, via their illegal actions, clearly prevented Plaintiffs' physicians, from being adequately warned and informed about the serious dangers of off-label use of Infuse®.  Plaintiff and Plaintiffs' physicians detrimentally relied upon Medtronic for truthful and accurate information, which Medtronic never provided them.   Therefore, Medtronic restricted physicians from becoming learned intermediaries and misled the physicians and ultimately the patients

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

to their detriment and damage.

6.    Independent studies have only recently revealed that the allegedly "scientific studies", which Medtronic and its secret physician agents (who received undisclosed compensation exceeding $210 million dollars, disguised as "royalties" but were actually illegal kickbacks) promoted to reliant physicians and patients as confirming the safety and efficacy of Infuse®, were in fact fraudulent and false. The original Medtronic sponsored studies when analyzed by truly independent experts including those who took part in the Medtronic funded YODA studies, *The Spine Journal,* and the U.S. Senate Report confirmed that Infuse® provided no additional benefits to patients and, in fact, exposed patients to serious and undisclosed increased risks and complications.

7.    Medtronic's fraudulent scheme was undertaken in conscious disregard of the health and safety of Infuse® patients and in violation of federal law and the PMA. Thousands of vulnerable and unsuspecting patients, including the Plaintiffs herein, have been seriously and permanently injured as a result of Medtronic's wrongful, illegal and immoral actions.

## II. PARTIES

### A. Plaintiffs

8.    Below is a list of each Plaintiff who is bringing his or her own case against Defendants:

9.    Plaintiff Joyce Smith is an individual who resides in Pacific, Missouri.

10.    Plaintiffs Julie Hance and Jonathan Kent Hance are individuals who reside in Cottage Grove, Minnesota.

11.    Plaintiffs Tereasa Cagley and Jeff Cagley are individuals who reside in Sardis, Mississippi.

12.    Plaintiffs Karen Albers and Patrick Albers are individuals who reside in North Plainfield, New Jersey.

13.    Plaintiffs Helen Alcala and Patrick Alcala Jr. are individuals who reside in Mesa, Arizona.

14.    Plaintiffs Alphonza Aultman and Beverly Aultman are individuals who reside in Kenansville, North Carolina.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

15.    Plaintiffs Dennis Aycock and Susan Aycock are individuals who reside in Green Cove Springs, Florida.

16.    Plaintiffs Keddie Bevis and Randy Bevis are individuals who reside in Owenton, Kentucky.

17.    Plaintiff Randy Black is an individual who resides in Marquette, Michigan.

18.    Plaintiffs Courtney Blunt and Zalekia Blunt are individuals who reside in Egg Harbor, New Jersey.

19.    Plaintiff Mathew Brodzinski is an individual who resides in Myrtle Beach, South Carolina.

20.    Plaintiffs Harlan Bryson and Cindy Bryson are individuals who reside in Ardmore, Oklahoma.

21.    Plaintiffs Christine Centers and Thomas Centers are individuals who reside in Livonia, Michigan.

22.    Plaintiff Tonya Davis is an individual who resides in Panama City, Florida.

23.    Plaintiff Mark Dunn is an individual who resides in Houston, Texas.

24.    Plaintiff Linda Eichorn is an individual who resides in Cedarburg, Wisconsin.

25.    Plaintiff Mark Evans is an individual who resides in St. Louis, Missouri.

26.    Plaintiffs Lukas Gayer and Erica Gayer are individuals who reside in Riverview, Michigan.

27.    Plaintiffs Albert Gilleo III and Tara Gallagher Gilleo are individuals who reside in Little River, South Carolina.

28.    Plaintiff Mary Haines is an individual who resides in Greenfield, Wisconsin.

29.    Plaintiff Daniel Hasley is an individual who resides in Fairbury, Nebraska.

30.    Plaintiff William Helmuth is an individual who resides in Minneapolis, Minnesota.

31.    Plaintiffs Linda Hyde and Neil Hyde are individuals who reside in Cliffside Park, New Jersey.

32.    Plaintiffs Gerald Jackson and Ruth Anne Jackson are individuals who reside in Crossville, Tennessee.

33.    Plaintiffs Faith Jones and Donald Jones are individuals who reside in Athens, Alabama.

34.    Plaintiff Ella Kinsey is an individual who resides in Kinston, North Carolina.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

35.    Plaintiffs Piere Louis and Suzette Louis are individuals who reside in Brentwood, New York.

36.    Plaintiff William Malenfant Jr. is an individual who resides in Palm Bay, Florida.

37.    Plaintiff Thomas Lee Manigault is an individual who resides in North Charleston, South Carolina.

38.    Plaintiffs Ronald Marino and Linda Marino are individuals who reside in Patterson, New York.

39.    Plaintiffs Joseph Mariotti and Lora Mariotti are individuals who reside in Port Charlotte, Florida.

40.    Plaintiff Troy Mason is an individual who resides in Farmville, North Carolina.

41.    Plaintiff Troy Mcgowan is an individual who resides in Clear Lake, South Dakota.

42.    Plaintiffs Timmy McGregor and Cathy McGregor are individuals who reside in Perry, Florida.

43.    Plaintiffs Gabriel Michael and Bernadette Michael are individuals who reside Kinston, North Carolina.

44.    Plaintiff Saint Miles Jr. is an individual person who resides in Davenport, Iowa.

45.    Plaintiffs Major Mosley and Margaret A. Mosley are individuals who reside in Milwaukee, Wisconsin.

46.    Plaintiffs Jeffrey Mulloy and Pamela Mulloy are individuals who reside in Elkhorn, Wisconsin.

47.    Plaintiff Helena Muse is an individual who resides in Clinton, Maryland.

48.    Plaintiff Michael Newkirk is an individual who resides in Pottstown, Pennsylvania.

49.    Plaintiff Harold Ogg Jr. is an individual who resides in Cedar Springs, Michigan.

50.    Plaintiffs Minnie Olinger is an individual who resides in Milwaukee, Wisconsin.

51.    Plaintiff Veronica Palacio is an individual who resides in Miami, Florida.

52.    Plaintiffs Caroline Payne and Cletus Lee Payne are individuals who reside in Herrin, Illinois.

53.    Plaintiff Cynthia Pfeil is an individual who resides in Cochecton, New York.

54.    Plaintiff Michael Rivers is an individual who resides in St. Paul, Minnesota.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

55.    Plaintiff Yvonne Russell is an individual who resides in Dallas, Texas.

56.    Plaintiffs Maurice Samai and Preteedersanee Samai are individuals who reside in Margate, Florida.

57.    Plaintiffs Danny Sanders and Candra Sanders are individuals who reside in Buffalo, New York.

58.    Plaintiff Laura Saude is an individual who resides in Yakima, Washington.

59.    Plaintiff Tonya Smith is an individual who resides in Macon, Georgia.

60.    Plaintiffs Darryl Sparlin and Joanna Ruth Sparlin are individuals who reside in Webb City, Missouri.

61.    Plaintiff Jason St. Pierre is an individual who resides in Westfield, Massachusetts.

62.    Plaintiff April Sterling is an individual who resides in Springfield Gardens, New York.

63.    Plaintiffs James Strong and Deborah Strong are individuals who reside in Skaneateles, New York.

64.    Plaintiff Phyllis Stuiber and Norman Stuiber are individuals who reside in Milwaukee, Wisconsin.

65.    Plaintiffs Roger Svare and Joan Elizabeth Svare are individuals who reside in Blaine, Minnesota.

66.    Plaintiff Marilyn Swinger is an individual who resides in Hot Springs, Arkansas.

67.    Plaintiff Deanna Ruth Thomas is an individual who resides in Palm Bay, Florida.

68.    Plaintiffs Johanna Wallace and Paul Wallace are individuals who reside in Taylor, Michigan.

69.    Plaintiff Melanie Weatherall is an individual who resides in Paris, Texas.

70.    Plaintiffs Richard West and Karen West are individuals who reside in Belleville, Wisconsin.

71.    Plaintiff John Williams Sr. is an individual who resides in Wilson, North Carolina.

72.    Plaintiffs Cynthia Willingham and James Willingham are individuals who reside in Kemp, Texas.

73.    Plaintiffs Mark Willis and Donna Willis are individuals who reside in Fairview Heights, Illinois.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## B. Defendants

74.    Defendant MEDTRONIC, INC. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.

75.    Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation, with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132. Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a wholly owned subsidiary of Defendant MEDTRONIC, INC.

76. Defendants MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK USA, INC., and DOES 1-100 shall be collectively referred to herein as "Medtronic" and/or "Defendants").

77.    The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of DOES 1 through 100, inclusive, are unknown to Plaintiffs at this time, who therefore sue defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when that same is ascertained.

78.    Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the DOE Defendants were the agent, servant, employee and/or joint venturer of the other co-defendants and other DOE Defendants, and each of them, and at all said times, each Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

79. At all times herein mentioned, the officers and directors of Defendants authorized and directed the production and/or participated in the "off-label" promotion of Infuse® when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the "off-label" use of Infuse®, and thereby actively participated in the tortious conduct which resulted in the physical injuries described herein.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

80.     There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants, and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

81.     At all times herein mentioned, each Defendant was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other, knowing that their collective conduct constituted a breach of duty owed to the Plaintiffs.

### III. JURISDICTION AND VENUE

82.     The Court has personal jurisdiction pursuant to § 506.500 R.S. Mo. over Defendants because at all relevant times they have engaged in substantial business activities in the State of Missouri. At all relevant times the Defendants transacted, solicited, and conducted business in Missouri through their employees, agents, and or sales representatives and derived substantial revenue from such business in Missouri.  Jurisdiction in this court is also proper as defendants committed torts in whole or in part against plaintiffs in Missouri.  Further, there is no federal subject matter jurisdiction because no federal question is raised and there is no diversity jurisdiction.

83.     Venue is proper in this Court pursuant to § 508.010(4) R.S. Mo., as the conduct which gave rise to plaintiff Joyce Smith's action occurred in the city of St. Louis, Missouri.

84. The plaintiffs herein are all properly joined in this action pursuant to 507.040 R.S. Mo as they assert a right to relief under the same series of occurrences and questions of law and fact are common to all plaintiffs in this action.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## IV. SUMMARY OF THE ALLEGATIONS

85.    This is an action for the serious and permanent injuries incurred by the Plaintiffs resulting from the "off-label" use of an unreasonably dangerous and defective combination medical device product known as Infuse® Bone Graft and LT Cage® Device ("Infuse®").

86.    Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Medtronic.

87.    The FDA approved Infuse® on July 02, 2002 for a specific "intended use".

88.    The "intended use" approved by the FDA in 2002 was a single-level anterior lumbar interbody fusion ("ALIF") to be used only in conjunction with a titanium metallic cage device known as the LT-Cage—meaning that Infuse® was only approved by the FDA for use in spinal fusion surgeries that were performed from a frontal (i.e. anterior) procedure in a specific level(s) of the spine. The 2002 approval restricted the use of Infuse® for ALIF procedures to the spinal region from L4-S1.[2]

89. In 2004 the FDA approved a supplement expanding the "intended use" of Infuse® to L2-S1.

90. To date, Infuse® has NOT been approved for posterior lumbar fusions.

91. To date, Infuse® has NOT been approved for lateral lumbar fusions.

92. To date, Infuse® has NOT been approved for use without an approved Cage.

93. To date, Infuse® has NOT been approved for use in regions of the spine other than L2-S1.

94. Uses other than those intended uses approved by the PMA are non-approved "off-label" uses.

95. Medtronic never applied to the FDA for approval of Infuse® for these off-label non-intended uses.

96. Medtronic never asked the FDA to make a determination as to whether the off-label use of Infuse® via other surgical approaches, methods or involving other areas of the spine is safe and effective.

---

[2] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1...InFUSE™ Bone Graft/LT -CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach," Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B"); *see also* Infuse® Label, "These components must be used as a system. The Infuse® Bone Graft component must not be used without the LT-Cage Lumbar Tapered Fusion Device component." *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

97. Medtronic never formulated adequate directions and warnings for such off-label non-intended uses of Infuse®.

98. Medtronic never provided adequate directions and warnings for such off-label non-intended uses of Infuse®.

99. Because the FDA never approved such off-label uses, there were no FDA-imposed requirements specific to the non-approved uses of Infuse® and therefore no FDA- approved labeling for such off-label uses.

100. Medtronic knew that the FDA did not approve such off-label non-intended uses.

101. Medtronic knew that the FDA did not grant them permission to market Infuse® for uses other than the "intended use" set for in their premarket application.

102. Medtronic knew that the FDA did not grant them permission to market Infuse® for uses other than the "intended use" set for in the PMA approval of Infuse®.

103. Medtronic knew that they were prohibited by federal law and the PMA received from the FDA, from promoting unapproved "off-label" uses of Infuse®.

104. Medtronic knew it was and is illegal for Medtronic to promote Infuse® for uses other than "intended uses".

105. It is illegal for Medtronic to distribute Infuse® with knowledge and/or notice that Infuse® was going to be used in an "off-label" manner.

106. Medtronic was aware that a PMA approved Class III medical device promoted for unapproved "off-label" use, is deemed a misbranded medical device in violation of 21 U.S.C. § 352(f) (2012).

107. Medtronic was aware that a PMA approved Class III medical device distribution of a misbranded medical device is prohibited pursuant to 21 U.S.C. §§ 331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

108. However, Medtronic recognized that the limited FDA approval obtained for Infuse® in 2002, severely restricted the potential market for Infuse® and consequently the ultimate sales volume and profit to be achieved.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

109.    Instead of submitting a PMA Supplement as required by the FDCA and the PMA, Medtronic devised a well-financed and extensive scheme to promote and market Infuse® for non-approved, off-label uses.  Medtronic devised and intended to devise a scheme to defraud physicians, hospitals and patients by means of false and fraudulent pretenses, representations and concealments of material facts.

110.    Medtronic knew that their promotion of Infuse® for non-FDA approved uses was illegal.

111.    Medtronic knew that the unapproved "off-label" use of Infuse® exposed patients to serious dangers and greatly increased adverse risks.

112.    Despite knowing that the "off-label" promotion of Infuse® was not only illegal but extremely dangerous to the health and safety of its consumers, Medtronic in conscious disregard for the safety of the patients, including Plaintiffs, successfully carried out their false and unlawful marketing and promotional scheme.

113.    These illegal promotional efforts proved to be highly effective and eventually more than eighty-five to ninety percent (85-90%) of all Infuse® sales involved "off-label" uses generating billions of dollars in ill-gotten sales revenue.

114.    As alleged herein in detail, in order to unlawfully enhance Infuse® sales, Medtronic engaged in substantial, widespread and systematic false, misleading and illegal promotional activities to encourage physicians to use Infuse® for dangerous and unapproved/"off-label" procedures.

115.    While Medtronic engaged in substantial, widespread and systematic false, misleading and illegal promotional activities they violated their duty owed to the physician and patients, in concealing and failing to warn the physicians and patients of the known serious increased risks and complications stemming therefrom.

116.    Medtronic's wrongful, illegal, and immoral conduct has become the subject of investigation, action and/or sharp rebuke, by the Department of Justice, the United States Senate, the authors of *The Spine Journal*, the authors of the two (2) independent papers constituting the YODA study as well as many other respected physicians and peer reviewed publications.  Further, the media such as the Wall Street Journal, New York Times and Medtronic's own home town, Star Tribune, has

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

published a significant number of in-depth, investigative articles concerning Medtronic's wrongful conduct causing the Infuse® catastrophe.

117.    According to articles in the June 2011 issue of *The Spine Journal* (an internationally recognized medical journal that publishes peer-reviewed research articles related to evidence-based spine care), wrote that Medtronic-sponsored studies and articles failed to disclose, or inaccurately reported, the safety of Infuse® by concealing and/or underestimating its increased risks and dangers. *The Spine Journal* revealed that Medtronic-sponsored articles failed to disclose the life threatening and completely debilitating serious adverse effects seen in its earliest trials of Infuse®. *The Spine Journal* also revealed that the actual rate of incidence of these serious side effects is much greater than the rate disclosed by Medtronic and the Medtronic-sponsored studies to physicians and to the public. *The Spine Journal* reported that the actual rate of incidence of certain side effects of Infuse® was up to **FIFTY TIMES** more than what was reported by Medtronic. Finally, *The Spine Journal* found that all of the "researchers" who wrote the original articles touting the perfect safety profile of Infuse® without disclosing the adverse events, were paid hundreds of millions of dollars by the Medtronic and that these payments were, at that point, never disclosed to the public.

118.    *The Spine Journal* demonstrated how far Medtronic would go in their aggressive "off-label" campaign. Medtronic paid their secret agents outrageous amounts of compensation, so large in fact that one can only interpret the payments as kickbacks or more appropriately, payoffs, to underreport the adverse effects of Infuse® in their studies. These highly paid secret agents acted as agents and were in fact agents for Medtronic. These secret agents wrote fraudulent studies about using Infuse® "off-label" while illegally and acting in concert with Medtronic to hide the adverse events from its consumers and surgeons. The fact that they were receiving extraordinary compensation from Medtronic, for their published "studies", all under the supervision and instruction of Medtronic, was concealed from physicians and patients.

119.    Following *The Spine Journal*, the United States Senate Finance Committee began an investigation into Medtronic concerning Infuse®. After the completion of the extensive investigation, the United States Senate Finance Committee published an official report confirming the independent

findings of *The Spine Journal*. The U.S. Senate Report officially found that Medtronic falsely manipulated the studies, under reported adverse events, paid their secret agents enormous sums of money, and directly participated in the writing of the false and misleading studies, without any indication in the articles that Medtronic had any role in writing or editing the published work. The U.S. Senate Report exposed Medtronic for their fraudulent activity.

120.    Not only did Medtronic illegally promote using Infuse® "off-label", but they knowingly promoted materially false information about the "off-label" use of Infuse®. Medtronic heavily used these Medtronic-sponsored studies that *The Spine Journal* criticized in the promotion of Infuse®. Following the limited FDA approval of Infuse® in 2002, Medtronic published a "Fact Sheet." The Medtronic Fact Sheet represented, in part, the following:

**Fact Sheet**

*INFUSE® Bone Graft/LT-CAGE®* Lumbar Tapered Fusion Device… Spinal fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is essentially the same as traditional autograft procedures**, without the need for the additional surgery to harvest bone from the patient's hip. Scientists determined that rhBMP-2, with an absorbable collagen sponge as the carrier, (INFUSE® Bone Graft) **is an effective replacement for autograft bone in spinal fusion surgery**. This conclusion is **based on data resulting from a large-scale, multi-center, prospective, randomized, two-year study** involving 279 degenerative disc disease patients implanted with INFUSE® Bone Graft and the LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety, efficacy and therapeutic benefits of the new procedure as compared to traditional autograft procedures**… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complication**s that would require follow-up visits…[3] (emphasis added).

121.    Medtronic knew when they made these representations that these "facts" were materially false, and misleading and illegal, as they violated federal law and the PMA. Medtronic actively concealed the truth related to the study results and concealed material information related to the safety and efficacy of Infuse® from the physicians and patients. In the wake of the storm of controversy,

---

[3] Medtronic, Fact Sheet (2002) *available at http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf*. (also attached hereto as Exhibit "A").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

discussed herein, related to the safety of Infuse, Medtronic was belatedly forced by the ever-mounting public pressure to disclose the underlying data from the Infuse® studies for independent YODA examination.

122.    Medtronic subsequently commissioned a review of the prior Medtronic-sponsored Infuse® studies to be led by Yale University. Medtronic paid Yale University over 2 million dollars to reanalyze and what Medtronic was hoping, would rebut *The Spine Journal* findings. Yale supervised the study, under their YODA program.  It took over two years.  The study was performed by 2 independent medical facilities, one in the United States and one in the United Kingdom, each reviewing the same data.  However, at the end of the day, the YODA studies confirmed that *The Spine Journal* was right. The YODA findings questioned the scientific integrity of those prior Medtronic sponsored studies and also confirmed that Medtronic wrongfully hid known serious adverse events.  The YODA reports pointed out that the Medtronic studies downplayed the adverse events actually observed with the use of Infuse® while improperly accentuating the adverse events when an autograft was used.  In fact the authors of the YODA study found that evidence suggested that some of the data related to previous Medtronic-sponsored studies were intentionally omitted.  The YODA study showed that not only did Infuse® lack any clinical benefit over alternative spine fusion procedures, but that Infuse® was associated with a greater prevalent risk of very serious injuries, including cancer.

123.    The results of the YODA study, published in June of 2013, confirmed that the Medtronic Fact Sheet (and the Medtronic sponsored studies) were false, misleading and deceptive.

124.    The results of the YODA study, confirmed that the Medtronic Fact Sheet (and the Medtronic sponsored studies) were therefore illegal and in violation of federal law, the PMA, and state common laws.

125.    Physicians and their patients relied upon the honesty, integrity and truth of Medtronic's (as well as Medtronic secret agents) representations regarding the safety of Infuse® to their detriment.

126.    Hundreds of thousands of vulnerable and unsuspecting patients, including the Plaintiffs, have become victims of Medtronic's ongoing campaign of fraud, deceit, illegal, and immoral conduct.

127.    The lead editorial of the July 6, 2013 edition of the Chicago Tribune accurately described

this shocking debacle with their headline: "The Danger of Rigged Medical Research."[4]

128.     Caught in the midst of this tangled web of wrongful conduct, fraud, and deceit are the unsuspecting and vulnerable victims —the patients. Tragically, the Plaintiffs are such victims.

129.     When used "off-label" in spine surgery, Infuse® has often failed to function in a safe and effective manner, thereby causing serious medical problems and, in some patients, like Plaintiffs, serious, permanent, and/or catastrophic injuries.

130.     The "off-label" use of Infuse® can cause serious physical injuries and/or death.

131.     When Infuse® is used off-label in spinal surgery, it often causes "ectopic" or "exuberant" bone growth.  This ectopic/exuberant bone growth results from Infuse®'s very mechanism of action.  In such cases, Infuse® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing – i.e. into or against the spinal cord or other spinal nerves.

132.     Ectopic/exuberant bone growth can create nerve compression, which can cause the patient to experience any number of adverse effects, including intractable pain, paralysis, spasms, cramps in limbs, and in some cases even leads to death.

133.     In "off-label" spine surgeries, Infuse® also can lead to many other serious and significant adverse events including severe inflammatory reactions, fluid collections, bone resorption (bone destruction), osteolysis (active resorption of bone matrix), subsidence (sinking of the cage), implant displacement, radiculitis, retrograde ejaculation, urinary and/or bowel retention or incontinence, seroma, infections, sterility, cancer, and even death.  These are debilitating and life threatening adverse events, often result in poorer global outcomes often resulting in the patient being in a significantly worse physical condition than they were in prior to the surgery, as a result of the off-label use of Infuse®, as in Plaintiffs' cases.

134.     Indeed, many adverse events associated with the use of Infuse® result from off-label use of the product by surgeons who did not fully understand the highly potent nature of rhBMP-2 as they

---

[4] Editorial: The danger of rigged medical research, Chicago Tribune, July 6, 2013, *available at* http://articles.chicagotribune.com/2013-07-06/opinion/ct-edit-medtronic-20130706_1_bone-growth-research-infuse (also attached hereto as Exhibit "D").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

were never fully informed by Medtronic of the increased risks and dangers stemming from its off-label use.

135. As discussed *infra* the learned intermediary doctrine provides that if the manufacturer fails to provide physicians with an adequate warning of the risks associated with their medical device and if the physician did not have independent knowledge of the risks, then the manufacturer's failure to adequately warn is the proximate cause of a patient's injuries.

136. It goes without saying, but yet we must, that an intermediary cannot be "learned" if they are not warned of the serious dangers and increased risks that can arise out of the use of a medical device.

137. Plaintiffs' physicians were not adequately warned by Medtronic of the increased risks and serious dangers of using Infuse® "off-label".

138. Plaintiffs' physicians could not have acquired independent knowledge of the increased risks and dangers as Medtronic intentionally concealed these increased risks and dangers so as to maximize their own financial gains.

139. Medtronic, by their actions, prevented Plaintiffs' physician from fulfilling their role as a learned intermediary.

140. A reasonably prudent physician would not select (nor would a patient consent to the use of) a product if they knew that there were important, life-altering serious health risks that were being concealed by the manufacturer.

141. Likewise, a reasonably prudent physician (nor would a patient consent to the use of) would not select a product that has no additional benefits, but has increased risks of serious, life-altering, physical injuries.

142. The Plaintiffs do not complain herein of fraud on the FDA in the PMA process. Further, Plaintiffs are not seeking to enforce the Federal Regulations in this action or are suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these federal regulations, as well as the PMA obtained for Infuse®, also violates parallel state laws. Plaintiffs, individually, claim that they (and their treating physicians) were deceived, misled,

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

defrauded, and as a result, injured by Medtronic's and Medtronic's secret agents' deceptive, false, and illegal promotion and distribution of Infuse® for unapproved off-label uses.

143.    Medtronic's fraudulent conduct includes, but is not limited to:

a. promoting Infuse® for unapproved "off-label" uses outside of the "intended uses" as set for in the premarket application and the PMA;

b. utilizing highly paid consultants/agents to canvas the country in presentations illegally promoting and marketing unapproved off-label uses of Infuse®;

c. ghostwriting and editing "scientific studies" to falsely tout that Infuse® that had a perfect safety record by intentionally deleting the adverse events, when in fact Medtronic knew this was not true and the underlying data did not support this claim;

d. publishing these "scientific studies" in leading medical journals, touting the success of Infuse® which appear to be authored by neutral physicians when in fact it was written by Medtronic secret agents who received in excess of $200 million dollars in undisclosed compensation/kickbacks and/or disguised "royalties"

e. summarizing and promoting the results of these fraudulent "scientific studies" on their direct to consumer "informational" websites, including but not limited to, Medtronic's Fact Sheet referenced herein.

f. failing to provide adequate warnings regarding the increased risks and dangers associated with the promoted "off-label" unapproved uses of Infuse® by requiring the physicians and others conducting the "studies" to publish accurate, truthful and undistorted results of those "studies";

g. failing to prohibit their employees and agents from manipulating the published materials concerning the actual adverse events found in those "studies";

h. failing to provide adequate warnings regarding the increased risks and dangers associated with the promoted off-label unapproved uses;

i. by not submitting a PMA Supplement as required by the FDCA and the PMA for the "off-label" unapproved uses Medtronic and their agents were illegally promoting and/or

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

marketing;

j. creating and distributing false and misleading advertising regarding the safety of Infuse®;

k. knowingly making misleading, false and deceptive statements regarding the safety of Infuse®;

l. knowingly failing to provide/concealing material information regarding the increased risks and dangers of Infuse®;

m. promoting and distributing an unreasonably dangerous and defective product.

144.    In doing the acts alleged herein, Medtronic (a) did not act reasonably with regard to the foreseeable harm to patients, including the Plaintiffs; (b) did not act as a responsible manufacturer of a Class III medical device; (c) acted unlawfully, in violation of the PMA; (d) acted unlawfully, in violation of the FDA regulations; and (e) violated state common law duties, all of which parallel FDA and federal requirements.

145.    Plaintiffs bring this action for full redress for the injuries and damages they have proximately incurred and will incur as a result.

## V. FACTS

### A. THE INFUSE® BONE GRAFT DEVICE

146.    Medtronic manufactured, designed, marketed, promoted, and sold Infuse® for use in lumbar spine fusion surgeries.

147.    Infuse® is a bioengineered bone-protein known as recombinant bone morphogenetic protein-2 ("rhBMP-2"), and it is used as an alternative to bone grafting, which involves the transplantation of a piece of bone from the patient's own hip (or bone from a cadaver) to the spine to promote bone growth.  The purported goal of Infuse® is to achieve the ultimate outcome of a bone transplantation by stimulating bone growth with the use of rhBMP-2 without producing the possible adverse side effects of a bone grafting procedure, which can be pain at the donor site.

148.    As an alternative to grafting/transplantation procedures, Infuse® uses a protein known as

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

rhBMP-2 (extracted from genetically-engineered cells which originate from the ovaries of Chinese Hamsters) to facilitate the fusion of vertebrae.

149.    The Infuse® "device" is a combination product and consists of three components compartmentalized into two parts: (1) a metallic spinal fusion cage; and (2) a drug consisting of the bone protein, rhBMP-2, as well as an absorbable collagen sponge (ACS), which acts as a carrier or scaffold that is manufactured from bovine collagen and used as a carrier for the protein and placed inside the fusion cage.



150.    The LT fusion cage allegedly maintains the spacing between vertebrae and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone, with the goal of permanent stabilization (fusion) of the spine.

151.    During surgery, rhBMP-2 is soaked onto and binds with the absorbable collagen sponge that is designed to resorb, or disappear, over time.  As the sponge dissolves, the rhBMP-2 is designed to stimulate the cells to produce new bone.

## B. BACKGROUND ON BONE MORPHOGENETIC PROTEIN IN THE INFUSE®
## BONE GRAFT

152.    Surgeons have for decades employed spinal fusion – a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them – to treat a number of spinal conditions and deformities.

153.    Spinal fusion is similar to the concept of welding.

154.    For years, autologous bone graft has been considered the "gold standard" in spinal fusion

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

surgery.  In an autologous bone graft, or "autograft," the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest, and implants the bone graft in the site where fusion is desired.  As the harvested bone exhibits all the properties necessary for bone growth – including osteogenic, osteoconductive and osteoinductive properties – successful fusions occur at significantly higher rates in autograft procedures.

155.    As an alternative to autograft, patients can undergo an allograft procedure, in which bone is taken from the cadavers of individuals who have donated their bone to so-called "bone banks." Although healing and fusion is not as predictable as with the patient's own bone, an allograft eliminates the need for, as well as the pain and patient risk associated with, the harvest procedure required in autograft.

156.    Consequently, studies revealing the ability for biologically manufactured protein to generate bone growth in laboratory animals represented a potential to provide a third surgical option to traditional bone graft procedures. The theory was that, if fusion could be accomplished through the use of biologically manufactured proteins, patients could forego the harvest surgery required in an autograft, but could still benefit from the superior fusion rates associated with autograft procedures.

## C. BACKGROUND INFORMATION ON THE CORPORATE OWNERSHIP OF INFUSE®

157.    Genetic Institute, Inc. identified, isolated, purified and cloned the bone morphogenetic protein known as BMP-2.

158.    Attempting to seize on this potentially lucrative opportunity to develop an alternative spinal fusion procedure, Sofamor Danek Group, Inc., a Memphis, Tennessee based spinal device maker ("Sofamor Danek"), acquired the exclusive rights to the recombinant human bone morphogenic rhBMP-2 for spinal applications in the United States from Genetics Institute in February 1995.

159.    Under the agreement, Sofamor Danek acquired the exclusive right in North America to develop and commercialize these products for spinal applications.  Sofamor Danek paid Genetics Institute, Inc. $12.5 million in license fees in 1995 and was obligated to pay up to $37.5 million between 1996-1998.  Genetics Institute, Inc. retained the exclusive right to manufacture rhBMP-2 for supply to

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Sofamor Danek. Genetics Institute, Inc. and Sofamor Danek agreed to equally share revenues.[5]

160.    Wyeth Pharmaceuticals, shortly after this agreement, acquired Genetic Institute, Inc. and the rights to BMP-2 in 1996.[6]

161.    In October 1996, Sofamor Danek filed an application for an Investigational Device Exemption with the FDA to conduct a pilot study on the effects of rhBMP-2 in humans, marking the first step to obtaining approval to commercially market BMP-2.[7]

162.    In January 1999, Medtronic purchased Sofamor Danek for $3.6 billion.[8]

163.    In 2009, Pfizer acquired Wyeth for $68 billion[9]

### D. REGULATORY FRAMEWORK

164.    To understand the full scope of the allegations contained in this Complaint, a brief general background regarding the applicable FDCA provisions is warranted, as well as an application of those laws to the present case.[10]

165.    The United States Food and Drug Administration ("FDA") is the federal agency of the United States of America that is charged with safeguarding the health and safety of the public by enforcing the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* (2012) (the "FDCA").[11]

166.    The FDCA was passed in 1933 to protect patients. Congress realized that there were drug manufacturers selling drugs that were neither effective nor safe. Congress felt that there regulations were necessary to protect patients by making the drug manufacturers go through an approval

---

[5] Genetics Institute and Sofamor Danek to Collaborate on Spinal Indication for rhBMP-2, (Feb 16, 1995), *available at* http://www.thefreelibrary.com/GENETICS+INSTITUTE+AND+SOFAMOR+DANEK+TO+COLLABORATE+ON+SPINAL...-a016518853 (also attached hereto as Exhibit "E").

[6] Wyeth Quietly Turns Itself Into A Biotech Power (Nov 23, 2007), *available at* http://www.blnz.com/news/2008/02/19/Wyeth_Quietly_Turns_Itself_Into_7301.html (also attached hereto as Exhibit "F").

[7] Bone Morphogenic Proteins: Applications in Spinal Surgery (Sep 2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504139/ (also attached hereto as Exhibit "G").

[8] Medtronic to Buy Maker of Spine Implants for $3.6 Billion, *LA Times,* (Nov 3, 1998), *available at* http://articles.latimes.com/1998/nov/03/business/fi-38827 (also attached hereto as Exhibit "H").

[9] Wyeth was subsequently purchased by Pfizer in 2009 for $68 billion. *see* Aaron Smith, *Pfizer to buy Wyeth for $68 billion,* CNNMoney.com (Jan. 30, 2009) *available at* http://money.cnn.com/2009/01/26/news/companies/pfizer_wycth/ (also attached hereto as Exhibit "I").

[10] Plaintiffs are not seeking to enforce these provisions in our action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these federal regulations, as well as the PMA obtained for Infuse®, also violates parallel state laws.

[11] The ultimate responsibility for the safety of a medical device, of course, rests with the Manufacturer.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

process before they can promote their drugs for specific indications.

167.      In 1976, there were the Dalkon Shield contraceptive tragedies where numerous patients were harmed by that medical device. Congress responded to these tragedies by enacting the Medical Device Amendments of 1976 ("MDA") to extend the coverage of the FDCA to medical devices. The MDA was passed to protect patients with the idea that medical devices should be subjected to a rigorous approval process _for specific indications_ and before medical device manufacturers are allowed to market them. Therefore, the FDA has authority over drugs and medical devices under the FDCA and the MDA.

168.      The MDA established three regulatory classes for medical devices. The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective according to user risk. Class I medical devices pose the least risk, whereas Class III medical devices pose the greatest risk to the users.[12]

169.      Class I devices are subject to "general controls" such as labeling requirements.[13] Class II devices are subject not only to "general controls," but also to "special controls" such as "performance standards, postmarket surveillance, [and] patient registries."[14] If a device cannot be determined to provide a reasonable assurance of safety and effectiveness under Class I or II controls and is either marketed as a life supporting device or may cause an unreasonable risk of illness or injury, then it rises to the level of a Class III medical device.

170.      Class III medical devices are the most regulated. The MDA defines a Class III medical device as one that supports or sustains human life or is of substantial importance in preventing impairment of human health or presents a potential, unreasonable risk of illness or injury.[15]

171.      Class III medical devices pose the greatest risk of death or complications and include most implantable surgical devices such as cardiac pacemakers, coronary artery stents, and several types of implantable orthopedic devices for spine and hip surgery.

### 1. The Premarket Approval (PMA) Application Process For Class III Medical Devices

---

[12] 21 U.S.C. § 360c(a)(1) (2012).
[13] 21 U.S.C. § 360c(a)(1)(A) (2012).
[14] 21 U.S.C. § 360c(a)(1)(B) (2012).
[15] Medtronic Infuse® is a Class III medical device.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

172.    The MDA imposes "detailed federal oversight" on the introduction of new medical devices onto the market. The level of federal oversight varies depending on the risks the devices present. Class III medical devices are given the greatest oversight in the pre-market approval process ("PMA") by the FDA.[16]

173.    Before a company can market a Class III medical device, the company is required to submit a premarket application to the FDA that provides the FDA with a reasonable assurance that the medical device is safe and effective for its *intended use*.[17] In order to show safety and effectiveness, the applicant is required to submit evidence to the FDA, typically in the form of clinical trial results.

174.    Without a premarket application, there is insufficient information about Class III medical devices so that performance standards (Class II) or general controls (Class I) cannot provide reasonable assurance that the medical device is safe and effective for its specific intended use.

175.    Under Section 515 of the FDCA, all medical devices placed into Class III are subject to premarket approval requirements. Premarket approval by FDA is the required process of scientific review in order to provide reasonable assuredness of the safety and effectiveness of Class III devices for their *intended uses*.

176.    The premarket approval process requires the manufacturer to provide reasonable assuredness of the product's safety and efficacy to the FDA through a process that analyzes clinical and other data, including: (1) technical data and information on the product including non-clinical laboratory studies that provide information on microbiology, toxicology, immunology, biocompatibility, stress, wear, shelf-life, and other laboratory or animal tests of the device, all of which must be conducted in compliance with federal regulations which set forth, *inter alia*, criteria for researcher qualifications, facility standards and testing procedures; and (2) clinical investigations in which study protocols, safety and effectiveness data, adverse reactions and complications, device failures and replacements, patient information, patient complaints, tabulations of data from all individual subjects, results of statistical analyses, and any other information from the clinical investigations are provided, including the results of any investigation conducted under an Investigation Device Exemption ("IDE").

---

[16] 21 U.S.C. § 360c(a)(1)(C) (2012).
[17] 21 U.S.C. §§ 360e(a)(2), 360e(d)(1)(B)(iii)II, 360e(d)(2)(A) (2012).

177.    The applicant must provide, among other things: 1) "a detailed description of the proposed conditions of use of the device,"[18] 2) a sample label delineating the *intended uses*[19], and 3) "full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective."[20]

178.    To determine if a medical device is safe and effective, the FDA reviews the scientific evidence regarding the medical device submitted by the applicant, including "evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device *under its conditions of use*."[21]

179.    "[T]he safety and effectiveness of a device are to be determined (A) with respect to the persons for whose use the device is represented or intended, (B) with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and (C) weighing any probable benefit to health from the use of the device against any probable risk of injury or illness form such use."[22]

180.    After the FDA finishes review of the premarket application, it then denies, approves, or approves with conditions on distribution, marketing, or sale.[23]

181.    After the FDA approves a Class III medical device through the premarket application process, the FDA essentially grants the applicant permission to market and sell a particular medical device for its *specific approved use* (i.e. its "*intended use*").

182.    "A device may not be manufactured, packaged, stored, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the

---

[18] 21 U.S.C. § 360c(a)(3)(D)(i) (2012).
[19] 21 U.S.C. § 360e(c)(1)(F) (2012).
[20] 21 U.S.C. § 360e(c)(1)(A) (2012).
[21] 21 C.F.R. § 860.7(c)(2) (2012) (emphasis added).
[22] 21 C.F.R. § 513(a)(1) (2012).
[23] 21 U.S.C. § 360e(d) (2012); 21 C.F.R. § 814.82 (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

device."[24]

## 2. The Food And Drug Administration (FDA) Applications Are Limited By The Applicants Claimed "*Intended Use*"

183.    The PMA is based on the manufacturer disclosing all of the pertinent information about the medical device for the FDA to review.  One of the most significant parts of the premarket application is the medical device's claimed "*intended use*" as these are the only uses that are evaluated by the FDA in their premarket approval process for efficacy and safety.[25]  The Code of Federal Regulations (CFR), Title 21, Chapter I, Subchapter H—Medical Devices, § 801.4 (2012) (Meaning of intended uses.), defines "intended use" in terms of "objective intent" of the manufacturer in a medical device approval setting:

> The words intended uses or words of similar import . . . refer to the objective intent of the persons legally responsible for the labeling of devices.  The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. **This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives.**  It may be shown by the circumstances that the article is, **with the knowledge** of such persons or their representatives, offered **and used for a purpose for which it is neither labeled nor advertised**. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer...But **if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses** to which the article is to be put.[26] (emphasis added).

184.    The FDCA requires Class III medical devices to be demonstrated to be safe and effective for each *intended use*.[27]

185.    The FDA ensures that medical devices intended for use in humans are demonstrated by

---

[24] 21 C.F.R. § 814.80 (2012).
[25] 21 U.S.C.§ 360e(c)(2)(A)(iv) (2012).
[26] 21 C.F.R. § 801.4 (2012) ("Meaning of 'Intended Uses" Under the "General Labeling Provisions" for the "Labeling" section.) (emphasis added).
[27] *See* 21 U.S.C. §§ 321, 355, 360c (2012).

the manufacturer to be safe and effective for each of their *intended uses* and that the labeling of such medical devices bore true and accurate information concerning their intended use.

186.     The FDA determines what is on label on the basis of a product's "intended use."

187.     The "intended use" of a medical device is defined at 21 C.F.R. § 801.4 (2012) as "the objective intent of the persons legally responsible for the labeling of devices…" "The intended use or uses of a medical drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source."[28] Manufacturers must obtain FDA approval for each intended use.

### 3. The Premarket Application Process Includes Not Only The Medical Device Itself But Also The Product Labeling

188.     Not only is the medical device itself part of the premarket application process, but the labeling and packaging that comes with it. Each premarket submission must also include all proposed "labeling" for the medical device and *its intended use*.

189.     The FDCA requires that a submission for approval of a device include proposed labeling for the proposed *intended uses* of the medical device that includes, among other things, the conditions for therapeutic use.

190.     In order to be approved by the FDA, an applicant for premarket approval of a Class III medical device must demonstrate its safety and effectiveness for "the persons for whose use the device is represented or intended" and "with respect to the conditions of use prescribed, recommended, or suggested in the label…"[29]

191.     The FDA performs a risk-benefit assessment of the medical device and then determines the adequacy of the manufacturer's proposed label.  When the FDA approves a premarket application, the FDA finds that based on the information supplied by the manufacturer, a device is safe and effective under the specific and limited conditions of use included on the label and that the label is not false or misleading.[30]

---

[28] 65 Fed. Reg. § 14286 (Mar. 16, 2000). There is also a definition of "intended use" for prescription drugs that is essentially the same as the definition for medical devices; *see* 21 C.F.R. § 201.128 (2012).
[29] 21 U.S.C. § 360c(a)(2)(A)-(B) (2012).
[30] 21 U.S.C. § 360e(d)(1)(A), (d)(2) (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

192.    A manufacturer is required to give adequate directions for the use of a medical device such that a "layman can use a device safely and for the purposes for which it is intended"[31], and conform to section 801.15 requirements governing the appearance of the label.

193.    Premarket approval of the product is conditioned upon the applicant incorporating any labeling changes as directed by the FDA, which typically includes labeling the product's risks and benefits, as well as adequate directions for use.[32]  "Labeling" encompasses all written, printed or graphic material accompanying the drug or device[33], and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.[34]

### 4. The FDA, By Its Regulations and PMA Process, Restricts Manufacturers From Promoting "Off-Label" Non-Intended Uses

194.    When the FDA approves a medical device, the agency approves the device for the specific intended use set out in the product's approved labeling.  A use approved by the FDA is usually referred to as an "approved", "labeled" or "intended use".  A use that does not appear in the labeling is not approved as safe and effective as it never went through the FDA's premarket approval review.  It is known as an "unapproved," "off-label," or "new use."  For the sake of consistency, in this complaint, Plaintiffs refer to such unapproved uses as "off-label" or "unintended" uses.

195.    A medical device manufacturer is not permitted to promote and/or market a new medical device submitted to the FDA under the premarket approval process until it had an approval for its intended use, including approval for the proposed labeling. Moreover, if approved, the medical device manufacturer is permitted to promote the medical device only for the medical conditions or *indicated uses* specified in the approved labeling. Therefore, a medical device manufacturer is not permitted to promote a medical device in an "off-label" manner, since the FDA did not approve the medical device for that medical condition or use.

196.    A central feature of the FDCA is that it prohibits medical device companies from

---

[31] 21 C.F.R. § 801.5 (2012).
[32] *See, e.g.,* 21 U.S.C. § 352 (2012).
[33] *Id.* §§ 321(k), (m) (2012).
[34] *See, e.g.,* 21 C.F.R. § 202.1 (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

promoting their devices for "off-label" uses.[35]

197.    "[O]ne of the [FDCA's] core objectives is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its intended use."[36]

198.    A medical device that is promoted for non-intended "off-label" uses is deemed "misbranded" in violation of 21 U.S.C. § 352(f) (2012) (misbranding).

199.    Under the FDCA and its accompanying regulations, a medical device manufacturer must include all intended uses in the label; otherwise the medical device is misbranded.[37]

200.    A product is "misbranded" when the directions and indications for the unapproved uses that the manufacturer "intends" the product to be used for have not been included on the label.[38]

201.    The FDCA's accompanying regulations require that medical devices sold by manufacturers have adequate directions for use[39], and failure to have adequate instructions for sue is considered "misbranding,"[40] which is prohibited.[41]

202.    The FDCA requires medical device manufacturers to disclose all material facts in advertising and labeling[42], and false or misleading labeling is considered "misbranded"[43], which is prohibited.[44]

203.    The distribution of a "misbranded" medical device is prohibited pursuant to 21 U.S.C. §§

---

[35] Congress created a very limited "safe harbor" for certain "off-label" promotion between 1997 and 2006. The "safe harbor" allowed manufacturers to provide copies of peer reviewed scientific articles to physicians. See 21 U.S.C. §§ 360aaa, 360aaa-1 (2012) (these statutes had a sunset clause of September 30, 2006 and were never renewed, see 21 C.F.R. §§ 99.101 (2012) (current FDA regulations on this issue). As further discussed herein, Plaintiffs, however, allege that Medtronic's "off-label" promotional efforts far exceeded these "safe harbor" activities (i.e. redistribution of peer reviewed articles) and included other impermissible acts, including but not limited to, using paid consultants, key opinion leaders, seminars, presentations, in-house corporate paid doctors operating phone banks to instruct outside surgeons over the phone when they call Medtronic headquarters on how to perform "off label" procedures, as well as drafting, editing and ghostwriting the so-called "peer reviewed articles" while paying the listed "authors" (who are acting as agents for the company) millions of dollars without disclosing these efforts or payments within the contents of the articles or anywhere publically, all to actively and consciously over promote the "off-label" uses of Infuse®.

[36] *United States v Caronia*, 703 F3d 149, 166 (2nd Cir. 2012) quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, (2000).

[37] 21 C.F.R. § 801.4 (2012).

[38] 21 C.F.R. § 801.4 (2012).

[39] 21 C.F.R. § 801.5 (2012).

[40] 21 U.S.C. § 352 (f) (2012).

[41] 21 U.S.C. § 331(b).

[42] 21 U.S.C. § 321 (n) (2012).

[43] 21 U.S.C. § 352 (a),(q)(1) (2012).

[44] 21 U.S.C. § 331(b).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

204.    The FDCA provides that a medical device is misbranded if, among other things, the labeling did not contain adequate directions for use.[45] Adequate directions for use could not be written for medical indications or uses for which the medical device has not been approved, and accordingly, directions for "off-label" use cannot be included in the approved labeling.

205.    "Similarly, a medical device that is distributed for a 'new use' is 'adulterated,' see 21 U.S.C. 351(f), and 'misbranded,' see 21 U.S.C. 352(f). An adulterated or misbranded product is prohibited from distribution in interstate commerce (21 U.S.C. 331(a), (k))…"[46] The reason a medical device that is distributed for an unapproved new use is considered 'misbranded' is that the device fails to include adequate directions and warnings.

206.    "Off-label" use of a medical device is a use that was not approved by the FDA, including different applications or surgical approaches, different dosages, different patient populations, or different conditions from those stated in the label.

207.    The FDA prohibits medical device manufacturers from promoting any "off-label" uses through advertisement, recommendations, or suggestions (*See* 21 C.F.R. § 202.1(e)(4)(i)(a) (2012) for the provision that advertising "shall not recommend or suggest any use that is not in the labeling.")

208.    A manufacturer is prohibited from promoting a use of the product that is not the specified use in the PMA or the label.[47]

209.    A manufacturer who wishes to modify the labeling, packaging, design, or indications for use of its device has to comply with a supplemental PMA process.[48]

210.    The FDA strictly regulates manufacturers based on the intended use of the device, and manufacturers cannot deviate from those specifications without permission. If a manufacturer wants to change the intended use for a device, it must follow the FDA's established procedure.[49]

---

[45] 21 U.S.C. § 352(f)(1) (2012); *See also* 21 C.F.R. § 801.5 (2012).

[46] Fed. Reg. § 14286 (Mar. 16, 2000).

[47] 21 U.S.C. § 331(a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a "device may not be… advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order to the device.")

[48] 21 C.F.R. § 814.39(a) (2012).

[49] *See* 21 C.F.R. § 814.39(a) (2012) (specifying how a manufacturer can add new indications for use through the supplemental PMA process); 21 U.S.C. § 360e(d)(6) (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

211.     Federal law requires a manufacturer to ensure that any warranty statements it voluntary makes are truthful, accurate, not misleading, and consistent with applicable federal and state law.[50]

212.     Under the FDCA and its accompanying regulations, a medical device manufacturer must include all intended uses in the label otherwise the device is misbranded.[51]

213.     Under the FDCA, medical device manufacturers are prohibited from introducing the adulteration or misbranding of any medical device into interstate commerce.[52]

214.     A Class III device that fails to meet and/or comply with the requirements of the PMA is considered to be adulterated under Section 501(f) of the FDCA and cannot be marketed. A device may also be adulterated or misbranded because it lacks requisite FDA clearance or approval.[53] Furthermore, "[l]isting of unapproved uses in the... advertising... results in an adulterated medical device."[54] Marketing the device for an unapproved intended use thus makes the device both misbranded and adulterated.

215.     The FDCA prohibits the introduction into interstate commerce of any medical device that is misbranded[55], and also prohibits the alteration of any part of the labeling, advertising, or promotional material for a medical device while the device is held for sale after shipment in interstate commerce that results in the device being misbranded.[56]

216.     A medical device manufacturer may not tell the FDA that its device should or will be used only in certain procedures, and then actively encourage physicians to use the device in other procedures.  By promoting and/or advertising the medical device to physicians for a new unapproved use the medical device manufacturer has shown that the intended use of the device has changed.  Off-label promotion violates federal law, the PMA and may carry criminal penalties.[57]

---

[50] 21 U.S.C. § 331(b) (effective 2013).  It should be noted that the FDA approval letter for Infuse® specifically states that the FDA "...does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws." *See* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B").

[51] 21 C.F.R. § 801.4 (2012).

[52] 21 U.S.C. § 331(b) (effective 2013).

[53] FDCA §§ 501(f), 502(o), 21 U.S.C. §§ 351(f), 352(o).

[54] 59 Fed. Reg. 59821 (Nov. 18, 1994).

[55] 21 U.S.C. § 331(a) (effective 2013).

[56] 21 U.S.C. § 331(k) (effective 2013).

[57] *See* 21 U.S.C. § 333(a) (2012).  This conduct also violates State parallel common laws.  The Second Circuit held that "off-label promotion that is false or misleading is not entitled to First Amendment protection." *United States v. Caronia*, 703 F.3d

**5. The FDA, By Its Regulations And PMA Process, Restricts Manufacturers From Distributing Products For "Off-Label" Non-Intended Uses**

217.    The FDA "generally prohibits the manufacturer... from distributing a product... for any intended use that the FDA has not approved as safe and effective..."[58]

218.    "If a manufacturer knows, or has knowledge of facts that would give him notice that a device... is to be used for conditions, purposes, or uses other than the ones for which he offers it, the manufacturer is required to provide adequate labeling for such other uses."[59]

219.    FDA regulations prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[60]

220.    Thus, a manufacturer that knows a device is being used for "off-label" uses is required to notify the FDA and obtain approval for labeling modifications consistent with the alternate use. Failure to do so renders the device adulterated and misbranded.

221.    The FDCA prohibits the introduction, or delivery for introduction, into interstate commerce of any device that is adulterated or misbranded.[61]

222.    FDA regulations also prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[62] Any manufacturer's statement, whether true or not–and even mere knowledge of use–can create a new "intended use," and thus a misbranded or adulterated product.

223.    The FDA regulations make it plain that it does not regulate the practice of medicine.

---

149, 160-69 (2d Cir. 2012). Further, the Ninth Circuit has assumed that "off-label" promotion violates federal law. *Carson v. Deput Spine, Inc.*, 365 Fed. App'x 812, 815 (9th Cir. 2010).

[58] 65 Fed. Reg. § 14286 (Mar. 16, 2000).

[59] 21 C.F.R. § 801.4 (2012). An example of direct knowledge would be when the manufacturer has a sales representative in the operating room. An example of notice would be when the manufacturer has a majority of sales for non-intended off-label uses.

[60] 21 C.F.R. §§ 201.100, 201.128 (2012); *see* 21 U.S.C. § 352(f)(1) (2012).

[61] 21 U.S.C. § 331(b) (2012).

[62] *See* 21 C.F.R. §§ 201.100, 201.128; *see also* 21 U.S.C. § 352(f)(1). Medtronic routinely had Corporate Sales Representatives directly in the operating room during "off-label" surgeries. These Corporate Sales Representatives had direct knowledge of the "off-label" use of Infuse®, which is imputed to Medtronic. As further discussed herein, Medtronic's sales of Infuse® were over 85-90% "off-label". This staggering high statistic is sufficient evidence to not only put Medtronic on notice of the "off-label" use, but it also highlights how successful Medtronic were with their illegal over promotional campaign for "off-label" uses. *See Minneapolis Firefighters*, 278 F.R.D. at 456 discussed further herein. (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

However the FDA regulations have also made it crystal clear that this is wholly separate and apart from the restrictions the FDA has placed on a manufacturer for promoting or distributing an unapproved product.

> Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient… **Further, this section shall not change any existing prohibition on the promotion of unapproved uses of legally marketed devices.**[63]

224.    Therefore, although the FDA does not regulate the practice of medicine,[64] the FDCA does prohibit a manufacturer from promoting a use of the product that is not the specified approved use.[65]

225.    Should a manufacturer wish to market a device "for a new or different indication for use, the premarket notification submission must include appropriate supporting data to show that the manufacturer has considered what consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device."[66]

### 6. FDA Regulations And PMA Requires A Manufacturer To File A Supplemental Application For "Off-Label" Uses

226.    In addition to limiting premarket approval to only those devices demonstrated to be safe **and** effective, the actual stated purpose of premarket approval is "[t]o ensure the disapproval of PMA's for devices that have not been shown to be safe **and** effective or that do not otherwise meet the statutory criteria for approval."[67]

227.    This prohibition in the FDCA is intended to protect patients and consumers by ensuring that manufacturers do not promote devices that are unsafe or ineffective based on the FDA's standards and review.

228.    The terms of 21 C.F.R. § 801.4 render any device "adulterated" or "misbranded" when

---

[63] 21 U.S.C. § 397 (emphasis added).
[64] 21 U.S.C. § 396.
[65] 21 U.S.C. § 331(a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a device "may not be … advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")
[66] 21 C.F.R. § 807.87(g) (2012).
[67] 21 C.F.R. § 814.2 (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

the manufacturer knew or should have known ("knowledge of facts that would give him notice") that the doctor/hospital/etc. to which the device was sold was going to use it in an "off-label" manner.

229.      Under 21 C.F.R. § 801.4, the FDA regulations state that "if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put."

230.      Consequently, federal law requires that a medical device manufacturer, who has knowledge or even notice of "off-label" use, is required to provide adequate labeling.

231.      The manufacturer must seek "adequate labeling for such a device which accords with such uses to which the article is to be put."

232.      If such a device does not have the required "adequate labeling" the medical device is "adulterated" and "misbranded."

233.      "Off-label" use is not approved by the FDA as "safe and effective," which approval is a prerequisite to placing any material on the labeling concerning any use.  A manufacturer must seek a PMA supplement for the new, unapproved, "off-label" use.

234.      21 C.F.R. § 814. 39(a) (2012) requires a manufacturer to file a PMA Supplement for changes that affect the safety or effectiveness of a device.  This section expressly requires that a manufacturer file a PMA for any "new indications for use of the device."  This is not a permissive choice, but rather a federally mandated requirement, as shown by the use of the term **"shall"** in the federal regulation.

235.      After FDA's approval of a PMA, an applicant **shall** submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device for which the applicant has an approved PMA … While the burden for determining whether a supplement is required is primarily on the PMA holder, **changes for which an applicant shall submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device:**

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

(1) **New indications for use of the device**

(2) **Labeling changes**…[68]

236.    A manufacturer must submit a PMA Supplement to the FDA for review/approval changes affecting safety and effectiveness of a device (specifically including new indications)[69]; a manufacturer who desires to market or distribute a device "for a new or different indication for use, the premarket notification must include appropriate data to show the manufacturer has considered what consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device."[70]

237.    If a manufacturer wishes to obtain approval for a new or different intended use, the manufacturer must go through a lengthy and expensive process to obtain FDA approval for the new use, either by filing a PMA Supplement application pursuant to § 814.39, or by filing a new PMA application.

238.    Any changes the manufacturer believes could affect the safety and effectiveness of the device, including any intention to promote the device for new, unlabeled uses, must be submitted, via a "PMA Supplement," to the FDA for approval. "After FDA's approval of the PMA, an applicant shall submit a PMA supplement for review and approval by FDA before making a change affecting the safety and effectiveness of the device for which the applicant has an approved PMA… While the burden for determining whether a supplement is required is primarily on the PMA holder, changes for which an applicant *shall* submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device: (1) *New indications for use of the device*…"[71]

### 7. The FDA, By Its Regulations and PMA Process, Prohibits Misleading Or False Promotion And Marketing Activities

239.    Under the FDCA and FDA's implementing regulations, labeling, promotional advertisements, and making claims about medical devices are deemed misleading if they fail to disclose

---

[68] *See* 21 C.F.R. § 814.39(a) (2012) "PMA Supplements" (emphasis added).

[69] 21 U.S.C. § 814.39(a) (2012).

[70] 21 C.F.R. § 807.87(g) (2012).

[71] 21 C.F.R. § 814.39(a) (2012) (emphasis added).

certain information about the product's risks.[72]

240.     Generally, to comply with the FDCA and FDA's implementing regulations, and therefore the PMA, such promotional pieces:

    a. Cannot be false or misleading in any particular;[73] and

    b. Must reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in the promotional piece;[74]

    c. Must be about only approved intended uses.[75]

241.     The FDA regulates the manufacture, sale, and distribution of medical devices in the United States under the authority of the FDCA.  This authority includes oversight of labeling and advertising for all medical devices.[76]

242.     A medical device shall be deemed to be misbranded if its labeling is false or misleading in any particular.[77]  Labeling or advertising may be considered misleading if it fails to reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in a promotional piece.[78]

243.     "In the case of any restricted device distributed for sale in any State, if (1) its advertising is false or misleading in any particular, or (2) it is sold, distributed, or used in violation of regulations prescribed under section 520(e)."[79]

244.     Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications…"[80]

245.     Restricted device advertisements must not be false or misleading[81] and must reveal facts

---

[72] Infuse® was initially approved as a combination medical product which contained a device (the LT-Cage) and a collagen sponge made up of BMP-2 (a Drug).  The FDA classified this combination product as a medical device.  Medtronic often sold the collagen sponge (drug) separately from the LT-Cage (the device).

[73] Drugs and devices are misbranded under the Act if their labeling is false or misleading in any particular. 21 U.S.C. § 352(a) (2012).

[74] 21 U.S.C. § 321(n) (2012); 21 C.F.R. §§ 1.21, 202.1(e)(5)(iii) (2012).

[75] 21 C.F.R. § 801.4 (2012).

[76] See 21 U.S.C. § 352(a), (n), (q), & (r) (2012).

[77] 21 U.S.C. § 352(a) (2012).

[78] See 21 U.S.C. § 321(n) (2012).

[79] 21 C.F.R. § 502 (q) (2012).

[80] See 21 U.S.C. § 352(r)(2) (2012).

[81] 21 U.S.C. § 352(q)(1) (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

that are material about the product being advertised, including facts about the consequences that can result from use of the product as suggested in an ad.[82]

**8. After A Medical Device Is Approved, The Manufacturer Still Has Requirements, Including General Reporting Requirements To The FDA, Mandated By FDA Regulations And PMA Approval Process**

246.     A Medical device manufacturer's obligations do not end with Premarket Approval.

247.     Even after premarket approval issues, manufacturers are required to report to the FDA "no later than 30 calendar days after the day: the manufacturer receive[s] or otherwise become[s] aware of information, from any source, that reasonably suggests that a device" marketed by the manufacturer:

(a) May have caused or contributed to death or serious injury; or

(b) Has malfunctioned and this device or a similar device [likewise marketed by the manufacturer] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.[83]

248.     In addition, manufacturers are required to make periodic reports to the FDA regarding approved devices, such reports to include summaries of:

(a) Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant.

(b) Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant.[84]

249.     Once the FDA has approved a medical device through the PMA application process (such as Infuse®), the manufacturer/applicant is required to comply with the standards set forth in the PMA approval letter. "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA

---

[82] 21 U.S.C. § 321(n) (2012).
[83] 21 C.F.R. § 803.50(a); *see also* 21 U.S.C. § 360i(a) (further detailing the post approval reporting requirements applicable to device manufacturer).
[84] 21 C.F.R. § 814.84(b)(2).

approval order for the device."[85]

250.     Under federal law, a medical device manufacturer has a continuing duty to monitor the product after premarket approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product.

251.     Following approval, a medical device manufacturer is required to report adverse events associated with the use of the product, *i.e.* those that may have caused serious injury or death or has malfunctioned and would likely cause or contribute to death or serious injury if recurred.[86]

252.     The medical device manufacturer is required to report any incidents or information that reasonably suggests that the device (1) "[m]ay have caused or contributed to a death or serious injury" or (2) "[h]as malfunctioned" in a manner that would likely "cause or contribute to a death or serious injury" if it recurred.[87]

253.     Another general reporting requirement for Class III medical devices after PMA approval is that the manufacturer is obligated to inform the FDA of new clinical investigations or scientific studies concerning the device about which the manufacturer knows or reasonably should know.[88]

254.     Further, the FDCA subjects approved devices to reporting requirements.[89]  For example, the manufacturer must update the FDA when it learns of investigations or scientific studies concerning its device[90], or incidents where the device used in any manner "[m]ay have caused or contributed to a death or serious injury," either due to malfunction or normal operation.[91]  The FDA can revoke its approval based on these post-approval reports.[92]  The manufacturer must establish internal procedures for reviewing complaints and event reports.[93]

255.     Medical device manufacturers are required by federal regulation to "establish and

---

[85] 21 C.F.R. § 814.80 (2012).
[86] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[87] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[88] 21 C.F.R. § 814.84(b)(2) (2012).
[89] 21 U.S.C. § 360i (2012).
[90] 21 C.F.R. § 814.84(b)(2) (2012).
[91] *Id.* § 803.50(a) (2012).
[92] 21 U.S.C. §§ 360e(e)(1), 360h(e) (2012).
[93] 21 C.F.R. § 820.198(a) (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

maintain" an adverse event database.[94]

### 9. Post Approval, The FDA, By Its Regulations And PMA Process, Requires A Manufacturer To Follow Good Manufacturing Practices

256.    Under 21 C.F.R. § 820.1(a) (2012) of the Quality System (QS) Regulation for Medical Devices, current good manufacturing practice (CGMP) requirements are set forth in this quality system regulation. The requirements in this part govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use. The requirements in this part are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act (FDCA). This part establishes basic requirements applicable to manufacturers of finished medical devices.

257.    21 C.F.R. § 820.5 (2012) "Quality Systems", the FDA regulations state, "Each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part."

258.    21 C.F.R. § 820.30 (2012) "Design controls" state (i) *Design changes.* Each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

259.    21 C.F.R. § 820.3(z)(2) (2012) *Design validation* means establishing by objective evidence that device specifications conform with user needs and intended use(s).

260.    21 C.F.R. § 820.22 (2012): "Quality Audit" states: "Each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system."

261.    21 C.F.R. § 820.160(a) (2012): "Distribution" states: Each manufacturer shall establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed and that purchase orders are reviewed to ensure that ambiguities and

---

[94] *See* 21 C.F.R. § 803.1(a) (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

errors are resolved before devices are released for distribution.

262.     21 C.F.R. § 820.170(a) (2012): "Installation" states: Each manufacturer of a device requiring installation shall establish and maintain adequate installation and inspection instructions, and where appropriate test procedures. Instructions and procedures shall include directions for ensuring proper installation so that the device will perform as intended after installation. The manufacturer shall distribute the instructions and procedures with the device or otherwise make them available to the person(s) installing the device.

263.     21 C.F.R. § 803 (2012), states: Manufacturers must include information that is reasonably known to the manufacturer, timely make Medical Device Reporting ("MDR") submissions, define the procedures for implementing corrective and preventative actions, and review sampling methods for adequacy of their intended use.

264.     21 C.F.R. § 820.100 (2012) "Corrective and Preventive Action" states: (a) [e]ach manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

a. Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

b. Investigating the cause of nonconformities relating to product, processes, and the quality system;

c. Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

d. Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; and

e. Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**10. If A Manufacturer Markets A Medical Device For Off-Label Uses That Have Not Been Approved By The FDA, Then The Manufacturer Does Not Get The Protection Afforded To FDA Approved Medical Devices By The Medical Advice Amendment (MDA) (i.e. If It's Not Approved, It's Not Protected)**

265.    Manufacturers that promote or distribute their products for "off-label" uses not only are not granted authority to do so by the FDA, but also are not afforded any of the protections or privileges of the FDCA or the MDA, including preemption of any kind or immunity from liability.

266.    In light of Medtronic's promotion of "off-label" uses – the uses not set forth in the premarket application as "intended uses" - the warning approved by the FDA for "on-label", indicated uses, was inadequate and harmful to Plaintiffs when Plaintiffs underwent an "off-label" use promoted by Medtronic.  21 U.S.C. § 352 (2012), 21 U.S.C. §§ 352(q), (r) (2012).

267.    In the absence of federal approval of the new intended use(s), there is nothing to preempt state law requirements as the FDA has not reviewed, approved, or passed on those uses not set forth in the premarket application.

268.    Medtronic's aggressive promotion of Infuse® for "off-label" non-intended uses and obfuscation of the true facts and increased risks and dangers of Infuse®, has led to widespread acceptance among spinal surgeons of such uses as these surgeons mistakenly relied on Medtronic to tell them the truth and/or not corrupt the science being published in peer-reviewed medical journals. Plaintiff's physician's "off-label" use of Infuse® resulted from Medtronic's active promotion of that "off-label" use and corruption of the published literature.  Plaintiff seeks to hold Medtronic liable for injuries that trace back to its illegal conduct.

269.    The FDA has not approved the way in which Infuse® was used in the Plaintiffs as it was not set forth in the premarket application and therefore it is not an "intended use" and therefore, there are no applicable federal regulations or need to establish a parallel claim.[95]

270.    There is a presumption against federal preemption of state laws that operate in traditional state domains. "In all preemption cases, and particularly those in which Congress has 'legislated... in a

_____

[95] Plaintiff claims are premised on Medtronic's "off-label" promotion of Infuse® and the resulting injury.  "Off-label" promotion violates federal law.  21 U.S.C. § 331(a) (effective 2013); 21 C.F.R. § 814.80 (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"[96]  Parties seeking to invalidate a state law based on preemption "bear the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'"[97] "[T]he historic police powers of the State include the regulation of health and safety."[98] "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, and historically, ... matter[s] of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'"[99]

271.    "Nothing in § 360k denies [the states] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."[100]

272.    As the Supreme Court held in *Reigel v. Medtronic, Inc.*, "State requirements are pre-empted under the MDA only to the extent that they are "different from, or in addition to" the requirements imposed by federal law. § 360k(a)(1).  Thus, § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case "parallel," rather than add to, federal requirements."[101]

273.    "The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of federal law that hurt patients is, to say the least, counter-intuitive."[102]

274.    "Medical device manufacturers who subject their Class III devices to the rigorous premarket approval process are protected by federal law from civil liability so long as they *comply* with federal law.  That protection does not apply where the patient can prove that she was hurt by the

---

[96] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

[97] *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814, (1997).

[98] *Id.*

[99] *Medtronic v. Lohr*, 518 U.S. at 475.

[100] *Id.* at 495.

[101] *Riegel v. Medtronic*, 552 U.S. 312, 330 (2008).

[102] *Bausch v. Stryker Corp.*, 630 F.3d 546, 549-550 (7th Cir. 2010).  See also *Bausch* quoted with approval by the 9th Circuit in *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013) (*en banc*).

manufacturer's *violation* of federal law."[103]

275.    Claims for failure to warn are not preempted. "Failure to warn claim is neither expressly nor impliedly preempted by the MDA to the extent that this claim is premised on [the defendant manufacturer]'s violation of FDA regulations with respect to reporting [adverse outcomes] caused by the device."[104]

276.    "A claim that promotion of off-label use beyond the safe harbor was coupled with a failure to warn would not be preempted."[105]

277.    "But we do hold, under *Lohr*, *Buckman*, and *Reigel*, that this claim is not preempted, either expressly or impliedly, by the MDA.  It is a state-law claim that is independent of the FDA's pre-market approval process that was at issue in *Buckman*.  The claim rests on a state-law duty that parallels a federal-law duty under the MDA, as in *Lohr*…  [W]e conclude that the MDA does not preempt… state-law failure-to-warn claim[s]…"[106]

278.    Likewise, claims for fraud are not preempted either.  "…[T]he *Cipollone* Plaintiff's fraud claim… fell outside of the Labeling Act's pre-emptive reach…."  Preemption "does not include the more general duty not to make fraudulent statements…  We conclude, as we did in *Cipollone*, that the Labeling Act does not pre-empt state-law claims like respondents' that are predicated on the duty not to deceive."[107]

279.    In a recent Federal District Court case regarding Infuse®, the court held that claims based on general state law duties are not preempted either.  "*Lohr* and its progeny contemplate two types of "parallel" state-law claims that escape express FDCA/MDA preemtion: (i) state-law claims that are premised on conduct that both violates the FDCA and is independently actionable under state law… and (ii) state-law claims that are premised on conduct that contravenes state-law duties of such generality as not to present any risk of interference with the federal medical-device regulatory scheme."[108]

280.    The generality of state-law duty to warn claims was an important distinction in the

[103] *Id.* at 550 (italicized emphasis original).
[104] *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 776 (5th Cir. 2011)
[105] *Cornett v. Johnson & Johnson*, 998 A.2d 543 (N.J. App.Div. 2010).
[106] *Stengel v. Medtronic, Inc.*, 704 F.3d at 1226-27.
[107] *Altria Group, Inc., et al., v. Good Et al.*, 555 U.S. 70 (2008).
[108] *Alton v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 3:13-CV-409-PK at 42.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Supreme Court's analysis in *Lohr v. Medtronic*. The Court wrote: "[T]he predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. Th[is] general obligation[ ][is] no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force.[109] The state-law duties upon which the Lohrs relied escape preemption "because their generality leaves them outside the category of requirements that § 360k envisioned to be 'with respect to' specific devices such as pacemakers."[110]

281.    In another recent federal district court case regarding Infuse®, the court stated that if the manufacturer remained in compliance with the federal scheme and promoted only the uses anticipated by the PMA, the manufacturer has, to some extent, shielded itself from such state law claims. But the shield totally drops when the manufacturer violates federal law.[111] The court went on to say, "In the absence of federal approval of the new use, there is nothing to preempt state law requirements. And in light of the limited breadth courts afford a preemption defense, §360k should not be read as a broad assertion of exclusive federal power over all things having to do with medical devices. Section 360k does not foreclose [Plaintiff]'s state law theory."[112]

282.    In summary, while manufacturers who *comply* with federal law may be entitled to certain protections, those who *violate* federal law are not entitled to preemption of state laws/immunity for their tortuous conduct and in fact are liable for their conduct that violates federal law. The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of Federal law that hurt patients is to say the least, counter-intuitive.

283.    Essentially, if a manufacturer does not abide by the federal requirements, it is not protected by them.[113]

//

//

---

[109] *Lohr v. Medtronic, Inc.*, at 501–02.
[110] *Id.* at 502.
[111] *Ramirez v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 118822 at 36-38.
[112] *Id.* at 38.
[113] The promotion of Infuse® for unapproved uses is akin to promoting a device that has never been approved by the FDA and therefore those unapproved uses cannot be protected by the FDA regulations since they have not received FDA approval.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### E. THE FDA'S LIMITED APPROVAL HISTORY OF INFUSE®

#### 1. The FDA Advisory Committee Hearing Prior To Approval Expressed Concerns Regarding Unapproved Uses Of Infuse®

284.    The FDA Advisory Committee hearing involving the initial Pre-Market Approval of Infuse® took place on January 10, 2002.

285.    The transcript of the hearing makes it clear that the principal concern of the Committee members was that Infuse® *should not be used for "off-label" uses* due to its high potential for injury.

286.    Several Committee members expressed profound concern that the use of Infuse® through an approach other than anterior would potentially cause exuberant growth of bone into the spinal canal, thus ossifying the neural elements of the spine and injuring the patient in a significant number of cases. Additionally, Committee members expressed concern regarding the potential cancer risk associated with Infuse®.

287.    According to the FDA official transcript of the Committee meeting leading to the initial approval of Infuse® for ALIF procedures only, Committee Member Stephen Li, Ph.D., remarked that nine (9) clinical investigators with a financial interest in the product had reported success with Infuse® more often than investigators without financial interest "almost by a factor of two." The identity of these investigators is not apparent from the transcript.[114]

288.    Medtronic's secret agents, Thomas A. Zdeblick, M.D., Hallett Matthews, M.D.,[115] and Scott Boden, M.D., three of Medtronic's most highly paid consultants and royalty recipients, were present and testified on behalf of Medtronic at the hearing.

289.    Agents Zdeblick, Mathews and Boden assured the Committee (particularly through Medtronic's secret agent Scott Boden, M.D.) that the only approval sought, *i.e.*, use of Infuse® for the single level lumbar anterior approach, would prevent leakage of the BMP into the neural elements of the

---

[114]Orthopedics and Rehabilitation Devices Advisory Panel, at page 306, (Jan 10, 2002), *available at* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDQQFjAB&url=http%3A%2F%2Fwww.fda.gov%2Fohrms%2Fdockets%2Fac%2F02%2Ftranscripts%2F3828t1.doc&ei=YaDuUfXnM5DhiwLaroCgCw&usg=AFQjCNFVP4BHeX9LJOkYgyQCMXcnz8EuMQ&sig2=QLM5gwh4Z9143xAkeCxgcw&bvm=bv.49478099,d.cGE (also attached hereto as Exhibit "K").

[115] John Fauber, *Medtronic Helped Write, Edit Positive 'Infuse' Spine Studies*, Milwaukee Journal Sentinel/MedPage Today (October 2012), *available at* http://www.medpagetoday.com/PainManagement/BackPain/35551 (also attached hereto as Exhibit "L").

spine.[116]

290.    During the hearing, panel member Dr. Hanley questioned the sponsored physicians regarding "off-label" use and asked, *"[w]e have one question and that relates to one of those letters that was read earlier about putting the BMP adjacent to the nerve for a posterior approach.  It doesn't relate to the indication being sought for here but any comments from people on that?"* [117]

291.    Medtronic's secret agent Scott Boden, M.D., dismissed this concern by responding:

*[o]bviously, the risks and complications of the device are that of the surgery, the insertion of the cage and what's inside the cage, and this specific application before the panel today is through an anterior approach, either an open or a laparoscopic and to talk about safety issues that are related to a different surgical approach seems to me to be outside the scope of what we ought to be focusing on today.* [118]

292.    At the time of this hearing, Medtronic's secret agent Thomas A. Zdeblick, M.D. was a consultant for Medtronic, making $400,000 per year for eight (8) days of consulting (not including "royalties" he received from Medtronic).

293.    At the time of this hearing, Medtronic's secret agent Scott Boden, M.D. was receiving at least $100,000 per year in consulting fees from Medtronic (not including "royalties" he received from Medtronic).

294.    At the time of this hearing, Medtronic's secret agent Hallett Mathews, M.D. was making an average of at least $250,000 per year in consulting fees from Medtronic.

295.    At the time of this hearing, Medtronic's secret agents Dr. Polly, J. Kenneth Burkus, M.D., and Charles Branch, M.D. were all listed by Medtronic as *resources* for this hearing, and were presumably present, but did not speak (all received significant consulting and/or royalty payments from Medtronic) as discussed herein supra.

---

[116] Orthopedics and Rehabilitation Devices Advisory Panel, at page 78, (Jan 10, 2002), *available at* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDQQFjAB&url=http %3A%2F%2Fwww.fda.gov%2Fohrms%2Fdockets%2Fac%2F02%2Ftranscripts%2F3828t1.doc&ei=Ya DuUfXnM5DhiwLaroCgCw&usg=AFQjCNFVP4BHeX9LJOkYgyQCMXcnz8EuMQ&sig2=QLM5gw h4Z9143xAkeCxgcw&bvm=bv.49478099,d.cGE (also attached hereto as Exhibit "K").
[117]*Id.* at 255-56.
[118]*Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

296.      Six months following the initial hearing, the Committee on July 2, 2002, voted to approve Infuse®, *but only with the tapered LT-Cage in a single level lumbar anterior approach.* Any surgical approach other than the anterior requires the posterior barrier to the spinal canal to be intentionally compromised and such was not approved.

297.      Following obtaining the FDA approval of Infuse® for a specific intended use, Medtronic's secret agents Scott Boden, M.D., Thomas A. Zdeblick, M.D. and J. Kenneth Burkus, M.D. actively worked to promote Infuse® for "off-label" uses within the medical community.

298.      During such period of time, Medtronic's secret agents Scott Boden, M.D., Thomas A. Zdeblick, M.D. and J. Kenneth Burkus, M.D. failed to making adequate, if any, disclosure of their relationship or compensation from Medtronic,

299.      During such period of time, the FDA approved use of Infuse® only had an extremely small share of the fusion market.

300.      Medtronic's secret agent Scott Boden, M.D. received compensation from Medtronic between 1996 and 2010 of $28,796,034.00.

301.      During such period of time, Medtronic's secret agent Scott Boden, M.D. wrote extensively on the use of Infuse® in "off-label" procedures.

302.      By way of example and not limitation, Medtronic's secret agent Scott Boden, M.D. wrote that when Infuse® is used "off-label", rhBMP-2 is likely to be effective. His article in *Orthopedic Nursing*, also praises the benefits of the product, noting that while rhBMP-2 "is quite expensive, [its] potential to lessen morbidity, accelerate healing and provide more consistent results undoubtedly justify these costs in appropriately selected patients."[119]

303.      By way of example and not limitation, Medtronic's secret agent Scott Boden, M.D. along with Drs. Paul A. Anderson, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in the *Journal of Bone and Joint Surgery* article, titled "What's New in Spine Surgery." The article discussed, among other things, a study that examined the use of Infuse® in an "off-label" Posterolateral Fusion procedure. According to the authors, the study reported that Infuse® improved fusion rates when used

---

[119] Scott Boden, *The ABC's of BMPs*, 24 Ortho. Nursing, 49-52 (2005) (also attached hereto as Exhibit "M").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

in combination with iliac crest bone graft in an unapproved procedure in which the rhBMP-2 was wrapped around local bone as a bulking agent. According to the authors, the study's findings suggested that "the current [Infuse] kit, while likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can provide a significant enhancer effect, improving the success of an autogenous bone graft." [120]

304.    During such period of time, Medtronic's secret agent Thomas A. Zdeblick, M.D., the Chairman of the Department of Orthopedics and Rehabilitation at the University of Wisconsin, failed to properly disclose his financial relationship with Medtronic.

305.    The only disclosure made by Medtronic's secret agent Thomas A. Zdeblick, M.D. were annual payments exceeding $20,000 in University conflict of interest forms when, in truth and in fact, he actually received between $2.6 and $4.6 million per year.

306.    Medtronic paid their secret agent Thomas A. Zdeblick, M.D. an annual salary of $400,000 under a contract that only required him to work eight (8) days per year. [121]

307.    Medtronic's secret agent Thomas A. Zdeblick, M.D. received $34,168,739.81 from Medtronic between 1996 and 2010. [122]

308.    Medtronic's secret agent Thomas A. Zdeblick, M.D. also has been a significant contributor to Medtronic's promotion of Infuse®, authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at medical conferences and symposia in which the topics included discussion of "off-label" uses of the product.

309.    Only a few months after Infuse® was approved, Medtronic's secret agent Thomas Zdeblick, M.D. authored a 2003 paper where he declared that the product could become "the new gold standard" in spine surgery and added that it was being used "exclusively" at his institution. The paper was published in the *Journal of Spinal Disorders & Techniques*, where Zdeblick is the editor-in-chief,

---

[120] Scott Boden et al., *What's New in Spine Surgery*, J Bone Joint Surg Am. 92(10):2017-28 (2010) (also attached hereto as Exhibit "N").

[121] *Medtronic Paid Researcher More than $20,000 – Much More*, The Wall Street Journal (Jan 16, 2009), *available at* http://online.wsj.com/article/SB123206035479087601.html (also attached hereto as Exhibit "O").

[122] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies*, at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2c-ae55-13550074fe86 (also attached hereto as Exhibit "P").

but failed to mention that Dr. Zdeblick received significant royalties on the Medtronic LT-Cage, which is the medical device component of Infuse®.

310.    On the website, www.Back.com, which is owned and operated by Medtronic, Medtronic's secret agent Thomas A. Zdeblick, M.D. he describes the advantages of Infuse® in "off-label" procedures and appears in an online video discussing the benefits of the product which he claims includes no adverse events. Conspicuously, the video only discusses spinal surgery from the *posterior* approach of the spine, an "off-label" use of Infuse®, and fails to discuss or provide any merit to the *on-label* approach. In this video Medtronic's secret agent Thomas A. Zdeblick states " we looked at the safety concerns with Infuse® very carefully and did not find any adverse events, it's a naturally occurring protein and well accepted by patients." (emphasis added)

311.    Medtronic's secret agent J. Kenneth Burkus, M.D., is an orthopedic surgeon and a self-described "consultant" for Medtronic.

312.    Medtronic's secret agent J. Kenneth Burkus, M.D. received $6,380,336.83 from Medtronic between 1996 and 2010.[123]

313.    During such period of time, Medtronic's secret agent J. Kenneth Burkus, M.D. was the lead author of four of the original thirteen studies of Infuse® sponsored by Medtronic.[124]

314.    All of the studies by Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report any of the observed adverse events that were subsequently revealed by a recent independent review of his data and the publication of the misleading and false results discussed hereinafter.

## 2. As A Result Of Those Serious Concerns, The FDA Narrowly Tailored The Approval Of Infuse®

315.    The FDA reviewed Infuse®'s safety and effectiveness only for the uses Medtronic

---

[123] *Id.*

[124] Burkus JK, Gornet, MF, Dickman CA, Zdeblick TA, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages,* J. Spinal Disord. Tech, 2002; 15:337-49; Burkus JK, Transfedlt EE, Kitchel SH, et al. *Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenetic protein-2,* Spine 2002; 27:1219-24; Burkus JK, Sandhu HS, Gornet MF, Longely MC, *Use of rhBMP-2 in Combination with Structural Cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion,* J. Bone Joint Surg. Am. 2005;87:1205-12; and Burkus JK, Heim SE, Gornet MF, Zdeblick TA, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-CAGE lumbar tapered fusion device,* J. Spinal Tech. 2003;16:113-22. (also attached hereto as Exhibit "Q").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

specified in its PMA application, and the regulations are premised on that specific review.[125]

316.    As presented in Medtronic's original PMA application, which was eventually approved by the FDA on July 2, 2002, Infuse® consists of two components: (1) the tapered LT-CAGE Lumbar Tapered Fusion Device Component, a thimble-sized hollow metal cylinder that keeps the vertebrae in place and provides a frame that contains and directs the development of new bone growth; and (2) The Infuse® Bone Graft Component, which includes an Absorbable Collagen Sponge ("ACS") that acts as a carrier and scaffold for the active ingredient in Infuse®, and rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the ACS.

317.    Although these two components are sold separately, the initial approved labeling for the product indicates that Infuse® requires both components.

318.    The approved labeling for the product reads in part with bold and underlined formatting: **"These components <u>must</u> be used as a system.  The Infuse<sup>®</sup> Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component."**[126] (emphasis added).

319.    The labeling also directs the specific manner in which both components are to be used in a fusion procedure.

320.    Infuse® was initially approved by the FDA for exclusive use in the lower lumbar region of the spine (at levels L4 through S1), via an anterior approach (where the spine is approached by going in through the patient's abdomen), and only at one level per surgery.[127]

321.    Infuse® was **NOT** approved for any other surgical approach or for use in any other region of the spine.[128]

---

[125] *See id.* § 360c(a)(2) (stating that the FDA measures the "safety and effectiveness of a device… with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use."); id. § 360e(c)(1) (2012).

[126] Infuse® Label, *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

[127] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…InFUSE™ Bone Graft/LT -CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach," Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B").

[128] While the Infuse® label remains substantially the same as that approved by the FDA in 2002, the FDA did make minor adjustments to the label through post-approval supplements. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-Sl to L2-Sl. Infuse® was also approved by the FDA to be used in dental

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

322.      The original PMA dated July 2, 2002 from the FDA to Richard Treharne, Ph.D. Senior Vice President of Regulatory Affairs, provides in part that the approval of Infuse® is strictly limited as follows:

> The sale, distribution, and use of this device are restricted to prescription use in accordance with 21 C.F.R 801.109 within the meaning of section 520(e) of the Federal Food, Drug, and Cosmetic Act (the act) under the authority of section 515(d)(1)(B)(ii) of the act. FDA has also determined that, to ensure the safe and effective use of the device, **the device is further restricted within the meaning of section 520(e)** under the authority of section 515(d)(1)(B)(ii), (1) insofar as the labeling specify the requirements that apply to the training of a practitioners who may use the device as approved in this order and (2) **insofar as the sale, distribution, and use must not violate sections 502(q) and (r) of the act**.[129] (emphasis added).

323.      The PMA also provides in part as follows:

> [i]n addition to the post-approval requirements outlined in the enclosure, you have agreed to provide the following data in a post approval report: 1. In order to assess the long-term performance of the InFUSE™ Bone Graft/LT-CAGE™ Lumbar tapered Fusion Device, please conduct a post-approval study to obtain a total of 6 years of postoperative data from a statistically-justified number of patients implanted with this device...2. Because of unknown long-term device performance, particularly the resulting bony fusion characteristics, the post approval study should also contain retrieval analyses of any InFUSE™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device that is implanted and subsequently removed. This section is not limited to the patient population as described in item 1 above...3. Perform post-approval studies, which assess the effects of rh-BMP2-2 on tumor promotion...4. Perform post-approval studies to investigate the potential for an immune response to rhBMP-2 to interfere in embryonic development in rabbits. Observation from tis investigation may indicate a necessity to create a pregnancy monitoring database and/or modify your labeling.

324.      The PMA was accompanied by an attachment setting forth the general "Conditions of Approval."

325.      These general conditions (applicable to all Class III approved devices during 2002) require that Medtronic submit a PMA supplement "when unanticipated adverse effects, increase in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or

---

procedures on March 9th, 2007 and in April of 2004 for repair to tibial fractures. These uses represent a relatively minor percentage of the product's overall sales.

[129] Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B"); It should be noted that Infuse® was approved a "restricted device" within the meaning of the ACT.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

device modification."

326.    These general conditions require Medtronic to provide a 'Special PMA Supplement – Changes Being Effected.'

327.    These general conditions specify that such supplement "is limited to the labeling, quality control and manufacturing process changes specified under 21 C.F.R. 814.39(d)(2) (2012). It allows for the addition of, but not the replacement of previously approved, quality control specification and test methods. These changes may be implemented before FDA approval upon acknowledgment by the FDA that the submission is being processed as a 'Special PMA Supplement – Changes Being Effected.' This procedure is not applicable to changes in device design, composition, specifications, circuitry, software or energy source."

328.    The general "Conditions of Approval" section of the PMA also sets forth in part that "[c]ontinued approval of this PMA is contingent upon submission of post-approval reports required under 21 C.F.R. 814.84 (2012) at intervals of 1 year from the date of approval of the original PMA."

329.    Such post-approval reports must include "a. unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices ("related" devices includes devices which are the same or substantially similar to the applicant's device); and b. reports in the scientific literature concerning the device."

330.    Additionally, the FDA PMA contains requirements concerning Medtronic's reporting of adverse reactions and device defect.

331.    Medtronic, pursuant to the general conditions of approval, is required to provide the FDA within 10 days of receiving or having knowledge of information concerning: "[a]ny adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and; a. has not been addressed by the device's labeling; and b. has been addressed by the device's labeling but is occurring with unexpected severity or frequency."

332.    The general "Conditions of Approval" section of the PMA provided, in part that Medtronic must comply with The Medical Devices Reporting Regulation and "report to the FDA whenever they receive or otherwise become aware of information, from any source, that reasonably

suggests that a device marketed by the manufacturer or importer: 1. May have caused or contributed to a death or serious injury; or 2. Has malfunctioned and such device or similar device marked by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."

333.    The PMA for Infuse® was expressly conditioned upon Medtronic's compliance with and satisfaction of the above general conditions and requirements.

334.    The FDA made clear in the PMA that "**[f]ailure to comply with the conditions of approval invalidates this approval order.  Commercial distribution of a device that is not in compliance with these conditions is a violation of the act.**" (emphasis added).

335.    Infuse® has never been approved by the FDA for use in other parts of the spine or for use in any other type of spinal procedure.[130]   Therefore, all other uses are "off-label" uses.

336.    Physicians may use FDA-approved medical devices in any way they see fit, but the manufacturer is not permitted to promote in any way a medical device for uses other than the "intended uses" as set for in the premarket application.

337.    The promotion by a medical device manufacturer for any "off-label" uses for its devices or to pay doctors inducements or kickbacks so that they promote "off-label" uses is strictly unlawful and in violation of the PMA and federal regulations.

338.    Medtronic has aggressively over-promoted, as well as induced, uses other than "indicated uses" a/k/a "off-label" uses, of Infuse®.

### 3. <u>After</u> The Limited FDA Approval Of Infuse®, Medtronic Published a "Fact Sheet" About Infuse®

339.    <u>Following</u> the limited FDA approval of Infuse® in 2002, Medtronic published a "Fact Sheet".  The Fact Sheet falsely represented, in part, the following:

---

[130] As further discussed herein, the FDA, in March of 2011, rejected Medtronic's application for Amplify, which is another rhBMP-2 bone growth protein used in Infuse® *see* Russolillo, Steven, *FDA Rejects Medtronic Spine Device,* Wall Street Journal (March 20120) http://online.wsj.com/article/SB10001424052748704823004576192593075897446.html; (also attached hereto as Exhibit "R")(emphasis added); Amplify contained three times the amount of rhBMP-2 found in Infuse®. The FDA reviewers stated "[t]he primary safety concern is the increased numbers of cancer events in patients treated with Amplify compared to the control group." Richwine, Lisa, *FDA staff: Cancer a concern with Medtronic device*, Reuters (July 2010) *available at* http://mobile.reuters.com/article/healthNews/idUKTRE66M2U820100723 (also attached hereto as Exhibit "S").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**Fact Sheet**

*INFUSE® Bone Graft/LT-CAGE®* Lumbar Tapered Fusion Device… Spinal fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is essentially the same as traditional autograft procedures**, without the need for the additional surgery to harvest bone from the patient's hip. **Scientists determined** that rhBMP-2, with an absorbable collagen sponge as the carrier, (INFUSE® Bone Graft) **is an effective replacement for autograft bone in spinal fusion surgery**. This conclusion is **based on data resulting from a large-scale, multi-center, prospective, randomized, two-year study** involving 279 degenerative disc disease patients implanted with INFUSE® Bone Graft and the LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety, efficacy** and therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complications** that would require follow-up visits…[131] (emphasis added).

340.    In the "Fact Sheet" Medtronic made representations that Infuse® is essentially the same autograft procedures.

341.    In the "Fact Sheet" Medtronic states that "The **study assessed the safety, efficacy** and therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complications** that would require follow-up visits…[132]".

342.    Medtronic does not reveal that its employees significantly altered the printed/reported results of those "studies" to reflect better outcomes for Infuse® and worse outcomes for the alternative procedures, than what was in truth observed.

343.    Nor did Medtronic disclose that **these "scientists" were extremely highly compensated** by Medtronic to the tune of millions and in some cases, tens of millions of dollars or that Medtronic actively edited, participated in the creation of, and/or **ghostwrote the text used in the published study**.

**F. ANY INFUSE USES THAT WAS NOT SET FORTH IN MEDTRONIC'S PREMARKET APPLICATION AS THE "INTENDED USES" HAVE NOT BEEN APPROVED BY THE FDA AND ARE "OFF-LABEL" USES**

---

[131] Medtronic, Fact Sheet (2002) *available at* http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf (also attached hereto as Exhibit "A")(emphasis added).
[132] *Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### 1. Description Of "Off-Label" Infuse® Uses

344.    To be considered an on-label use, Infuse® must be applied as follows:

a. Infuse® is impregnated on a supplied absorbable collagen sponge that is inserted inside an FDA approved Medtronic cage;[133]

b. This cage is placed via anterior approach;

c. Only a single level is fused; and

d. The fusion is performed between the L2 and S1 levels of the spine.

345.    If any one of these criteria is violated, the FDA considers Infuse® to have been applied in an "off-label" manner.

346.    The off-label use of Infuse® is outside the scope of the FDA's approval.

347.    There are many ways in which Infuse® is used "off-label".

348.    Generally speaking, Infuse® can be placed in three locations: inside an interbody cage, surrounding the cage within the disc space, and along the posterior elements of the spine.

349.    Only approved cages can be used; therefore, the use of any other cage constitutes an "off-label" fusion. There are numeros of models of cages manufactured by a variety of companies. An incomplete list of the most noted "off-label" models includes cages manufactured by Medtronic, Depuy Lordotic Cages, Striker Interbody Fusion Cages, NuVasive Spine Cages, and Zimmer Interbody Fusion PEEK Cages.[134]

---

[133] The FDA has only approved the LT-CAGE Lumbar Tapered Fusion Device (LT-Cage), the Inter Fix Threaded Fusion Device for use with Infuse® in Spinal Fusions, *see* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=2344 (also attached hereto as Exhibit "T"); The FDA also approved Mastergraft with the use of Infuse® for a humanitarian exception which was later withdrawn at the request of Medtronic in 2010, *available at* http://www.fda.gov/medicaldevices/productsandmedicalprocedures/deviceapprovalsandclearances/hdeapprovals/ucm161827.htm (also attached hereto as Exhibit "U")(emphasis added).

[134] Per Counsels' investigation, additional cages including but not limited to the following cages: Allograft Strut; Alphatec; Alphatec Novel; Alphatec PEEK; Alphatec Spine; Alphatec Zodiak; Altiva ArcTec LT; AVS Interbody; Axial Cage; AxiaLIF Cage; BAK; Bak Titanium Cage; Banana; Bengal Cage; Biomechanical Cage; Biomet PEEK; Biomet Solitaire PEEK; Blackstone; Blackstone PEEK Cage; Boomerang; Brantigan Carbon Fiber Cages; Bullet; Carbon Bullet Cage; Clydesdale Cage; Concord; Cornerstone; CoRoent; Crescent; Crosslink Medium; Custom Machine Biomechanical Femoral Allograft Prosthetic Space; Depuy; Depuy Acromed; DePuy Acromed Cage; DePuy Allograft Spacers; DePuy Anterior Lordotic Carbon Fiber Cages; DePuy Carbon Fiber Cage; Depuy Concode Bullet Cage; DePuy Cougar; DePuy Leopard; DePuy Lordotic Cage; Depuy Saber – PEEK; Femoral Ring Allograft; Geo; Global; Globus; Graftech Anterior Ramp; Harms Cage; Hollywood Interbody Fusion Device; HSR Graft; Hydrasorb Type Spacer; IC Graft Chamber; Implex; Infinity; InFix Innovasis X Box Cages; Innovasive; Innovation PEEK; Ionic; Ladotic; LANX Cage; Laris-Is Anteliys GX PEEK; LDR ROA

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

350.     If Infuse® is directly placed in this space between two vertebrae, without benefiting from the confinement of a cage, the application is considered "off-label". The surgeon's operative report will commonly refer to placing Infuse® in the anterior disc space prior to inserting a cage. Similarly, Infuse® can be applied laterally or posteriorly to the cage after insertion, which is "off-label".

351.     The surgeon has a number of choices when selecting a surgical approach for cage insertion in an interbody fusion. The most common of these are the anterior approach, the posterior approach, transforaminal approach, and extreme lumbar approach.

352.     When adopting an anterior approach, the surgeon makes an incision in the abdomen with the patient in a supine (face-up) position. He or she proceeds to insert the cage through the retroperitoneal space to the front face of the spine. Spinal fusions that use a cage and adopt an anterior approach are called "anterior lumbar interbody fusions" or "ALIFs." When combined with the three other criteria, this is the **only** approach that will constitute an **on-label** procedure.



Anterior Lumbar Fusion with Cages

353.     A cage can be inserted via a posterior approach when an incision is made in the back with

Cage; Leftnet; Legacy; Life Spine Spacer & Biomet Biologics Spacer; LifePlan Health VG2P; Linxx Peek; Long Vuc-Pod Cages Loop TLIF Cage AMT Loop Interbody Cages; Mesh Cage; Mobis PEEK Spacer; Novel; Nutech; NuVasive; Nuvasive Spine Wave; Nuvasive STD; Synthes CCALIF Biomechanical Device; Ocelot Cage; ODC Implant; Perimeter Cage; Pioneer Bullet; Pyramesh; Rabea 5 Peek; Rattlesnake-Eminent; Ray Cage; Redmed PEEK; Regeneration Tech Threaded Bone Dowel; RTI Biologics Cage; Scientx; Sea Spine PEEK Spacers Seaspine Hollywood; Shadow Mesh; Signature Peak; Signus Tetrus; SinMesh Interbody Cage; Sofamar Boomerang II; Sonoma; Sovereign Cage; Spinal USA Titanium; Spine Frontier; Synthes CCALIF; Spine Metrics PEEK Spacer; Spine Wave Expandable Cage; Spine Wave XD Cartridge; Spinefrontier S-LIFT PEEK Cage; Spineology; Spinewave Staxx XD Cartridge; StaXx - D PEEK Expandable Cage; Stryker; Synfix; Synthes OPAL; Synthes PEEK; T Lift; Tangent; Telemon; Tetris; Theken Interbody Cage; Theken Spine Non-Tapered Cage; Thekenspine Nontapered Cage; Thekon PEEK Spacer; Threaded Bone Dowell; Titan; Titan Endoskeleton; USA Cage System; Ventura;Versa Trac P Cage; Verte Stack; VG2C Lifenet Health; Vitoss; X Core Expandable XLIF Cage – Nuvasive; X2 Crescent PEEK; Zero-P Synthes Spacer; Zimmer Parallel Slotted; Zimmer Ardis P; Zimmer BAK; Zimmer Lucent; and Zimmer PEEK.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

the patient in the prone position (faced down).  The cage is then implanted into the interbody space from the back face of the spine.  This kind of fusion is called a "posterior lumbar interbody fusion" or "PLIF." This is an "off-label" use of Infuse®.



354.	A cage can be inserted from either the right or left face of the spine by modifying the PLIF. These fusions are called "transforaminal lumbar interbody fusions" or "TLIFs." A TLIF is accomplished by creating an incision in the back, reaching around the side of the spine, and inserting the cage from either the left or the right.  This is "off-label" use of Infuse®.

355.	An additional procedure is also considered to be "off-label" when Infuse® is applied along the posterior or posterolateral elements of the spine, including the facet joints, posterolateral gutters, and transverse processes.  When Infuse® is placed in any of these posterior elements the surgery is called a "posterior" or "posterolateral" fusion, and no cage is used.



356.	In fact, any use of Infuse® that was not set forth in the premarket application as the

Electronically Filed – City of St. Louis – October 01, 2013 – 10:19 AM GMT+00:00

"intended uses" and thereafter approved by the FDA in any of the PMAs, is an "off-label" use.

357.    The spine consists of four general regions, cervical (neck), thoracic (chest), lumbar (low back), and sacral (lowest portion of the spine).  Each region consists of individual vertebra, which are described as "levels." These levels are numbered, with lower values corresponding to the vertebra that lay higher on the spine.

358.    The cervical spine consists of seven levels, designated C1-C7.  The thoracic spine consists of twelve levels, ranging from T1-T12.  The lumbar spine usually consists of five vertebras, ranging from L1-L5.  The sacrum is a structure immediately below the lumbar spine and consists of two levels, S1 and S2.

359.    To be considered an on-label use, Infuse® must be applied at only one level, from L2-S1 in the lumbar or lumbosacral spine.

360.    If Infuse® is used in more than one level, or outside L2-S1, then the FDA considers the procedure to be "off-label".

**2. Medtronic Deliberately Breached Its Obligations Under Federal Law To Seek Supplemental FDA Approval For Non-Intended "Off-Label" Uses**

361.    Medtronic did not seek a post-approval supplement to the PMA.

362.    Medtronic did not seek such a post-approval supplement because it wanted to avoid the lengthy and time-consuming supplemental PMA process.

363.    Medtronic did not seek such a post-approval supplement because it knew that the science would not support their application.

364.    Medtronic knew or had reason to know that based upon the results of prior Medtronic-sponsored clinical studies of "off-label" uses, which were abruptly terminated as a result of observed complications, that "off-label" uses would be neither safe, nor effective.

365.    Medtronic knew or had reason to know that for that reason, the supplemental PMA would be rejected.

366.    Instead, Medtronic engaged in very active and concerted efforts to market, promote, and sell Infuse® for "off-label" uses.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

367. In undertaking such effort, Medtronic totally disregarded the increased risks, dangers, and complications that Medtronic knew or should have known were associated with "off-label" use of Infuse®.

368. Medtronic did not notify the FDA of the "off-label" uses, as required by federal law.

369. Medtronic did not track and report the adverse events associated with the "off-label" uses, as required by federal law.

370. Medtronic did not seek to strengthen or increase the labeling to warn of the known and/or knowable dangers associated with "off-label" uses of Infuse®, as required by federal law.

371. Medtronic did not file a PMA Supplement to seek approval for the "off-label" uses they were promoting, as required by federal law.

372. Medtronic did not file a new PMA application for the "off-label" uses, as required by federal law.

373. Medtronic did not discontinue sales of the device that Medtronic knew, or had reason to know, were intended for "off-label" purposes.

374. Medtronic did not report the "off-label" use to the hospital(s) where Medtronic knew Infuse® was being used "off-label", as required by federal law.

375. Medtronic did not report the "off-label" use to the FDA where Medtronic knew Infuse® was being used "off-label", as required by federal law.

376. Medtronic did not act as a reasonably prudent manufacturer of Class III medical devices in the promotion, sale, and distribution of Infuse®.

377. Medtronic continued to illegally promote, market, and sell the Infuse® device for "off-label" uses in order to reap enormous profits from those sales for use on hundreds of thousands of unsuspecting and vulnerable patients, some of whom would later suffer irreparable, debilitating and life-altering injuries caused by the "off-label" of Infuse®.

378. Medtronic prioritized market share and profit above the health and safety of patents and consumers, above FDA rules and regulations and above state common law duties.

379. Medtronic has violated federal law, FDA regulations, their PMA, state common law

duties, breached the trust of physicians who relied on Medtronic to act as reasonably prudent manufacturers, breached the trust of patients who relied on Medtronic to act as reasonably prudent manufacturers. Medtronic acted in concert with their secret agents and with other Defendants as set forth herein, and acted in conscious and willful disregard of the health and safety of Infuse® patients, including the Plaintiffs.

### 3. Medtronic Failed To Satisfy Its Duties Its Imposed By The FDA Regulations and PMA Process, To Adequately Warn Physicians And Patients Of The Increased Risks, Dangers, And Adverse Events Associated With The "Off-Label" Use Of Infuse®

380. Medtronic failed to fully and adequately warn physicians and patients of the increased risks and dangers associated with the "off-label" uses of Infuse®.

381. Medtronic had a duty to warn physicians of the possible increased risks and dangers associated with the "off-label" uses of Infuse® so that physicians could properly weigh the risks and benefits of the treatment and obtain proper informed consent from patients.

382. Medtronic knew of additional risks and serious adverse events that they did not report in violation of their federally mandated duties.

383. By continuing to illegally promote, market, and sell Infuse® for "off-label" use, Medtronic therefore breached their duty to physicians, and their patients, wholly failed to act a reasonably prudent medical device manufacturer, all in violation of federal law, the PMA and state common law duties.

### G. WYETH WARNED OF SERIOUS ADVERSE EVENTS RELATED TO INDUCTOS® IN EUROPE (INFUSE® IS MARKETED IN EUROPE AS A DRUG – NOT A MEDICAL DEVICE - UNDER THE NAME INDUCTOS®), BUT MEDTRONIC AND WYETH FAILED TO TAKE SIMILAR ACTION IN THE UNITED STATES

384. Wyeth Pharmaceuticals in co-ownership with Medtronic gained authorization to market

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Infuse® under the name InductOs® in Europe in September of 2002.[135]

385.    InductOs® first received approval for use in the treatment of acute tibia fractures in adults to increase the probability that tibial fractures will heal faster and reduce the need for additional surgeries.[136]

386.    Subsequently, the European Commission expanded the approval of InductOs® in March of 2005 for use with the LT-Cage® Device for "single-level anterior (from the front) lumbar spinal fusion in adults with degenerative disc disease who had at least six months of non-operative treatment for this condition" at the L4 - S1 levels only.

387.    This is still a limitation in Europe today.[137]

388.    On March 23, 2007, less than two years after approval for use in the spine, Wyeth sent a letter to physicians in Europe warning that "[t]he unapproved use of InductOs® in posterior lumbar spine surgery or inappropriate use (e.g. overfilling of the implant/cage) has resulted in limited number of cases of localized fluid collection (e.g. pseudocysts, localized edema, implant suite effusion) some times encapsulated, regularly requiring intervention."[138]

389.    According to the letter, the majority of the reports of fluid collection occurred in surgeries where InductOs® was used in the "posterior lumbar approaches and/or in a manner inconsistent with the instruction for use, such as placing the sponge in places outside the cage and/or in overfilling of the implant/cage."

390.    The letter also specified that fluid collection could occur within days or months after the spinal fusion, and that in more than half of the reported cases, the fluid collection encapsulated, and "resulted in nerve compression, neurological deficit or pain." In cases where the fluid collection persisted, clinical aspiration or surgical removal of the fluid was required.

391.    The letter also explicitly recommended to surgeons that they use InductOs® exclusively

---

[135] Medtronic Announces European Commission Approval of New Indication for InductOs® for Spinal Surgery (April, 19, 2005), *available at* http://thefreelibrary.com/_/print/printarticle.aspx?id=131684515 (also attached hereto as Exhibit "V").
[136] *Id.; see also* FDA news Device Daily Bulletin (April 21, 2005), *available at* http://www.fdanews.com/newsletter/article?issueId=7469&articleId=71339 (also attached hereto as Exhibit "W").
[137] *Id.*
[138] Important Safety Information, Wyeth (March 23, 2007), *available at* http://www.cbg-meb.nl/NR/rdonlyres/F0155F2D-4488-49AF-A224-0B0498CFB201/0/DHPCL_InductosMar2007.pdf (also attached hereto as Exhibit "X").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

in accordance with the instructions "paying attention to correct dosage and proper placement of the product within the LT-Cage."

392.    Finally, the letter heralds the benefits of InductOs® stating, "InductOs® is approved for use in anterior spine fusion surgery as an alternative to autologous bone graft, resulting in non-inferior rates of radiographic fusion and clinical improvement. This potential post-operative adverse events needs to be placed in the context of reducing the need for autologous bone graft harvest."

393.    The Committee for Medicinal Products for Human Use ("CHMP"), a division of the European Medicines Agency, also approved and released a Summary of Product Characteristics for InductOs® in 2007.

394.    In Sections 4.2, 4.4, and 4.9 of this document, Wyeth directs surgeons to follow the instructions for InductOs®, exactly as provided ("Failure to follow the product preparation instructions for rhBMP-2/ACS may compromise its safety and effectiveness. Care and caution should be used to prevent overfilling of the construct and/or intervertebral space.").

395.    In Sections 4.4, 4.8, and the Package Leaflet, Wyeth once again warns surgeons in detail of the formation of fluid collections, nerve compression, and pain when InductOs® is used in unapproved applications, where InductOs® is indicated exclusively for single-level (L4-S1) anterior lumbar spine fusion coupled with an LT-CAGE® in adults, or for acute tibia fractures.

396.    Conspicuously, neither the 2007 letter distributed to physicians in Europe regarding the dangerous effects of InductOs® when used in an "off-label" manner, nor the Summary of Product Characteristics approved by the CHMP, was provided to physicians in the United States.

## H. IN JULY 2008 THE FDA SENT A "DEAR DOCTOR" LETTER WARNING OF LIFE-THREATENING RISKS ASSOCIATED WITH THE "OFF-LABEL" USE OF INFUSE® WHEN USED IN THE CERVICAL SPINE

397.    On July 1, 2008, the FDA sent out a public health notification regarding the life-threatening complications associated with using Infuse® in cervical spine fusions.

398.    In the letter, the FDA stated "[t]his is to alert you to reports of life-threatening

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

complications associated with recombinant human Bone Morphogenetic Protein (rhBMP) when used in the cervical spine. Note that the safety and effectiveness of rhBMP in the cervical spine have not been demonstrated and these products are not approved by FDA for this use."

399.     The FDA further stated, "complications were associated with swelling of the neck and throat tissue, which resulted in compression of the airway and/or neurological structures in the neck. Anatomical proximity of the cervical spine to airway structures in the body has contributed to the seriousness of the events reported and the need for emergency medical intervention."

400.     With respect to unknown risks, the FDA stated that "[t]he mechanism of action is unknown, and characteristics of patients at increased risk have not been identified."

401.     The FDA warned that Infuse® was only approved by the FDA for the limited-use of only fusions of the lumbar spine, in skeletally mature patients with degenerative disc disease (DDD), at one level from L2-S1.

402.     The FDA emphasized that "off-label" use of Infuse® is dangerous and "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions has not been demonstrated, and in light of the serious adverse events described above, the FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."[139]

403.     Medtronic has resolved at least one wrongful death civil case filed related to the use of Infuse® in the cervical spine.[140]  On August 21, 2008, Shirley Nisbet, a resident of Vista, California, underwent a cervical fusion procedure in which a Medtronic sales representative allegedly encouraged and recommended to her surgeon, prior to and during the surgery, that the surgeon use Infuse® in Ms. Nisbet's cervical spine. Following the operation, Ms. Nisbet had difficulty breathing and swallowing, and experienced severe pain and swelling in her neck. In the following days, her symptoms became progressively worse until her breathing became so compromised due to neck swelling and compression of her airway that she stopped breathing and fell into a coma on August 23, 2008. She remained in a

[139]FDA Public Health Notification: Life-Threatening Complications Associated with Recombinant Human Bone Morphogenic Protein in Cervical Fusion (July 1, 2008), *available at* http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm (also attached hereto as Exhibit "Y").

[140] *Nisbet v. Medtronic*, Case No. 8:08-cv-01361-JVS-RNB (C.D. Calif. [Southern Div.-Santa Ana]) was filed on 12/2/2008 and terminated on 2/27/09 by the filling of a Notice of Voluntary Dismissal w/o Prejudice by plaintiffs on 2/27/09.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

vegetative state but was kept alive by artificial means for several days, until she died on August 30, 2008.[141] It has been reported that Medtronic subsequently settled this wrongful death action.

## I. THE "OFF-LABEL" SALE OF INFUSE® IS A VERY PROFITABLE PART OF MEDTRONIC'S BUSINESS AND PROVIDES LUCRATIVE COMPENSATION TO WYETH/PFIZER

404.    Infuse® has become a blockbuster product for Medtronic.

405.    Infuse® sales alone were nearly $900 million for the fiscal year of 2011.[142]

406.    Medtronic has depended heavily on Infuse®, since its sales in other market areas, such as cardiac defibrillators, have significantly slowed due to numerous product recalls of a wide-variety of defective Medtronic products.

407.    Medtronic's reliance on Infuse® for sales is exhibited by SEC filings and statements to analysts as well as the investing public, where Medtronic urged that Infuse® was a rapidly growing product and expected to greatly increase its market presence in the upcoming years.

408.    In the 2007 fiscal year alone, according to Medtronic's Second Quarter press release filed with the SEC in November of 2006, "Worldwide Infuse® 2007 Bone Graft revenue grew 36 percent, driven by expanded surgeon adoption."[143]

409.    In February of 2007, Arthur D. Collins, Jr., Medtronic Chairman of the board responded to Citigroup analyst, Matthew Dodds, about the performance of the Infuse®, stating that "Infuse® still grew 15%...**one of the biggest opportunities we have is continuing to expand the indication.**" (emphasis added).[144]

410.    During the Goldman Sachs 28th Annual Global Health Care Conference, June 13, 2007,

---

[141] Medtronic Is Sued Over Bone Product (Dec 3, 2008), *available at* http://online.wsj.com/article/SB122827750515975273.html (also attached hereto as Exhibit "Z").
[142] Critique could put bigger drag on Infuse sales (Oct 25, 2012), *available at* http://www.startribune.com/business/175896771.html (also attached hereto as Exhibit "AA").
[143] Medtronic Reports Second Quarter Revenue Growth of 11 Percent (Nov 11, 2006), *available at* http://wwwp.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1164113830755&lang=fr_CH (also attached hereto as Exhibit "BB").
[144] Complaint, as alleged in the shareholder action at Paragraph 195, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota* (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Medtronic's CFO, Gary Ellis stated, "Infuse is…one of our big growth platforms over the next several years."[145]

411.    Additionally, Medtronic's Spinal Divisions Vice President for Clinical Affairs explained at an Investor and Analyst Meeting on June 20, 2007 that the company was sponsoring several clinical trials to obtain additional FDA approvals for Infuse®, including an ongoing Investigational Device Exemption ("IDE") trial examining the use of Infuse® in "off-label" Posterolateral Fusion and other studies using Infuse® in the cervical spine.

412.    FDA approval for these "off-label" uses was never procured.[146]

413.    In 2002, Infuse® was used in less than 1% of all spinal fusions.

414.    By 2006, the product was used in 25% of all spinal fusions.

415.    By 2007, as a result of Medtronic's over-aggressive promotion and concealment of dangers associated with Infuse®, over 40% of PLIF procedures employed the "off-label" use of Infuse®.

416.    The majority of growth enjoyed by Medtronic stems from "off-label" sales, which comprise 85-90% of the total annual revenue from Infuse®.[147]

## J. MEDTRONIC PAYS THE UNITED STATES GOVERNMENT $40 MILLION TO SETTLE WHISTLEBLOWER SUITS REGARDING ILLEGAL KICKBACKS TO DOCTORS TO INDUCE THE "OFF-LABEL" USE OF INFUSE®

417.    Medtronic has also been named as a defendant in two prior *qui tam*[148] actions related to Infuse®, *United States ex rei. (UNDER SEAL)* v. *Medtronic. Inc., et al.*, Civil Action No. 02-2709 (W.

---

[145] *Id.* at 207 as alleged in the shareholder action.

[146] *Id.* at 208 as alleged in the shareholder action.

[147] *See also* Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events Reported to the Manufacture and User Facility Device Experience Database,"* The Spine Journal, 12 (10): 894-899, October 2012 (also attached hereto as Exhibit "CC"); *see also* John Carreyrou and Tom McGinity, *Medtronic Surgeons Held Back, Study Says*, Wall St. J. June, 29, 2011, *available at* http://online.wsj.com/article/SB10001424052702303627104576413663395567784.html  (also attached hereto as Exhibit "DD").

[148] *United States ex rei. (UNDER SEAL)* v. *Medtronic. Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn.)(also attached hereto as Exhibit "EE").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

D. Tenn.) (This action was commenced by a former Medtronic employee working as in-house counsel), and *United States ex rei. Poteet* v. *Medtronic, Inc., et al.,* Civil Action No. 03-2979 (W. D. Tenn.)[149] (collectively the *"qui tam* lawsuits").

418.    The Plaintiffs in both cases alleged that Medtronic violated the False Claims Act, 31 U.S.C. § 3729, *et seq.* (2012), by paying illegal kickbacks to physicians in order to promote the "off-label" use of Infuse®, and by inducing the submission of false and fraudulent claims to federal health care programs like Medicare and Medicaid.

419.    In July 2006, Medtronic agreed to pay $40 million[150] to the federal government as part of its agreement to settle two *qui tam* actions under the False Claims Act, 31 U.S.C. §§ 3729-3733 (2012), the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a (2012), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12 (2012).[151]

420.    In these lawsuits, the United States Department of Justice ("DOJ") contended that between January 1, 1998 and April 30, 2003, Medtronic made payments to physicians and entities in connection with its spinal products, in the form of:  (1) payments and other remuneration for physicians' attendance and expenses at medical education events, "think tanks", VIP/Key Opinion Leader events, and meetings at resort locations (2) access for physicians to Medtronic's Healthcare Economic Services and eBusiness Departments; and (3) payments made to various physicians and entities, pursuant to consulting, royalties, fellowships, and research agreements associated with Medtronic products.

421.    Peter Keisler, Assistant Attorney General for the Department's Civil Division stated in response to the settlement that *"kickbacks to physicians are incompatible with a properly functioning health care system...They corrupt physicians' medical judgment and they cause overutilization and misallocation of vital health care resources."*[152]

---

[149] *United States ex rei. Poteet v. Medtronic, Inc., et al.,* Civil Action No. 03-2979 (W. D. Tenn.)(also attached hereto as Exhibit "FF").

[150] Press Release, Department of Justice (July 18, 2006), *available at* http://www.justice.gov/opa/pr/2006/July/06_civ_445.html (also attached hereto as Exhibit "GG").

[151] Medtronic also recently paid $23.5 million to settle allegations regarding Doctor kickbacks related to the sales of pacemakers. *See* Minnesota-Based Medtronic Inc. Pays U.S. $23.5 Million to Settle Claims That Company Paid Kickbacks to Physicians (Dec. 12, 2011), *available at* http://www.justice.gov/opa/pr/2011/December/11-civ-1623.html (also attached hereto as Exhibit "HH").

[152] Press Release, Department of Justice (July 18, 2006), *available at*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

422.       Specifically, the *qui tam* brought forth by the former Medtronic counsel disclosed payments in the form of sham seminars and think tanks.

423.       Seminars included free travel and lodging for physicians and their families, were alleged to be without adequate training benefit.  The locations ranged from Cancun at the Ritz Carlton, Hawaii, Malaysia and Los Cabos.

424.       Additionally, Medtronic held all expenses-paid think tanks and study/discussion groups in Alaska, Amelia Island, Arnold Palmer Champions for Children Golf Tournament, New Orleans Mardi Gras including up to a $25,000 payment to allow physicians to ride on a float and $15,000 spent on Mardi Gras beads, Idaho, Teton Valley and New York comprising at least 30 think-tanks and groups.[153]

425.       Medtronic also entertained physicians at strip clubs in Memphis, Tennessee, home to Medtronic Sofamor Danek.[154]

426.       These trips were extravagant and the Medtronic funded visits to strip clubs inappropriate.  As revealed hereinafter, the payments disclosed in these actions represented only the tip of the iceberg.

427.       Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper, and thus resulted in the submission of false or fraudulent claims.

428.       Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper and resulted in the submission of false or fraudulent claims in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), *et seq.* (2012), which prohibits individuals from offering, soliciting or making any payment or remuneration to induce business reimbursed under a federal or state health care program, and the False Claim Act, 31 U.S.C. § 3729, *et seq.* (2012), which provides penalties for the submission of false claims to the federal government.

429.       Under the settlement, Medtronic and Medtronic Sofamor Danek also agreed to enter into

---

http://www.justice.gov/opa/pr/2006/July/06_civ_445.html (also attached hereto as Exhibit "GG").

[153] *United States ex rei. (UNDER SEAL) v. Medtronic. Inc., et al.,* Civil Action No. 02-2709 (W. D. Tenn.) (also attached hereto as Exhibit "EE").

[154] Lawsuit Says Medtronic Gave Doctors Array of Perks, (Sept 25, 2008), *The Wall Street Journal, available at* http://online.wsj.com/article/SB122230535985873827.html (also attached hereto as Exhibit "II").

a five-year Corporate Integrity Agreement with the U.S. Department of Health and Human Services' Office of Inspector General.[155]

430.      Medtronic explained in its July 18, 2006 press release that this agreement implemented substantial oversight structures and procedures meant to ensure *"top-level attention to corporate compliance measures."*[156]

431.      Among other items, the Corporate Integrity Agreement required Medtronic to establish an electronic database to capture and manage all non-sales related transactions between Medtronic's Spinal segment and its physicians or customers, with all transaction subject to an established set of internal controls and review processes, including monitoring by Medtronic senior management and Chief Compliance Officer.

432.      The settlement also provided for negotiations between Medtronic and representatives of the National Association of Medicaid Fraud Control Units for the purposes of distributing certain sums to several states which had been adversely affected by Medtronic's conduct.

**1. Despite Medtronic's Settlement With The Department of Justice (DOJ), Medtronic's Secret Agent Colonel Timothy Kuklo, M.D. Was Found To Have Published A Falsified Study On The Experimental Use Of Infuse® On War Veterans Without Their Knowledge Or Consent Nor The Knowledge Or Consent of The United States Army, Regarding Infuse® While Secretly Consulting For Medtronic And Without The Knowledge of Walter Reed National Military Medical Center**

433.      Medtronic's secret agent Timothy Kuklo, M.D., a physician who was a former, Army Colonel, retired from the military as Chief of Orthopaedic Surgery at Walter Reed Army Medical Center, the nation's premier military research hospital, in December 2006.

434.      Nonetheless, Timothy Kuklo, M.D. received hundreds of thousands of dollars per year in fees from Medtronic following the DOJ settlement.

---

[155] Corporate Integrity Agreement, *available at* http://oig.hhs.gov/fraud/cia/agreements/Medtronic_and_MSD_CIA.pdf also attached hereto as Exhibit "JJ")
[156] Press Release, Medtronic Resolves Qui Tam Suits (July 18, 2006), *available at* http://www.sec.gov/Archives/edgar/data/64670/000095013406013343/c06802exv99w1.htm (also attached hereto as Exhibit "KK").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

435.     While still on active duty, Medtronic's secret agent Col. Kuklo was handsomely compensated by Medtronic.

436.     From 2001 to 2005, Medtronic's secret agent Timothy Kuklo, M.D. received a total of $42,295 from Medtronic.

437.     In 2006, his payments from Medtronic went up to $42,627 for the single year.

438.     Thereafter, Dr. Kuklo's payments skyrocketed. *The Wall Street Journal* revealed a substantial and dramatic increase in payments from Medtronic of $356,242 in 2007, $249,772 in 2008, and $132,453 in the first few months of 2009.[157]

439.     Medtronic's secret agent Timothy Kuklo, M.D. worked closely with Medtronic as an active promoter of the "off-label" uses of Infuse®.

440.     A U.S. Army investigation uncovered shocking misconduct by the former Army Colonel identifying a falsified study touting the benefits of Infuse® to treat wounded soldiers in Iraq, despite the fact that this use of Infuse® in the manner used in the study, was considered experimental.

441.     The experimental nature of the study was never disclosed to the soldiers who were operated on and in which Infuse® was used in this experimental fashion.

442.     The U.S. Army never approved the "study".

443.     The U.S. Army never received the funds that Medtronic paid to fund the "study".

444.     Colonel J. Edwin Atwood, an Army physician who led the Army's inquiry described Kuklo's conduct as "the ultimate tragedy and catastrophe in academic medicine."[158]

445.     Medtronic's secret agent Timothy Kuklo, M.D.'s "study" which purported to compare fusion results of 67 patients who received autogenous bone graft versus 62 that were treated with Infuse® to treat certain tibial (shin bone) fractures in injured soldiers (including "off-label" uses), reported that employing Infuse® resulted in "strikingly" better outcomes than a traditional (autogenous) bone graft.

---

[157] Medtronic Paid the Surgeon Accused Of Falsifying Study Nearly $800,000, (June 18, 2009), *available at* http://online.wsj.com/article/SB124527830694724953.html (also attached hereto as Exhibit "LL").

[158] *Doctor Falsified Study on Injured G.I.'s, Army Says, The New York Times,* (May 13, 2009), *available at* http://www.nytimes.com/2009/05/13/business/13surgeon.html?pagewanted=all&_r=0 (also attached hereto as Exhibit "MM").

446.      Medtronic's secret agent Timothy Kuklo, M.D. reported that those receiving autogenous bone grafts had successful fusion in 76% of procedures, while the union rate for the Infuse® group was significantly better at 92%; he claimed that this was a "striking finding."[159]

447.      Not only were Medtronic's secret agent Timothy Kuklo, M.D.'s reported union rates claimed better with Infuse® than with an autograft, but, according to this falsified study, patients who received Infuse® also reportedly experienced favorable outcomes in other clinical measures.

448.      The study concluded that "the primary outcomes measures of union, rate of infection, and reoperation were all improved with rhBMP-2: and that those treated with Infuse® had a "strikingly lower infection rate (3.2%), which we believe is directly attributable to rhBMP-2."[160]

449.      Dr. Kuklo's Medtronic-sponsored study was false, the falsity only uncovered when one of the study's supposed "co-authors," Lt. Col. Romney C. Andersen, was congratulated on its publication by a colleague. After his discovery, Lt. Col. Andersen alerted Army investigators to the false claims.

450.      Dr. Kuklo had listed four other Army surgeons as "co-authors" without their knowledge, when these four physicians had neither participated in nor reviewed the article's preparation or submission for publication.

451.      The signatures of the four physicians listed as co-authors on the copyright release forms submitted to *The Journal of Bone and Joint Surgery* were <u>forged</u> by Dr. Kuklo.

452.      The number of cases cited by Dr. Kuklo in the article <u>differed</u> from the number of cases contained in the Wartime casualty database, with no explanation for the discrepancies in the articles.

453.      Contrary to Army policy, Dr. Kuklo did <u>not</u> obtain publication review or clearance from Walter Reed prior to submitting the article for publication.

454.      The published results of the article suggested a much higher efficacy rate for Infuse® than was supported by the experience of the purported co-authors.[161]

---

[159]Recombinant human bone morphogenetic protein-2 for grade III open segmental tibial fractures from combat injuries in Iraq, 1071, 1068-1072, *available at* http://graphics8.nytimes.com/packages/pdf/business/20090513kuklo-journal-article.pdf (also attached hereto as Exhibit "NN").
[160] *Id.* at 1068.
[161] *Doctor Falsified Study on Injured G.I.'s, Army Says,* The New York Times, (May 13, 2009), *available at* http://www.nytimes.com/2009/05/13/business/13surgeon.html?pagewanted=all&_r=0 (also attached hereto as Exhibit

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

455.      One of the Army's investigators, Col. Norvell V. Coots, cited a higher number of patients and injuries in Dr. Kulko's study than the hospital could account for.  Coots stated "It's like a ghost population that were reported in the article as having been treated that we have no record of ever having existed…this really was all falsified information."[162]

456.      After receiving correspondence from Walter Reed dated November 6, 2008 stating that Medtronic's secret agent Timothy Kuklo, M.D. did not follow Army regulations in submitting the article, that the signatures of the purported co-authors had been forged, and that the article's purported co-authors had questioned the study findings, *The Journal of Bone and Joint Surgery* formally retracted the article and banned Dr. Kuklo from submitting further papers to the Journal.[163]

457.      As noted in a May 19, 2009 follow-up article in *The New York Times,* when questioned about its ties to Medtronic's secret agent Timothy Kuklo, M.D., Medtronic repeatedly declined to disclose when it began its financial relationship with the former Army surgeon or the extent of funding it provided.[164]

458.      The funding for the study, which the Army never received, is, to date, unaccounted for.

459.      Medtronic's secret agent Timothy Kuklo, M.D. appeared as a "distinguished guest surgeon" at Medtronic's Spine Division Business Overview Conference Call on September 28, 2006, alongside another Medtronic consultant, Dr. Rick Sasso—who received $150,000 in consulting fees in 2006—as well as Gary L. Ellis, Medtronic Vice President, Corporate Controller and Treasure and Peter Wehrly ("Wehrly"), Medtronic Spinal Division Senior Vice President.

460.      During the call, a Merrill Lynch analyst asked about "issues that have come up in the past in terms of potential side effects with using INFUSE in the cervical region," and whether such "off-label" use was a concern for surgeons.

461.      Dr. Sasso responded by referring to a "Level 1, controlled randomized study which was published in 2002" which, according to Dr. Sasso, demonstrated that "when you used the appropriate

---

"MM").

[162] *Id.*

[163] Withdrawal of a paper, J. Scott, J Bone Joint Surg. Br. March 2009 91-B:285-286, *available at* http://www.bjj.boneandjoint.org.uk/content/91-B/3/285.extract (also attached hereto as Exhibit "OO").

[164] Senator Seeks Data on Doctor Accused by Army of Falsifying a Product Study, (May 18, 2009), *available at* http://www.nytimes.com/2009/05/19/business/19surgeon.html?_r=0 (also attached hereto as Exhibit "PP").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

dosage of Infuse®, you did not get problems with esophageal obstruction and problems swallowing."

462.     Medtronic's secret agent Timothy Kuklo, M.D. responded that the question "was well answered as far as appropriate dosage.  I think it's really the bottom line."[165]

463.     Medtronic's secret agent Timothy Kuklo, M.D.'s and Dr. Sasso's rendition of the medical literature was not accurate.

464.     Drs. Kuklo and Sasso intentionally and with the full knowledge of Medtronic misrepresented the seriousness of the adverse events that Medtronic knew were occurring in the cervical spine – their misrepresentations only hinted at the significant influence of Medtronic's payments had on its consultants' medical judgment.

465.     Additionally, Senator Grassley discovered that Medtronic's secret agent Timothy Kuklo, M.D.'s name did not appear on a list of paid consultants for Infuse® provided by Medtronic to Senator Grassley that the Senator had requested in a September 30, 2008 letter to the Medtronic.

466.     Senator Grassley disclosed the list Medtronic provided – which included 22 physicians who were paid a total of $943,000 from 2005 to 2008 – in a May 18, 2009 letter to Medtronic that was published in the *Congressional Record* the following day.

467.     According to the May 18, 2009 letter, Senator Grassley was "concerned" that Medtronic did not provide their secret agent Timothy Kuklo, M.D.'s name in response to his inquiry that specifically requested information regarding consultants whose work involves Infuse®, as it was "clear that Dr. Kuklo had some sort of consulting agreement" and was named in *The New York Times* as a consultant for Medtronic in regards to Infuse®.

468.     By this time, Medtronic's secret agent Timothy Kuklo, M.D. had given countless presentations promoting Infuse® on behalf of Medtronic, not to mention his fraudulent "studies".[166]

469.     On June 18, 2009, Medtronic disclosed to *The Wall Street Journal* that Medtronic's secret agent Timothy Kuklo, M.D. had received almost $850,000 in payments from Medtronic over the past ten (10) years, the majority of which – nearly - $800,000 – were made in the preceding three (3)

---

[165] Complaint at 120, *Minneapolis Firefighters' Relief Association v. Medtronic, INC.*, et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[166] Letter, Letter to Medtronic, Inc. (May 18, 2009), *available at* http://www.gpo.gov/fdsys/pkg/CREC-2009-05-19/html/CREC-2009-05-19-pt1-PgS5609-2.htm (also attached hereto as Exhibit "QQ").

years when Dr. Kuklo was shopping his study to medical journals.

470.       Medtronic paid their secret agent Timothy Kuklo, M.D. $356,242 in 2007, the year their secret agent Timothy Kuklo, M.D. sought publication of the study in two medical journals.

471.       Medtronic paid Dr. Kuklo $249,772 in 2008, the year the study was published.[167]

472.       Medtronic made both of these payments after it announced its settlement with the DOJ in July of 2006.

473.       Medtronic only placed their secret agent Timothy Kuklo, M.D. on "inactive status" *after* reports that he falsified the study's data were published in *The New York Times.*

## K. MEDTRONIC PAYS $85 MILLION TO SETTLE A LAWSUIT BROUGHT BY ITS SHAREHOLDERS REGARDING ALLEGATIONS OF AGGRESSIVE MARKETING AND PROMOTION OF THE "OFF-LABEL" USE OF INFUSE®

474.       *Minneapolis Firefighters' Relief Association v Medtronic, INC, et.al,* 08-06324, U.S. District Court, District of Minnesota (Minneapolis)[168] was brought on behalf of institutional shareholders and arose from allegations of Medtronic's materially false, misleading, and incomplete public statements concerning Infuse®, notably including over-aggressive promotion of its "off-label" use.[169]

475. Judge Magnuson in the United States District Court for the District of Minnesota described the shareholder action, in part, in his Memorandum and Order on December 12, 2011 as follows:

> a. "Infuse is a surgically-implanted medical device containing a genetically engineered protein designed to stimulate bone growth." (Am. Compl. (Docket No. 68) ¶ 1.) Medtronic received approval from the Food and Drug Administration ("FDA") for certain specific uses on Infuse®:  treatment of degenerative discs in the lower lumbar region of the spine, fractures of

---

[167] Medtronic Paid the Surgeon Accused Of Falsifying Study Nearly $800,000, (June 18, 2009), *available at* http://online.wsj.com/article/SB124527830694724953.html (also attached hereto as Exhibit "LL").

[168] *See* Complaint *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[169] Jonathan Stempel, *Medtronic to pay $85 million to settle Infuse lawsuit,* Reuters, (March 31, 2012), *available at* http://206.132.6.104/article/2012/03/30/us-medtronic-settlement-idINBRE82T1A920120330 (also attached hereto as Exhibit "RR").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

the tibia, and certain facial/oral surgeries." (*Id.*)

b. "Plaintiffs' claims arise from what they characterize as Medtronic's intentional promotion of off-label use for Infuse®. A physician's use of a device in a manner not specifically approved by the FDA is not illegal. It is illegal, however, for a manufacturer to promote device's off-label use. Plaintiffs contend that Medtronic engaged in such promotion, and that eventually more than 85% of Infuse® sales involved off-label use. (*Id.* ¶ 3)…[t]he Infuse product generated approximately $800 million annually or 6% of Medtronic's total corporate revenue. (*Id.* ¶ 40.) In the summer of 2008, the FDA issued a warning about a particular off-label use of Infuse® and several months later, Medtronic disclosed that it was the target of an investigation by the Department of Justice ("DOJ") regarding off-label use of Infuse®."

c. "Plaintiffs allege that Medtronic both implicitly and explicitly encouraged its sales force to promote the off-label use of Infuse®. Plaintiffs rely on the testimony of 15 confidential witnesses to support this allegation."

d. **"The information provided by the confidential witnesses either established or implies that Medtronic actively promoted off-label uses for Infuse by, among other things, hosting physician meetings at which a Medtronic-paid consulting physician would give a presentation on off-label uses** (Am. Compl. ¶ 93), **instructing its sales force in the off-label use of Infuse** *(Id.* ¶ 94), **giving physicians literature about off-label uses for Infuse** *(Id.* ¶ 96) **or directing physicians to other surgeons who used Infuse for off-label procedures** *(Id.* ¶ 102), **and advising physicians regarding the appropriated dosage of Infuse for off-label uses** *(Id.* ¶ 105). Plaintiffs also claim that Medtronic set high sales targets for Infuse and knew or should have known that such high targets could be reached only through illegal promotion of off-label uses of Infuse." (e.g., *Id.* ¶ 107).[170] (emphasis added).

---

[170] Memorandum and Order at 2-3, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "SS").

## 1. Medtronic Engaged In Active, Systematic "Off-Label" Over-Promotion Through Its Employees And Agents Without Seeking Prior Approval From The FDA Or In Furtherance Of The Safe Harbor Provisions

476. As noted by Judge Magnuson, according to former Medtronic employees in the shareholder action against Medtronic, Medtronic engaged in systematic "off-label" promotion. Some of the techniques alleged in the shareholder action used by Medtronic include: sponsoring "off-label" presentations by "opinion leaders;" providing sales representatives specific, step-by-step instructions regarding the dosage and techniques of "off-label" use of Infuse®, including how to roll the ACS (collagen sponge) like a "burrito" to optimize its fit in the spine (without the approved cage); directing physicians to other doctors who had alleged "success" using Infuse® "off-label"; sending Medtronic representatives, who were not medically-trained, into the operating room during surgical procedures involving Infuse®; and finally, setting sales quotas that would not have been met absent "off-label" sales.[171]

477. These former employees worked for and represented Medtronic at various levels of management and sales at private meetings, conferences, and hospitals with physicians across the United States, demonstrating that these practices were widespread throughout Medtronic, rather than isolated to particular areas.

### a. Medtronic sponsored physician meetings and corporate visits focused on "off-label" training

478. Medtronic promoted the "off-label" use of Infuse® in several ways, often by sponsoring meetings targeted toward physicians. A confidential witness who was employed by Medtronic as a territory sales manager in the southeastern United States from 2002 through 2005 disclosed that these sponsored events include meetings for local physicians to attend presentations on the "off-label" use of Infuse® given by a Medtronic-paid surgeon, as well as corporate visits for physicians to receive "off-label" training by guest surgeons, including those from the Norton Leatherman Spine Center, a clinic that had agreed to split royalties with Medtronic in exchange for helping to develop spinal implants.[172]

---

[171] *Id.*

[172] *See* Complaint at as alleged in the shareholder action Paragraph 93, *Minneapolis Firefighters' Relief Association v*

479.    Medtronic consistently hired and slotted surgeons at its national sales meetings to educate Medtronic sales representatives on the "off-label" uses of Infuse®, according to Kirk Riley, a Spinal sales representative who promoted Infuse® sales in the Northeast United States from 2002 until 2006.[173]

480.    Medtronic actively recruited doctor-experts to engage in peer-to-peer conversations with other doctors regarding Infuse®, according to Matt Tosch, another sales representative who promoted Infuse® sales in the Northeast United States in 2002 and 2003.[174]

**b. Medtronic instructed its sales representatives on particular dosage requirements for various "off-label" uses of Infuse®**

481.    Medtronic held regional and national sales team meetings during which sales representatives received specific instructions on how to administer Infuse® for various "off-label" uses, in order to convey these specifics to the doctors using Infuse® off-label, according to the confidential witness employed by Medtronic as a territory sales manager. These sales representatives were specifically instructed not to document any of the information they passed on to the doctors, and to limit communications to verbal form.[175]

482.    Additionally, Chris Powell, a Biologics sales representative who promoted Infuse® sales in the Mid-Atlantic United States in 2005, confirmed that Medtronic showed its sales staff how to use Infuse® "off-label".[176]

**c. Medtronic sales representatives would cite data from Medtronic-sponsored published literature promoting "off-label" use and provide techniques for "off-label" procedures**

483.    Medtronic's response to physician inquiries on the "off-label" uses for Infuse® was to provide data from published literature and other information reinforcing the "off-label" use of Infuse®, according to Matthew Bine, a product manager for Medtronic's Biologics Marketing, who promoted

---

*Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[173] *See id.* as alleged in the shareholder action at Paragraph 100; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[174] *See id.* as alleged in the shareholder action at Paragraph 107; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[175] *See id.* as alleged in the shareholder action at Paragraph 94.

[176] Memorandum and Order at 9, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota as alleged in the shareholder action (also attached hereto as Exhibit "SS").

Infuse® sales from 2005 to 2008.[177] Medtronic did not seek the prior approval of the FDA, nor comply with the Safe Harbor provisions before distributing the promotional materials regarding the "off-label" use of Infuse®. Nor did they disclose any part of Medtronic employees played in crafting the published articles. Nor did they disclose the enormous sums paid to the "scientists" conducting the "studies" contained in the published articles they were citing.

### d. Medtronic sales representatives routinely directed doctors inquiring about the "off-label" use of Infuse® to surgeons who had previously used Infuse® "off-label"

484.    If a doctor inquired about the "off-label" use of Infuse®, Medtronic employees would suggest that the doctor making the inquiry talk directly to other surgeons using the product "off-label", according to Scott Baumer, a Spinal sales representative who promoted Infuse® sales in Northwestern United States from 1998 to 2003[178] and according to Mark Marchan, a clinical data director.[179]

485.    Additionally, if a doctor inquired into how to use Infuse® "off-label", a Medtronic sales representative would direct the doctor to other surgeons who had used the product "off-label", and the representative would also offer to demonstrate or explain the technique, according to Chris Powell, a Biologics sales representative.[180]

### e. Medtronic routinely informed surgeons regarding the dosage of Infuse® for "off-label" procedures in the cervical spine

486.    As early as 2006, doctors have reported adverse events associated with the "off-label" use of Infuse® in the cervical spine, including swelling, dysphagia and dysphonia, according to Matthew Bine, the product manager for Medtronic's Biologics Marketing. Medtronic addressed the issue, not by informing the surgeons that the use of Infuse® in the cervical spine was "off-label", but instead by assuring doctors that smaller doses of rhBMP-2 used in the cervical spine would alleviate the incidence

---

[177] Complaint as alleged in the shareholder action at Paragraph 96, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al*, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J"); *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[178] *See id.* as alleged in the shareholder action at Paragraph 103; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[179] *See id.* as alleged in the shareholder action at Paragraph 102; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[180] *See id.* as alleged in the shareholder action at Paragraph 99; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

of adverse events. Bine reported that "our goal was to tell surgeons, don't put 2.8 on; put 1.4 or 0.7 [in "off-label" cervical applications]." Furthermore, Bine noted that Infuse® kits are now available in these smaller sizes, even though the FDA-approved uses remain the same.[181]

487.     Medtronic instructed its sales representatives to advise doctors to use roughly half the indicated dosage of rhBMP-2 (or 1.4 cc) in cervical applications, according to Kirk Riley, another Spinal sales representative. Riley also confirmed that Medtronic was aware of swelling in the neck caused by cervical applications of Infuse®, but that in response, Medtronic merely recommended that each surgeon prescribe steroids to treat these symptoms.[182]

488.     Mr. Riley further reported that when surgeons first began to use Infuse® in cervical fusion surgeries, they were not aware of the potential adverse consequences of using an entire sponge (or full rhBMP-2 dosage) in the cervical spine. After Medtronic's national sales meetings, however, the instructions on how to use Infuse® in the cervical spine--even though the product was only FDA-approved for lumbar anterior fusion--became so widespread throughout the medical community that information on how to use "off-label" Infuse® was readily available.[183]

489.     One of the confidential witnesses disclosed that when adverse reactions were reported in conjunction with the cervical application of Infuse® in 2006, Medtronic organized a conference call with its sales representatives to instruct them that surgeons should not be using the "whole sponge" (or full rhBMP-2 dosage) in cervical fusion surgery. Medtronic disregarded the fact that cervical surgeries with Infuse® were "off-label", not FDA-approved as it is not an "intended use" of Infuse® in the PMA and therefore it was a violation of federal law and the PMA for Medtronic to provide anyone with such instructions or information. [184] This was also confirmed by Mark Marchan, a clinical data director who was employed by Medtronic from 2000 to 2007.[185]

---

[181] *See id.* as alleged in the shareholder action at Paragraph 97; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[182] *See id.* as alleged in the shareholder action at Paragraph 100; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[183] *See id.* as alleged in the shareholder action at Paragraph 100; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[184] *See id.* as alleged in the shareholder action at Paragraph 102; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[185] *See Id.* as alleged in the shareholder action at Paragraph 102; *see also* Memorandum and Order identifying the names of

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**f. Medtronic representatives showed doctors how to roll the absorbable collagen sponge (ACS) "like a burrito" or "like a taco" to be placed in the spine for "off-label" procedures**

490.    Medtronic sales representative would show the doctor how to perform a specific procedure by rolling up the Infuse® material "like a burrito" to place into the lateral spine, according to Chris Powell, a Biologics sales representative.

491.    Further, according to Victor Harmon, a Medtronic sales associate from 2000 to 2004 in the Southwestern region of the United States, promoted Infuse® and recalled the "off-label" use of Infuse® where "[Medtronic's regional management] talked about rolling [it] into almost a little taco in the lateral gutters."[186]

**g. The vast majority of Infuse® sales (over 85-90%) were from "off-label" uses**

492.    The vast majority of Infuse® surgeries were "off-label" applications of the product, according to Sean Hirschkorn, a sales representative who promoted Infuse® sales in Southwestern United States and who was employed by Medtronic from 2004 through 2008.  The reason for this was because very few surgeons used the LT-CAGE or Anterior Lumbar Interbody Fusion ("ALIF") procedure, which would have constituted FDA-approved use of Infuse®.  According to Hirschkorn, the Posterior Lumbar Interbody Fusion ("PLIF") and Transforaminal Lumbar Interbody Fusion ("TLIF") "off-label" procedures were far more common surgeries than an ALIF surgery in the lumbar region.[187]

493.    Further, Chris Eddy, a regional sales manager in Northwestern United States from 2002 to 2004, also reported that the vast majority of Infuse® sales were for "off-label" uses, citing the high volume of sales coupled with very low numbers of ALIF procedures (the only FDA-approved spinal procedure) actually being performed.[188]

494.    Victor Harmon, a sales associate, corroborated these reports by disclosing that the vast

---

confidential witnesses (also attached hereto as Exhibit "SS").

[186] *See id.* as alleged in the shareholder action at Paragraph 104; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[187] *See id.* as alleged in the shareholder action at Paragraph 105; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[188] *See id.* as alleged in the shareholder action at Paragraph 106; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

majority of Infuse® procedures were in fact "off-label", and that the product was "tremendous" with regard to Medtronic's overall growth.[189]

### h. Medtronic packaged, sold, and distributed Infuse® and the LT-Cage separately, therefore knowing that Infuse® far out-sold the FDA required LT-Cage

495.    Sales of the Infuse® rhBMP-2 component far outsold sales of the LT-CAGE, according to sales representative Matt Tosch. Further, Tosch reported that Medtronic pressured its sales representatives to reach high sales targets, which Medtronic increased every year,[190] thus proliferating the discrepancy of sales between the two components of Infuse® and therefore escalating use of Infuse® "off-label."

496.    Medtronic packaged and sold the two components of Infuse® separately, even though both parts were needed for each spinal surgery, as required by the FDA approval.

497.    Additionally, Matthew Bine, a product manager for Medtronic's Biologics Marketing, also reported that by the time he left Medtronic, Infuse® sales for "off-label" use accounted for the vast majority of total sales, with sales of the rhBMP-2 component of Infuse® greatly outpacing sales of the LT- CAGE, which were packaged and sold separately, although these components must be used together according the to Infuse® FDA-approved label.[191]

498.    Furthermore, Charles Koenig, a Spinal financial analyst, employed by Medtronic from 2002 through 2007, stated that it was his "impression that Infuse® was used in off-label procedures."[192]

### i. Medtronic set Infuse® sales quotas for its representatives that could not have been achieved without an aggressive, illegal "off-label" promotional campaign

499.    Medtronic set sales quotas for Infuse® that were much higher than what could possibly be reached by relying exclusively on FDA-approved uses of Infuse®, and that "there was no way" that Medtronic executives could have expected the sales quotas to be met without "off-label" sales,

---

[189] *See id.* as alleged in the shareholder action at Paragraph 104; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[190] *See id.* as alleged in the shareholder action at Paragraph 107; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[191] *See id.* as alleged in the shareholder action at Paragraph 98; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[192] *See id.* as alleged in the shareholder action at Paragraph 108; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

according to the confidential witness who served as territory sales manager for southeastern United States.[193]

500.    The sales related to "off-label" use of Infuse® were necessary in order to satisfy sales quotas and the minimum 20% annual sales growth expected by Medtronic, according to Chris Powell, a Biologics sales representative.[194]

501.    Medtronic sales representatives knew that they could not reach Medtronic's sales targets without utilizing "off-label" sales, according to Chris Eddy, a Spinal regional sales manager, stated that.[195]

502.    Medtronic set very high sales targets with sales expected to grow 15-20% per year, and that Medtronic's Spine (and mainly) Biologics division were considered "one of the big growth engines of Medtronic," by Matthew Bine, a product manager for Medtronic's Biologics Marketing.  Bine further reported that 95% of Infuse® revenues related to spinal usage (cervical and lumbar), with only 5% allocated from trauma and oral maxillofacial applications.[196]

503.    Taken together, Medtronic profited extremely, exponentially, and directly from "off-label" Infuse® sales with each passing year.

> **j. Medtronic trained its sales representatives to provide step-by-step instructions to doctors conducting "off-label" surgeries using Infuse® and in fact encouraged its representatives to attend "off-label" Infuse® surgeries in operating rooms across the country**

504.    Medtronic's sales representatives participated in surgeries by providing surgeons with step-by-step instructions on how to use Infuse®, even when the product was used "off-label", according to a confidential witness who was employed by Medtronic as an associate sales representative in the

---

[193] *See id.* as alleged in the shareholder action at Paragraph 95; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[194] *See id.* as alleged in the shareholder action at Paragraph 99; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[195] Memorandum and Order at 16, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al*, 08-06324, U.S. District Court, District of Minnesota, as alleged in the shareholder action (also attached hereto as Exhibit "SS").

[196] Complaint at Paragraph 98, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al*, 08-06324, U.S. District Court, District of Minnesota, as alleged in the shareholder action (also attached hereto as Exhibit "J"); *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

South, Southwest, and Midwest. The witness further disclosed that "off-label" use of Infuse® was far more common than "on-label" use, which was "few and far between."[197]

505.    It was common practice for Medtronic sales representatives to be present in the operating room for surgeries using Infuse®, and sales representatives were in fact encouraged by Medtronic to attend such surgeries, according to the associate sales representative.[198]

506.    Medtronic expected its sales representatives to be present in the operating room during procedures with Infuse® "to assist and direct and give advice when asked, according to the territory sales manager for Southeastern United States."[199]  Matthew Bine, a product manager for Medtronic's Biologics Marketing division, corroborated Medtronic's policy of sending sales representatives into operating rooms.[200]

507.    Medtronic sales representatives were often present in the operating room to demonstrate to the doctor how to assemble the sponge, or to explain other procedures and assist with any issues that may arise, according to Chris Powell, a Biologics sales representative.[201]  This was also confirmed by both Mark Marchan, a clinical data director,[202] as well as Kirk Riley, a Spinal sales representative.[203]

### k. Medtronic secret agents Defendant Lawrence G. Lenke, M.D. and Defendant Keith H. Bridwell, M.D. from Washington University St. Louis would train surgeons on the use of Infuse®, 85-90% of which was "off-label"

508.    Medtronic secret agents, Defendant Lawrence "Larry" G. Lenke, M.D. and Defendent Keith H. Bridwell, M.D., two surgeons from Washington University in St. Louis, where Dr. Kuklo worked as an associate professor, similarly acted as "Opinion Leaders" or "guest surgeons" during

---

[197] *See id.* as alleged in the shareholder action at Paragraph 101.

[198] *See id.* as alleged in the shareholder action at Paragraph 101.

[199] *See id.* as alleged in the shareholder action at Paragraph 95; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[200] *See id.* as alleged in the shareholder action at Paragraph 97; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[201] *See id.* as alleged in the shareholder action at Paragraph 99; *see also* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS").

[202] Memorandum and Order at 12, Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota, as alleged in the shareholder action (also attached hereto as Exhibit "SS").

[203] *See id.* Memorandum and Order identifying the names of confidential witnesses (also attached hereto as Exhibit "SS"); see also Complaint, as alleged in the shareholder action at Paragraph 99, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota* (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

"corporate visits" in which Medtronic would invite targeted surgeons to attend training sessions in Memphis, Tennessee. While in Memphis, the visiting surgeons met with Medtronic corporate officers, product managers, and guest surgeons, such as Lawrence "Larry" G. Lenke, M.D. and Keith H. Bridwell, M.D. The visiting surgeons also received "hands-on training" on Infuse®, including instruction in cadaver labs. The visiting surgeons "would bring up the use of Infuse® and ask how to use it, and [the guest surgeons] would show them how to do it." Medtronic chose which surgeons to invite to these corporate visits based, in part, upon the volume of Infuse® procedures they performed.[204]

### 2. U.S. District Court Judge Paul Magnuson Determined That Statements Made By Confidential Witnesses Supported Allegation Of Medtronic's "Off-Label" Promotion Activities

509. Judge Magnuson found that following statements were in fact made by former Medtronic employees:

a. "*Medtronic did provide information to doctors about appropriate doses of Infuse® for off-label use,*" stated by Chris Powell;[205]

b. "*Medtronic showed its sales staff how to use Infuse off-label so that they could support the safe use of the product, stated by Chris Powell;*"[206]

c. "*Medtronic instructed its sales representatives to refer doctors to the Office of Medical Affairs with questions about dosages in off-label uses, but that if a physicians had a question about dosage in the operating room, the sales representative could answer the question to "support patient safety,"* stated by Kirk Riley;[207]

d. "*[i]t is true that I attended surgical procedures involving Infuse in the operating room, and if asked questions by the doctors concerning the procedure, I would answer his questions to the best of my ability as part of my role to support patient safety, stated by Kirk Riley;*"[208]

---

[204] Complaint, as alleged in the shareholder action at Paragraph 140, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota.* (also attached hereto as Exhibit "J").

[205] Memorandum and Order at 8, Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "SS").

[206] *Id. at* 9.

[207] *Id. at* 10.

[208] *Id. at* 11.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

e. In reference to a doctor's inquiry about "off-label" uses with information about other surgeons using the product "off-label", Scott Baumer disclosed, *"that when faced with such questions about off-label use, his 'practice was simply to suggest that the doctor making the inquiry talk directly to the other doctor;"*[209]

f. Chris Eddy disclosed, in relation to directing inquiring doctors to others who were using Infuse® "off-label," *"he and sales representatives he supervised would direct physicians to Medtronic's Office of Medical Affairs;"*[210]

g. Charles Koenig states his *"impression was that [Infuse] was used in off-label procedures;"*[211] and

h. Derek Crim, who worked for Medtronic in 2008 stated that Medtronic set sales quotas that were *"very, very, very aggressive."*[212]

510.    On February 1, 2012, Judge Magnuson upheld Chief Magistrate Judge Boylan's holding that Confidential Witness 2 had waived any Fifth Amendment privileges in the documents being sought.[213]

511.    Thereafter, on March 30, 2012, Medtronic agreed to pay $85 million to settle the shareholder lawsuit pertaining to alleged illegal "off-label" over-promotion of Infuse®.[214]

## L. "OFF-LABEL" USE OF INFUSE® IN THE LUMBAR SPINE IS NEITHER SAFE NOR EFFECTIVE AND IS UNREASONABLY DANGEROUS AND DEFECTIVE

512.    Susan Levine, a Vice President at Hayes, Inc., a company which evaluates medical technologies for insurers, expressed concern over Medtronic's handling of Infuse®.

513.    Upon her review of the research conducted on Infuse®, Ms. Levine stated that it is "distressing to see something like this used in a potentially harmful way and without adequate

---

[209] *Id. at* 13.

[210] *Id. at* 10.

[211] *Id.* at 18.

[212] *Id.* at 20.

[213] Order at 1-2, Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "TT").

[214] Medtronic to settle suit for $85 million, (Mar 30, 2012), *available at* http://www.startribune.com/business/145214355.html (also attached hereto as Exhibit "UU").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

evidence."[215]

514.    Prior Medtronic-sponsored studies demonstrated that the use of Infuse® outside of the PMA's limited approval presented serious adverse events and risks to patient safety.

515.    Dr. David Malone, a surgeon from Oklahoma involved with an earlier study (led by Medtronic's secret agent Regis Haid, M.D.) had first-hand experience with the adverse effects of "off-label" use.

516.    Dr. Malone had two patients who suffered from significant posterior bony over-growth impinging on their nerve roots as a result of "off-label" use of Infuse®, and who subsequently required revision surgeries.

517.    Dr. Malone noted these adverse events by stating, "BMP may lead to excessive bone growth and may cause significant neural impingement if placed in the posterior lumbar interbody space."[216]

518.    The study that Dr. Malone was involved in was abruptly discontinued due to bony overgrowth at the annulotomy site.

519.    A computed tomography scan evaluation detected new bone growth in the spinal canal or neuroforamina in 24 of 32 rhBMP-2 patients.[217]

520.    Subsequent studies have indeed shown that 25% to 50% of PLIF surgeries are riddled with complications and adverse events.[218]

521.    Medtronic was well aware of the dangers of "off-label" use.

522.    In a May 15, 2006 article in *The Spine Journal* notes, "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces...Although this phenomenon has not been thoroughly studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction."[219]

---

[215] Medtronic Product Linked to Surgery Problems, (Sept 4, 2008), *available at* http://online.wsj.com/article/SB122047307457096289.html (also attached hereto as Exhibit "VV").

[216] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 481, 463-468 (2011) (also attached hereto as Exhibit "WW").

[217] *Id.* at 480.

[218] *Id.* at 487.

[219] Patel W, et al., *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein Stimulated Bone*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

523.    Thousands of patients have been reportedly harmed by "off-label" uses of Infuse®.

524.    At least 3,585 reports of adverse events involving Infuse® have been made to the FDA as of March 2013,[220] and approximately 85-90% of all surgeries using Infuse® are "off-label".[221]

525.    It is well know by the FDA that adverse events involving medical devices to be well underreported. "A 1986 General Accounting Office (GAO) study showed that less than one percent of device problems occurring in hospitals are reported to FDA, and the more serious the problem with a device, the less likely it was to be reported. A GAO follow-up study in 1989 concluded that despite full implementation of the Medical Device Reporting (MDR) regulation, serious shortcomings still existed."[222]

## M. DESPITE THE LACK OF SAFETY AND EFFECTIVENESS AND THE UNREASONABLY DANGEROUSNESS OF "OFF-LABEL" USE OF INFUSE®, MEDTRONIC PROMOTED AND MARKETED "OFF-LABEL" USE OF INFUSE® TO PHYSICIANS INCLUDING THROUGH KEY OPINION LEADERS, WITHOUT OBTAINING FDA APPROVAL TO DO SO

526.    Medical device companies look for surgeons who are known as "Key Opinion Leaders" and who will use a high volume of their devices.

527.    Key Opinion Leaders are physicians whose opinions on medical procedures and medical devices are held in high regard.

528.    If these influential physicians are willing to promote the use of a certain device, it is thought that other surgeons will follow suit, even if the promoted use is "off-label" and not FDA-approved.

529.    Medtronic cultivated financial relationships with Key Opinion Leaders, paying them

---

*Growth Using Fibrin Glue*, Spine Journal Vol. 31, 1201-1206 (2006) (also attached hereto as Exhibit "XX").
[220] MAUDE – Manufacturer and User Facility Device Experience, *available at* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/search.CFM.
[221] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 3, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").
[222] http://www.fda.gov/medicaldevices/safety/reportaproblem/default.htm (also attached hereto as Exhibit "YY").

handsomely (in the case of Infuse®, these figures can exceed $30 million, per physician) for consulting fees, disguised royalties, travel expenses, seminars, and other perks, in order to encourage and reward these physicians for promoting the use of a particular medical device like Infuse®.

530.    Medtronic did not only engage in such activities with respect to Infuse® in general; it improperly paid doctors specifically to promote, both directly and indirectly, the "off-label" use of Infuse® in spinal fusion surgeries.

## N. MEDTRONIC DIRECTLY MARKETED, WARRANTED, AND MISREPRESENTED THE SAFETY AND EFFICACY OF "OFF-LABEL" USE OF INFUSE® ON MEDTRONIC-OWNED WEBSITES, WITHOUT OBTAINING FDA APPROVAL

### 1. Medtronic Misrepresented The Efficacy Of Infuse® On Medtronic.com And Infusebonegraft.com, Which Was A Violation Of Federal Law And The PMA Received For Infuse®

531.    Medtronic misrepresented the efficacy of Infuse® directly to physicians through its corporate sponsored websites.

532.    Medtronic misrepresented the efficacy of Infuse® directly to potential patients through its corporate sponsored websites.

533.    Medtronic through its website, www.Medtronic.com, falsely claims that "[b]one formation remote from the site of the implantation was not seen in the clinical trails."[223]  As of the date of the filing of this complaint, Medtronic holds this information out to the public.

534.    Medtronic is fully aware of multiple studies which have confirmed uncontrolled ectopic bone growth following a fusion using Infuse®.

535.    Medtronic's website exaggerates the side effects of Infuse® alternatives.

536.    Medtronic misleads viewers through the bolded section "**I have heard people talk about**

---

[223] Questions and Answers – Infuse Bone Graft and LT Cage Device, *available at* http://www.medtronic.com/patients/lumbar-degenerative-disc-disease/surgery/questions-and-answers/index.htm (also attached hereto as Exhibit "ZZ").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**hip pain after harvesting lasting up to 2 years or longer.  Is that true?"**[224]

537.    Medtronic knows or should know that it is a violation of federal law and the Infuse® PMA to make representations about the use of an approved Class III medical device that goes beyond the "intended uses" set forth in the premarket application as well as the approved labeling.

538.    A recent United States Senate Report, released October, 2012 uncovered that fears relating to "donor site" hip pain were manufactured by one of Medtronic's Vice Presidents and is quoted as saying "plant the seed of doubt" in regards to pain from autograft bone harvesting.[225]

539.    Medtronic warrants a 94.5% fusion rate with Infuse® compared to autograft's 88.7% on the company sponsored website www.infusebonegraft.com.[226]

540.    The purported success rates are derived from two studies provided on the website. Medtronic paid five of the seven authoring physicians of these articles collectively $76,603,827 in various forms of compensation.[227]  Medtronic did not adequately disclose their financial relationship with these physicians, and it failed to provide accurate and unbiased information to physicians and patients on its corporate sponsored website.

## 2. Medtronic Directly Marketed The "Off-Label" Use Of Infuse® On Back.com, Which Was A Violation Of Federal Law and The PMA Received for Infuse®

541.    Following FDA Approval of Infuse®, Medtronic published a website providing back pain resources, including surgical and non-surgical treatment options.  The website highlights the fact that its information is "brought to you by Medtronic."[228]

542.    Surgical options described on the website include Spinal Fusion, ALIF, DLIF, PLIF, and

---

[224] *Id.*

[225] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 2, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

[226] Clinical Research – Infuse® Bone Graft LT-Cage® Device, *available at* https://www.infusebonegraft.com/clinical_research (also attached hereto as Exhibit "AAA").

[227] Dr. Burkus $6,380,336, Dr. Gornet $3,985,776, Dr. Dickman $3,272,942, Dr. Zdeblick $34,168,739, and Dr. Boden, $28,796,034; U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

[228] http://www.back.com (also attached hereto as Exhibit "BBB").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

TLIF.[229]

543.    Medtronic posted a section on June 27, 2002 entitled "Surgery from the Front or Back: Is There a Difference?"

544.    The author, Dr. Thomas Schuler, discussed the benefits and complications related to ALIF (approved use of Infuse®) and PLIF (an "off-label" procedure when used with Infuse®).[230]

545.    Dr. Schuler first discussed the complications related to a PLIF surgery conducted without the advantages afforded by Infuse®. He shares that PLIFs frequently require an autograft, which is bone generally removed from the pelvis or iliac crest of the patient using either chisels or different awls and further states:

> *[t]he reason for taking the autograft is that it is very effective and is the gold standard for use in the fusion surgery that we have had to date.* ***The problem with the removal of this bone is that it can be very painful. In fact, around 25% of patients who have had this bone graft procedure have some sort of chronic pain associated with the graft site after surgery.***[231] (emphasis added)

546.    Dr. Schuler then describes the benefits of Infuse®, asserting the following:

> the ***beauty of this substance is that it will allow us to obtain a solid fusion without any of the complications of harvesting bone graft.*** *In essence, surgeons get the same or better results without the problems.*
> *For patients who are petrified of pain and bone grafts, this is wonderful news.*[232]

547.    In February of 2009, Medtronic published an entire section on this website dedicated to the benefits of PLIF, a procedure that is "off-label" if used with Infuse®.[233]

548.    Medtronic wrote that "PLIF is a type of spine surgery that can be performed in a minimally invasive way" and "involves approaching the spine from the back (posterior) of the body to place ***bone graft material*** between two adjacent vertebrae (interbody) to promote bone growth that joins

---

[229] Back,com, Treatment Options, Jan. 15, 2002, *available at* http://www.back.com/treatment.html (also attached hereto as Exhibit "CCC").

[230] Dr. Thomas Shuler, *Surgery from the Front or Back: Is There a Difference*, Back.com, June 27, 2002, *available at* http://www.back.com/article-schuler.html?infusebox=true (also attached hereto as Exhibit "DDD").

[231] *Id.*

[232] *Id.*

[233] *Posterior Lumbar Interbody Fusion (PLIF)*, Back.com, Feb. 19, 2008, *available at* http://www.back.com/treatment-surgical-posterior.html (also attached hereto as Exhibit "EEE").

together, or "fuses" the two structures (fusion)." (emphasis added).[234]

549.    Medtronic further asserted that this "minimally invasive procedure allows many patients to be discharged the day after surgery" and that "[m]any patients will notice immediate improvement of some or all of their symptoms."[235]

550.    In 2004 Medtronic-sponsored a study heralding the benefits of a PLIF surgery performed with Infuse®.[236]

551.    As of 2007, Infuse® was used in at least 40% of PLIF surgeries.[237]

552.    In 2010, Medtronic published a section on its sponsored website that was dedicated to Direct Lateral Interbody Fusion (DLIF), an "off-label" procedure when used with Infuse®.  Similar to PLIF, the article claimed that "DLIF is one of several minimally invasive spine procedures available today and is an approach to interbody fusion [that] offers surgeons and their patients a less invasive option for spine surgery."[238]

553.    The website also provides the corroborative insight of Dr. Richard Hynes, who declares that "DLIF is another 'next-generation' step in the process" of spinal fusion.

554.    Dr. Hynes enthusiastically recommends that a patient considering DLIF or any other spinal fusion should "[d]o you homework!" and "talk to your doctor, go to reputable Web sites such as Back.com to learn all about the procedure as well as any other options that are available."[239]

555.    Medtronic posted a section on its website dedicated to Transforaminal Lumbar Interbody Fusion (TLIF), stating "TLIF is a procedure that can be performed using minimally invasive spine surgery."[240]

556.    The sections on the website related to PLIF, DLIF and TLIF do not refer to the use of

---

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned,* 11 Spine J. 472, 471-91 (2011) (also attached hereto as Exhibit "FFF").

[238] *Direct Lateral Interbody Fusion – A Minimally Invasive Approach to Spinal Stabilization* Back.com, Feb. 4, 2010, *available at* http://www.back.com/treatment-surgical-direct.html (also attached hereto as Exhibit "GGG").

[239] *Id.*

[240] *Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

ICBG harvested from the patient, but rather refers to *"bone graft material"* that can facilitate **"minimally invasive"** spinal surgery.

557.    According to Medtronic-sponsored studies on PLIF and the previously posted article published on Back.com, a surgery using ICBG is anything but "minimally invasive."

558.    According to Medtronic, ICBG is surgery accompanied by a litany of complications related to harvesting the bone graft from the patient's hip.

559.    Medtronic's omission of the need for bone harvesting and the existence of adverse effects related to PLIF, DLIF and TLIF on its sponsored website Back.com is thus an "off-label" promotion for Infuse®, since the procedures can only be accomplished as advertised through the "off-label" use of Infuse®.

560.    Medtronic has since used Back.com to actively promote the use of PLIF, DLIF, and TLIF as a surgical option while sponsoring studies that exaggerated the complications associated with non-Infuse® PLIFs, violating federal law and the PMA restrictions.

561.    Medtronic's misleading statements, along with repudiated Medtronic-sponsored studies regarding the "off-label" use of Infuse®, evidences Medtronic's over-promotion of the use of Infuse® in "off-label" spinal fusion, made with full knowledge that such statements are highly misleading.

### 3. Medtronic Directly Marketed And Misrepresented The Safety Of "Off-Label" Use Of Infuse® On Necksurgery.com, Another Medtronic-Owned Website, Which Was A Violation Of Federal Law And The PMA Received For Infuse®

562.    Medtronic published Necksurgery.com touting the website as "[t]he online resource for questions about neck pain, spinal health and treatment options." This site conspicuously states that it is "brought to you by Medtronic."[241]

563.    Necksurgery.com lists several surgical options for the neck, which include Anterior Cervical Discectomy with Fusion (ACDF), an "off-label" surgery when performed with Infuse®.

564.    Navigating the site brings a list of links "Articles."[242]

565.    One of these articles is entitled "INFUSE® Bone Graft/PEEK Interbody Spacer/Anterior

---

[241] Neck Surgery http://www.necksurgery.com (also attached hereto as Exhibit "HHH").

[242] *See* http://www.necksurgery.com/treatment-surgical-fusion.html (also attached hereto as Exhibit "III").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Cervical Plate Clinical Trial Underway." This page was published February 13, 2008 and updated September 07, 2011. For nearly two pages, the article heralds the benefits of Infuse®, stating that "[o]ver 500,000 patients have been successfully treated since FDA approval in 2002," and that "[o]ver 15 FDA-approved clinical trials have been performed using INFUSE Bone Graft, making it the most studied biologic agent available to surgeons today."

566.    However, 13 of the 15 studies referenced have been repudiated for gross bias and inaccurate disclosures of adverse effects.[243]

## O. LEADING SPINE EXPERTS REPUDIATE MEDTRONIC STUDIES

567.    On June 1, 2011 *The Spine Journal,* a leading medical journal in the United States, published a special edition entirely dedicated to addressing serious patient safety and ethical concerns stemming from the use of rhBMP-2 (Infuse®) in spinal surgeries.[244]

568.    The Journal's articles discussed Medtronic's failure to accurately report the serious side effects from its clinical trials.

569.    The Journal's articles discussed Medtronic's failure to report that many of the authors had failed to disclose that they had received substantial compensation and had significant financial ties to Medtronic and that Infuse® can lead to severe side effects.

570.    This special edition analyzed thirteen peer-reviewed articles about rhBMP-2 by industry-sponsored authors, including many sponsored by Medtronic, finding that these articles had inaccurately reported the safety and risks associated with rhBMP-2.

571.    It is without precedent that the journal devoted **the entire issue** to setting the record straight by repudiating the prior Medtronic-sponsored Infuse® research.

572.    These studies universally touted the benefits of Infuse® and simultaneously failed to disclose the adverse events associated with its use.

573.    In an editorial summarizing the findings of the special issue, five prominent physicians-- including spine surgeons at Stanford University--wrote that the earlier Medtronic-sponsored trials and

---

[243] *See* Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned,* 11 Spine J. 471, 471-91 (2011) (also attached hereto as Exhibit "FFF").
[244] *Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

reports were "remarkable for the complete absence of reported rbBMP-2-related clinical adverse events." In fact, the initial studies did not report "a single adverse event associate with rhBMP-2 use in 780 protocol patients."[245]

574.    The leading physicians further remarked, "*none* of the original estimates of safety for any of the rhBMP-2 applications proved accurate." (emphasis added).[246]

575.    And further, that the studies "underestimated the risks of rhBMP-2 use despite indication from the earliest trials." For example, the Medtronic-sponsored articles falsely omitted mention of adverse events which were evident from the earliest trials, including "inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement."[247]

576.    The Medtronic-sponsored studies also omitted mention of sterility and cancer risks associated with rbBMP-2.[248]

577.    One of the most damaging aspects of this article was the disclosure that the risk of adverse events associated with rhBMP-2 is actually "*10 to 50 times the original estimates*" reported in the Medtronic-sponsored peer-reviewed publications as revealed by the unbiased review of the data. (emphasis added).[249]

578.    According to the Medtronic-sponsored studies Infuse® adverse events are *less than one-fortieth (1/40)* the adverse events of a commonly used anti-inflammatory (such as ibuprofen or aspirin) or antibiotic medications.[250]

579.    These Medtronic-sponsored trials suffered from multiple flaws, including idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.[251]

---

[245] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 464, 466, 463-468 (2011) (also attached hereto as Exhibit "WW").

[246] *Id.* at 463.

[247] *Id.* at 464.

[248] *Id.*

[249] *Id.*

[250] Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned,* 11 Spine J. 472, 471-91. (2011) (also attached hereto as Exhibit "FFF").

[251] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

580.     According to *The Spine Journal* editorial, the thirteen Medtronic-sponsored articles reported only successful fusions and low rates of complications with Infuse®. The reviewing physicians opined that the articles "may have promoted widespread and poorly-considered on-label and off-label use, along with eventual life-threatening complications and deaths."[252]

581.     The actions of Medtronic failed the medical industry and patients as Dr. Spengler, former Editor-in-Chief of the *Journal of Spinal Disorders*, contends, "the core of our professional faith…is to first do not harm. It harms patients to have biased and corrupted research published. It harms patients to have unaccountable special interests permeate medical research. It harms patients when poor publication practices become business as usual. Yet harm has been done."[253]

582.     One author asserts that industry sponsored studies, such as these by Medtronic, have "devolved into information laundering operation."[254]

583.     The table below shows that the original 13 studies performed by Medtronic influenced physicians reported zero adverse events out of 780 clinical patients. According to these studies, not a single adverse event was attributed to Infuse®. In other words, the product was falsely marketed as perfect.[255]

---

*living dangerously with the promotion of bone growth factors,* 11 Spine J. 463, 466, 463-468 (2011) (also attached hereto as Exhibit "WW").

[252] *Id.*

[253] *Id.* at 466.

[254] *Id.* at 466.

[255] *Id.* at 473.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

| Authors | rhBMP-2 Placement | rhBMP-2, n | rhBMP-2 Adverse events (%) | Authors comment regarding rhBMP-2–related observed adverse events in study patients |
|---|---|---|---|---|
| Boden et al. [2] | Anterior interbody (LT-cage, lumbar, rhBMP-2) | 11 | 0 | "There were no adverse events related to the rhBMP-2 treatment" |
| Boden et al. [3] | Posterolateral (lumbar, ± instrumentation) | 20 | 0 | "There were no adverse effects directly related to the rhBMP-2..." |
| Burkus et al. [5] | Anterior interbody (LT-cage, lumbar, INFUSE) | 143* | 0 | "There were no unanticipated device-related adverse events..." |
| Burkus et al. [6] | Anterior interbody (bone dowel, lumbar, INFUSE) | [24]² | 0 | "There were no unanticipated adverse events related to the use of INFUSE Bone Graft." (2002) |
| Burkus et al. [39] | | 79 | 0 | None reported (2005) |
| Burkus et al. [40] | Anterior interbody (LT-cage, lumbar, INFUSE) | 277 | 0 | None reported |
| Baskin et al. [7] | Anterior interbody (cervical, INFUSE) | 18 | 0 | "There were no device-related adverse events" |
| Haid et al. [8] | Posterior interbody fusion (lumbar, INFUSE) | 34 | 0 | "No unanticipated device-related adverse events occurred" |
| Boakye et al. [41] | Anterior interbody (cervical, INFUSE) | 24 | 0 | "Analysis of our results demonstrated the safety and efficacy of this combination of cervical spine fusion therapy.... a 100% fusion rate and nonsignificant morbidity" |
| Dimar et al. (2009) | Posterolateral (lumbar, INFUSE, pedicle screws) | 53 | 0 | None reported |
| Glassman et al. [42] | Posterolateral (lumbar, AMPLIFY, and pedicle screws) | [148]² | 0 | None reported |
| Dimar et al. [10] | Posterolateral (lumbar, AMPLIFY, and pedicle screws) | 239 | 0 | "No adverse event that was specifically attributed to the use of rhBMP-2 matrix in the study group was identified" |
| Dawson et al. [11] | Posterolateral (lumbar, INFUSE, and pedicle screws) | 25 | 0 | None reported |
| Total | All types | 780 | 0 | 99% CI <0.5% adverse event rate |

Original industry-sponsored or industry-associated author rhBMP-2 clinical studies and reported adverse event rates because of rhBMP-2

**1. *The Spine Journal* Identifies Financial Inducements Paid To Medtronic's Secret Agents Who Acted Ostensibly As "Research Physicians" But Collectively Received Hundreds Of Millions Of Dollars From Medtronic For Their "Opinions"**

584.     The median known financial compensation that Medtronic has paid to authors is $12 million-$16 million per study (range, $560,000-$23,500,000).[256]

585.     One or more authors were found to have financial relationships with Medtronic in excess of $1 million for all studies reporting more than 20 patients who received BMP-2.

586.     For studies reporting more than 100 patients receiving BMP-2, one or more authors had a financial relationship with Medtronic in excess of $10 million.[257]

587.     One such study has been openly criticized for inconsistencies thought to be attributed to Medtronic's financial involvement.  In response to the Haid, *et al* study regarding PLIF "off-label" uses,

---

[256] *Id.* at 473.
[257] *Id.* at 475.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Dr. Spengler, former Editor-in-Chief of the *Journal of Spinal Disorders* commented that he doubted "the [Haid, *et al.*] article would have been written in such positive terms by authors without financial ties to Medtronic."[258]

588.    Others have also suspected a fundamental bias in the reporting offered by Medtronic-sponsored studies of BMP-2, calling one article "more of a marketing paper than an objective scientific study."[259]

### 2. Medtronic-Sponsored Studies Exaggerated The Morbidity Of Traditional Auto-Graft Harvesting Fusion, Thereby Exaggerating The Relative Benefits Of Infuse®

589.    Two recent reports suggest that the morbidity of ICBG harvesting was exaggerated in the Medtronic-sponsored studies described immediately above.  Medtronic-sponsored trials estimated that the long-term harm associated with ICBG harvesting was 60%.[260]

590.    However, two subsequent independent reports have indicated that patients do not perceive more pain on the operative side of ICBG harvesting, compared with the non-operative side, even one year post-surgery.[261]

591.    Furthermore, an unsponsored study showed that at two years post-surgery, patients were actually less satisfied with their surgery when BMP was used, than when BMP was not used.  The unsponsored study demonstrated that patients had more bothersome symptoms, more functional impairment, and less satisfaction with BMP-2 surgery, than those who were treated with non-BMP-2, ICBG harvesting fusion.[262]

592.    The overestimation of morbidity rates by Medtronic-sponsored studies therefore inappropriately exaggerated the potential benefits of Infuse®.

### 3. Medtronic, In Their Sponsored Studies, Engaged In Various Activities That Resulted In The Published Studies Failing To Disclose The Actual Serious, Sometimes Life-Threatening Or Life-Altering Side-Effects Actually Observed In

---

[258] *Id.* at 486.
[259] *Id.* at 486.
[260] *Id.* at 485.
[261] *Id.* at 485.
[262] *Id.* at 480.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### Those Medtronic-Funded "Studies"

593.     An initial Medtronic-sponsored study failed to report any adverse events related to the use of BMP-2 in the cervical spine.

594.     Medtronic's failure to accurately report adverse events directly contributed to the prevalence of Infuse® in 2007, where 20% of all ACDF surgeries used Infuse®.

595.     The graph below demonstrates the overall "off-label" use of Infuse® in both the cervical and lumbar spine.[263]



596.     *The Spine Journal* reported that cervical fusions using BMP-2 carried a risk of complications approximately 40% to 50% higher than a cervical fusion conducted without BMP-2. A non-sponsored study also reported a 27.5% rate of "clinically significant" cervical swelling in cervical fusions where BMP-2 was used.[264]

597.     These significant and life-threatening complications arising from the use of BMP-2 in the

---

[263] Bozic, M.D., BMP Use: Evaluating Industry-Funded Trials, *available at* http://medicine.yale.edu/core/projects/yodap/463_117257_YODA_Project_Bozic_BMP_Use_02.06.12.pdf (also attached hereto as Exhibit "JJJ") *See also* U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 3, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").
[264] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 482, 463-468 (2011) (also attached hereto as Exhibit "WW").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

cervical spine prompted the FDA to issue a 2008 Public Health Notification regarding "off-label" use of Infuse® in the cervical spine.[265]

## P. MEDTRONIC, IN VIOLATION OF FEDERAL LAW AND THE INFUSE® PMA, CONCEALED AND/OR FAILED TO ADEQUATELY WARN OF THE SERIOUS ADVERSE EVENTS, DANGERS, AND INCREASED RISKS, ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE®

### 1. In Fact, A Subsequent Review Demonstrated The "Off-Label" Use Of Infuse® In Posterior Approaches Creates A 500% Increase In Inflammatory Reactions And At Least Three Times The Back And Leg Pain Compared To Iliac Crest Bone Graft (ICBG)

598.    The pilot study comparing the use of Infuse® to ICBG in a PLF approach, was lead by Medtronic's secret agent Scott Boden, M.D.

599.    Medtronic's secret agent Scott Boden, M.D. reported, *"there were no complications attributable to the rhBMP-2."*

600.    A subsequent review of the study's data by *The Spine Journal* showed that there were in fact adverse effect occurring with BMP-2 at a confidence of 80-90%.

601.    Wound problems were at least 10% higher with rhBMP-2 than ICBG in the pilot study, which is likely related to the inflammatory effect of rhBMP-2.

602.    A more recent study performed by the Scoliosis Research society found a 500% higher rate of both epidural hematoma and wound complications with rhBMP-2 when used in a posterior approach.[266]

603.    The human body can have a severe inflammatory response to bone morphogenetic protein. As the response progresses, fluid accumulates that causes damage to bone, resorption, cage migration, subsidence (sinking of the cage), compression to nerve roots, and/or leads to a non-union. The inflammatory response from a lumbar surgery and/or rhBMP-2 migrating can damage the cauda equina

---

[265] *Id.* at 482.
[266] *Id.* at 476.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

leading to neurogenic bladder, bowel/bladder incontinence, and retrograde ejaculation.

604.    An additional Medtronic-sponsored study published in 2009 reported that the posterolateral approach did not present any adverse events related to rhBMP-2.

605.    Subsequent review of the data revealed nearly three times as many back and leg pain adverse events with the use of rhBMP-2.[267]

### 2. Medtronic-Sponsored Studies Failed To Report Catastrophic Ectopic Bone Growth, Reoperation, Radiculitis, Osteolysis, Resorption And Loss Of Alignment Related To The Use Of Infuse®

606.    Medtronic's secret agent Regis Haid, M.D. received $25,549,813[268] from Medtronic between 1996 and 2010.

607.    Medtronic's secret agent Regis Haid, M.D. led a Medtronic-sponsored study that was peremptorily halted.

608.    Medtronic's secret agent Regis Haid, M.D. reported, "no unanticipated device-related adverse events occurred."

609.    Medtronic's secret agent Regis Haid, M.D. asserted that no patient required reoperation because of an rhBMP-2 adverse event.

610.    Medtronic's secret agent Regis Haid, M.D. concluded that the study "confirmed the safety" of rhBMP-2 and suggested that the findings might "eliminate the need" for autograft in "successful PLIF."[269]

611.    These false and misleading statements and their promotion led to an increase in the use of "off-label" PLIF and TLIF fusions using Infuse®.[270]

612.    A subsequent review of this incomplete study renders a picture riddled with catastrophic

---

[267] *Id.* at 476.

[268] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

[269] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 463-468 (2011) (also attached hereto as Exhibit "WW").

[270] *Id.* at 480.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

adverse events that were not reported by the authors. In fact, ectopic bone growth in the spinal canal or neuroforamina occurred in 24 of 32 rhBMP-2 patients.[271]

613.    Shockingly, the physicians noted, "[a]lthough not desirable, bone formation in the spinal canal does not appear to have a discernable effect on the patient outcomes," and "the de novo rhBMP-formed bone occurred predictably, not compressing the neural structures." The authors surprisingly did not find the incidents of bony overgrowth to be a clinically significant concern.[272]

614.    An independent surgeon, Dr. Neil Kahanovitz, questioned the authors' interpretations, suggesting that they may have been "overwhelmed by their enthusiasm of using" rhBMP-2 in a PLIF procedure. Dr. Kahanovitz further noted:

> while there are lengthy discussion of various trends throughout this study, which imply the superiority of rhBMP over autograft…one fact remains: in every clinical measure examined in this study, there were no statistically superior outcomes in the rhBMP group except one, and the clinical significance of this one statistically significant finding is unclear.[273]

615.    Further, Dr. Kahanovitz disagreed with the authors' conclusion that the presence of bone growth in the spinal canal and foramina (the two apertures between vertebrae) in those patients who received rhBMP-2 had no clinical implications. Rather, Dr. Kahanovitz stated that, "most surgeons would be less than enthusiastic to see this statistically significant variable present in the majority of their patients."[274]

616.    Ectopic bone growth occurs when bone emerges exuberantly from the rhBMP-2 application site. This bone can compress the spinal cord or exiting nerve roots causing severe pain that radiates to the extremities, numbness/paralysis, urologic, or gastrointestinal injury.

617.    A review of the data at two (2) years post-surgery showed patients were less satisfied with

---

[271] *Id.* at 480.

[272] *Infuse cited in patients' painful bone overgrowth,* Journal Sentinel (June 2011), *available at* http://www.jsonline.com/watchdog/watchdogreports/124630959.html (also attached hereto as Exhibit "KKK").

[273] Commentary, Neil Kahanovitz, M.D., Haid RW, Branch CL, Alexander JT, Burkus JK. Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages. Spine J. 2004, 538, 527-538, Commentary *available at http://www.bmp2.com.br/BMPLiteraturas/Spine/Spine 2004 Haid INTERFIX PLIF commentary.pdf* (also attached hereto as Exhibit "LLL").

[274] *Id.* at 538-539.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

rhBMP-2 surgery than those with the traditional ICBG fusion.   Patients within the study who were exposed to rhBMP-2 appeared to have more adverse events than the ICBG patients, including functional impairment.[275]  Functional impairment can range from complete immobility to neuro deficit.  Neuro deficit can progress to paraplegia and occurs when a nerve has been damaged to the point that it is no longer capable of carrying an electrical impulse.  This can manifest as paralysis, paresthesia, dysesthesia, numbness, tingling, pins and needles, loss of fine motor skills, or falling down.

618.    Medtronic's secret agent Regis Haid, M.D. failed to include **any** data pertaining to patients requiring an additional surgery to remove ectopic bone growth.  Dr. Malone reported that two of his patients involved in the study "had significant posterior bony over-growth impinging on their nerve roots requiring additional surgery."  One of these patients required two surgeries "to clear excessive bone formation from his spinal canal."  Rather than disclose this critical safety information, Medtronic's secret agent Regis Haid, M.D. chose to contrive the findings of his study and "confirmed the safety" of rhBMP-2.[276]

### 3. Medtronic-Sponsored Physicians Failed To Disclose Adverse Events Related To Osteolysis, Subsidence, And Reoperation Related To The Use Of Infuse®

619.    Medtronic-sponsored studies related to rhBMP-2 failed to report adverse events that occurred within the trial period.

620.    Subsequent independent reviews of Medtronic-sponsored studies showed osteolysis, subsidence, and reoperation occurred in patients exposed to rhBMP-2.

621.    End-plate failure, a catastrophic destruction of the spine, was observed within the first four (4) months after surgery using rhBMP-2 and was not reported by the sponsored authors.[277]

622.    Aggressive resorption or osteolysis keeps hardware from attaching to bone, thus leading to a non-union. This can affect the interbody cages or the rods and screws that support a posterolateral fusion.  Without the underlying structural support of the fusion hardware, the spine can become grossly unstable, exacerbating degenerative changes and injuring adjacent levels.  When the interbody cages fail

---

[275] *Id.* at 480.
[276]*Id.* at 480-481.
[277] *Id.* at 477.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

to fuse to the spine, they can migrate, impinging on the spinal cord or exiting nerve roots, or sink (subside) into the vertebra causing disc space collapse.

623.    A further review of an original study lead by Medtronic's secret agent J. Kenneth Burkus, M.D. published in 2002 and 2004 revealed that subsidence, which occurred in seven patients within two years of the surgery, was not disclosed in the original or initial follow-up study, but rather were only parenthetically reported nearly six years later.

624.    In fact, subsidence was not listed at all in the 2002 study. However, four of the seven non-reported patients with subsidence required an additional surgery directly related to their fusion with rhBMP-2. Strikingly, 22 additional surgeries were required for patients in this Burkus study specifically relating to device failure.

625.    Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report **any** of these adverse events or revision surgeries in his Medtronic-sponsored study.[278]

### 4. Medtronic-Sponsored Physicians Failed To Disclose An Alarming Rate Of Retrograde Ejaculation Related To The Use Of Infuse®

626.    Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report the association of retrograde ejaculation with Infuse® in ALIF procedures.[279] Retrograde ejaculation is an injury that affects a male while engaging in sexual intercourse. With retrograde ejaculation, semen is not expelled through the penis, rather it is diverted into the urinary bladder. This process is painful, and can lead to sterility and infection.

627.    When Medtronic's secret agent J. Kenneth Burkus, M.D. was questioned about this in a "Letter to the Editor Inquiry" he dismissed any relationship between Infuse® and retrograde ejaculation and instead attributed the debilitating adverse event to surgical complication/approach.

628.    Data was eventually disclosed regarding the Burkus studies showing a 7.2% rate of retrograde ejaculation among men in ALIF procedures utilizing Infuse® in comparison to .06% rate in ALIF procedures using ICBG!

629.    The data regarding retrograde ejaculation related to three studies led by Medtronic's secret

---

[278] *Id.* at 480.
[279] *Id.* at 478.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

agent J. Kenneth Burkus, M.D., who did not release the data until seven years following the original publication. Subsequent studies corroborate a finding of approximately 6% to 7% of men are afflicted with retrograde ejaculation following an ALIF procedure using ICBG.[280]

### 5. Medtronic-Sponsored Studies Failed To Report Urogenital Adverse Events Were Twice As Likely To Occur Using Infuse® Compared To ICBG

630.    Four original Medtronic-sponsored studies related to ALIF procedures and Infuse® failed to report urogenital adverse events. A subsequent review of the data showed that 7.9% of ALIF procedures performed resulted in a urogenital adverse event.[281] Urogenital adverse events consist of bladder incontinence, neurogenic bladder, retrograde ejaculation, sterility, and erectile dysfunction. Urogenital injuries are caused when the lumbar spine is exposed to Infuse®, and/or the cauda equina is damaged.

631.    When a person suffers from urinary incontinence, the nerves are damaged to a point that the urinary sphincters are never triggered to close properly. This renders a person incapable of controlling the flow of urine out of the body.

632.    With neurogenic bladder, the effect is the opposite. The nerves are damaged to the point that they cannot release the sphincter, forcing urine to be retained in the bladder. If left untreated, urine can back up into the kidneys, causing a condition called hydronephrosis. When this occurs, the kidneys become saturated with urine causing lasting, and possibly life threatening kidney damage.

633.    Similarly, damage to the cauda equina by Infuse® following an ALIF procedure can also result in gastrointestinal injuries. Gastrointestinal injuries caused by Infuse® consist of bowel incontinence, neurogenic bowel (chronic constipation), gastroparesis, and Gastroesophageal reflux disease known as GERD (acid reflux). Like bladder incontinence, bowel incontinence occurs when injury is severe enough that the nerves that controlling the rectal sphincters no longer function properly. This makes it difficult or impossible for the person to retain stool.

634.    With neurogenic bowel, the opposite effect occurs, whereby the nerves that propel stool through the intestine no longer function properly. The stool remains in the intestine, causing severe and

---

[280]*Id.* at 478-479.
[281]*Id.* at 479.

chronic constipation.

635.    With gastroparesis, stomach motility is diminished, crippling the body's ability to move food from the stomach into the intestine.

636.    With GERD, the nerves are no longer able to regulate the amount of stomach acid that is secreted into the stomach.  This stomach acid can erode away at the lower esophagus causing pain and difficulty swallowing, and an increased risk of esophageal cancer.

### 6. Medtronic-Sponsored Physician/Authors Failed To Report Adverse Events That Occurred During A Clinical Trial For "Amplify", A Higher Dosed rhBMP-2 (Infuse®) Product

637.    In anticipation of seeking FDA approval, Medtronic sponsored a study of Amplify, another product manufactured by Medtronic that uses the same rhBMP-2 bone growth protein used in Infuse®.[282]  This study was led by Medtronic's secret agent John Dimar, M.D.  Amplify is a tripled dose of rhBMP-2 and was meant to be used in posterolateral spinal fusions.

638.    Similar to the previous Medtronic-sponsored studies, Medtronic's secret agent John Dimar, M.D. reported, "no adverse event that was specifically attributed to the use of rhBMP-2 matrix in the study was identified."

639.    A subsequent review of the trial published in 2010 identified several classes of serious adverse events, which appeared to be associated with Amplify but were not reported as such by Medtronic's secret agent John Dimar, M.D.[283]

640.    Medtronic's secret agent John Dimar, M.D. failed to report the "notably increased cancer rates in the Amplify group."  During the study using the higher dose of rhBMP-2, nine (9) new cancers were diagnosed.  The sponsored authors did not reveal this finding of increased cancer.

641.    In March of 2011, Medtronic disclosed that in December 2010, the FDA sent Medtronic a

---

[282] *U.S. nixes Medtronic bone graft product, shares down* (March 10, 2011) *available at* http://www.reuters.com/article/2011/03/10/medtronic-amplify-idUSN1016154820110310 (also attached hereto as Exhibit "MMM").

[283] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-483 (2011) (also attached hereto as Exhibit "WW").

non-approval letter regarding Amplify.[284]  The FDA reviewers stated "[t]he primary safety concern is the increased numbers of cancer events in patients treated with Amplify compared to the control group."[285]  A Medtronic spokesman stated that there is "no plausible biological mechanism for cancer induction."  However, lead authors of *The Spine Journal* report, **"the basic biology of growth factor signaling in carcinogenesis suggests that categorical denial is not supportable."** [286]

642.    Importantly, doctors often administer Infuse® for "off-label" use at levels significantly higher than the recommended dosage for on-label procedures, without being informed by Medtronic of the increased risks and dangers, such that the amount of rhBMP-2 in certain Infuse® approaches or exceeds that of Amplify®.

643.    Furthermore, Dr. Carragee of *The Spine Journal* described the stunning risks of cancer as, ***"[a]lmost certainly this is cancer promoting and not a carcinogenic,"*** he told Reuters in an interview, noting that exposure to a carcinogen takes many more years to result in disease as opposed to a cancer promoting  and enabling mechanism found within rhBMP-2.  More recent studies show that there is a 2.5 times greater risk of developing cancer one year after the product was used and a five (5) times greater risk after three years.[287]

## Q. UNITED STATES SENATORS QUESTION MEDTRONIC ABOUT UNREPORTED SIDE EFFECTS, FINANCIAL TIES TO CLINICAL INVESTIGATORS, AND "OFF-LABEL" PROMOTION AND MARKETING OF INFUSE®

644.    Despite Medtronic's $40 million dollar settlement in July 2006 settlement with the Department of Justice and Medtronic's $85 million dollar settlement in March 2012 with a group of

---

[284] *U.S. nixes Medtronic bone graft product, shares down* (March 10, 2011) *available at* http://www.reuters.com/article/2011/03/10/medtronic-amplify-idUSN1016154820110310 (also attached hereto as Exhibit "MMM").

[285] *FDA staff: Cancer a concern with Medtronic device* (Jul 23, 2010), *available at* http://www.reuters.com/article/2010/07/23/us-medtronic-spine-idUSTRE66M2U820100723 (also attached hereto as Exhibit "NNN").

[286]Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-483 (2011) (also attached hereto as Exhibit "WW").

[287] *Researcher sees cancer risk for Medtronic's Infuse,* Reuters (November 3, 2011), *available at* http://www.reuters.com/article/2011/11/03/us-medtronic-infuse-idUSTRE7A27GT20111103 (also attached hereto as Exhibit "OOO").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

shareholders, the United States Senate remained concerned with Medtronic's "off-label" marketing activities and related payments to doctors.   Both the United States Senate Special Committee on Aging and the Committee on Finance have directed Medtronic to answer their questions regarding Infuse.

**1. Medtronic's Payments To Doctors For The Promotion And Marketing Of Infuse®**

**"Off-Label" Sales Prompts Individual Inquiries From United States Senators**

645.    On September 30, 2008, U.S. Senator Herb Kohl, chairman of the Special Committee on Aging, sent a letter to Medtronic expressing concern over Medtronic's compliance with the July 2006 Settlement Agreement.[288]

646.    Senator Kohl's letter expressed several concerns:

*Earlier this year, your company's outside counsel provided the Committee with a written account of Medtronic's efforts to comply with the settlement agreement it reached with the United States Department of Justice (DOJ) concerning allegations that Medtronic and its subsidiary improperly compensated surgeons and physicians.  That account also addressed the corporate integrity agreement (CIA) that Medtronic and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those allegations.*

*In that same letter...Medtronic and its subsidiary both denied that "improper payments were made to physicians in the first place...much less that improper payments 'have continued.'"*

***Consequently, it was with concern that I read recent articles, in the Wall Street Journal and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by Medtronic to surgeons and physicians.***

*[C]ontinuing allegations are directly relevant to the Committee's oversight of inappropriate physician compensation practices within the medical device industry.  All of the major orthopedic device companies that settled with the DOJ over such allegations were required to publicly reveal information related to their payments to physicians.* ***Medtronic has articulated no specific reasons as to why it should be excused from making the same disclosures.*** (emphasis added).

---

[288] Letter, U.S. Senate, Senate Special Committee on Aging, Herb Kohl to Bill Hawkins, CEO Medtronic (Sep 30. 2008), *available at* http://www.pharmalive.com/sites/default/files/blogs/attachments/kohl-to-medtronic.pdf (also attached hereto as Exhibit "PPP").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

647.     Senator Kohl requested documentation of Medtronic's efforts to comply with the July 2006 Settlement Agreement, as well as interviews with corporate witnesses, *"given the ongoing, serious concerns publicly raised regarding the integrity and transparency of Medtronic's physician compensation practices."*

648.     Senator Kohl asked Medtronic to explain *"the circumstances that led Medtronic's former counsel to file suit against the company [alleging improper payments to physicians] and how that matter was subsequently settled."*

649.     On September 30, 2008 U.S. Senator Charles Grassley, on behalf of the Committee on Finance, sent a similar letter[289] to Medtronic expressing concern over its marketing of Infuse® and allegations that it had provided kickbacks to physicians who actively promoted Infuse®, noting that:

> Last week, the Wall Street Journal (WSJ)[290] reported allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to Alaska and patent royalties on inventions they played no part in." I would appreciate your assistance in better understanding these allegations and would like to take this opportunity to lay out my specific concerns and questions.
>
> [O]ne of the incentives Medtronic provided physicians was to include them on patents for medical devices and reward them with royalties, even though the physicians may not have contributed to the development of the product.

650.     Senator Grassley specifically addressed issues related to Medtronic's marketing of Infuse®:

> It was reported that Medtronic gave payments to physicians, in the form of consulting agreements, as a means of increasing sales of Infuse®. The allegations that Medtronic has been disguising these consulting agreements as inducements or kickbacks for physicians to use Infuse® are equally troubling. Likewise, this is a practice that I would like to better understand and I would like to know what if anything has changed since these reported events.

651.     Senator Grassley also questioned why several lawsuits against Medtronic pertaining to Infuse® remained under seal, and indicated that he would like to *"better understand the status of these*

---

[289]Senator Grassley's Letter to Medtronic Regarding Financial Relationships with Physicians, (Oct. 2, 2008), *available at* http://www.finance.senate.gov/newsroom/ranking/release/?id=10014db8-2710-44e9-8398-6bda246f08df,http://www.finance.senate.gov/newsroom/ranking/release/?id=10014db8-2710-44e9-8398-6bda246f08df (also attached hereto as Exhibit "QQQ").

[290] David Armstrong, *Lawsuit Says Medtronic Gave Doctors Array of Perks,* Wall St. J, Sept. 25, 2008, *available at* http://online.wsj.com/article/SB122230535985873827.html (also attached hereto as Exhibit "II").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

*lawsuits and the procedural process that has led to the current situation."*

### 2. The U.S. Senate Committee On Finance Launches An Investigation, In June 2011, Into Medtronic's Influence Over Clinical Investigators' Failure To Disclose Adverse Events

652.    The Senate Committee on Finance investigated whether Medtronic continued to misrepresent the adverse events caused by Infuse® and rhBMP-2, as well as the possibility that Medtronic improperly influenced the reporting of results collected from clinical trials and reporting regarding rhBMP-2.

653.    On June 21, 2011, Senators Charles Grassley and Max Baucus sent a letter to Medtronic on behalf of the Senate Committee on Finance requesting that Medtronic produce documents and communication pertaining to "adverse postoperative events and/or medical complications" resulting from the use of rhBMP-2.[291]   The letter also requested that Medtronic provide *"[a] detailed account of payments that Medtronic made to all Infuse® clinical investigators."*

654.    In the June 21 letter, Senators Grassley and Baucus state:

> *We're extremely troubled by press reports suggesting that doctors conducting clinical trials examining the safety and effectiveness of Infuse® on behalf of Medtronic were aware that Infuse®, a treatment commonly used in spinal surgery, may cause medical complications, but failed to report this in the medical literature.  This issue is compounded by the fact that some clinical investigators have substantial financial ties to Medtronic.*

655.    The Senators' letter also addressed concern related to inconsistencies arising from a Medtronic-funded study asserting:

> *that 75% of bone morphogenic protein 2 (BMP-2) patient experienced ectopic growth, where potentially harmful bone growth occurs outside of the fusion area.  The authors, who had financial ties to Medtronic, 'concluded that 'although not desirable,' the ectopic bone growth "did not appear to have an ill effect on patients."  However, in a separate 2008 study conducted without financial ties to Medtronic, 'neurological impairment occurred in five patients who had the same ectopic bone formation.'*

---

[291] Letter from Charles Grassley & Max Baucus to Medtronic (June 21, 2011), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=a7c974b6-b4b6-4e2c-a738-edcfac30fcb6 (also attached hereto as Exhibit "RRR").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

656.    The Senators cited an article in *The New York Times* that reported a recent study "found that men treated with Infuse developed a condition that causes temporary or permanent sterility at a far higher rate than men who received a bone graft." The Senators noted that this link to sterility was not reported in the original Medtronic-funded study.

657.    The Senators added:

> *We are also concerned that other severe side-effects of Infuse® and similar bone-growth products developed by Medtronic may have been unreported or under-reported in clinical literature. Reports have linked Infuse® to potentially fatal swelling in the neck and throat, and radiating leg pain. Concerns have also been expressed about a potential link to cancer.*

### 3. The U.S. Senate Also Inquires Into Medtronic's Practices Regarding Recalls And Post-Market Surveillance Of Infuse® And Clinical Investigators' Failure To Disclose Adverse Events

658.    Senators Herb Kohl, Charles E. Grassley, and Richard Blumenthal addressed further concerns over Medtronic's oversight of recalls and post-market surveillance of Infuse®, in a letter dated December 13, 2011:[292]

> *We take seriously our responsibility to protect the interests of our nation's health care consumers. We are writing today to request information on how your company handles recalls and post-marketing surveillance on your products…All health care consumers in the United States depend on companies such as Medtronic to deliver high-quality, safe, and effective products. Recently, your company has experienced safety issues, such as with your product Infuse. A researcher at Stanford University School of Medicine found a higher risk of cancer associated with Infuse, and there have been allegations that researchers who received funds from Medtronic, sometimes millions of dollars, did not report negative finding from clinical trials. We are concerned that consumers who have long relied on your products, are being adversely affected by these issues, both through the on-label and off-label use of the product.*

659.    Further, the Senators requested additional information pertaining to Medtronic's promotion of the "off-label" use of Infuse®

> a. *How does your company derive failure rates or rates of serious adverse events of medical devices?*

---

[292] Letter from US Senate to Omar Ishrak, Medtronic CEO (Dec.13, 2011), *available at* http://www.grassley.senate.gov/about/upload/Medtronic.pdf (also attached hereto as Exhibit "SSS").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

b. *What is the current estimate of the serious adverse event rate of Infuse? Please give rates for both on-label and off-label.*

c. *How many individual complaints has your company received about Infuse to date? What percentage of these complaints were for off-label usage?*

d. *Do you require physicians who receive funds from your company to disclose those payments to their patients before the patients receive one of your medical devices? If not, why not?*

**R. UNITED STATES SENATORS BAUCUS AND GRASSLEY'S INVESTIGATION OF MEDTRONIC REVEALS IN A U.S. SENATE REPORT RELEASED OCTOBER 2012 THAT MEDTRONIC MANIPULATED SCIENTIFIC STUDIES RELATING TO INFUSE® AND DISCLOSED THE PAYMENTS OF HUNDREDS OF MILLIONS OF DOLLARS TO THE "RESEARCHERS"**

660.    In October 25, 2012, the U.S. Senate concluded its official investigation of Medtronic, which sought to determine whether it had improperly influenced peer-reviewed studies on Infuse®. In response to demands made during the investigation, Medtronic provided over 5,000 documents related to the 13 BMP studies identified by *The Spine Journal* as sponsored by Medtronic.[293]

661.    The 16-month inquiry led the U.S. Senate to conclude:

a. "Medtronic was heavily involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles. Medical journals should ensure industry role contributions be fully disclosed."

b. "Medtronic paid a total of approximately $210 million to physician authors of

---

[293] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 1, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=81d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements."

c. "An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events possibly associate with Infuse in a 2005 Journal of Bone and Joint Surgery articles."

d. "Medtronic officials inserted language into studies that promoted InFuse as a better technique than taking a bone graft from the pelvic bone (autograft technique) by emphasizing the pain of the autograft technique."

e. Documents indicate that Medtronic prepared Dr. Hal Mathew's remarks to the U.S. Food and Drug Administration (FDA) advisory panel meeting prior to InFuse being approved. At the time, Dr. Mathews was a private physicians but was hired as a vice president at Medtronic in 2007.

f. Medtronic documents show the company unsuccessfully attempted to adopt weaker safety rules for a clinical trial studying InFuse in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck. [294]

662.    These findings prompted Senator Baucus to state "patients are at serious risk when companies distort the facts the way Medtronic has." [295]

663.    The U.S. Senate Report revealed the following multi-million dollars payments to physicians, totaling approximately $210,000,000 paid by Medtronic in the below chart. [296]

---

[294] U.S. Senate, Committee on Finance, Press Release, *Baucus-Grassley Investigation into Medtronic Reveals Manipulated Studies, Close Financial Ties with Researchers,* (October 2012), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "TTT").
[295] *Id.*
[296] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 6, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

| Year | Scott D. Boden | Charles L. Branch | J. Kenneth Burkus | Concept Properties, LLC [18] | Curtis A. Dickman |
|---|---|---|---|---|---|
| 1996 | $18,750.00 | — | — | — | — |
| 1997 | $75,000.00 | — | — | — | $5,003.70 |
| 1998 | $75,000.00 | $140,703.15 | $18,700.00 | — | $73,239.25 |
| 1999 | $86,957.00 | $49,238.87 | $34,712.12 | — | $130,352.64 |
| 2000 | $75,000.00 | $104,495.00 | $29,285.75 | — | $41,419.50 |
| 2001 | $73,750.00 | $150,000.00 | $149,920.00 | $636,182.00 | $56,960.00 |
| 2002 | $80,000.00 | $201,997.75 | $220,539.50 | $1,028,882.00 | $72,881.00 |
| 2003 | $82,500.00 | $180,219.99 | $268,742.50 | $1,226,179.00 | $316,215.00 |
| 2004 | $138,500.00 | $175,473.78 | $360,447.78 | $4,992,137.00 | $320,045.99 |
| 2005 | $1,364,100.00 | $127,087.44 | $331,070.44 | $13,141,165.00 | $339,338.00 |
| 2006 | $1,782,550.00 | $136,390.58 | $613,849.71 | $8,842,157.00 | $401,138.77 |
| 2007 | $3,400,875.00 | $114,159.39 | $719,281.84 | $9,683,098.00 | $383,192.00 |
| 2008 | $21,543,052.00 | $487,688.50 | $1,928,503.35 | $9,159,891.00 | $388,248.00 |
| 2009 | — | $460,319.35 | $732,563.85 | $7,117,112.00 | $355,809.00 |
| 2010 | — | $827,851.81 | $972,719.99 | $9,004,465.00 | $389,099.00 |
| Total | $28,796,034.00 | $3,155,625.61 | $6,380,336.83 | $64,831,268.00 | $3,272,941.85 |

| Year | John R. Dimar, III | Steven D. Glassman | Matthew F. Gornet | Regis W. Haid, Jr. | John G. Heller |
|---|---|---|---|---|---|
| 1996 | $6,250.00 | $6,250.00 | — | — | — |
| 1997 | $27,000.00 | $25,000.00 | $1,880.00 | $27,500.00 | — |
| 1998 | $50,000.00 | $50,000.00 | — | $216,842.44 | $10,892.00 |
| 1999 | $52,022.65 | $52,216.41 | $29,900.00 | $1,019,832.54 | $70,817.57 |
| 2000 | $50,000.00 | $50,976.43 | $16,369.97 | $1,507,242.15 | $30,000.00 |
| 2001 | $188,428.00 | $194,528.00 | $15,128.00 | $1,394,390.61 | $37,975.10 |
| 2002 | $100,100.00 | $71,750.00 | $4,762.00 | $1,669,745.11 | $1,161.73 |
| 2003 | $116,283.65 | $138,941.44 | $10,194.00 | $1,957,742.86 | $49,191.50 |
| 2004 | $104,043.67 | $146,137.07 | $17,924.00 | $2,484,450.94 | $42,957.44 |
| 2005 | $147,207.99 | $248,019.59 | $67,763.93 | $2,473,518.00 | $154,835.70 |
| 2006 | $236,306.95 | $155,753.16 | $238,787.49 | $2,454,569.00 | $149,215.39 |
| 2007 | $130,767.60 | $257,926.16 | $649,542.33 | $2,626,576.07 | $330,792.15 |
| 2008 | $234,094.50 | $187,605.50 | $1,181,039.87 | $2,467,911.23 | $288,957.11 |
| 2009 | $160,551.00 | $88,139.80 | $892,500.87 | $2,525,743.88 | $255,236.24 |
| 2010 | $163,310.20 | $75,019.80 | $859,983.76 | $2,723,749.13 | $352,404.36 |
| Total | $1,766,366.21 | $1,748,263.36 | $3,985,776.22 | $25,549,813.96 | $1,774,436.29 |

| Year | Inspire, LLC [19] | Gerald E. Rodts, Jr. | Volker Sonntag | Ensor E. Transfeldt | Thomas A. Zdeblick |
|---|---|---|---|---|---|
| 1996 | — | — | — | $12,500.00 | $95,185.34 |
| 1997 | — | — | $34,745.92 | $50,000.00 | $422,668.65 |
| 1998 | — | $25,065.54 | $207,622.16 | $56,196.00 | $838,794.89 |
| 1999 | — | $44,748.08 | $795,053.91 | $61,219.28 | $1,131,463.17 |
| 2000 | — | $ 152,496.47 | $1,756,041.55 | $56,170.90 | $1,037,381.49 |
| 2001 | — | $140,343.39 | $1,036,993.00 | $71,117.56 | $1,984,356.45 |
| 2002 | — | $172,278.04 | $1,646,050.49 | $115,315.16 | $3,471,930.41 |
| 2003 | — | $142,025.68 | $1,904,689.00 | $258,912.62 | $4,580,361.62 |
| 2004 | — | $161,149.02 | $2,728,639.00 | $299,477.72 | $4,447,269.00 |
| 2005 | — | $303,877.98 | $2,202,595.00 | $30,474.70 | $3,950,516.08 |
| 2006 | — | $396,139.57 | $2,090,998.00 | $206,388.76 | $3,469,863.71 |
| 2007 | $247,365.00 | $629,451.53 | $2,163,661.90 | $722,779.00 | $2,961,272.00 |
| 2008 | $329,998.00 | $581,984.26 | $2,271,477.00 | $548,584.74 | $2,521,170.00 |
| 2009 | $698,829.00 | $432,403.00 | $1,772,361.00 | $483,254.00 | $1,582,156.00 |
| 2010 | $1,632,813.00 | — | $2,241,156.00 | $589,930.00 | $1,674,351.00 |
| Total | $2,909,005.00 | $3,181,962.56 | $22,852,083.93 | $3,562,320.44 | $34,168,739.81 |

664.    In response to the Senate's finding that Medtronic failed to disclose payments of

120

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

enormous sums of money to physicians, many of whom were responsible for publishing articles regarding Infuse®, articles which have now been exposed by the U.S. Senate investigation to have been manipulated by Medtronic intentionally omitting the reporting of adverse events, Michael Heggeness and Charles Mick, president and first vice president of the North American Spine Society, applauded the Senate Committee's report.

665.    Significantly, the two preeminent surgeons remarks directly debunked what is claimed by Medtronic to be the "learned intermediary" defense, "If surgeons had known that the lead authors of the 13 original studies on InFuse had received payments ranging from $1.7 million to $64 million from Medtronic and that its marketing employees were co-authors and co-editors, would they have been so eager to use InFuse on their patients?"[297]

666.    As Doctors Michael Heggeness and Charles Mick observed, there is no way that a surgeon making the decision on what procedure and/or medical device to use for their patients, would use a procedure and/or medical device where the manufacturer of the device had paid the lead authors of the studies amounts ranging from $1.7 million to $64 million, and where the manufacturers own marketing employees were "secret" co-authors and co-editors of those very studies and resulting in the material distortion of the actual findings and results of those "studies."

667.    The federal judiciary has recognized a genuine risk that financial conflicts of interest induce bias in scientific research.  The Federal Judicial Center's key reference guide for judges considering scientific issues in their cases explains, "Judges and juries . . . must consider financial conflicts of interest when assessing scientific testimony.  The threshold for pursing the possibility of bias must be low."  Reference Manual on Scientific Evidence (Third) Preface (2011).[298]

668.    Research published in the *New England Journal of Medicine*, as well as other surveys, show that information brought by industry representatives to physicians impacts medical decision-making.[299]  Medtronic's misleading marketing of Infuse® to physicians, including Plaintiffs' surgeon,

---

[297] McCarthy, Michael, *US firm accused of manipulating journal articles and paying millions to authors,* (Oct 2012), BMJ 2012, *available at* http://www.bmj.com/content/345/bmj.e7299 (also attached hereto as Exhibit "UUU").

[298]Reference Manual on Scientific Evidence, 13, (2011) *available at* http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf (also attached hereto as Exhibit "VVV").

[299] Bernard Lo, M.D., Serving Two Masters – Conflicts of Interest in Academic, *N Engl J Med 2010, available at* http://www.nejm.org/doi/full/10.1056/NEJMp1000213 (also attached hereto as Exhibit "WWW").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

was designed to impact surgeons selections with the goal of expanding the market for Infuse® beyond FDA-approved uses. Medtronic consciously created this misleadingly marketing campaign even though they knew that it would expose patients, including Plaintiffs, to increased risks of danger and serious injuries.

669. The published articles listed below were repudiated by *The Spine Journal* and the authors' financial relationships with Medtronic were only discovered through their investigation and disclosed by the U.S. Senate Report.

670. **Medtronic paid its Secret Agent Scott Boden, M.D. $28,796,034.00 from 1996-2010.**

a. **Scott Boden** and Thomas A. Zdeblick et al., *The use of rhBMP-2 in interbody fusion cages. Definitive evidence of osteoinduction in humans*, 25 J. Spinal Disord. 376 (2000).

b. **Scott Boden** and John G. Heller et al., *Use of recombinant human bone morphogenetic protein-2 to achieve posterolateral lumbar spine fusion in humans: a prospective, randomized clinical pilot trial: 2002 Volvo Award in clinical studies*; 27 Spine 2662 (2002).

c. **Scott Boden**, Steven Glassman, John Dimar, Kenneth Burkus et al., *The efficacy of rhBMP-2 for posterolateral lumbar fusion in smokers*, 32 Spine 1693 (2007).

671. **Medtronic paid its Secret Agent Charles Branch, M.D. $3,155,625.61 from 1996-2010.**

a. **Charles Branch**, Regis Haid, Kenneth Burkus and J.T. Alexander., *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*, 4 Spine J. 527 (2004).

672. **Medtronic paid its Secret Agent J. Kenneth Burkus, M.D. $6,380,336.83 from 1996-2010.**

a. **J. Kenneth Burkus**, Michael F. Gornet, Curtis A. Dickman and Thomas A. Zdeblick, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

b. **J. Kenneth Burkus**, Ensor E. Transfeldt et al., *Clinical and radiographic outcomes of*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

*anterior lumbar interbody fusion using recombinant human bone morphogenic protein-2*, 27 Spine 2396 (2002).

c. **J. Kenneth Burkus**, S.E. Heim, Michael F. Gornet and Thomas A. Zdeblick, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-Cage lumbar tapered fusion device*, 16 J. Spinal Disord. Tech. 113 (2003).

d. **J. Kenneth Burkus**, Charles Branch, J.T. Alexander and Regis Haid, *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*, 4 Spine J. 527 (2004).

e. **J. Kenneth Burkus** and Matthew Gornet et al., *Use of rhBMP–2 in combination with structural cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion*, 87 J. Bone Joint Surg. Am. 1205 (2005).

f. John R. Dimar, Steven D. Glassman, **J. Kenneth Burkus** and Leah Y. Carreon, *Clinical outcomes and fusion success at 2 years of single-level instrumented posterolateral fusions with recombinant human bone morphogenic protein-2/compression resistant matrix versus iliac crest bone graft*, 31 Spine 2534 (2006).

g. **J. Kenneth Burkus**, Steven Glassman and John Dimar et al. *The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers*, 32 Spine 1693 (2007).

h. John Dimar, Steven Glassman, **J. Kenneth Burkus**, et al. *Clinical and radiographic analysis of an optimized rhBMP–2 formulation as an autograft replacement in posterolateral lumbar spine arthrodesis*, 91 J. Bone Joint Surg. Am. 1377 (2009).

h. **J. Kenneth Burkus** and Steven Glassman et al., *Recombinant human bone morphogenetic protein–2 on an absorbable collagen sponge with an osteoconductive bulking agent in posterolateral arthrodesis with instrumentation. A prospective randomized trial*, 9 J. Bone Joint Surg. Am. 1604 (2009).

673. **Medtronic paid its Secret Agent Curtis Dickman, M.D. $3,272,941.85 from 1996-2010.**

a. J. Kenneth Burkus, Michael F. Gornet, **Curtis A. Dickman** and Thomas A. Zdeblick,

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

*Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

674.    **Medtronic paid its Secret Agent John Dimar, M.D. $1,766,366.21 from 1996-2010. Medtronic also paid Concept Properties, LLC is a limited liability corporation owned in part by Medtronic's Secret Agent John Dimar, M.D. $64,831,268.00 from 1996-2010.**

a. **John R. Dimar**, Steven D. Glassman, J. Kenneth Burkus and Leah Y. Carreon, *Clinical outcomes and fusion success at 2 years of single-level instrumented posterolateral fusions with recombinant human bone morphogenic protein-2/compression resistant matrix versus iliac crest bone graft*, 31 Spine 2534 (2006).

b. Steven D. Glassman, J. Kenneth Burkus and **John R Dimar** et al. *The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers*. 32 Spine 1693 (2007).

c. **John R Dimar**, Steven D Glassman, J Kenneth Burkus, Philip W Pryor, James W Hardacker and Leah Y Carreon, *Clinical and radiographic analysis of an optimized rhBMP-2 formulation as an autograft replacement in posterolateral spine arthrodesis*, 91 J. Bone Joint Surg. Am. 1377 (2009).

675.    **Medtronic paid its Secret Agent Steven Glassman, M.D. $1,748,263.36 from 1996-2010. Medtronic also paid Concept Properties, LLC is a limited liability corporation owned in part by Medtronic's Secret Agent Steven Glassman, M.D. received $64,831,268.00 from 1996-2010.**

a. John R. Dimar, **Steven D. Glassman**, Kenneth J. Burkus and Leah Y. Carreon, *Clinical outcomes and fusion success at 2 years of single-level instrumented posterolateral fusions with recombinant human bone morphogenic protein-2/compression resistant matrix versus iliac crest bone graft*, 31 Spine 2534 (2006).

b. **Steven D. Glassman**, J. Kenneth Burkus and John Dimar et al. *The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers*. 32 Spine 1693 (2007).

c. John R Dimar, **Steven D Glassman**, J Kenneth Burkus, Philip W Pryor, James W Hardacker and Leah Y Carreon, *Clinical and radiographic analysis of an optimized*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

*rhBMP-2 formulation as an autograft replacement in posterolateral spine arthrodesis*, 91 J. Bone Joint Surg. Am. 1377 (2009).

d. J. Kenneth Burkus and **Steven Glassman** et al., *Recombinant human bone morphogenetic protein–2 on an absorbable collagen sponge with an osteoconductive bulking agent in posterolateral arthrodesis with instrumentation. A prospective randomized trial*, 9 J. Bone Joint Surg. Am. 1604 (2009).

676. **Medtronic paid its Secret Agent Matthew Gornet, M.D. $3,985,776.22 from 1996-2010.  Gornet Enterprises, LLC is a limited liability corporation owned in part by Medtronic's Secret Agent Matthew Gornet, M.D.**

a. J. Kenneth Burkus, **Matthew F. Gornet**, Curtis A. Dickman and Thomas A. Zdeblick, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

b. J. Kenneth Burkus, S.E. Heim, **Michael F. Gornet** and Thomas A. Zdeblick, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-Cage lumbar tapered fusion device*, 16 J. Spinal Disord. Tech. 113 (2003).

c. J. Kenneth Burkus and **Matthew Gornet** et al., *Use of rhBMP–2 in combination with structural cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion*, 87 J. Bone Joint Surg. Am. 1205 (2005).

677. **Medtronic paid its Secret Agent Regis Haid, M. D. $25,549,813.96 from 1996-2010.**
a. Charles Branch, **Regis Haid**, Kenneth Burkus and J.T. Alexander., *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages*, 4 Spine J. 527 (2004).

b. Gerald E. Rodts, **Regis Haid** et al., *Anterior cervical discectomy and fusion involving a polyetheretherketone spacer and bone morphogenetic protein*, 2 J. Neurosurg. Spine 521 (2005).

678. **Medtronic paid its Secret Agent John G. Heller, M.D. $1,774,436.29 from 1996-2010.**

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

a. Scott Boden and **John G. Heller** et al., *Use of recombinant human bone morphogenetic protein-2 to achieve posterolateral lumbar spine fusion in humans: a prospective, randomized clinical pilot trial: 2002 Volvo Award in clinical studies*; 27 Spine 2662 (2002).

679.    **Medtronic paid its Secret Agent Gerald E. Rodts, Jr., M.D. $3,181,962.56 from 1996-2010.**

a. **Gerald E. Rodts,** Regis Haid et al., *Anterior cervical discectomy and fusion involving a polyetheretherketone spacer and bone morphogenetic protein*, 2 J. Neurosurg. Spine 521 (2005).

680.    **Medtronic paid its Secret Agent Volker Sonntag, M.D. $22,852,083.93 from 1996-2010.**

a. **Volker Sonntag**, et al., *A prospective, randomized, controlled cervical fusion study using recombinant human bone morphogenetic protein–2 with the CORNERSTONE–SR allograft ring and the ATLANTIS anterior cervical plate*, 28 Spine 1219 (2003).

681.    **Medtronic paid its Secret Agent Ensor Transfeldt, M.D. $3,562,320.44 from 1996-2010. Additionally, Medtronic paid Inspire, LLC a limited liability corporation owned in part by Medtronic's Secret Agent Ensor Transfeldt, M.D. $2,909,005.00.**

a. J. Kenneth Burkus, **Ensor E. Transfeldt** et al., *Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenic protein-2*, 27 Spine 2396 (2002).

682.    **Medtronic paid its Secret Agent Thomas A. Zdeblick, M.D. $34,168,739.81 from 1996-2010.**

a. Scott Boden and **Thomas A. Zdeblick** et al., *The use of rhBMP-2 in interbody fusion cages. Definitive evidence of osteoinduction in humans*, 25 J. Spinal Disord. 376 (2000).

b. J. Kenneth Burkus, Michael F. Gornet, Curtis A. Dickman and **Thomas A. Zdeblick**, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages*, 15 J. Spinal Disord. Tech. 337 (2002).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

c. J. Kenneth Burkus, S.E. Heim, Michael F. Gornet and **Thomas A. Zdeblick**, *Is INFUSE bone graft superior to autograft bone? An intergrated analysis of clinical trials using the LT-Cage lumbar tapered fusion device*, 16 J. Spinal Disord. Tech. 113 (2003).

**1. High-Level Medtronic Employees Conspired With Medtronic's Secret Agent/Author J. Kenneth Burkus, M.D. To Intentionally Omit Serious Adverse Events From Medtronic-Funded Published "Studies"**

683.    Medtronic officials recommended against publishing "a complete list of adverse events possibly associated with Infuse."[300]  In 2004, Dr. Julie Bearcroft, the Director of Technology Management in Medtronic's Biologics Marketing Department, wrote an email to other high-level Medtronic employees stating:

> *I have made some significant changes to this document (some at the request of Dr. Burkus) both in format and content. . . .**How much information should we provide relative to adverse events?. . .You will see my [note] in the attached document but I don't think significant detail on this section is warranted.***

| From: | Bearcroft, Julie, PhD |
|---|---|
| Sent: | Wednesday, June 16, 2004 10:04:33 AM |
| To: | Treharne, Rick; Beals, Neil; Lipscomb, Bailey; McKay, Bill |
| CC: | Ma, Guorong; Peckham, Steve, Ph.D.; King, Vanja, Ph.D.; Woodward, Lyndsay; Hood, Tara |
| Subject: | Combined pilot & pivotal rhBMP-2/TCBD draft manuscript |
| Attachments: | Bone Dowel BMP superiority revision without tracking changes 061104.doc |

Please find attached a revised version of the combined bone dowel data paper. I have made some significant changes to this document (some at the request of Dr Burkus) both in format and content.

684.    The prior draft of the paper included material adverse events. However, Medtronic's secret agent J. Kenneth Burkus, M.D., deliberately and intentionally deleted these adverse events from

---

[300] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 2, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=81d112cb-230f-4c2e-ac55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

the final published report.

685.    This was confirmed by the findings of the Senate Investigation. The U.S. Senate Committee on Finance found that "**the adverse events were observed in the clinical trial and formatted in a detailed table. But following the advice of Bearcroft, this table of adverse events was not included in the published paper by J. Kenneth Burkus, M.D.**"[301]

686.    *The Spine Journal* scrutinized this particular Medtronic-sponsored study for failing to report any adverse events and for neglecting to mention that Medtronic funded three of the physician authors with more than $12 million.

687.    According to the Senate Report, "**Medtronic recommended against including information in the study** that was ultimately revealed to have an association between Infuse® and weakening that could lead to collapse of the bone and implant and required patients undergo additional surgery."[302]

### 2. Medtronic's Vice-President Of Biologic Marketing Worked In Concert With Authoring Physicians To Over-Emphasize The Pain In Alternative Spinal Treatments From Medtronic-Funded Published "Studies"

688.    Medtronic directly edited and even ghostwrote publications, which to the outside medical world, were ostensibly written by the named authors, promoting the use of Infuse® over the use of a bone graft by over stressing the pain at the donor site when using a bone graft and omitting the injuries that were actually observed when Infuse® was used.

689.    The Senate Report uncovered documents that show "**Medtronic edited draft publication to stress the pain patients experienced from undergoing a bone graft procedure** instead of receiving Infuse."

690.    Neil Beals, Medtronic's Vice President of Biologic Marketing, sent emails to authoring physicians in two separate studies suggesting that more emphasis be placed on the elimination of "donor site" pain when the surgeon elected to use Infuse® instead of a bone graft.[303]

---

[301] *Id.* at 2, as confirmed in the United States Senate Report.
[302] *Id.* at 9-10, as confirmed in the United States Senate Report.
[303] *Id.* at 11, as confirmed in the United States Senate Report.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

691.    Following these studies, Medtronic's website promoted the benefits of Infuse® over traditional iliac crest bone grafts stating, that "[a]ccording to numerous studies, the harvesting procedure is actually more painful than the fusion itself, and nearly a third of patient experience hip pain two years following surgery."[304]  However these studies only included such information after persistent insistence by the Medtronic's Vice President.

692.    Vice President Beals worked directly with Medtronic's secret agent J. Kenneth Burkus, M.D. and encouraged him to include information emphasizing the pain related to the "donor site."

693.    After reviewing a draft of Medtronic's secret agent J. Kenneth Burkus, M.D.'s study, Vice President Beals emailed Dr. Burkus stating "a bigger deal should be made of elimination of donor site pain with Infuse."

694.    Nearing publication, Vice President Beals again sent an email suggesting, *"would it be appropriate to make a bigger deal out of donor site pain."*

| From: | Neil Beals |
|---|---|
| Sent: | Friday, March 8, 2002 04:04:43 PM |
| To: | J. Kenneth Burkus |
| CC: | Tom Zdeblick M.D., Tara Hood; Bailey Lipscomb; Pete Wehrly; Bill Martin; Clark Charlton; Julie Bearcroft; ▮▮▮▮▮▮▮▮▮▮ |
| Subject: | FW: Open LT BMP manuscript |
| Attachments: | Final revisions OPEN LTCAGE BMP.1.doc |

- would it be appropriate to make bigger deal out of donor site pain and include more discussion and references?

695.    A sentence, at the apparent direct request of Vice President Beals was incorporated into the final published study stating, "[t]he use of rhBMP-2 is associated with high fusion rates without the need for harvesting bone graft from the iliac crest and exposing the patient to adverse effects associated with that procedure."[305]

696.    Again, Vice President Beals inserted comments encouraging discussion of donor site pain

---

[304] Fact Sheet, Medtronic Sofamor Danek, *available at* http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf (also attached hereto as Exhibit "A").

[305] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 12 S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=81d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

on a draft article co-authored by another Medtronic's secret agent Volker Sonntag, M.D.

697.    According to the Senate Report, Medtronic paid their secret agent Volker Sonntag, M.D. nearly $23 million dollars.  The article stated, "[b]y 12 months after surgery, the patients [sic] graft-site pain resolved…and no patient complained about the graft-site appearance."

698.    Despite this finding, Vice President Beals inserted comments on the draft stating, *"ALTHOUGH THE PATIENTS DID NOT COMPLAIN ABOUT APPEARANCE DIDN'T SOME STILL EXPERIENCE PAIN AT THE DONOR SITE? SEEMS LIKE RESIDUAL EFFECT OF DONOR SITE SHOULD BE NOTED."* (emphasis in original).[306]

699.    And if secret agent Volker Sonntag, M.D. didn't get it from the above communication from Vice President Beals, Beals wrote a subsequent email further thrusting Medtronic's involvement in the ghostwriting of the published studies.  In this subsequent email, Medtronic's Vice President wrote, *"I would also add in more discussion on donor site pain and need for osteogenetic graft **material (plant seed of doubt for just using allograft by itself)**."*(emphasis added).

| From: | Neil Beals |
|---|---|
| Sent: | Friday, August 30, 2002 01:23:35 PM |
| To: | Mark Marchan |
| CC: | Julie Bearcroft; Jim Van Hoeck; Bill McKay; Missy Taylor |
| Subject: | FW: Revised BMP paper and response |
| Attachments: | Resubmission Cervical BMP Paper 082902.doc; Resubmission Cervical BMP Paper 082302.doc; Response letter 2.doc; Rev 1.jpg |

- I would also add in more discussion on donor site pain and need for osteogenic graft material (plant seed of doubt for just using allograft by itself)

700.    These suggestions were incorporated into the final published version of the scientific article without mention of the nearly $23 million dollars Medtronic's paid their secret agent Volker Sonntag or of Medtronic's significant participation in the ghostwriting of the study.[307]

701.    Despite the two studies augmented by Medtronic's Vice President, the Senate Report cited studies that are in direct contrast with Medtronic's initial publications.  The Senate Report revealed

---

[306] *Id.* at 5, 12.
[307] *Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

that "spinal surgeons are beginning to question whether the "the oft-cited 'painful iliac crest donor site' is less serious and frequent than BMP enthusiasts would have us believe."[308]

702.     A 2011 study included in the Senate Report found that "[t]he incidence of pain over the iliac crest was similar in patients in which iliac crest was harvested and those in which no graft was harvested." This study, and those like it, are in direct contrast with what is said in the Medtronic's sponsored studies and therefore not only cast serious doubt on the benefits of using Infuse® over traditional iliac crest bone graft, but the veracity of Medtronic in general.[309]

### 3. Medtronic Employees (Including Its Director Of Marketing) Covertly Participated As "Peer-Reviewers" On Behalf Of The Physician Authors Named On The Paper And Secretly Instructed The Author To Remove All References To Adverse Events From Medtronic-Funded Published "Studies"

703.     The Senate Report found that "*Medtronic employees not only edited the draft manuscript to include comments supportive of Infuse®, they also covertly participated in the peer-reviewers on behalf of the physician authors named on the paper.*"

704.     Medtronic's secret agent J. Kenneth Burkus, M.D. "*sent a draft manuscript of the study to Medtronic officials asking for assistance with "further data analysis.*"

705.     Bill Martin, Vice President for Spinal Marketing Global Communications, and Medical Education at Medtronic made it clear to other employees that Medtronic would play a '***supporting cast' in assisting Dr. Burkus.*"

706.     Medtronic's secret agent J. Kenneth Burkus, M.D. informed Bill Martin that he "**wanted his name last (and all the neruo's first) so that it would be well accepted by the Neurosurgical community**."[310]

---

[308] *Id.* at 11.

[309] Hu, Serena S., *Commentary: Illiac crest bone graft: are the complications overrated? The Spine Journal,* June 2011, *available at* http://www.spine.org/Documents/TSJJune2011_Hu_Commentary.pdf (also attached hereto as Exhibit "XXX"); Howard *et. al., Posterior iliac crest pain after posterolateral fusion with or without iliac crest graft harvest, The Spine Journal, June 2011, available at* http://www.ncbi.nlm.nih.gov/pubmed/20947439 (also attached hereto as Exhibit "YYY").

[310] *Id.* at 15.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

-----Original Message-----
**From:** Martin, Bill
**Sent:** Wednesday, January 01, 2003 8:06 AM
**To:** Beals, Neil; Wehrly, Peter [ITD Div. Pres.]
**Cc:** Bearcroft, Julie; Charlton, Clark; Martin, Bill; DeMane, Michael; Lipscomb, Bailey
**Subject:** RE: PLIF Study Manuscript

A word of caution.
I'm pretty sure that on this paper Dr. Burkus just wants us to provide him the data he requested. Dr. Burkus mentioned that his plan for this paper was to do all the work, put Drs Haid, Branch and Alexander's names first, and then he plans to route it to them "as is" for approval. If they don't agree with the data, then they may of course take their name off. Dr. Burkus has done ground work with Charlie and Reg and they have indicated initially that they seem to be fine with this - I don't anticipate any issues between them. Dr. Burkus wanted his name last (and all the neuro's first) so that it would be well accepted by the Neurosurgical community. I know that he has talked in depth with Charlie about what the paper *should*, and equally important, *should not* include.

707.    Vice-President Richard Treharne also instructed Medtronic's secret agent Steven Glassman, M.D. to dramatically downplay references to what he referred to as complications, related to Infuse® by stating in an email, *"[a]gain its probably too late, but page 14 line 13 says "The high complication rate is alarming and warrants intense scrutiny." I think what you are trying to say is that the occurrence adverse events (not effects as in the title) in these patients was higher than expected and warrants further investigation."*[311]

| | |
|---|---|
| **From:** | Treharne, Rick |
| **Sent:** | Wednesday, December 15, 2004 04:29:48 PM |
| **To:** | Steve Glassman (E-mail) ████████ |
| **Subject:** | Article Reminder |

Again it is probably too late, but page 14 line 13 says "The high complication rate is alarming and warrants intense scrutiny." I think what you are trying to say is that the occurrence adverse events (not effects as in the title) in these patients was higher than expected and warrants further investigation.

708.    Vice President Richard Treharne (recipient of the original FDA approval letter for Infuse® in 2002) wrote an email to Medtronic's secret agent J. Kenneth Burkus, M.D. stating, *"[i]n looking over the data, I was impressed with how well the BMP patients actually did. So much so that I*

---

[311] *Id.* at 1055.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

*added a few paragraphs at the end that you may not agree with.*[312]

| From: | Treharne, Rick |
|---|---|
| Sent: | Friday, January 10, 2003 04:42:15 PM |
| To: | Burkus, J. Kenneth |
| BCC: | Lipscomb, Bailey; Ma, Guorong |
| Subject: | PLIF Study Paper |
| Attachments: | PLIF BMP paper.1.doc; Burkus PLIF Paper 01-09-03.doc |

In looking over the data, I was impressed with how well the BMP patients actually did. So much so that I added a few paragraphs at the end that you may not agree with, but which basically say that future studies are needed. I think the data support such a conclusion. I also took the liberty to add a paragraph about the neuro results and a discussion of the iliac crest pain vs. the anterior study. I also added an Acknowledgement section. Take a look and see what you think. You can delete or edit as you wish, or send it out for review by your co-authors.

709.    The additions to Medtronic's secret agent J. Kenneth Burkus, M.D.' study by Vice President Richard Treharne read in part: *"[i]n conclusion, this detailed, **independent review** of the results which represent the first of use osteoinductive proteins in a PLIF procedure are encouraging."*[313]

710.    All of the above were unknown to The Spine Journal's peer-review committee. However, following submission of the initial draft to *The Spine Journal,* the peer-reviewing physicians were critical of the article's "presentation of the study result." The bias added by Medtronic was so apparent that critiques by the peer-reviewers included: *"[u]nless the authors can discuss the results of this study in an unbiased manner, which they have not been able to do in its present form, this data should not be published."* Another reviewing physician stated, *"The manuscript is full of biased statements that are a reflection of the data evaluators-the company that markets the product...As it stands it is an advertisement for a specific product without significant scientific merit."*[314]

711.    In response to the concerns expressed by the peer-reviewing physicians, Medtronic's

---

[312] *Id.*
[313] *Id.*
[314] *Id.* at 16.

letter "**seemingly misled *The Spine Journal***" according to the U.S. Senate Report. In response to the letter from one of *The Spine Journal's* peer-reviewers, Medtronic assisted in a draft response noting, "[t]o help eliminate any potential bias, only one of the co-authors was a clinical investigator – the other three were independent reviewers of the data. Since these data are taken from a clinical IDE study sponsored by a company, only the company would have all the data in its database – data that is reviewed by FDA auditors. We don't believe any discussion of bias is needed for the text."[315]

712.    The U.S. Senate Report found that these "**independent reviewers**" - Medtronic's secret agents Regis Haid, M.D. and J. Kenneth Burkus, M.D. - received $7,793,000 and $722,000, respectively by the end of 2003 and a total of $31,930,150.79 by 2010.

713.    According to the Senate Report, the "draft letter, written at least in part by Medtronic on behalf of Dr. Burkus, did not disclose the company's role in directly editing the paper, nor did it disclose the magnitude of financial payments made to the supposed '**independent reviewers**.'"[316]

714.    The U.S. Senate Report also uncovered an email, between Medtronic's Senior Vice President and President for Europe, Canada, Latin America and Emerging Market, Michael Demane to Medtronic's Vice President Bill Martin. Realizing that Medtronic's significant involvement in editing and ghostwriting had been uncovered, Demane stated, "this is going to hurt more than help because of the reviewers [sic] comments. Too late to turn back tho [sic]," in response to an upcoming editorial criticizing the study.[317]

715.    Without shame or any sense of remorse or wrongdoing, Medtronic defends its secret collaboration with physician authors in two ways; first, Medtronic claims that "[s]ome of the employees who reviewed these articles resided nominally in the "Marketing" Department, but the employees are technically and scientifically trained who have earned doctoral or other advanced degrees in relevant disciplines and draw on deep expertise in the science of bone morphogenetic proteins."[318]

716.    Second, Medtronic had the temerity to attempt to defend its practice ghostwriting journal articles by asserting that "physicians – not Medtronic personnel-prepare draft manuscripts, select

---

[315] *Id.* at 17.
[316] *Id.*
[317] *Id.*
[318] *Id.* at 8.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

content, approve suggested modifications, and are responsible for the final article content that they submit for publication and review by the scientific community."[319]

717.    However, Medtronic paid authors such as their secret agent "authors" J. Kenneth Burkus, M.D. and Volker Sonntag $ 6.38 million and $28.85 million, respectively, between 1998 and 2010 in the form of consultant fees, royalties, and other compensation.[320]

718.    Medtronic's secret agent J. Kenneth Burkus, M.D. acting on behalf of Medtronic, co-authored 10 of the original 13 false studies.[321]

719.    Both Medtronic and the authoring physicians failed to disclose these financial relationships to the scientific community when they published these highly biased and now shown to be false "studies".

## S. THE YALE STUDY, PUBLISHED IN JUNE 2013, FUNDED WITH MILLIONS OF DOLLARS FROM MEDTRONIC, CONFIRMS THE LACK OF SCIENTIFIC INTEGRITY OF PREVIOUS COMPANY SPONSORED "STUDIES" OF MEDTRONIC'S INFUSE®

720.    Following the unprecedented findings by *The Spine Journal*, Medtronic under its new CEO, Omar Ishrak commissioned a subsequent review of the effectiveness of Infuse® and the integrity of their previously funded studies of Infuse® that had become the subject of significant controversy.

721.    In August 2011, Medtronic provided a $2.5 million grant to Harlan Krumholz, M.D. to fund the Yale University Open Data Access Project (YODA).[322]

722.    YODA's stated goal was to "increase transparency and enhance the public trust in industry-funded clinical trials by facilitating the independent assessment and dissemination of data relevant to the benefits and harms of drugs and devices."[323]

723.    Through YODA, Yale led independent and systematic reviews conducted simultaneously

---

[319] *Id.* at 8.
[320] *See id.* at 5.
[321] *See id.* at 6-7.
[322] Center for Outcomes Research & Evaluation (CORE), YODA Project, *available at* http://medicine.yale.edu/core/projects/yodap/index.aspx (also attached hereto as Exhibit "ZZZ").
[323] *Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

by two (2) independent teams of the entire body of scientific evidence regarding the safety and effectiveness of Medtronic's recombinant bone morphogenetic protein-2 (rhBMP-2) product. Each team reviewed all of the data independently of each other.

724.     In a public response to the initiation of the YODA study, twenty-one (21) preeminent spine surgeons voiced their concern about Medtronic's corruption of the independent study process. In an editorial *A biologic without guidelines: the YODA project and the future of bone morphogenetic protient-2 research*, published in *The Spine Journal* in October 2012. The surgeons stated in part:

> [a]s a specialty, *it is painful to consider how early prudent reporting of even the most obvious and suspicious adverse events might well have prevented a decade of serious complications* related to the use of rhBMP-2. In retrospect, we can see how false confidence in a reportedly perfect safety profile promoted a period of BMP-2 application in areas of greater and greater potential danger. . . And yet, given the legacy of questionable research and limitations in the primary body of rhBMP-2 data, there is a possibility that expectations of YODA have been exaggerated.[324] (emphasis added).

725.     The editorial by these twenty-one (21) preeminent spine surgeons further noted that: "clinical researchers cannot act as financially engaged business associates, and dispassionate investigators cannot be both credible authors and entrepreneurs in research involving human subjects...[m]any principal investigators in the Medtronic-sponsored trials had financial conflicts of unprecedented magnitude, the effect of which will be difficult to estimate, but nearly impossible to overestimate, in post hoc analyses."[325] (emphasis added).

726.     Even Dr. Krumholz, the creator of YODA, when told of the findings in the U.S. Senate Report (October, 2012) and while the YODA studies were still in progress, expressed his concerns stating, "This sounds eerily familiar to many of the transgressions we've read about from the pharmaceutical industry...It paints a picture of a company very heavily involved in the science; marketing contaminating the science; and the medical profession and researchers being complicit."[326] (emphasis added).

---

[324] Carragee EJ, *A biologic without guidelines: the YODA project and the future of bone morphogenetic protein-2 research,* 12 Spine J. 878, 877-80 (2012) (also attached hereto as Exhibit "AAAA").
[325] *Id.* at 878-79
[326] John Fauber, *Medtronic Helped Write, Edit Positive 'Infuse' Spine Studies*, (Oct 25, 2012), *available at* http://www.medpagetoday.com/PainManagement/BackPain/35551 (also attached hereto as Exhibit "L").

727.     In hopes to quell concerns of further impropriety, two academic teams, Oregon Health and Science University and University of York, conducted an independent review, on behalf of YODA, with full access to all of Medtronic's clinical trials, post-marketing and safety data regarding rhBMP-2.[327]

728.     Oregon Health and Science University stated that "[t]he primary aims of this report are 1) to estimate the effectiveness and harms of rhBMP-2 in spinal fusion in a systematic review using the individual patent data (IPD) when available, and 2) to assess reporting biases in published articles of industry-sponsored studies."[328]

729.     Oregon Health and Science University released their findings in June of 2013 and found that:

    a.    **"there was serious selective reporting and underreporting of adverse events in the published articles** for both rhBMP-2 and ICBG groups, especially in the Medtronic trials published early.

    b.    **The actual rates of adverse events were much higher than reported."**[329] (emphasis added).

730.     More specifically, the Oregon Health and Science University reported that the individual patent data (IPD) data contained "315 adverse events in the rhBMP-2 group and 274 adverse events in the autograft group two years after surgery."[330]

731.     These findings are in direct contrast with the published version of the Medtronic-sponsored studies, which simply reported either "no unanticipated device-related adverse events" or "no adverse events directly or attributable to rhBMP-2."[331]

---

[327] rhBMP-2 Project, Center for Outcomes Research & Evaluation (CORE), YODA Project, *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/overview.aspx (also attached hereto as Exhibit "BBB").

[328] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, Executive Sumary -1 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "CCC").

[329] *Id.* at Executive Summary - 9.

[330] *Id.*

[331] Eugene J. Carragee, Alexander J. Ghanayem, Bradley K. Weiner, *A challenge to integrity in spine publications: years of living dangerously with the promotion of bone growth factors,* 11 Spine J. 480, 482-83, 463-468 (2011) (also attached hereto as Exhibit "RR").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

732.    The study defined reporting bias as "…[the] incomplete or inaccurate reporting of study outcomes and encompasses publication bias, outcome reporting bias, multiple publication bias, location bias, language bias, time lag bias, citation bias, and others (e.g. ghostwriting, misrepresentation of facts, reframing)."[332]

733.    After comparing results reported in the published literature to individual patient data, the authors concluded that "[e]vidence of reporting bias in the published articles of industry-sponsored trials is *substantial.*"[333]

734.    Dr. Rongwei Fu, the lead author of the Oregon Health and Science University study, stated *"[w]e found a lot of reporting bias in [Medtronic's] published papers that tends to overstate the benefits and played down the risks."* Further, Dr. Fu said *"it was difficult to identify "clear indications" for using the product,* as Infuse® offered no additional benefits beyond the normal benefits of the spine surgery."[334] (emphasis added).

735.    The misrepresentations and bias were not contained only to the "benefits" of Infuse®. The authors noted that some publications overemphasized "donor site hip pain," which was only assessed in the control group patients and only on the side of their ICBG.[335]

736.    The authors recognized the consequences of this widespread reporting bias by stating "[s]uch underreporting and practice could affect the spine surgeons' ability to evaluate the balance between the benefits and harms of using rhBMP-2 and prevent informed consent."

737.    Following an independent review of Medtronic's data, Oregon Health and Science University study found that Infuse® had more adverse events and an increased risk associated with its

---

[332] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, 10 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "CCCC").

[333] *Id.* at Executive Summary 9.

[334] Christopher Weaver, *Studies Fail to Back Medtronic Spine Product*, The Wall Street Journal, (June 17, 2013), *available at* http://online.wsj.com/article/SB10001424127887323836504578551801689098558.html (also attached hereto as Exhibit "DDDD").

[335] Rongwei Fu et al., *Effectiveness and Harms of Recombinant Human Bone Morphogenic Protein-2 (rhBMP-2) in Spine Fusion: A Systematic Review and Meta-analysis, Executive Summary*, Oregon Health & Science University, Executive Summary - 9 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158786_OHSU rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "CCCC").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

use, when compared to the gold standard traditional ICBG.

738.    Specifically, the YODA reviewers from Oregon found that Infuse® resulted in:

a. an overall risk of cancer almost triple that of ICBG;[336]

b. contrary to a previously published Medtronic-sponsored study, Infuse® does not have a higher rate of success in Posterolateral fusions;[337]

c. Subsidence occurred in four times as many patients using Infuse® in comparison to ICBG;[338]

d. a cohort study reported more aggressive resorption of the graft and endplates in the rh-BMP-2 group compared with ICBG;[339]

e. 315 adverse events where found within studies in direct contrast to published results stating "no unanticipated device-related adverse events."[340]

739.    Furthermore, a meta-analysis of the IPD showed that "there was moderate strength of evidence of *no consistent differences between rh-BMP-2 and ICBG in overall success of fusion.*"[341] (emphasis added).

740.    This finding directly contradicts the false and misleading marketing materials provided by Medtronic directly to physicians and consumers on their websites which touted a greater fusion rates with Infuse® when compared to ICBG.

741.    The Oregon Health and Science University concluded "[there was] substantial evidence of reporting bias, no evidence that rhBMP2 is more effective than ICGB in spinal fusion, and some evidence of an association with important harms."[342]

742.    Further, Mark Helfand, MD, co-author of the report from Oregon Health & Science University discussed the results regarding Infuse® stating **"[i]t is hard to find a clear advantage for using it...When you add in the potential harms, it tips the scale further toward not using it."**[343]

---

[336] *Id.* at 62.
[337] *Id.* at Executive Summary - 9.
[338] *Id.* at 30-31
[339] *Id.*
[340] *Id.*
[341] *Id.*
[342] *Id.* at 86
[343] John Fauber, *Reports question benefit of Medtronic's spine* surgery product, (June 2013) *available at*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

743.    Similarly, YODA reviewers from the University of York, in York England stated that the three objectives of their independent review of Medtronic's data were to "1) [e]xamine the potential benefits of rhBMP-2; 2) Examine the potential harms of rhBMP-2; and 3) Assess the reliability of the published evidence base."[344]

744.    University of York, in June of 2013, published results that were similar to those of Oregon Health and Science University.  Their review found:

a. The use rhBMP-2 in spinal surgery had modest benefits when compared with ICBG surgery 24 months after surgery;[345]

b. a near doubling in number of cancers with rhBMP-2;[346]

c. heterotopic bone growth was 5.57 times more likely to occur in PLIF and TLIF spinal fusions using Infuse® as opposed to ICBG;[347]

d. osteolysis or bone destruction was 4.26 times more likely to occur in a TLIF and 3.17 times more likely in PLIF using Infuse® than in a spinal fusion using ICBG;[348]

e. retrograde ejaculation was 4.76 times more likely with Infuse® than with ICBG;[349]

f. hardware failure was as high as 8.37 times more likely to occur using Infuse® than with ICBG with a comparator like the Maverick disc system.[350]

g. Analyses of adverse event IPD from the Medtronic-sponsored trials showed some adverse events to be more common among rhBMP-2 patients...Arthritis, implant-related events, retrograde ejaculation, adverse wound events and neurological, urogenital and vascular events were also more common among rhBMP-2 patients;[351] and finally

---

http://www.jsonline.com/watchdog/watchdogreports/reports-question-benefit-of-medtronics-spine-surgery-product-b9935439z1-211874181.html (also attached hereto as Exhibit "EEEE").

[344] Jennifer V.E. Brown et al., Systemic review and meta-analysis of the safety and efficacy of recombinant human bone morphogenic protein-2 (rhBMP-2) for spinal fusion, Centre for Reviews and Dissemination University of York, 49 (2013), *available at* http://medicine.yale.edu/core/projects/yodap/rhbmp/463_158787_York rhBMP-2 Final Report.pdf (also attached hereto as Exhibit "FFFF").

[345] *Id.* at 49.

[346] *Id.* at xvi.

[347] *Id.* at 75.

[348] *Id.* at 76.

[349] *Id.* at 55.

[350] *Id.* at 79.

[351] *Id.* at xvi

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

h. University of York showed further concern stating, "[s]tudies published in the wider literature and post marketing data raise concerns about other adverse events not captured or easily apparent in the IPD provided, including heterotopic bone formation, osteolysis, retrograde ejaculation, urinary retention, and dysphagia. Owing the non-randomised nature of the studies and difference between them, the strength of this body of evidence is weak and findings should be interpreted cautiously."[352]

745.    University of York commented specifically on the reliability of Medtronic's published evidence stating, **"we found adverse events to be incompletely and inadequately described in the trial publications."[353]**

746.    Additionally, "comparing the CSR categories against the adverse events described in published journal articles suggests that *adverse event reporting across the Medtronic publications is relatively sparse and inconsistent.*"[354](emphasis added).

747.    Further, University of York found that the *"[p]ublished papers provided far less information than was available* in the confidential CSRs (or in the supplied IPD). The way in which the adverse data were presented in the literature was *highly inconsistent and the rationale for presenting some adverse events and not others was rarely clear*. Brief, vague statements in some publications that simply noted 'no unanticipated device-related adverse events' were inadequate and unhelpful. In our view, such statements, without supporting evidence, should not be considered acceptable for publication."[355](emphasis added).

748.    University of York stated further that *"[s]tudies published in the wider literature and post marketing data raise concerns* about other adverse events not captured or easily apparent in the IPD provided, including heterotopic bone formation, osteolysis, retrograde ejaculation, urinary retention, and dysphagia. Owing the non-randomised nature of the studies and difference between them, *the strength of this body of evidence is weak and findings should be interpreted cautiously.*"[356]

---

[352] *Id.* at 119.
[353] *Id.* at xvi.
[354] *Id.* at 100.
[355] *Id.* at 118.
[356] *Id.* at xvi.

749.     The main conclusion the University of York arrived at was that "rhBMp-2 seems to increase the chance of successful fusion, *according to Medtronic definitions*, but this does not translate to clinically meaningful benefits in pain reduction, function or quality of life."[357](emphasis added).

750.     The findings of the YODA reviewers did not go unnoticed. Medtronic manipulated the studies by creating a threshold definition of what constituted a fusion that is not accepted by the spine community but permitted Infuse® to have positive results in the "studies." Medtronic defined spinal fusion as a success or failure according to their own made-up definition. Medtronic's definition allowed for "translation of less than or equal to 3 mm and angulation of less than 5 degrees."[358] The Mayo Clinic defines spinal fusion as "...surgery to permanently connect two or more vertebrae in your spine, eliminating motion between them".[359]

751.     Other preeminent researchers and scientific journals also weighed in on the study results. Dr. Krumholz of Yale commented on the study findings stating that "*[e]vidence suggests that some data are not missing at random.*"[360]

752.     Christine Laine, editor-in-chief of *Annals*, said it now will be difficult for doctors to recommend BMP-2 since it was shown to offer no meaningful benefit over the traditional method used for spinal fusion.[361] Dr. Laines statement also further emasculates any claimed, learned intermediary defense.

753.     Further, U.S. Senator Max Baucus, chairman of the Senate Committee on Finance, said the new reports amounted to more evidence of "collusive relationships" between Medtronic and the doctors who wrote the questionable papers about Infuse. "If not for those relationships and the misleading studies they produced, patients might have gotten more effective treatments and avoided

---

[357] *Id.* at 119.

[358] Burkus JK, Gornet, MF, Dickman CA, Zdeblick TA, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages,* J. Spinal Disord. Tech, 2002; 15:337-39; (also attached hereto as Exhibit "Q").

359Spinal Fusion, Mayo Clinic *available at* http://www.mayoclinic.com/health/spinal-fusion/my01235 (also attached hereto as Exhibit "GGGG").

[360] Eugene Caragee, *Response to Long-Awaited YODA Report on Controversial Spinal Fusion Products,* The Spine Journal. (June 17, 2003), *available at* http://www.spine.org/Documents/Carragee_Statement_YODA_Reports_061713.pdf (also attached hereto as Exhibit "HHHH").

[361] John Fauber, *Medtronic $$$ Buy Reports That Slam Spine Product,* (Jun 17, 2013), *available at* http://www.medpagetoday.com/PainManagement/BackPain/39903 (also attached hereto as Exhibit "IIII").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

harmful side effects," Baucus said in a statement. "The bottom line is ailing patients should never have to fear they're being sold a bill of goods."

754.     In a press release following the release of the YODA study results, *The Spine Journal* announced, ***"[i]n a triumph of understatement, the YODA group informs us that ten years after its development 'it is difficult to identify a clear indication for BMP-2 use in spinal fusion.'"***

755.     Dr. Carragee, Chief Editor of *The Spine Journal* further explained in part:

> *To put the YODA finding in perspective, one must understand the carnival-like promotion that preceded BMP-2's fall from grace.* ***Market boosters advertised*** *that BMP-2 went beyond all other medical innovations.  Perhaps confusing Infuse*® *with penicillin or the polio vaccine, one zealot proclaimed:* '***Infuse, the single most successful biologic product ever launched in orthopedics and possibly ever in medicine.***'

> *It is astonishing to recall the lavish praise for BMP-2 use by some Medtronic-associated surgeons just a few years ago.* ***..Dr. Scott Boden declared, '[t]he age of BMP has arrived.'*** *Then within three months of FDA approval in July of 2002,* ***Dr. Thomas Zdeblich and Dr. J. Kenneth Burkus reported that Infuse had become their exclusive bone grafting method for anterior lumbar fusions:*** *"With it superiority,* ***InFuse Bone Graft may now become the new gold standard*** *for replacing autograft bone.*

> ***[A]n extraordinary merry-go-round of comprehensively conflicted faces are found where independent checks should have provided critical review.*** *In some instances, it seems the principal investigator with strong financial ties helped design a trial, and then acted as surgeons who monitored their own complications.  To complete the circuit the same surgeon/investigator would co-author the paper and then submit the manuscript for review to...well...himself as chief or section editor of the journal.  In some cases the editor in chief of the journal approving his own paper was also the developer and the royalty holder on products being investigated.*

> *And now the [Yale Open Data Access Project] group – echoing The Spine Journal's critical review from 2 years ago – tells us that important concerns about BMP-2 complications were 'underreported' or just missing.  As YODA project director Harlan Krumholz, MD, SM, delicately puts it,* ***'Evidence suggests that some data are not missing at random.'*** *Annals editors are more blunt:* ***'Early journal publications misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting.'*** *Ouch.*

756.     Dr. Carragee concludes:

> ***[i]t's ultimately disappointing that after 15 years of largely self-congratulatory***

Electronically Filed – City of St. Louis – October 01, 2013 – 10:19 AM GMT+00:00

*research, we have only indirectly discovered BMP-2' many potential complications…The suggested gap in our understanding if true, is simply appalling: these complications were systematically, 'misrepresented,' 'underreported' or just 'missing' from the first decade of publications.*[362] (emphasis added).

757.     However, Medtronic's reaction to the YODA results was, not surprisingly misleading and disingenuous.

758.     Following the release of the YODA studies, Omar Ishrak, CEO of Medtronic, publicly announcing as if YODA supported their methodology and past behavior, that over one million patients have used Infuse® and that the YODA study results "add to a growing body of evidence regarding INFUSE Bone Graft as a safe and effective treatment option for patients in approved indications for use." [363]

759.     In making this public announcement, CEO Ishrak deliberately ignored the undisputed fact that over 85-90% of Infuse® surgeries were "off-label", as a result of Medtronic's illegal marketing, promotion, and distribution of Infuse®. Nor did CEO Ishrak disclose that YODA, the United States Senate, and independent leading experts in the spine community, severely criticized Medtronic for their actions and even questioned the use of Infuse® in light of the serious adverse risks with a lack of any increased benefit or advantage over other available techniques.

760.     *The Journal of the American Medical Association* ("JAMA") published an article that appeared in the July 23, 2013 edition. JAMA is the most widely circulated medical journal in the world. The article addressed the YODA study. The title of the article accurately sums up the results: "Open Access to Data Closes the Book on Efficacy of Popular Bone-Graft Device."

761.     The article reports that YODA revealed Infuse® as product "has no clinical advantage over the traditional bone grafting methods." It further reports that both independent Universities found similar results, quoting York University's lead author Mark C. Simmonds; "[w]e think although we had different approaches, we did come up with similar findings [as the Oregon team]." The article reports that "[c]linically, Simmonds could not recommend using rhBMP-2." Finally, the Oregon Health and

---

[362] *Id.*

[363] Press Release, Infuse Bone Graft Remains Important Treatment Option (June 17, 2013), *available at* http://newsroom.medtronic.com/phoenix.zhtml?c=251324&p=irol-newsArticle&id=1830515 (also attached hereto as Exhibit "JJJJ").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Science University study team noted "earlier release of all relevant data would have better-informed clinicians and patients making medical decisions."[364]  The *JAMA* article is further recognition by the leaders of the medical community that Infuse® was misrepresented by Medtronic and its secret agent authors.

## T. RECENT STUDIES, RELEASED SEPTEMBER 4, 2013, RECOGNIZED RHBMP-2 EXPOSURE LEADS TO A FIVE- FOLD INCREASE IN CANCER

762.　　Doctors Eugene J. Carragee, Bradley K. Weiner, and other esteemed authors in the most recent study published in the September 4, 2013 edition of *The Journal Of Bone And Joint Surgery,* looking into the connection of rhBMP-2 and cancer, determined that the patients exposed to a 40 milligram dose of Infuse® experienced a 7.77% increase in risk of developing cancer in comparison to ICBG spinal fusions.  When multiple cancers in a single patient were not considered, five-fold (5) more patients developed one or more cancers when compared to ICBG.  Therefore, for every 17.4 patients, one patient developed cancer within two years of their spinal fusion using Medtronic's rhBMP-2.  More specifically, rhBMP-2 may play a role in the tumor progression of pancreatic and breast cancer cells and the epithelial-to-mesenchymal, enabling the tumor to penetrate more deeply in lung cancer.[365]

763.　　Notably the population for this cancer study was selected based upon its low risk or likelihood for developing cancer from other external factors.  The physician authors warn, "the cancer risk associated with rhBMP-2 may be greater in populations with a higher prevalence of indolent or in situ cancer (e.g., older individuals, those with a history of cancer or known concurrent cancer, and those with genetic or exposure-related predisposition)."[366]

---

[364] Mike Mitka, MSJ, *Open Access to Data Closes the Book on Efficacy of Popular Bone-Graft Device,* 359-340, (July 24, 2013) JAMA (also attached hereto as Exhibit "KKKK").

[365] Eugene J. Carragee, et al., *Cancer Risk After Use of Recombinant Bone Morphogenetic Protein-2 for Spinal Arthrodesis,* The Journal of Bone and Joint Surgery 1537-1544,  (July 2013) (also attached hereto as Exhibit "LLLL").

[366] *Id.*

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## U. ARTICLES FROM THE RECENT SEPTEMBER 2013 ISSUE OF THE SPINE JOURNAL DISCUSSES THE LACK OF EFFICACY, INCREASED RISKS, SAFETY CONCERNS, AND THE CORRUPTED INFUSE® STUDIES

764.      The September 2013 *The* Spine *Journal* editorial entitled "Moving forward after YODA", written by Eugene J. Carragee, M.D., Bradley K. Weiner, M.D., Eric L. Hurwitz, DC, Ph.D., and Mark L. Schoene, BS examined the safety concerns and the lessons learned of rhBMP-2.[367] In this article the authors stated the following in their conclusions:

- Our review discovered that rhBMP-2 appeared to work no better than iliac crest bone graph for fusion but that the potent growth factor did appear to have a number of potential drug- and implant- associated adverse events, including some very serious complications.

- The YODA findings confirmed the *TSJ* findings and, indeed, identified several additional research problems *including the apparent misrepresentation of effectiveness and safety in the early articles through selective and incomplete reporting and the fact that the research design limited the ability of the studies to precisely assess safety. They concluded that 'rhBMP-2 provided little or no benefit compared to bone graft and may be associated with more harms, possibly including cancer.'* (emphasis added).

- [W]e note that some of the YODA and the *Annals* editors suggest that there may be *no clear* indications for use.

- The YODA findings suggest that the entire research system, at least for commercial products, has broken down in a fundamental way and needs to be redesigned.

- It provides the clearest argument for reform of the current system and open access to data, to protect the health and safety of patients, and the ability of health-care providers to provide humane and effective treatment. *The BMP-2 issue is just the most recent example (eg Vioxx, Tamiflu, Paxil, Avandia) to show that questionable behavior has been going on in the medical research for years, resulting in publication/reporting bias, biased systematic reviews, and public health and patient harm."* (emphasis added).

- For all:  Really, it is about putting patient safety ahead of personal financial profit, professionalism pride/ego, and surgical convenience.

---

[367] Eugene J. Carragee, et al., *Moving forward after Yoda,* The Spine Journal 995 -997 (September 2013) (also attached hereto as Exhibit "MMMM").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

***The Spine Journal* "When Money Talks"**

765.      The September 2013 issue of *The Spine Journal*, has an article written by David J. Rothman, PhD and Shelia M. Rothman, PhD entitled "When money talks."[368]  In the article the authors concluded the following:

- Despite the explicit and detailed reports of extensive financial ties between physicians and researchers on the one hand and device and drug companies on the other hand… some recipients of industry largess continue to deny that these relationships are in any way problematic.

- *One outstanding case in point involves Medtronic-funded studies on BMP-2, as examined in 2011 in this journal.*  As many readers will know, critics found the results of the Medtronic studies so self-serving and incomplete that the company funded and released all its BMP-2 research data to the Yale University Open Data Access Project.  (emphasis added).

- In June 2013, the findings of two independent research teams were published, and one of them (Fu et al.) was particularly troubled by the effects of company-sponsored research.  'No trials were truly independent of industry sponsorship,' its author concluded.  'Earlier disclosure of all relevant data would have better informed clinicians and the public then the initial published trial reports did' [9].  So too, the editors of the Annals of Internal Medicine concluded that '*Early journal publications misrepresented the effectiveness and harms through selective reporting, duplicate publication and underreporting.*'  In other words, just as gifts bias the recipient, so apparently do research grants and consulting [10].  (emphasis added).

- In most cases, recipients of company largess are not being 'bribed'—they are being 'gifted.'

- The Yale University Open Data Access Project groups critical assessment of decade-old research was not only relevant to the company but also reflected back in stark terms on the original authors…

- *Patient welfare and scientific integrity are too important to allow bias to affect the research reports in journal articles, the prescribing habits of physicians, the content of lectures, the decisions of professional associations' guideline committees, and the choice made by formularies for drugs and devices.*  (emphasis added).

- Those denying or qualifying the reality and scope of the problem are in a losing position.  To be sure, scandals will inevitably recur.  The drive for income and profit, no matter what the cost, cannot be completely contained.

---

[368] David J. Rothman, et al. *When Money Talks*, The Spine Journal 998-1000 (September 2013) (also attached hereto as Exhibit "NNNN").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**The Spine Journal "Black, white, or gray: how different (or similar) are YODA and the Spine Journal reviews of BMP-2?"**

766.     In the September 2013 issue of *The Spine Journal* an NASS review article written by Christopher M. Bono, M.D., F. Todd Wetzel, M.D., on behalf of the North American Spine Society Executive Committee, endorsed by the North American Spine Society Section on Biologics entitled "Black, white, or gray: how different (or similar) are YODA and the Spine Journal reviews of BMP-2?" examined the outcomes and adverse events of BMP-2 comparing the studies and data used from the Yale University YODA study and the Spine Journal 2011study.[369]

767.     The publications reviewed were: (a) The 2011 The Spine Journal article by Dr. Carragee et al. entitled "A critical review of recombinant human bone morphogenetic protein-2 trials in spinal surgery: emerging safety concerns and lessons learned"; (b) The YODA article by Dr. Simmonds et al. entitled "Safety and effectiveness of recombinant human bone morphogenetic protein-2 for spinal fusion"; and (c) The article by Dr. Fu et al. entitled "Effectiveness and harms of recombinant human bone morphogenetic protein-2 in spine fusion".

768.     The authors reviewed the original Dr. Carragee studies because Dr. Carragee "concluded that 'Level I and Level II evidence from *original FDA summaries, original published data, and subsequent studies suggest possible study design bias in the original trials, as well as a clear increased risk of complications and adverse events to patients receiving rhBMP-2 in spinal fusion.*'  Furthermore, they documented that the '*risk of adverse events associated with rhBMP-2 is 10 to 50 times the original estimates reported in the industry-sponsored peer reviewed publications.*'" (emphasis added).

769.     In this recent article comparing the results of the Carragee studies with the YODA publications, the authors concluded that Carragee's original review was correct and was further corroborated by the YODA findings.  They stated:

> With careful examination of these findings, it appears that the concern of Carragee et al. [2] about leg pain in the early postoperative after surgery is substantiated by both reviews.  Regarding cancer risk, Fu et al. [5] found a stronger association than both

---

[369] Christopher M. Bono, et al., *Black, white, or gray: how different (or similar) are YODA and the Spine Journal reviews of BMP-2*, The Spine Journal 1001-1005 (also attached hereto as Exhibit "OOOO").

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Caragee et al. [2] and Simmonds et al…

770.     The authors went on to say:

Simmonds et al. [3] appear to be in agreement with Carragee et al. [2] regarding concerns of retrograde ejaculation, urogential complications, subsidence, infections, and implant-related adverse events (if this can be used as a proxy for osteolysis). Fu et al. [5] seem to corroborate these concerns, finding that retrograde ejaculation, subsidence, and urogential problems were more common with BMP…

The common conclusion of the three groups was that heterotopic (i.e., ectopic) bone formation was much more common with rhBMP-2…

771.     Finally, the authors said, "Suffice it to say that Fu et al. [5], similar to Carragee et al. [2], found instances in which 'no adverse events because of rhBMP-2' were reported when in fact IPD analysis found that they in fact did occur (and were recorded)."

## V. MEDTRONIC'S PARTICIPATION IN THE COVERING UP OF AND FAILURE TO ADEQUATELY WARN OF SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE® CAUSED PLAINTIFFS' INJURIES

772.     A manufacturer has the duty to provide adequate and timely warnings regarding increased risks and dangers associated with the foreseeable uses of its product.

773.     Medtronic knew that Infuse® was being widely used for non-approved uses, in non-approved ways, by untrained surgeons and in violation of federal law and the restrictions set forth in the PMA.

774.     Medtronic actively encouraged such use through its illegal promotional scheme and other illegal activities.

775.     Medtronic grossly failed to satisfy their duty mandated by federal law, the PMA, and state common law duties.

776.     Medtronic did not provide adequate and timely warnings or instructions regarding the "off-label" uses of Infuse®

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

777.    Medtronic directed/encouraged and helped to disseminate misleading and false information concerning the "off-label" use of Infuse®.

778.    Medtronic provided undisclosed financial incentives to lecturing physicians, authors of scientific and medical articles, and sales representatives.

779.    Medtronic purposefully concealed the serious increased risks and complications associated with "off-label" use of Infuse®;

780.    **Medtronic failed to take the required action when it learned that Infuse® was being used in ways and in a manner that was not approved and required by the PMA,** all of which is in direct violation of federal law and the PMA.

781.    Medtronic cannot and should not be permitted to absolve itself from liability by pointing to the "off-label" use of its device by physicians or by pointing to the FDCA or the MDA, claiming preemption, when it is Medtronic who chose to violate the law deliberately concealed its knowledge of the increased risks, complications, and the serious and dangerous adverse side effects associated with "off-label" use of Infuse®.

782.    Medtronic cannot and should not be permitted to absolve itself from liability by pointing to the off-label use of its device by physicians, when it is Medtronic who, in violation of federal law and the PMA, distorted the actual facts of the studies so as to conceal the true adverse events observed with the use of Infuse® as compared to that of other types of procedures and techniques, all while concealing Medtronic's involvement in that scheme.

783.    A medical device manufacturer only gets the benefits afforded by federal law, *i.e.* the FDCA and MDA, when it abides by federal law.

784.    Federal law requires that a medical device manufacturer submit to the FDA a premarket application for approval of a class III medical device, include proposed labeling, setting forth the proposed "intended uses" of the medical device.

785.    It is only the "intended uses" set forth by the device manufacturer in the premarket application that the FDA put through the premarket approval review process and ultimately passes on.

786.    If a medical device manufacture markets, promotes, distributes and/or sells a medical

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

device for uses other than the "intended use" that went through the FDA premarket approval process, those unapproved and un-reviewed uses are not afforded any of the benefits of federal law including the FDCA and MDA.

787.    Medtronic's aggressive marketing efforts influenced Plaintiff's physician to use Infuse® in an "off-label" manner.

788.    The degree to which Medtronic secretly promoted "off-label" Infuse® was so permanent and pervasive that "off-label" use in fact represented nearly 90% of all Infuse® sales.

789.    Medtronic's illegal promotion of Infuse® for "off-label" use and its concealment of material information regarding the risks associated with "off-label" use of Infuse® was therefore the proximate cause of Plaintiffs' injuries.

790.    Not only did Medtronic not provide the Plaintiffs' physician nor Plaintiffs with the necessary information in order to make an informed decision in the best interests of Plaintiffs' health, Medtronic intentionally and purposefully deceived Plaintiffs' physicians and the Plaintiffs as to the safety and efficacy of Infuse®.

791.    Medtronic did not discharge its duty, required by federal law, the PMA, and state common law duties to adequately and fully warn and inform Plaintiffs' physician and Plaintiffs of the known dangers and increased risks associated with the "off-label" use of Infuse® nor did Medtronic provide Plaintiffs' physician with adequate instructions for its use.

792.    Plaintiffs' physician and Plaintiffs reasonably relied, and did rely, on Defendants' misrepresentations and concealments.

793.    Moreover, Plaintiffs would not have consented to the "off-label" use of Infuse® had they been fully informed of its increased dangers, risks, and adverse consequence.

794.    As a direct and proximate result of Medtronic's fraudulent concealment and misrepresentations concerning material health and safety risks related to Infuse®, as well as Medtronic's reckless and irresponsible "off-label" promotion and marketing practices, Plaintiffs were permanently injured and suffered and will continue to suffer injuries, damages, and economic loss.

795.    As the direct, proximate and legal result of Medtronic's fraudulent concealment and

misrepresentations concerning material health and safety risks related to Infuse®, as well as Medtronic's reckless and irresponsible "off-label" promotion and marketing practices, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, physical and mental pain and suffering, and loss of the quality and enjoyment of life as a result.

## VI. EQUITABLE TOLLING/FRAUDULENT CONCEALMENT

796.  Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

797.    Medtronic's failure to document or follow up on the known defects of its products, and concealment of known defects, serious increased risks, dangers, and complications, constitutes fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiffs herein.

798.    Medtronic and the defendants named herein are estopped from relying on any statute of limitations defense because they continued to refute and deny reports and studies questioning the safety of Infuse®, actively and intentionally concealed the defects, suppressed reports and adverse information, crafted the published reports to falsely increase the benefits of Infuse® while falsely increase the adverse event profile of the alternative procedures and methods, failed to satisfy FDA and PMA requirements, failed to satisfy FDA and PMA notification requirements, and failed to disclose known dangerous defects and serious increased risks and complications to physicians and the Plaintiffs.

799.    Instead, Medtronic continued to represent Infuse® was/is safer, more effective and the best alternative for spinal fusion all the while they knew that this was absolutely false and not true, even after the United States Senate report and the YODA study were released.

800.    Medtronic and the defendants named herein did the above acts which were and are illegal under federal law, the PMA and parallel state law, to encourage surgeons to use Infuse® in "off-label" manners.

801.    Medtronic and the defendants named herein did the above acts which were and are illegal under federal law, the PMA and parallel state law, to encourage patients to permit their surgeons to use

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Infuse® in "off-label" manners.

802.     At all relevant times, Medtronic was under a continuing duty under federal law, the PMA and parallel state laws to disclose the true character, quality, and nature of the increased risks and dangers associated with Infuse®.

803.     As a result of Medtronic's concealment of the true character, quality and nature of their product, they are estopped from relying on any statute of limitations defense.

804.     Medtronic furthered their fraudulent concealment through act and omission, including misrepresenting known dangers and/or defects in Infuse® and/or arising out of the use of Infuse® and a continued and systematic failure to disclose and/or cover-up such information from/to the Plaintiffs, Plaintiffs' physicians, and the public.

805.     Medtronic's acts and omissions, before, during and/or after the act causing Plaintiffs' injury, prevented Plaintiffs and/or Plaintiffs physicians from discovering the injury or cause thereof until recently.

806.     Medtronic's conduct, because it was purposely committed, was known or should have been known by them to be dangerous, heedless, reckless, and without regard to the consequences or the rights and safety of the Plaintiffs.

## VII. GENERAL ALLEGATIONS

807.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

808.     At all relevant times, Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold and distributed by Medtronic.

809.     Medtronic negligently, carelessly, and/or recklessly manufactured, marketed, advertised, promoted, sold and distributed Infuse® as a safe and effective device to be used for spinal fusion surgery.

810.     Medtronic knew, and/or had reason to know, that Infuse® was defective, unreasonably dangerous, and not safe for off-label non-intended uses.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

811.    Medtronic knew, and/or had reason to know, that Infuse® was defective, unreasonably dangerous and not safe for off-label non-intended uses because the adverse events reported and scientific studies performed showed substantially increased risks of serious dangers.

**Representations**

812.    Medtronic promoted Infuse® for off-label surgeries that are outside of the intended uses approved by the FDA.

813.    Medtronic negligently, carelessly, recklessly, and/or intentionally promoted Infuse® for off-label surgeries that are outside of the intended uses approved by the FDA to physicians and patients, including the Plaintiffs and Plaintiffs' physicians.

814.    Medtronic downplayed to physicians and patients, including Plaintiffs and Plaintiffs' physicians the dangerous side effects of Infuse®, including downplaying the dangers of off-label use.

815.    Medtronic misrepresented the safety of Infuse® to physicians and patients, including Plaintiffs and Plaintiffs' physicians.

816.    Medtronic willfully and/or intentionally failed to warn and/or alert physicians and patients, including Plaintiffs and Plaintiffs' physicians, of the increased risks and significant dangers resulting from the off-label use of Infuse®.

817.    Medtronic knew and/or had reason to know, that their representations and suggestions to physicians that Infuse® was safe and effective for off-label use were materially false and misleading that physicians and patients including Plaintiffs and Plaintiffs' physicians, would rely on such representations.

818.    Medtronic and its secret agents knew or should have known and/or recklessly disregarded the materially incomplete, false, and misleading nature of the information that they caused to be disseminated to the public and to physicians, including Plaintiffs and Plaintiffs' physicians, as part of Medtronic's surreptitious campaign to promote Infuse® for off-label surgeries were outside of the intended uses approved by the FDA.

819.    Any warnings Medtronic may have issued concerning the dangers of off-label surgeries outside of the intended uses approved by the FDA of Infuse® or regarding the specific risks of those

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

uses were inadequate and insufficient in light of Medtronic's contradictory prior, contemporaneous and continuing illegal promotional efforts and over-promotion of Infuse® for non-FDA-approved off-label uses in the spine and contemporaneous efforts to hide or downplay the true increased risks and serious dangers of the off-label uses of Infuse®.

820.    The ongoing scheme described herein could not have been perpetrated over a substantial period of time, as has occurred here, without knowledge and complicity of personnel at the highest level of Medtronic, including the corporate officers.

821.    Medtronic knew and/or had reason to know of the likelihood of serious injuries caused by the off-label use of Infuse®, but they concealed this information and did not warn Plaintiff or Plaintiffs' physicians, preventing Plaintiff and Plaintiffs' physicians from making informed choices in selecting other treatments or therapies prior to Plaintiffs' implantation surgery and preventing Plaintiff and Plaintiffs' physicians from timely discovering Plaintiffs' injuries.

**Causation**

822.    Plaintiffs would not have consented to be treated with the off-label use of Infuse® had Plaintiffs known of or been fully and adequately informed by Medtronic of the true increased risks and serious dangers of the off-label use of Infuse®.

823.    Plaintiff and Plaintiffs' physician reasonably relied on Medtronic's representations and omissions regarding the safety and efficacy of Infuse® in Plaintiffs' spine surgeries.

824.    Plaintiffs and Plaintiffs' physicians did not know of the specific increased risks and serious dangers, and/or were misled by Medtronic, who knew or should have known of the true risks and dangers, but consciously chose not to inform Plaintiffs or their spine surgeons of those risks and to actively misrepresent those risks and dangers to the Plaintiffs and Plaintiffs' physicians.

825.    Medtronic's off-label promotion and marketing of Infuse® caused Plaintiffs' surgeons to decide to implant Infuse® in Plaintiffs using it in off-label non-intended uses.

**Damages**

826.    Plaintiffs have suffered serious personal injuries as a direct and proximate result of Medtronic's misconduct.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

827.    As a direct and proximate result of Medtronic's wrongful conduct and the use of Infuse® in these surgeries, Plaintiffs have suffered and will suffer continue to suffer from severe injuries and damages, including but not limited to severe pain, great emotional distress, and mental anguish.

828.    As a result of the off-label use and failure to warn of the risks associated with the off-label use of Infuse® as manufactured, promoted, sold and supplied by Medtronic, and as a result of the negligence, callousness and the other wrongdoing and misconduct of Medtronic's as described herein:

a. Plaintiffs have been injured and suffered injuries to their body and mind, the exact nature of which are not completely known to date;

b. Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown;

c. Plaintiffs have incurred and will be required to incur additional medical expenses in the future to care for themselves as a result of the injuries and damages Plaintiffs have suffered;

d. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interests thereon and costs.

829.    Plaintiffs had no reason until recently to suspect that their chronic pain and injuries were caused by Infuse®. Thus, Plaintiffs did not know and could not have known and through the exercise of reasonable diligence, that the off-label use of Infuse® caused their injuries.

830.    Each of the Plaintiffs herein brings their respective actions within the applicable statutes of limitations. Specifically, Plaintiffs bring their actions within the prescribed time limits following their injuries and their knowledge of the wrongful cause. Prior to such time, Plaintiffs did not know nor have reason to know of their injuries and/or the wrongful cause thereof.

## VIII. SPECIFIC PLAINTIFF ALLEGATIONS

831.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follow:

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**1. Joyce Smith**

832.      Plaintiff Joyce Smith is an individual who resides in Pacific, Missouri. Plaintiff was born on March 28, 1954. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

**a. Initial Infuse® Surgery**

833.      On September 3, 2003, Joyce Smith was admitted to Barnes Jewish Hospital in St. Louis, Missouri where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Joyce Smith in the Lumbar region of her spine from vertebrae L4 to S1.

834.      During the surgery, Infuse® was used in Plaintiff Joyce Smith off-label in the following manners:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c. Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

   d. Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

**b. Post-Infuse® Surgery Care and Treatment**

835.      Plaintiff Joyce Smith's post-operative period was marked by increasingly severe pain and numbness in the low back and lower extremities.

836.      A CT study conducted on September 24, 2004 shows that Plaintiff Joyce Smith continues to experience heterotopic bone growth along the surgical site. The heterotopic bone revealed by the CT study performed September 24, 2004 encroaches on the nerve roots that exit the spine, causing severe and debilitating pain and numbness.

**c. Plaintiff's Current Condition**

837.      Since her exposure to Infuse®, Plaintiff Joyce Smith's condition has gradually, but relentlessly deteriorated. She is now chronically disabled and can neither sit nor stand for more than one

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

hour at a time.  She cannot lift more than ten pounds, nor can she walk for more than fifteen consecutive minutes.  Her primary care physician does not believe she will ever be able to be employed in any capacity again.  She now describes her pain as unbearable, and she has otherwise suffered serious injuries.

### 2. Julie Hance and Jonathan Kent Hance

838.      Plaintiff Julie Hance is an individual who resides in Cottage Grove, Minnesota.  Plaintiff was born on October 21, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

#### a. Initial Infuse® Surgery

839.      On July 24, 2009, Julie Hance was admitted to Woodwinds Health Campus in Woodbury, Minnesota where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Julie Hance in the Lumbar region of her spine from vertebrae L4 to S1.

840.      During the surgery, Infuse® was used in Plaintiff Julie Hance off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

#### b. Post-Infuse® Surgery Care and Treatment

841.      Julie Hance's post-operative period was marked by increasingly severe pain in her low back and lower extremities.

842.      On August 13, 2010, approximately one year after her initial surgery using Infuse®, Julie Hance had to undergo a revision surgery.

843.      Since the revision surgery, Julie Hance continues to suffer significant pain and functional impairment.

844.      A CT study conducted on April 14, 2010 shows that Julie Hance's complications include exuberant bone growth at the L5 to S1 level of the spine, hardware failure, and a non-union at the L4 to L5 levels.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

845.     On July 15, 2013, nearly four years after her initial surgery using Infuse®, Julie Hance had to undergo a second revision surgery.

846.     Since her second revision surgery, Plaintiff Julie Hance continues to endure severe back pain, radiating pain to the buttocks, numbness and loss of feeling in her legs and toes, and pain in her calves.

### c. Plaintiff's Current Condition

847.      Plaintiff Julie Hance suffers from significant chronic radiating pain that has gradually increased over time.  Following her fusion surgery, pain continuously radiates down her lower extremities as a result of severe nerve damage , and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

848.     Plaintiff Jonathan Kent Hance is an individual who resides in Cottage Grove, Minnesota.

849.     Plaintiff, Jonathan Kent Hance, is the spouse of Plaintiff Julie Hance.

850.     Plaintiff, Jonathan Kent Hance, is bringing a claim for loss of consortium.

## 3. Tereasa Cagley and Jeff Cagley

851.     Plaintiff Tereasa Cagley is an individual who resides in Sardis, Mississippi.  Plaintiff was born on May 28, 1964.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

852.     On November 28, 2008, Plaintiff Tereasa Cagley was admitted to Methodist Le Bonheur Healthcare in Memphis, Tennessee where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Tereasa Cagley in the Lumbar region of her spine from vertebrae L5 to S1.

853.     During the surgery, Infuse® was used in Plaintiff Tereasa Cagley off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage.

    b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.   Infuse® was used in a PLIF surgical approach that was not approved by the FDA.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**b. Post-Infuse® Surgery Care and Treatment**

854.     Plaintiff Tereasa Cagley's post-operative period was marked by increasingly severe and unrelenting pain to her lower back and lower extremities.

855.     An x-ray study conducted on March 26, 2009 shows that Plaintiff Tereasa Cagley continues to experience severe and unrelenting pain to her lower back and lower extremities. Comparing this region to an August 19, 2008 MRI study, the March 26, 2009 x-ray study reported anterior subluxation of L5 on S1.  This subluxation impinges on Plaintiff's exiting nerve roots and causes spinal instability, manifesting as severe pain and an exacerbation of future degenerative changes to the spine.

**c. Plaintiff's Current Condition**

856.      Plaintiff Tereasa Cagley has suffered and continues to suffer severe and unrelenting pain that prevents her from performing, much less enjoying the simplest activities of daily life she could perform preoperatively, and has otherwise suffered serious injuries.

**d. Plaintiff's Spouse**

857.     Plaintiff Jeff Cagley is an individual who resides in Sardis, Mississippi.

858.     Plaintiff, Jeff Cagley, is the spouse of Plaintiff Tereasa Cagley.

859.     Plaintiff, Jeff Cagley, is bringing a claim for loss of consortium.

**4. Karen Albers and Patrick Albers**

860.     Plaintiff Karen Albers is an individual who resides in North Plainfield, New Jersey. Plaintiff was born on November 17, 1969.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

**a. Initial Infuse® Surgery**

861.     On August 2, 1950 Plaintiff Karen Albers was admitted to Saint Clare's Hospital in Denville, New Jersey where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

862.     During the surgery, Infuse® was used in Plaintiff Karen Albers off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

b. Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

### b. Post-Infuse® Surgery Care and Treatment

863.    Plaintiff Karen Albers' post-operative period has been marked by increasingly severe low back and leg pain. She describes her current pain level as far worse than it ever was preoperatively.

864.    A CT study conducted on November 29, 2012 shows that Karen Albers' suffered a violent resorption reaction that inhibited new bone formation. This persisted and developed into a chronic inflammatory state that serves as her current primary pain generator as demonstrated in a CT myelogram on January 15, 2013.

### c. Plaintiff's Current Condition

865.    Since her exposure to Infuse®, Plaintiff Karen Albers' condition has gradually, but relentlessly deteriorated. She suffers from significant and radiating pain through her lower extremities and experiences neurologic deficit and numbness in her toes, and cannot perform the basic activities of daily living she enjoyed preoperatively without extreme discomfort, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

866.    Plaintiff Patrick Albers is an individual who resides in North Plainfield, New Jersey.

867.    Plaintiff, Patrick Albers, is the spouse of Plaintiff Karen Albers.

868.    Plaintiff, Patrick Albers, is bringing a claim for loss of consortium.

## 5. Helen Alcala and Patrick Alcala Jr.

869.    Plaintiff Helen Alcala is an individual who resides in Mesa, Arizona. Plaintiff was born on August 2, 1950. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterior fusion surgery.

### a. Initial Infuse® Surgery

870.    On November 4, 2011, Plaintiff Helen Alcala was admitted to Scottsdale Healthcare in Scottsdale, Arizona where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to S1.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

871.    During the surgery, Infuse® was used in Plaintiff Helen Alcala off-label in the following manners:

 a.  Infuse® was used without the mandatory approved LT-cage.

 b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

 c.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

 d.  Infuse® was used in a TLIF and Posterior surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

872.    Plaintiff Helen Alcala's post-operative period has been marked by increasingly severe pain and weakness in her legs.

873.    An x-ray conducted on May 17, 2012 shows that Plaintiff Helen Alcala continues to experience nerve root compression. Comparing this region to a January 7, 2010 MRI study, the May 17, 2012 x-ray study reported severe narrowing at L5-S1.

### c. Plaintiff's Current Condition

874.    Plaintiff continues to experience severe and unrelenting pain that radiates into her lower extremities. This prevents her from practicing and enjoying the activities of daily life that she enjoyed pre-operatively, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

875.    Plaintiff Patrick Alcala Jr. is an individual who resides in Mesa, Arizona.

876.    Plaintiff, Patrick Alcala Jr., is the spouse of Plaintiff Helen Alcala.

877.    Plaintiff, Patrick Alcala Jr., is bringing a claim for loss of consortium.

### 6. Alphonza Aultman and Beverly Aultman

878.    Plaintiff Alphonza Aultman is an individual who resides in Kenansville, North Carolina. Plaintiff was born on May 2, 1956. Plaintiff underwent a spinal fusion surgery in which Infuse® was

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

used off-label in a L5-S1 Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

879.       On January 12, 2011, Plaintiff Alphonza Aultman was admitted to New Hanover Regional Medical Center in Wilmington, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Alphonza Aultman in the Lubmar region of his spine from vertebrae L5 to S1.

880.       During the surgery, Infuse® was used in Plaintiff Alphonza Aultman off-label in the following manners:

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c. Infuse® was used in a TLIF and Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

881.       Plaintiff Alphonza Aultman's post-operative period was marked by increasingly severe low back pain, right leg pain, numbness, tingling, and weakness.

882.       Since the revision surgery, Alphonza Aultman continues to suffer significant back pain and numbness, tingling in his right leg, pain, and weakness in right leg.

### c. Plaintiff's Current Condition

883.        Plaintiff continues to have unrelenting lower back pain that radiates to his legs, he suffers from neurogenic bowel, and can only stand for short periods of time before his legs give out.  His injuries have rendered him unemployable, he is forced to ambulate with a cane, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

884.       Plaintiff Beverly Aultman is an individual who resides in Kenansville, North Carolina.

885.       Plaintiff, Beverly Aultman, is the spouse of Plaintiff Alphonza Aultman.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

886.    Plaintiff, Beverly Aultman, is bringing a claim for loss of consortium.

### 7. Dennis Aycock and Susan Aycock

887.    Plaintiff Dennis Aycock is an individual who resides in Green Cove Springs, Florida. Plaintiff was born on September 18, 1952. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterior Fusion surgery.

### a. Initial Infuse® Surgery

888.    On February 03, 2010 Plaintiff Dennis Aycock was admitted to Flagler Hospital in St. Augustine, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Dennis Aycock in the Lumbar region of his spine from vertebrae L5 to S1.

889.    During the surgery, Infuse® was used in Plaintiff Dennis Aycock off-label in the following manners:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutter).

c.    Infuse® was used in a PLIF and Posterior Fusion surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

890.    Plaintiff Dennis Aycock's post-operative period was marked by increasingly severe and significant pain and weakness in his legs. Additionally, Plaintiff Dennis Aycock suffers from gastrointestinal problems.

### c. Plaintiff's Current Condition

891.    Since his exposure to Infuse® Plaintiff Dennis Aycock's condition has gradually and relentlessly deteriorated. He suffers from severe and significant pain and weakness his legs. Additionally, Plaintiff Dennis Aycock suffers from gastrointestinal problems, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

892.    Plaintiff Susan Aycock is an individual who resides in Green Cove Springs, Florida.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

893.    Plaintiff, Susan Aycock, is the spouse of Plaintiff Dennis Aycock.

894.    Plaintiff, Susan Aycock, is bringing a claim for loss of consortium.

### 8. Keddie Bevis and Randy Bevis

895.    Plaintiff Keddie Bevis is an individual who resides in Owenton, Kentucky.  Plaintiff was born on October 1, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

896.    On September 30, 2005, Plaintiff Keddie Bevis was admitted to Healthport Central Baptist Hospital in Lexington, Kentucky where Plaintiff's physician performed a spine fusion surgery on Plaintiff Keddie Bevis in the Lumbar region of her spine from vertebrae L3 to L5.

897.    During the surgery, Infuse® was used in Plaintiff Keddie Bevis off-label in the following manners:

   a.   Infuse® was used without the mandatory approved LT-cage.

   b.   Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

   c.   Infuse® was used in a PLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

898.    Plaintiff Keddie Bevis' post-operative period was marked by increasingly severe low back pain radiating to the legs and epidural fibrosis.

### c. Plaintiff's Current Condition

899.    Plaintiff Keddie Bevis found no relief after her Infuse® surgery and instead found herself with increasingly severe and excruciating back pain.  This severe pain began to radiate to her bilateral legs.  Radiographic imaging revealed that epidural fibrosis near the Infuse® surgical site was pressing on Plaintiff's spine, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

900.    Plaintiff Randy Bevis is an individual who resides in Owenton, Kentucky.

901.    Plaintiff, Randy Bevis, is the spouse of Plaintiff Keddie Bevis.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

902.    Plaintiff, Randy Bevis, is bringing a claim for loss of consortium.

### 9. Randy Black

903.    Plaintiff Randy Black is an individual who resides in Marquette, Michigan.  Plaintiff was born on September 13, 1966.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior cervical fusion surgery.

#### a. Initial Infuse® Surgery

904.    On November 16, 2007, Plaintiff Randy Black was admitted to St. Vincent Hospital in Green Bay, Wisconsin where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Randy Black in the Cervical region of his spine from vertebrae C4 to C7.

905.    During the surgery, Infuse® was used in Plaintiff Randy Black off-label in the following manners:

a.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters)

b.    Infuse® was used in the Cervical region of the spine outside of the approval.

c.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

d.    Infuse® was used in a Posterior Cervical surgical approach that was not approved by the FDA.

#### b. Post-Infuse® Surgery Care and Treatment

906.    Plaintiff Randy Black's post-operative period was marked by increasingly severe pain that has rendered him unemployable.  He reports that he cannot sleep because any pressure that he puts on his neck elicits an electric "shock" type pain.

#### c. Plaintiff's Current Condition

907.    Plaintiff Randy Black is unable to secure gainful employment due to his current condition, which has left him partially bedridden.  Plaintiff suffers from constant extreme pain in his legs, back, and neck.  Plaintiff has also developed numbness in his right arm and gradual numbness developing in his left arm, and has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### 10. Courtney Blunt and Zalekia Blunt

908.      Plaintiff Courtney Blunt is an individual who resides in Egg Harbor, New Jersey. Plaintiff was born on March 31, 1974.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label Posterior Lumbar Interbody Fusion (PLIF) surgery for Plaintiff, Courtney Blunt by Plaintiff's physician.

### a. Initial Infuse® Surgery

909.      On October 25, 2011, Plaintiff Courtney Blunt was admitted to Shore Memorial Hospital in Somers Point, New Jersey where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Courtney Blunt in the Lumbar region of her spine from vertebrae L4 to s1.

910.      During the surgery, Infuse® was used in Plaintiff Courtney Blunt off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage

    b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters)

    c.   Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

    d.   Infuse® was used in a PLIF and Posterolateral fusion surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

911.      Plaintiff Courtney Blunt's post-operative period was marked by increasingly severe gastrointestinal problems, nerve injury, radiating pain to legs, and significant pain.

### c. Plaintiff's Current Condition

912.      After Plaintiff Courtney Blunt's Infuse® surgery,she continues to experience gastrointestinal problems, nerve injury, radiating pain to legs, and significant pain, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

913.      Plaintiff Zalekia Blunt is an individual who resides in Egg Harbor, New Jersey.

914.    Plaintiff, Zalekia Blunt, is the spouse of Plaintiff Courtney Blunt.

915.    Plaintiff, Zalekia Blunt, is bringing a claim for loss of consortium.

**11. Matthew Brodzinski**

916.    Plaintiff, Matthew Brodzinski is an individual who resides in Old Bridge, New Jersey. Plaintiff was born on June 10, 1978.  Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

917.    On March 1, 2012, Plaintiff Matthew Brodzinski was admitted to Ocean Medical Center at Meridian Health in Brick, New Jersey where Plaintiff's physicians performed a spine fusion surgery on Plaintiff Matthew Brodzinski in the Lumbar region of his spine from vertebrae L5 to S1.

918.    During the surgery, Infuse® was used in Plaintiff Matthew Brodzinski off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disc space)

    c.  Infuse® was used in a Transforaminal surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

919.    Plaintiff Matthew Brodzinski's post-operative period was marked by initial relief, followed by increasingly severe pain, that eventually developed into paresthesias including numbness and tingling that radiated through his left lower extremity.

920.    On December 10, 2012, approximately nine months after being exposed to Infuse®, Plaintiff Matthew Brodzinski underwent a revision surgery to evacuate inflammatory fluid, and remove bone that was emerging from the Infuse® application site and impinging on the exiting nerve roots. Plaintiff's surgeon attributes plaintiff's injury to Infuse®.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### c. Plaintiff's Current Condition

Plaintiff Matthew Brodzinski currently suffers from severe pain that begins in his lower back and radiates to his lower extremities. He suffers from paresthesias including numbness and tingling so severe that his legs give out, and he collapses. He is no longer able to perform the most basic activities of daily living, that he enjoyed preoperatively, pain free. He has been rendered permanently semi-disabled and continues to suffer severe injuries.

### 12. Harlan Bryson and Cindy Bryson

921.    Plaintiff Harlan Bryson is an individual who resides in Ardmore, Oklahoma. Plaintiff was born on August 16, 1956. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a L5-S1 laminectomy and discectomy; L5-S1 Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

922.    On February 12, 2012, Plaintiff Harlan Bryson was admitted to Pine Creek Medical Center in Dallas, Texas where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Harlan Bryson in the Lumbar region of his spine from vertebrae L4 to L5.

923.    During the surgery, Infuse® was used in Plaintiff Harlan Bryson off-label in the following manners:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c.    Infuse® was used in a PLIF surgical approach that was not approved by the FDA.

### b. Plaintiff's Current Condition

924.    After Plaintiff Harlan Bryson's Infuse® surgery, he continues to experience increasingly severe lower back pain and sharp pain down his legs. It is impossible for him to find lasting comfort as he can only endure standing, sitting, walking, or reclining for a few minutes at a time. He is unable to ambulate long distances, walks with a cane, and cannot go so far as to walk to the street to collect the newspaper. Plaintiff suffers from fatigue, soreness across his lower back, and burning pain throughout

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

his buttocks, and has otherwise suffered serious injuries.

### c. Plaintiff's Spouse

925.    Plaintiff Cindy Bryson is an individual who resides in Ardmore, Oklahoma.

926.    Plaintiff, Cindy Bryson, is the spouse of Plaintiff Harlan Bryson.

927.    Plaintiff, Cindy Bryson, is bringing a claim for loss of consortium.

## 13. Christine Centers and Thomas Centers

928.    Plaintiff Christine Centers is an individual who resides in Livonia, Michigan.  Plaintiff was born on December 13, 1955.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral Fusion surgery.

### a. Initial Infuse® Surgery

929.    On May 31, 2006, Plaintiff Christine Centers was admitted to Providence Hospital in Southfield, Michigan where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Christine Centers in the Thoracic and Lumbar region of her spine from vertebrae T12 to S1.

930.    During the surgery, Infuse® was used in Plaintiff Christine Centers off-label in the following manners:

a.   Infuse® was used without the mandatory approved LT-cage.

b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters)

c.   Infuse® was used in a region of the spine outside of the approval (i.e. it was used in the Thoracic region).

d.   Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

e.   Infuse® was used in a PLIF and a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

931.    Plaintiff Christine Centers' post-operative period was marked by an inflammatory reaction at the surgical site.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

932.    On April 25, 2008, approximately nine (9) weeks after her initial surgery using Infuse®, Christine Centers had to undergo a revision surgery for hardware removal.

933.    A Lumbar MRI study conducted on May 9, 2009 shows that Christine Centers continues to experience fluid collection from the L2-L5 level. A Lumbar CT study on May 22, 2009 study reported mild right-sided neural foraminal narrowing at L5-S2 due to bony overgrowth. New bowel and bladder incontinence necessitated a Lumbar MRI study on August 23, 2010, which revealed that the central canal was patulous at L4-L5 and L5-S1. Additionally, a Lumbar MRI study conducted on December 23, 2012 revealed there is a linear fluid collection seen posterior to L2, L3 and L4 vertebral bodies.

934.    Following the revision surgery, Plaintiff Christine Centers continues to suffer from a significant inflammatory reaction, neural foraminal narrowing at the L5-S1 due to endplate spur formation, and bowel and bladder incontinence.

### c. Plaintiff's Current Condition

935.    Plaintiff Christine Centers suffers from severe nerve injury that continues to increase and manifest as severe radiating pain throughout her lower extremities. She has developed osteoarthritis. Tragically she suffers from bowel and bladder incontinence and must plan all social activities with the ever-present fear of soiling herself without notice, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

936.    Plaintiff Thomas Centers is an individual who resides in Livonia, Michigan.

937.    Plaintiff, Thomas Centers, is the spouse of Plaintiff Christine Centers.

938.    Plaintiff, Thomas Centers, is bringing a claim for loss of consortium.

### 14. Tonya Davis

939.    Plaintiff Tonya Davis is an individual who resides in Panama City, Florida. Plaintiff was born on September 5, 1980. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion, L5-S1 surgery.

### a. Initial Infuse® Surgery

940.    On February 8, 2010, Plaintiff Tonya Davis was admitted to Bay Medical Center in

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Panama City, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Tonya Davis in the Lumbar region of her spine from vertebrae L5 to S1.

941.    During the surgery, Infuse® was used in Plaintiff Tonya Davis off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA (i.e. it was used in a posterior approach).

### b. Post-Infuse® Surgery Care and Treatment

942.    Plaintiff Tonya Davis' post-operative period was marked by increasingly severe leg pain (right side), hip pain, lower back pain, constipation, and diarrhea.

### c. Plaintiff's Current Condition

943.    After Plaintiff Tonya Davis' Infuse® surgery, she continues to experience severe leg pain (right side), hip pain, lower back pain, constipation, and diarrhea, and has otherwise suffered serious injuries.

### 15. Mark Dunn

944.    Plaintiff Mark Dunn is an individual who resides in Houston, Texas.  Plaintiff was born on January 16, 1970.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Fusion surgery.

### a. Initial Infuse® Surgery

945.    On January 11, 2012, Plaintiff Mark Dunn was admitted to Houston Orthopedic Surgical Hospital in Houston, Texas where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Mark Dunn in the Lumbar region of his spine from L4 to L5.

946.    During the surgery, Infuse® was used in Plaintiff Mark Dunn off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters.)

c.  Infuse® was used in a Posterior Lumbar surgical approach that was not approved by the FDA.

**b. Plaintiff's Current Condition**

947.    After Plaintiff Mark Dunn's Infuse® surgery, he continues to experience increasingly severe lower back pain, stiffness, and sharp pain down his legs, and has otherwise suffered serious injuries.

**16. Linda Eichorn**

948.    Plaintiff, Linda Eichorn is an individual who resides in Cedarburg, Wisconsin.  Plaintiff was born on April 22, 1952.  Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral spinal fusion surgery.

**a. Initial Infuse® Surgery**

949.    On April 11, 2008, Plaintiff Linda Eichorn was admitted to Columbia St. Mary's Hospital in Milwaukee, Wisconsin where Plaintiff's physicians performed a spine fusion surgery on Plaintiff Linda Eichorn in the Lumbar region of her spine from vertebrae L3 to L4.

950.    During the surgery, Infuse® was used in Plaintiff Linda Eichorn off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters)

c.  Infuse® was used in Transforaminal and Posterolateral surgical approaches that were not approved by the FDA.

**b. Post-Infuse® Surgery Care and Treatment**

951.    Plaintiff Linda Eichorn's post-operative period was marked by initial relief, followed by increasingly severe pain, that eventually developed into paresthesias including numbness and tingling that radiated through her left lower extremity.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

952.      On May 31, 2012, approximately four years after being exposed to Infuse®, Plaintiff Linda Eichorn underwent a revision surgery to remove excess bone that was compressing the exiting L3 nerve root.

### c. Plaintiff's Current Condition

953.      Plaintiff Linda Eichorn currently suffers from severe pain that begins in her lower back and radiates to her lower extremities. She suffers from paresthesias including numbness and tingling so severe that her legs give out, and she collapses.  She is currently able to walk with the assistance of a walker.  She is no longer able to perform the basic activities of daily living, that she enjoyed preoperatively, pain free.  She has been rendered unemployable, and is faced with undergoing a dangerous, costly, and painful revision surgery in an attempt to mitigate any further, permanent, nerve damage she might sustain and has otherwise suffered severe injuries.

### 17. Mark Evans

954.      Plaintiff, Mark Evans is an individual who resides in St. Louis, Missouri.  Plaintiff was born on June 28, 1971.  Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in an Anterior cervical spinal fusion surgery for Plaintiff, Mark Evans by Plaintiff's physician.

### a. Initial Infuse® Surgery

955.      On February 20, 2009, Plaintiff Mark Evans was admitted to St. Louis Spine and Orthopedic Surgery Center in St. Louis, Missouri where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Mark Evans in the Cervical region of his spine from vertebrae C5 to C6.

956.      During the surgery, Infuse® was used in Plaintiff Mark Evans off-label in the following manners:

     a.  Infuse® was used without the mandatory approved LT-cage.

     b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

     c.  Infuse® was used in a region of the spine outside of the approval (i.e. it was used in the cervical region).

     d.  Infuse® was used in an Anterior cervical surgical approach that was not approved by the

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

FDA.

### b. Post-Infuse® Surgery Care and Treatment

957.    Plaintiff Mark Evans's post-operative period was marked by increasingly severe pain, left arm numbness and difficulty swallowing or speaking.

### c. Plaintiff's Current Condition

958.    Following his Infuse® surgery Plaintiff Mark Evans felt increasing radiating pain eventually causing numbness in his left arm, radiating pain to the legs, neck pain, and leaving him greatly debilitated. In addition, these conditions are accompanied by increased difficulty swallowing and speaking, and has otherwise suffered severe injuries.

## 18. Lukas Gayer and Erica Gayer

959.    Plaintiff Lukas Gayer is an individual who resides in Riverview, Michigan. Plaintiff was born on October 28, 1980. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgeries.

### a. Initial Infuse® Surgery

960.    On November 9, 2010, Plaintiff Lukas Gayer was admitted to Henry Ford Wyandotte Hospital in Wyandotte, Michigan where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Lukas Gayer in the Lumbar region of his spine from vertebrae L4 to L5.

961.    During the surgery, Infuse® was used in Plaintiff Lukas Gayer off-label in the following manners:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c.  Infuse® was used in a PLIF and Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

962.    An MRI study conducted on August 25, 2011 demonstrates that Lukas Gayer has significant injury to his spine and exiting nerve roots. Comparing this region to a preoperative June 1,

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

2010 MRI study, the August 25, 2011 MRI study reveled a widespread inflammatory response that exerts enough pressure to strangle the exiting nerve roots. This is expressed as severe pain that radiates to the lower extremities, and has developed into a neurologic deficit that impairs Plaintiff Lukas Gayer's ability to perform activities of daily living.

### c. Plaintiff's Current Condition

963.    Plaintiff Lukas Gayer describes his current pain levels as significantly worse than they ever were preoperatively. As his nerve injury has progressed, the feeling in his lower extremities has evolved from electric-shock type pain to more frequent numbness and tingling, an indication that his injury is reaching a point where it may become irreversible. His surgeon has recommended that he present for a costly, and risky, revision surgery, and has otherwise suffered severe injuries

### d. Plaintiff's Spouse

964.    Plaintiff Erica Gayer is an individual who resides in Riverview, Michigan.

965.    Plaintiff, Erica Gayer, is the spouse of Plaintiff Lukas Gayer.

966.    Plaintiff, Erica Gayer, is bringing a claim for loss of consortium.

## 19. Albert Gilleo III and Tara Gallagher Gilleo

967.    Plaintiff Albert Gilleo III is an individual who resides in Little River, South Carolina. Plaintiff was born on September 23, 1973. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a L5-S1 Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

968.    On October 7, 2009, Plaintiff Albert Gilleo III was admitted to Holy Cross Hospital in Fort Lauderdale, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Albert Gilleo III in the Lumbar region of his spine from vertebrae L5 to S1.

969.    During the surgery, Infuse® was used in Plaintiff Albert Gilleo III off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

### b. Post-Infuse® Surgery Care and Treatment

970.    Plaintiff Albert Gilleo III's post-operative period was marked radiating pain to the legs,

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

erectile dysfunction, significant pain, and localized edema.

### c. Plaintiff's Current Condition

971.     After Plaintiff Albert Gilleo III's Infuse® surgery, he continues to experience radiating pain to the legs, erectile dysfunction, significant pain, and localized edema, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

972.     Plaintiff Tara Gallagher Gilleo is an individual who resides in Little River, South Carolina.

973.     Plaintiff, Tara Gallagher Gilleo, is the spouse of Plaintiff Albert Gilleo, III.

974.     Plaintiff, Tara Gallagher Gilleo, is bringing a claim for loss of consortium.

## 20. Mary Haines

975.     Plaintiff Mary Haines is an individual who resides in Milwaukee, Wisconsin. Plaintiff was born on November 10, 1964. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

976.     On September 4, 2007, Plaintiff Mary Haines was admitted to Wheaton Franciscan Healthcare in Milwaukee, Wisconsin where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Mary Haines in the Lumbosacral region of her spine from vertebrae L4 to S1.

977.     During the surgery, Infuse® was used in Plaintiff Mary Haines off-label in the following manners:

a.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

b.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

c.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### b. Post-Infuse® Surgery Care and Treatment

978.    Plaintiff Mary Haines' post-operative period was marked by increasingly severe back pain and a diagnosis of Kidney cancer.

979.    On January 3, 2010, two years after her initial surgery using Infuse®, Plaintiff Mary Haines had to undergo a revision surgery to remove the cancerous tumor mass from her kidney.

980.    An MRI study conducted on March 11, 2011 shows that Plaintiff Mary Haines continued to experience severe low back pain.

### c. Plaintiff's Current Condition

981.    Following her Infuse® surgery Plaintiff Mary Haines experienced increasingly severe and excruciating low back pain. Most seriously, Plaintiff was diagnosed with kidney cancer two years after her original surgery, which she underwent surgery to remove. Even after this surgery, Plaintiff continued to experience debilitating and serious low back pain, which makes movement, activities and even breathing painful, and has otherwise suffered serious injuries.

### 21. Daniel Hasley

982.    Plaintiff Daniel Hasley is an individual who resides in Fairbury, Nebraska. Plaintiff was born on June 12, 1961. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

983.    On November 19, 2003, Plaintiff Daniel Hasley was admitted to Bryan LGH Medical Center in Lincoln, Nebraska where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Dan Hasley in the Lumbosacral region of his spine from vertebrae L4 to S1.

984.    During the surgery, Infuse® was used in Plaintiff Daniel Hasley off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### b. Plaintiff's Current Condition

985.    After Plaintiff Daniel Hasley's Infuse® surgery, he continues to experience increasingly severe pain in legs and in his abdomen. Plaintiff suffers from severe gastrointestinal complication. Plaintiff's condition significantly restricts his day-to-day life, as he is only able to sit for approximately 30 minutes at a time due to pain and discomfort. Further, he has difficulty walking after sitting for any extended period of time, and has otherwise suffered serious injuries.

### 22. William Helmuth

986.    Plaintiff William Helmuth is an individual who resides in Minneapolis, Minnesota. Plaintiff was born on March 4, 1961. Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) spinal fusion surgery.

### a. Initial Infuse® Surgery

987.    On January 7, 2010, Plaintiff William Helmuth was admitted to Hennepin County Medical Center in Minneapolis, Minnesota where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff William Helmuth in the Lumbar region of his spine in order to attempt to fuse vertebrae L4 to S1.

988.    During the surgery, Infuse® was used in Plaintiff William Helmuth off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

    c.    Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

989.    Plaintiff William Helmuth's post-operative period was marked by increasingly severe nerve injury with tingling pain radiating to his legs and bony overgrowth.

990.    A lumbar myelogram study conducted on June 10, 2010 show that Plaintiff William Helmuth suffers from bony overgrowth with bone formations effacing is nerves.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### c. Plaintiff's Current Condition

991.    Since his Infuse® surgery Plaintiff William Helmuth suffers from increasingly serious and severe nerve injuries.  Plaintiff's lower back pain continues to be severe and was found to have bony overgrowth that impacts his spine. The debilitating leg pain presents to Plaintiff as tingling and affects both his legs, with severe pain radiating down his left leg greater than right.  These complications greatly negate Plaintiff's quality and enjoyment of life and his doctors feel he has no further surgical options, and has otherwise suffered serious injuries.

### 23. Linda Hyde and Neil Hyde

992.    Plaintiff Linda Hyde is an individual who resides in Cliffside Park, New Jersey.  Plaintiff was born on August 3, 1947.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody (ALIF) fusion surgery.

### a. Initial Infuse® Surgery

993.    On March 29, 2012, Plaintiff Linda Hyde was admitted to New York University Hospital for Joint Diseases in New York, New York where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Linda Hyde in the Lumbosacral region of her spine from vertebrae L4 to S1.

994.    During the surgery, Infuse® was used in Plaintiff Linda Hyde off-label in the following manners:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

### b. Post-Infuse® Surgery Care and Treatment

995.    Plaintiff Linda Hyde's post-operative period was marked by increasingly severe radiating pain and weakness.

996.    An EMG and Nerve Conduction Study completed April 1, 2012 determined that Plaintiff suffered from lumbar radiculopathy.

### c. Plaintiff's Current Condition

997.    Since Plaintiff Linda Hyde underwent Infuse® surgery she experienced increasingly

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

severe radiating lower back pain and weakness. In addition Plaintiff finds walking and day to day activities increasingly painful and difficult, particularly as her left leg collapses intermittently without warning, and has otherwise suffered serious injuries.

### d. Plaintiff Spouse

998.    Plaintiff Neil Hyde is an individual who resides in Cliffside Park, New Jersey.

999.    Plaintiff, Neil Hyde, is the spouse of Plaintiff Linda Hyde.

1000.    Plaintiff, Neil Hyde, is bringing a claim for loss of consortium.

### 24. Gerald Jackson and Ruth Anne Jackson

1001.    Plaintiff Gerald Jackson is an individual who resides in Crossville, Tennessee.  Plaintiff was born on February 14, 1949.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1002.    On November 3, 2010, Plaintiff Gerald Jackson was admitted to Centennial Medical Center in Nashville, Tennessee where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Gerald Jackson in the Lumbar region of his spine from vertebrae L3 to L5.

1003.    During the surgery, Infuse® was used in Plaintiff Gerald Jackson off-label in the following manners:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

   d.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1004.    Plaintiff Gerald Jackson's post-operative period was marked by increasingly difficulty breathing, nerve injury, osteoarthritis, radiating pain to the legs, erectile dysfunction, severe pain, loss of

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

balance, contact dermatitis, etc.

### c. Plaintiff's Current Condition

1005. After Plaintiff Gerald Jackson's Infuse® surgery he continues to sever pain, nerve injury, osteoarthritis, radiating pain to the legs, erectile dysfunction, and loss of balance, and has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1006. Plaintiff Ruth Anne Jackson is an individual who resides in Crossville, Tennessee.

1007. Plaintiff, Ruth Anne Jackson, is the spouse of Plaintiff Gerald Jackson.

1008. Plaintiff, Ruth Anne Jackson, is bringing a claim for loss of consortium.

## 25. Faith Jones and Donald Jones

1009. Plaintiff Faith Jones is an individual who resides in Athens, Alabama. Plaintiff was born on December 9, 1960. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a laminectomy and facetectomy at L4-S1, Transforaminal Lumbar Interbody Fusion (TLIF) surgery at L3-L5.

### a. Initial Infuse® Surgery

1010. On January 8, 2013, Plaintiff Faith Jones was admitted to Crestwood Medical Center in Huntsville, Alabama where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Faith Jones in the Lumbar region of her spine from vertebrae L3 to S1.

1011. During the surgery, Infuse® was used in Plaintiff Faith Jones off-label in the following manners:

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c. Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

d. Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### b. Post-Infuse® Surgery Care and Treatment

1012.    Plaintiff Faith Jones' post-operative period was marked by increasingly radiating pain in her legs, nerve injury, and significant pain.

### c. Plaintiff's Current Condition

1013.    After Plaintiff Faith Jones' Infuse® surgery, she continues to experience pain in her legs, nerve injury, and significant pain, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1014.    Plaintiff Donald Jones is an individual who resides in Athens, Alabama.

1015.    Plaintiff, Donald Jones, is the spouse of Plaintiff Faith Jones.

1016.    Plaintiff, Donald Jones, is bringing a claim for loss of consortium.

## 26. Ella Kinsey

1017.    Plaintiff Ella Kinsey is an individual who resides in Kinston, North Carolina. Plaintiff was born on July 27, 1953. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1018.    On June 8, 2009, Plaintiff Ella Kinsey was admitted to Pitt County Memorial Hospital in Greenville, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Ella Kinsey in the Lumbar region of her spine in order to attempt to fuse vertebrae L4 to S1.

1019.    During the surgery, Infuse® was used in Plaintiff Ella Kinsey off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

    d.    Infuse® was used in a TLIF and Posterolateral surgical approach that was not approved by the FDA (i.e. it was used in transforaminal and posterolateral approaches).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### b. Post-Infuse® Surgery Care and Treatment

1020.     Plaintiff Ella Kinsey's post-operative period was marked by increasing pain, a failure of her hardware, and the onset of a vicious and aggressive cancer.

1021.     After being exposed to a large Infuse® kit over two levels of her spine, Plaintiff Ella Kinsey developed breast cancer.  Approximately six months after her spinal fusion with Infuse®, Plaintiff underwent a mastectomy.  A CT study taken March 16, 2011 found multifocal subcentimeter hypointense lesions scattered throughout the lumbar visualized thoracic and sacral spine.  After biopsy, these are identified to be metastatic, malignant cancer cells. Seventeen days after Plaintiff Ella Kinsey's surgery, her physician, observed that her C-reactive protein is quite high and that might be related to her BMP use.  Approximately six months after Plaintiff's surgery, her surgeon's opinions are unchanged as he notes her CT scan show incomplete incorporation of her interbody grafts with endplate resorption most likely related to her fusion at L4-L5.  Plaintiff suffered a severe inflammatory response to Infuse® which ultimately led to a violent resorption reaction and a failure of her fusion hardware, leading to a non-union.

### c. Plaintiff's Current Condition

1022.      Plaintiff Ella Kinsey has bravely fought both breast and spine cancer, and endured the pain, nausea, and weakness associated with chemotherapy and radiation therapy.  She also suffers significant pain in her lower back from her fusion that never healed, and has otherwise suffered serious injuries.

### 27. Piere Louis and Suzette Louis

1023.     Plaintiff Piere Louis is an individual who resides in Brentwood, New York.  Plaintiff was born on February 16, 1956.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

1024.     On July 14, 2009, Plaintiff Piere Louis was admitted to Lenox Hill Hospital in New York, New York where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Piere Louis in the Lumbar region of his spine from vertebrae L4 to S1.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1025.    During the surgery, Infuse® was used in Plaintiff Piere Louis off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

### b. Post-Infuse® Surgery Care and Treatment

1026.    Plaintiff Piere Louis' post-operative period was marked by increasingly persistent mechanical back pain and left thigh pain. On August 13, 2013, nearly four years after his initial surgery using Infuse®, Plaintiff Piere Louis had to undergo a revision surgery. This surgery consisted of a full decompression of the L4 to L5 exiting nerve root and dura to relieve pressure at the previous Infuse® exposure fusion site.

### c. Plaintiff's Current Condition

1027.    After Plaintiff Piere Louis' Infuse® surgery, Plaintiff was compelled to undergo a risky, costly, and painful revision surgery. Plaintiff experienced and continues to experience radiating pain to the legs and nerve injury, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1028.    Plaintiff Suzette Louis is an individual who resides in Brentwood, New York.

1029.    Plaintiff, Suzette Louis, is the spouse of Plaintiff Piere Louis.

1030.    Plaintiff, Suzette Louis, is bringing a claim for loss of consortium.

## 28. William Malenfant, Jr.

1031.    Plaintiff William Malenfant Jr. is an individual who resides in Palm Bay, Florida. Plaintiff was born on January 17, 1953. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1032.    On December 7, 2009, Plaintiff William Malenfant Jr. was admitted to Wuesthoff Memorial Hospital in Melbourne, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff William Malenfant Jr. in the Lumbar region of his spine from vertebrae L3 to L4.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1033.    During the surgery, Infuse® was used in Plaintiff William Malenfant Jr. off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1034.    Plaintiff William Malenfant Jr.'s post-operative period was marked by increasingly severe pain that radiated to his lower extremities.

### c. Plaintiff's Current Condition

1035.     Plaintiff William Malenfant Jr. suffers from severe pain in his lower back that radiates to his lower extremities, and has otherwise suffered serious injuries.

### 29. Thomas Lee Manigault

1036.    Plaintiff Thomas Lee Manigault is an individual who resides in North Charleston, South Carolina.  Plaintiff was born on December 16, 1948.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1037.    On September 17, 2010, Plaintiff Thomas Lee Manigault was admitted to the East Cooper Medical Center in Mt. Pleasant, South Carolina where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of his spine from vertebrae L4 to L5.

1038.    During the surgery, Infuse® was used in Plaintiff Thomas Lee Manigault off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

    c.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1039.    Plaintiff Thomas Lee Manigault's post-operative period was marked by increasing and severe lower back pain radiating to the lower extremities with increased weakness, numbness and difficulty walking. Additionally Plaintiff suffered from a fluid collection appearing after his surgery.

1040.    Plaintiff's treating physician recommends that Plaintiff undergo a revision surgery to treat his post-Infuse® surgery symptoms and complications.

1041.    An MRI study conducted on October 21, 2010 revealed that Plaintiff has an extensive inflammatory fluid collection in the location of his surgery.

### c. Plaintiff's Current Condition

1042.    Following his Infuse® surgery Plaintiff Thomas Lee Manigault experienced increasingly severe and excruciating lower back pain, which radiated to his lower extremities and right foot, accompanied by weakness and increasing numbness. These nerve injuries were exacerbated by a post-operative inflammatory fluid collection in Plaintiff's spinal surgical site. Plaintiff's severe injuries greatly decrease his mobility and require him to walk with a cane. Due to the serious nature of Plaintiff's deteriorating condition his medical providers recommend her undergo a further revision surgery, and has otherwise suffered serious injuries.

### 30. Ronald Marino and Linda Marino

1043.    Plaintiff Ronald Marino is an individual who resides in Patterson, New York. Plaintiff was born on December 14, 1958. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) surgery.

### a. Initial Infuse® Surgery

1044.    On November 19, 2009, Plaintiff Ronald Marino was admitted to New York University Hospital for Joint Diseases in New York, New York where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Ronald Marino in the Lumbar region of his spine from vertebrae L3 to L4.

1045.    During the surgery, Infuse® was used in Plaintiff Ronald Marino off-label in the

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.  Infuse® was used in a PLIF surgical approach that was not approved by the FDA.

### b. Plaintiff's Current Condition

1046.    Following his Infuse® surgery Plaintiff Ronald Marino experienced increasing severe pain accompanied by radiating pain to the legs and decreased sensation. In addition to these excruciating nerve injuries Plaintiff must contend with cauda equine syndrome along with bladder and bowel incontinence. Plaintiff's quality of life and sense of well-being are further undermined by erectile dysfunction and extremely painful retrograde ejaculation, and has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1047.    Plaintiff Linda Marino is an individual who resides in Patterson, New Jersey.

1048.    Plaintiff, Linda Marino, is the spouse of Plaintiff Ronald Marino.

1049.    Plaintiff, Linda Marino, is bringing a claim for loss of consortium.

### 31. Joseph Mariotti and Lora Mariotti

1050.    Plaintiff Joseph Mariotti is an individual who resides in Port Charlotte, Florida. Plaintiff was born on October 19, 1961. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1051.    On August 28, 2006, Plaintiff Joseph Mariotti was admitted to Sarasota Memorial Hospital in Sarasota, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Joseph Mariotti in the Lumbar region of his spine from vertebrae L4 to L5.

1052.    During the surgery, Infuse® was used in Plaintiff Joseph Mariotti off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

anterior disk space).

c. Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1053.    Plaintiff Joseph Mariotti's injury developed insidiously, as observed on multiple diagnostic studies. A CT study conducted on April 25, 2007 shows that Plaintiff Joseph Mariotti suffered a severe osteolytic reaction whereby the left fact joint appears substantially eroded and there is some apparent destruction of the adjacent posterior endplates of L4 and L5. This bony destruction is not apparent on the preoperative CT study dated March 21, 2006. Osteolysis causes extreme pain in itself, but it also destabilizes the spine, and exacerbates other injuries inflicted by Infuse®. As Plaintiff Joseph Mariotti's condition continued to decline, an MRI dated June 9, 2007 revealed a high signal intensity area within the intervertebral disc space of L4-L5, which may represent an expander. As the bony structure of the spine continued to dissolve, the bone graft migrated, causing neuroforaminal stenosis and ectopic bone growth. This bone growth grew into parts of the spine and impinged on the exiting nerve roots, as evidenced on an MRI dated November 30, 2007 whereby, some foraminal narrowing occurs bilaterally at L4-5 and L5-S1 mostly due to osseous structures.

### c. Plaintiff's Current Condition

1054.    Plaintiff Joseph Mariotti continues to suffer from severe back and lower extremity pain. This pain prevents him from comfortably performing the most basic activities of daily life that he enjoyed before being exposed to Infuse®. Plaintiff has suffered permanent nerve damage that is expressed through numbness and tingling in his legs. His legs unpredictably collapse, forcing him to ambulate with a cane. Because of his exposure to Infuse®, Plaintiff can never enjoy lasting comfort because he cannot tolerate standing, sitting, reclining, or walking for more than 30 minutes at a time and has otherwise suffers severe injury.

### d. Plaintiff's Spouse

1055.    Plaintiff Lora Mariotti is an individual who resides in Port Charlotte, Florida.

1056.    Plaintiff, Lora Mariotti, is the spouse of Plaintiff Joseph Mariotti.

1057.    Plaintiff, Lora Mariotti, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### 32. Troy Mason

1058.    Plaintiff Troy Mason is an individual who resides in Farmville, North Carolina.  Plaintiff was born on August 4, 1958.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

#### a. Initial Infuse® Surgery

1059.    On January 2nd, 2007, Plaintiff Troy Mason was admitted to Pitt County Memorial Hospital in Greenville, North Carolina where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Troy Mason in the Lumbar region of his spine from vertebrae L1 to S1.

1060.    During the surgery, Infuse® was used in Plaintiff Troy Mason off-label in the following manners:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

d.    Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

#### b. Post-Infuse® Surgery Care and Treatment

1061.    Plaintiff Troy Mason's post-operative period was marked by increasingly severe pain and weakness in his lower back and lower extremities.

1062.    On January 18, 2008, nearly one year after his initial surgery using Infuse®, Plaintiff Troy Mason had to undergo a revision surgery.

1063.    Since the revision surgery, Plaintiff Troy Mason continues to suffer significant pain and numbness that interferes with his ability to perform activities of daily living.

1064.    The CT study performed on May 30, 2012 shows that Plaintiff Troy Mason continues to experience an exuberant overgrowth of bone that painfully impinges on the exiting nerve roots of his lumbar spine. Comparing this region to surgeon Plaintiff's physician's observations during the January

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

18, 2008 revision surgery, the May 30, 2012 CT study reports bilateral lateral bridging osteophytes in the left larger than right. These osteophytes are a regrowth of bone that had been resected in the revision surgery, and exert an excruciating pressure on the exiting nerve roots of the spine. Furthermore, excess bone has continued to grow throughout the Infuse® application site as evidenced by bilateral disc osteophyte complexes extending into the neural foramina. These bony osteophytes growing into the neural foramina, are effectively strangling the nerves that exit the spine causing pain and neurologic deficit that radiates into the lower extremities.

### c. Plaintiff's Current Condition

1065.    Plaintiff Troy Mason now suffers from pain so severe that he is unable to perform the most basic activities of daily living that he used to enjoy preoperatively. He is unable to walk, stand, or lay down for extended periods of time, rendering him incapable of ever finding lasting comfort, and has otherwise suffered serious injuries.

### 33. Troy Mcgowan

1066.    Plaintiff Troy Mcgowan is an individual who resides in Clear Lake, South Dakota. Plaintiff was born on December 24, 1986. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral and Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

1067.    On February 4, 2002, Plaintiff Troy Mcgowan was admitted to Unity Hospital in Fridley, Minnesota where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Troy Mcgowan in the Lumbosacral region of his spine from vertebrae L5 to S1.

1068.    During the surgery, Infuse® was used in Plaintiff Troy Mcgowan off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

d.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Plaintiff's Current Condition

1069.    Plaintiff Troy Mcgowan's post-operative period is marked by increasingly severe pain and weakness in his back and lower extremities, and has otherwise suffered serious injuries.

### 34. Timmy McGregor and Cathy McGregor

1070.    Plaintiff Timmy McGregor is an individual who resides in Perry, Florida. Plaintiff was born on August 14, 1965. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) and Posterolateral surgery.

### a. Initial Infuse® Surgery

1071.    On March 23, 2010, Plaintiff Timmy McGregor was admitted to North Florida Regional Medical Center in Gainesville, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Timmy McGregor in the Lumbosacral region of his spine from vertebrae L4 to S1.

1072.    During the surgery, Infuse® was used in Plaintiff Timmy McGregor off-label in the following manners:

a.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

b.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

c.  Infuse® was used in a TLIF and Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1073.    Plaintiff Timmy McGregor's post-operative period was marked by increased and severe low back and radiating leg pain.

1074.    An MRI study conducted on April 6, 2011 shows that plaintiff continued to experience severe lower back and leg pain post-Infuse® surgery.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### c. Plaintiff's Current Condition

1075.    Plaintiff's post-Infuse® surgery was marked not by recovery but increasingly severe and excruciating low back and leg pain, and has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1076.    Plaintiff Cathy McGregor is an individual who resides in Perry, Florida.

1077.    Plaintiff, Cathy McGregor, is the spouse of Plaintiff Timmy McGregor.

1078.    Plaintiff, Cathy McGregor, is bringing a claim for loss of consortium.

## 35.  Gabriel Michael and Bernadette Michael

1079.    Plaintiff Gabriel Michael is an individual who resides in Kinston, North Carolina. Plaintiff was born on July 11, 1952.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgeries.

### a. Initial Infuse® Surgery

1080.    On February 18, 2009, Plaintiff Gabriel Michael was admitted to St. Anthony's Medical Center in the City of St. Louis, Missouri where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Gabriel Michael in the Lumbar region of his spine from vertebrae L4 to L5.

1081.    During the surgery, Infuse® was used in Plaintiff Gabriel Michael off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters).

c.  Infuse® was used in a PLIF and Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1082.    Plaintiff Gabriel Michael's post-operative period was marked by sexual dysfunction and increasingly severe pain that radiated from the lower back into the lower extremities.

1083.    Postoperatively, Plaintiff Gabriel Michael developed a form of sexual dysfunction called retrograde ejaculation.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### c. Plaintiff's Current Condition

1084.    After his exposure to Infuse®, Plaintiff Gabriel Michael is unable to have children or fully enjoy the intimacy of married life, has lived with severe pain, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1085.    Plaintiff Bernadette Michael is an individual who resides in Kinston, North Carolina.

1086.    Plaintiff, Bernadette Michael, is the spouse of Plaintiff Gabriel Michael.

1087.    Plaintiff, Bernadette Michael, is bringing a claim for loss of consortium.

## 36. Saint Miles Jr.

1088.    Plaintiff Saint Miles Jr. is an individual who resides in Davenport, Iowa.  Plaintiff was born on February 14, 1965.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1089.    On January 31, 2012, Plaintiff Saint Miles Jr. was admitted to Blodgett Hospital in Grand Rapids, Michigan where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Saint Miles Jr. in the Lumbar region of his spine from vertebrae L4 to L5.

1090.    During the surgery, Infuse® was used in Plaintiff Saint Miles Jr. off-label in the following manners:

    a.   Infuse® was used without the mandatory approved LT-cage.

    b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.   Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1091.    Plaintiff Saint Miles Jr.'s post-operative period was marked by increasingly severe and painful low back pain, spinal hardware instability, bone overgrowth and radiating leg pain with numbness and loss of sensation.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1092.    A CT scan conducted on November 12, 2012 reveals that Plaintiff Saint Miles Jr. continues to experience severe low back pain, hardware screw fracture and lack of bony fusion, and bone overgrowth in the surgical area of his spine.

### c. Plaintiff's Current Condition

1093.    Following Plaintiff Saint Miles Jr.'s Infuse® surgery, he experienced increasing severe lower back pain radiating to his leg with increased numbness and a loss of sensation.  In addition Plaintiff's spinal fusion hardware became increasingly unstable and failed to consolidate.  Bone overgrowth at Plaintiff's spine surgical site further contributed to his symptoms and difficulty.  The increasing complications since the surgery have negatively impacted Plaintiff's quality of life and presented him with excruciating pain that is difficult to control, and has otherwise suffered serious injuries.

### 37. Major Mosley and Margaret A. Mosley

1094.    Plaintiff Major Mosley is an individual who resides in Milwaukee, Wisconsin. Plaintiff was born on December 12, 1956.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1095.    On March 18, 2011, Plaintiff Major Mosley was admitted to Aurora St. Luke's Medical Center of Aurora in Milwaukee, Wisconsin where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Major Mosley in the Lumbar region of his spine from vertebrae L4 to S1.

1096.    During the surgery, Infuse® was used in Plaintiff Major Mosley off-label in the following manners:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

   d.  Infuse® was used in a Posterolateral surgical approach that was not approved by the

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

FDA.

### b. Post-Infuse® Surgery Care and Treatment

1097.     Plaintiff Major Mosley has experienced increasingly severe radiating pain in his legs and lower back.   Plaintiff is currently disabled as he is unable to perform simple activities such bending, twisting, and lifting.  Plaintiff has difficulty driving due to unrelenting pain.  Plaintiff is unable to maintain an intimate relationship with his wife due to the pain throughout his back and legs.  Plaintiff is unable to enjoy simple activities that were routine pre-operatively such as fishing, working around his home, or caring for his wife and son, and has otherwise suffered serious injuries

### d. Plaintiff's Spouse

1098.     Plaintiff Margaret A. Mosley is an individual who resides in Milwaukee, Wisconsin.

1099.     Plaintiff, Margaret A. Mosley, is the spouse of Plaintiff Major Mosley.

1100.     Plaintiff, Margaret A. Mosley, is bringing a claim for loss of consortium.

### 38. Jeffrey Mulloy and Pamela Mulloy

1101.     Plaintiff Jeffrey Mulloy is an individual who resides in Elkhorn, Wisconsin.  Plaintiff was born on December 12, 1951.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral fusion surgeries.

### a. Initial Infuse® Surgery

1102.     On December 26, 2007, Plaintiff Jeffrey Mulloy was admitted to Aurora St. Luke's Medical Center in Milwaukee, Wisconsin where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Jeffrey Mulloy in the Lumbar region of his spine from vertebrae L4 to S1.

1103.     During the surgery, Infuse® was used in Plaintiff Jeffrey Mulloy off-label in the following manners:

   a.   Infuse® was used without the mandatory approved LT-cage.

   b.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c.   Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

d. Infuse® was used in a PLIF and Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1104.    Plaintiff Jeffrey Mulloy's post-operative period was marked by increasingly severe pain that radiated from his low back to his bilateral lumbar extremities.

1105.    On September 9, 2011, nearly three and a half years followings his initial surgery using Infuse®, Plaintiff Jeffrey Mulloy had to undergo a revision surgery.

1106.    Since the revision surgery, Plaintiff Jeffrey Mulloy continues to suffer significant pain, neurologic deficit, and functional impairment.

1107.    While performing the revision surgery on Plaintiff Jeffrey Mulloy on September 9, 2011, Plaintiff's physicians observed that the screws at S1 had been fractured midway through the screw itself. He noted the left-sided fusion mass was poorly consolidated.

### c. Plaintiff's Current Condition

1108.    Plaintiff Jeffrey Mulloy was compelled to undergo a risky, costly, and painful revision surgery.  Plaintiff has suffered and continues to suffer severe pain that radiates from his lower back to his bilateral lower extremities.  Walking and standing often leads to shocking pain throughout his back and radiates through lower extremities.  This pain precludes him from performing many of the activities of daily living that he used to enjoy preoperatively.  Plaintiff has difficulty maintaining an intimate relationship with his wife due to retrograde ejaculation and constant pain.  It is painful for him to stand, sit, walk, and lay down, essentially keeping him from ever finding lasting comfort, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1109.    Plaintiff Pamela Mulloy is an individual who resides in Elkhorn, Wisconsin.

1110.    Plaintiff, Pamela Mulloy, is the spouse of Plaintiff Jeff Mulloy.

1111.    Plaintiff, Pamela Mulloy, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### 39. Helena Muse

1112.    Plaintiff Helena Muse is an individual who resides in Clinton, Maryland.  Plaintiff was born on February 19, 1960.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

#### a. Initial Infuse® Surgery

1113.    On October 12, 2010, Plaintiff Helena Muse was admitted to Georgetown University Hospital in Washington, D.C. where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Helena Muse in the Lumbar region of her spine from vertebrae L4 to S1.

1114.    During the surgery, Infuse® was used in Plaintiff Helena Muse off-label in the following manners:

   a.    Infuse® was used without the mandatory approved LT-cage.

   b.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

#### b. Post-Infuse® Surgery Care and Treatment

1115.    Plaintiff Helena Muse's post-operative period was marked by increasingly numbness and tingling; severe back pain (where the surgery was performed); pain in the thighs/buttocks; difficulty sleeping; and she has been unable to exercise, drive, cook, and/or perform housework for extended periods of time.

#### c. Plaintiff's Current Condition

1116.     After Plaintiff Helena Muse's surgery, she continues to experience numbness and tingling; back pain (where the surgery was performed); pain in the thighs/buttocks; difficulty sleeping; and she has been unable to exercise, drive, cook, and/or perform housework for extended periods of time, and has otherwise suffered serious injuries.

### 40. Michael Newkirk

1117.    Plaintiff Michael Newkirk is an individual who resides in Pottstown, Pennsylvania. Plaintiff was born on February 7, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse®,

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

was used off-label in a Posterolateral spinal fusion surgery.

### a. Initial Infuse® Surgery

1118.    On October 2, 2011, Plaintiff Michael Newkirk was admitted to Pottstown Memorial Medical Center in Pottstown, Pennsylvania where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Michael Newkirk in the Lumbar region of his spine in order to attempt to fuse vertebrae L4 to S1.

1119.    During the surgery, Infuse® was used in Plaintiff Michael Newkirk off-label in the following manners:

   a.    Infuse® was used without the mandatory approved LT-cage.

   b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters)

   c.    Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval

   d.    Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1120.    Plaintiff Michael Newkirk's post-operative period was marked by increasingly severe radiating pain from his lower back to his legs, left foot and calf.

1121.    An x-ray study conducted on February 3, 2012 showed L4 and L5 laminectomy defects with bone resorption around S1 pedicle screw threads of Plaintiff's spinal fusion with motion and a potential lack of fusion of the spinal hardware.

### c. Plaintiff's Current Condition

1122.    After Plaintiff Michael Newkirk's Infuse® surgery he began to experience significant and excruciating lower back pain. Plaintiff did not receive any relief after Infuse surgery and his pain increased and radiated from his lower back down to his legs. This severe pain was particularly pronounced in Plaintiff's left calf and foot and exacerbated his nerve injury, gastrointestinal discomfort and difficulty swallowing. As a result of these complications Plaintiff's treating physicians have

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

recommended the implantation of a nerve stimulator device to attempt to manage Plaintiff's symptoms and he has otherwise suffered serious injuries.

**41. Harold Ogg Jr.**

1123.　Plaintiff Harold Ogg Jr. is an individual who resides in Cedar Springs, Michigan. Plaintiff was born on October 9, 1956. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterior fusion surgery.

### a. Initial Infuse® Surgery

1124.　On March 15, 2011, Plaintiff Harold Ogg Jr. was admitted to Carson City Hospital in Carson City, Missouri where surgeon performed a spine fusion surgery on Plaintiff Harold Ogg Jr. in the Lumbar region of his spine from vertebrae L3 to L5.

1125.　During the surgery, Infuse® was used in Plaintiff Harold Ogg Jr. off-label in the following manners:

 a.　Infuse® was used without the mandatory approved LT-cage.

 b.　Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

 c.　Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

 d.　Infuse® was used in a PLIF and Posterior surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1126.　Plaintiff Harold Ogg Jr.'s post-operative period was marked by increasingly severe pain, numbness, and tingling in his lower back that radiated to his bilateral lower extremities. He also had to undergo an expensive and painful revision surgery, and developed a stage III T2N1M0 squamous carcinoma of the oropharynx.

1127.　On February 17, 2012, 103 weeks after his initial surgery using Infuse®, Plaintiff Harold Ogg Jr. had to undergo a revision surgery.

1128.　Since the revision surgery, Plaintiff Harold Ogg Jr. continues to suffer significant and

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

chronic low back and lower extremity pain.

1129.    A CT scan on November 5, 2011 shows that Plaintiff Harold Ogg Jr. continues to experience ectopic bone growth emerging from the Infuse® application site and effacing the exiting nerve roots. This exuberant bone growth is not visible on the preoperative October 18, 2010 MRI study. Additionally, a PET-CT study dated May 4, 2012 revealed a small focus of hypermetabolism high in the left posterolateral nasopharynx. A biopsy identified this as a stage three squamous carcinoma of the oropharynx. This cancer was not known to exist prior to Plaintiff Harold Ogg Jr.'s Infuse® exposure.

### c. Plaintiff's Current Condition

1130.    Since his March 15, 2011 surgery using Infuse®, Plaintiff Harold Ogg Jr. has been compelled to undergo a risky, costly, and painful revision surgery. Plaintiff has endured and continues to endure severe pain and hardship. His pain begins in his lower back and radiates to his lower extremities. He has extreme sharp pain and numbness in his left leg. It impairs his ability to perform basic activities of daily living including walking for more than 100 yards, sitting, standing, laying down, housework, grooming, and toileting. He also had to endure months of radiation and chemotherapy, rendering him weak, with nausea, and with added pain. The chemotherapy has rendered Plaintiff Harold Ogg unable to eat whole food requiring all that foods are blended before consumption, and he has otherwise suffered serious injuries.

### 42. Minnie Olinger

1131.    Plaintiff Minnie Olinger is an individual who resides in Milwaukee, Wisconsin. Plaintiff was born on November 30, 1952. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Cervical Discectomy and Fusion surgery for Plaintiff Minnie Olinger by Plaintiff's physician.

### a. Initial Infuse® Surgery

1132.    On November 16, 2006, Plaintiff Minnie Olinger was admitted to Aurora Health Care – St. Luke's Medical Center in Milwaukee, WI where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Minnie Olinger in the cervical region of her spine from vertebrae C5-C6.

1133.    During the surgery, Infuse® was used in Plaintiff Minnie Olinger off-label in the

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in an anterior cervical surgical approach that was not approved by the FDA.

    c.  Infuse® was used in a region of the spine outside of the approval (i.e. it was used in the cervical region)

### b. Post-Infuse® Surgery Care and Treatment

1134.    Plaintiff Minnie Olinger's post-operative period was marked by increasingly severe pain that radiated from the neck into the right hand, difficulty breathing, and nerve injury. An MRI study of the Infuse® exposure site taken on August 6, 2008 reveals evidence of myomalacia involving the right aspect of the cord at the lower C5 level Myomalacia is a rotting of the spinal column, and as it progresses, Plaintiff's injuries will become increasingly severe.

### c. Plaintiff's Current Condition

1135.    After Plaintiff Minnie Olinger's Infuse® surgery her neck is no longer able to support the weight of her head.  She feels like her neck is "falling," and despite wearing a cumbersome neck brace, she continues to feel severe and unrelenting pain from her neck into her right hand. She is losing sensation in her upper extremities, and is worried about how her condition will continue to deteriorate.

### 43. Veronica Palacio

1136.    Plaintiff Veronica Palacio is an individual who resides in Miami, Florida.  Plaintiff was born on September 2, 1980.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1137.    On February 25, 2010, Plaintiff Veronica Palacio was admitted to Doctors Hospital in Corral Gables, Florida where Plaintiff's surgeon performed a spine fusion surgery in the Lumbar region of her spine in order to attempt to fuse vertebrae L4 to S1.

1138.    During the surgery, Infuse® was used in Plaintiff Veronica Palacio off-label in the

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

following manners:

    a. Infuse® was used without the mandatory approved LT-cage.

    b. Infuse® was used in surgical techniques in which no cage was used and Infuse® was placed in the disk space.

    c. Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

    d. Infuse® was used in a (TLIF) surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1139.    Plaintiff Veronica Palacio's post-operative period was marked by increasingly severe pain to her lower back and bilateral lower extremities.

1140.    An MRI study conducted on March 14, 2010 shows that Plaintiff Veronica Palacio suffered a severe inflammatory reaction to Infuse® that resulted in a fusiform fluid collection within the subcutaneous fat extending from L3 down through S2. An additional smaller collection was noted along the paraspinal tissues at L4-L5 midline and to the left abutting the thecal sac dorsal aspect with mild indentation. Comparing this region to a preoperative February 20, 2010 MRI study, the March 14, 2010 MRI study provides a clinical explanation for Plaintiff's severe post-operative pain and radicular symptoms.

### c. Plaintiff's Current Condition

1141.    Plaintiff Veronica Palacio suffers severe and debilitating pain that preclude her from performing the simple activities of daily life that she enjoyed preoperatively. This pain caused her to lose her source of employment, and she has since filed for disability, and has otherwise suffered serious injuries.

### 44. Caroline Payne and Cletus Lee Payne

1142.    Plaintiff Caroline Payne is an individual who resides in Herrin, Illinois. Plaintiff was born on April 1, 1979. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody (PLIF) Surgery for Plaintiff Caroline Payne by Plaintiff's physician.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1143.    **a. Initial Infuse® Surgery**

1144.    On January 30, 2012, Plaintiff Caroline Payne was admitted to Good Samaritan Regional health Center in Mount Vernon, Illinois where Plaintiff's surgeon performed a spine fusion surgery on the Lumbosacral region of her spine from vertebrae L5 to S1.

1145.    During the surgery, Infuse® was used in Plaintiff Caroline Payne off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in a (PLIF) surgical approach that was not approved by the FDA (i.e. it was used in a posterior approach).

**b. Post-Infuse® Surgery Care and Treatment**

1146.    Plaintiff Caroline Payne's post-operative period was marked by increasingly severe back pain and bones spurs in her surgery site.

1147.    A CT study dated July 26, 2013 shows that Plaintiff continues to experience severe back pain. The study also revealed ectopic bone growth at Plaintiff's Infuse® surgery cite.

**c. Plaintiff's Current Condition**

1148.    Subsequent to Plaintiff Caroline Payne's Infuse® surgery she experiences excruciating back pain and nerve injury. This injury has left her unable to ambulate for more than a few minutes. She now suffers from dyspareunia which interferes with the intimacy she would otherwise share with her husband. She has been rendered unemployable, and has otherwise suffered serious injuries.

**d. Plaintiff Spouse**

1149.    Plaintiff Cletus Lee Payne is an individual who resides in Herrin, Illinois.

1150.    Plaintiff, Cletus Lee Payne, is the spouse of Plaintiff Caroline Payne.

1151.    Plaintiff, Cletus Lee Payne, is bringing a claim for loss of consortium.

**45. Cynthia Pfeil**

1152.    Plaintiff, Cynthia Pfeil is an individual who resides in Cochecton, New York. Plaintiff was born on May 1, 1978. Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-

label in a Posterolateral spinal fusion surgery for Plaintiff, Cynthia Pfeil by Plaintiff's physician.

### a. Initial Infuse® Surgery

1153.    On May 18, 2011, Plaintiff Cynthia Pfeil was admitted to Putnam Hospital in Carmel, New York where Plaintiff's physicians performed a spine fusion surgery on Plaintiff Cynthia Pfeil in the Lumbar region of her spine from vertebrae L5-S1.

1154.    During the surgery, Infuse® was used in Plaintiff Cynthia Pfeil off-label in the following manners:

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the lateral gutters)

c. Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1155.    Plaintiff Cynthia Pfeil's post-operative period was marked by initial relief, followed by increasingly severe pain, that eventually developed into paresthesias including numbness and tingling that radiated through her left lower extremity.

1156.    Plaintiff Cynthia Pfeil underwent a lumbar MRI study on July 16, 2013 that identifies reactive endplate changes at L5 and S1.  It also finds heterotopic bone emerging from the Infuse® exposure site that narrows the bilateral neuroforamen at the L5 to S1 levels.  This effectively strangles the exiting nerve roots, and is Plaintiff's primary pain generator.  These changes were not visible on any preoperative imaging.

### c. Plaintiff's Current Condition

1157.    Plaintiff Cynthia Pfeil was initially pleased with the outcome of her spinal fusion. Approximately six months after her surgery, however, she began to feel severe pain that begins in her low back, and radiates into her lower extremities.  This pain is of an insidious onset, and now Plaintiff reports that her condition is far worse than it ever was preoperatively.  As her nerve injury progresses, and her nerves die, she feels numbness in her legs that causes her to collapse.  She is unable to perform

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

the most basic activities of daily living that she used to enjoy, pain free, preoperatively. She has been rendered unemployable, and is faced with the possibility of undergoing a dangerous, costly, and painful revision surgery to mitigate the damage of this permanent and progressive injury. Otherwise, she continues to suffer from other severe injuries.

### 46. Michael Rivers

1158.    Plaintiff Michael Rivers is an individual who resides in St. Paul, Minnesota. Plaintiff was born on June 13, 1956. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior cervical fusion surgery.

#### a. Initial Infuse® Surgery

1159.    On December 14, 2007, Plaintiff Michael Rivers was admitted to Regions Hospital in St. Paul, Minnesota where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Michael Rivers in the Cervical region of his spine in order to attempt to fuse vertebrae C3 to C6.

1160.    During the surgery, Infuse® was used in Plaintiff Michael Rivers off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c.  Infuse® was used in a region of the spine outside of the approval (i.e. it was used in the cervical region).

d.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

e.  Infuse® was used in a Posterior surgical approach that was not approved by the FDA.

#### b. Post-Infuse® Surgery Care and Treatment

1161.    Plaintiff Michael Rivers' post-operative period was marked by increasingly severe neck pain as well as increasing difficulty and discomfort with swallowing and speaking. Plaintiff was also diagnosed with a squamous cell carcinoma node on his vocal cord.

1162.    A CT study conducted on July 6, 2010 show that Plaintiff Michael Rivers continues to

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

experience neck pain, hardening and overgrowth of the bone joints along with looseness in the C6 spine vertebrae.

### c. Plaintiff's Current Condition

1163. Plaintiff Michael Rivers continues to experience neck pain along with difficulty speaking and swallowing following his Infuse® surgery and cancer diagnosis, and has otherwise suffered serious injuries.

### 47. Yvonne Russell

1164. Plaintiff Yvonne Russell is an individual who resides in Dallas, Texas. Plaintiff was born on July 24, 1956. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior and Posterolateral L4-L5 fusion surgery.

### a. Initial Infuse® Surgery

1165. On October 28, 2011, Plaintiff Yvonne Russell was admitted to Baylor Medical Center in Dallas, Texas where Plaintiff's surgeon performed a spine fusion surgery in the lumbar region of her spine from vertebrae L4 to L5.

1166. During the surgery, Infuse® was used in Plaintiff Yvonne Russell off-label in the following manners:

    a. Infuse® was used without the mandatory approved LT-cage.

    b. Infuse® was used in a Posterior and Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1167. Plaintiff Yvonne Russell's post-operative period was marked by increasingly difficulty breathing, radiating pain to the legs and hip, and significant back pain.

### c. Plaintiff's Current Condition

1168. After Plaintiff Yvonne Russell's Infuse® surgery, she continues to experience difficulty breathing, radiating pain to the legs and hip, and significant back pain, and has otherwise suffered serious injuries.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### 48. Maurice Samai and Preteedersanee Samai

1169.    Plaintiff Maurice Samai is an individual who resides in Margate, Florida.  Plaintiff was born on October 7, 1940.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) surgery.

#### a. Initial Infuse® Surgery

1170.    On November 6, 2009, Plaintiff Maurice Samai was admitted to Wellington Regional Medical Center in West Palm Beach, Florida where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Maurice Samai in the Lumbosacral region of his spine from vertebrae L5 to S1.

1171.    During the surgery, Infuse® was used in Plaintiff Maurice Samai off-label in the following manners:

a.    Infuse® was used without the mandatory approved LT-cage.

b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c.    Infuse® was used in a PLIF surgical approach that was not approved by the FDA.

#### b. Post-Infuse® Surgery Care and Treatment

1172.    Plaintiff Maurice Samai's post-operative period was marked by increasingly severe and unrelenting pain to his lower extremities.  He has been prescribed high doses of narcotic pain medication with risky and undesirable side effects.

#### c. Plaintiff's Current Condition

1173.    Following Plaintiff Maurice Samai's Infuse® surgery he began to suffer severe radicular pain and chronic nerve damage.  As his nerves die, he has felt paresthesias, including numbness and tingling, with increasing frequency.  His legs give out, causing him to collapse, and he is forced to ambulate with a cane, and has otherwise suffered serious injuries.

#### d. Plaintiff Spouse

1174.    Plaintiff Preteedersanee Samai is an individual who resides in Margate, Florida.

1175.    Plaintiff, Preteedersanee Samai, is the spouse of Plaintiff Maurice Samai.

1176.    Plaintiff, Preteedersanee Samai, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

**49. Danny Sanders and Candra Sanders**

1177.    Plaintiff Danny Sanders is an individual who resides in Buffalo, New York.  Plaintiff was born on September 27, 1968.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion (ALIF) surgery.

### a. Initial Infuse® Surgery

1178.    On October 23, 2010, Plaintiff Danny Sanders was admitted to Sisters of Charity Hospital in Buffalo, New York where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Danny Sanders in the Lumbar region of his spine from vertebrae L5 to S1.

1179.    During the surgery, Infuse® was used in Plaintiff Danny Sanders off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage

### b. Post-Infuse® Surgery Care and Treatment

1180.    An MRI study conducted on March 18, 2011 shows that Plaintiff Danny Sanders developed a severe and persistent fluid collection that compromised his fusion hardware, displacing it so that it occluded the right-sided neuroforamen as evidenced on a CT study conducted on the same date. This fluid collection does not resolve, and is again evidenced on an MRI study dated May 14, 2012.  A Lumbar EMG/NCV taken on June 13, 2012 finds that Plaintiff Danny Sanders' pain generator is the right-sided neuroforamen from the same level of the spine. By comparison, there is no identifiable fluid collection on the preoperative October 13, 2010 MRI study.

### c. Plaintiff's Current Condition

1181.    Plaintiff Danny Sanders suffers from severe and insidious low back pain that radiates to his lower extremities.  This pain complicates even the most simple activities of daily life including walking, sitting, standing, and laying down.  A painful and expensive revision surgery has been recommended, and he has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1182.    Plaintiff Candra Sanders is an individual who resides in Buffalo, New York.

1183.    Plaintiff, Candra Sanders, is the spouse of Plaintiff Danny Sanders.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1184.    Plaintiff, Candra Sanders, is bringing a claim for loss of consortium.

**50. Laura Saude**

1185.    Plaintiff Laura Saude is an individual who resides in Yakima, Washington. Plaintiff was born on November 21, 1959. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

**a. Initial Infuse® Surgery**

1186.    On October 8, 2008, Plaintiff Laura Saude was admitted to the Billings Clinic in Billings, Montana where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Laura Saude in the Lumbar region of her spine from vertebrae L4 to L5.

1187.    During the surgery, Infuse® was used in Plaintiff Laura Saude off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage

    b.    Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters)

    c.    Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

**b. Post-Infuse® Surgery Care and Treatment**

1188.    Plaintiff Laura Saude's post-operative period was marked by initial relief followed by severe and unrelenting pain to her lower extremities.

1189.    An MRI study conducted on December 29, 2011 shows that Plaintiff Laura Saude experiences posterior element hypertrophy. There is foraminal narrowing on the left at the Infuse® application site. This injury was not previously evidenced nor remarked upon by her surgeon when he performed the surgery on October 8, 2008.

**c. Plaintiff's Current Condition**

1190.    Plaintiff Laura Saude continues to suffer nerve damage that is expressed as severe and unrelenting pain to her lower extremities. This pain precludes her from performing the most basic activities of daily living that she used to enjoy before she was exposed to Infuse®, and she has otherwise

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

suffered serious injuries.

### 51. Tonya Smith

1191.    Plaintiff Tonya Smith is an individual who resides in Macon, Georgia.  Plaintiff was born on February 2, 1973.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1192.    On December 19, 2011, Plaintiff Tonya Smith was admitted to the Medical Center of Central Georgia in Macon, Georgia where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Tonya Smith in the Lumbosacral region of her spine from vertebrae L4 to S1.

1193.    During the surgery, Infuse® was used in Plaintiff Tonya Smith off-label in the following manners:

   a.  Infuse® was used without the mandatory approved LT-cage.

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

   d.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1194.    Plaintiff Tonya Smith's post-operative period was marked by increasingly severe lower back pain and a yellow drainage from the surgical wound.  Plaintiff's severe low back pain worsened after surgery and began to radiate into her thighs and lower extremities with a marked increase in weakness in her legs.

1195.    An MRI study conducted on September 20, 2012 show that Plaintiff Tonya Smith continues to experience fluid collection and bony hypertrophy in the posterior spinal elements.

### c. Plaintiff's Current Condition

1196.    Since Plaintiff Tonya Smith's Infuse® surgery she has experienced significant and

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

excruciating nerve injuries and lower back pain. Plaintiff's Infuse® surgery offered no relief for her spinal conditions, on the contrary her severe pain began to radiate to her lower extremities exacerbating her pain and discomfort. This extensive injury leaves Plaintiff unable to sit, stand or lie down for any extended period of time. Plaintiff's excruciating pain leaves her unable to sleep further detracting from her quality of life, and she has otherwise suffered serious injuries.

## 52. Darryl Sparlin and Joanna Ruth Sparlin

1197.    Plaintiff Darryl Sparlin is an individual who resides in Webb City, Missouri. Plaintiff was born on September 8, 1957. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Tranforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1198.    On October 20, 2008, Plaintiff Darryl Sparlin was admitted to St. John's Regional Medical Center in Joplin, Missouri where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Darryl Sparlin in the Lumbar region of his spine from vertebrae L5 to S1.

1199.    During the surgery, Infuse® was used in Plaintiff Brian Curtis, M.D. off-label in the following manners:

      a.    Infuse® was used without the mandatory approved LT-cage.

      b.    Infuse® was used in a (TLIF) surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1200.    Plaintiff Darryl Sparlin's post-operative period was marked by increasingly severe pain, weakness, and numbness in his legs.

1201.    MRI study conducted on November 8, 2012, revealed central canal stenosis, left lateral recess stenosis, bilateral foraminal stenosis, soft tissue attenuation in the left posterolateral aspect of the spinal canal and left lateral recess early ectopic bone formation. Additionally, bilateral foraminal stenosis at L5-S1, and impingement of the left L4 root due early ectopic bone growth.

1202.    Darryl Sparlin received a spinal Stimulator inserted at St. Johns Hospital in June 2009. He suffers from numbness in his legs, when sitting which leads to difficulty while driving.

### c. Plaintiff's Current Condition

1203.    Plaintiff Darryl Sparlin suffers from debilitating radiating pain, weakness, and numbness in his lower extremities deriving from severe nerve injury.  His daily life is greatly impacted by his inability to function without severe pain.  Plaintiff Darryl Sparlin is losing his independence, as his condition is progresses to the point where simple tasks such as driving his car are becoming more difficult and dangerous, and he has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1204.    Plaintiff Joanna Ruth Sparlin is an individual who resides in Webb City, Missouri.

1205.    Plaintiff, Joanna Ruth Sparlin, is the spouse of Plaintiff Darryl Sparlin.

1206.    Plaintiff, Joanna Ruth Sparlin, is bringing a claim for loss of consortium.

## 53. Jason St. Pierre

1207.    Plaintiff Jason St. Pierre is an individual who resides in Westfield, Massachusetts. Plaintiff was born on July 22, 1974.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1208.    On October 18, 2006, Plaintiff Jason St. Pierre was admitted to Cooley Dickinson Hospital in Northhampton, Massachusetts where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Jason St. Pierre in the lumbar region of his spine from vertebrae L5-S1.

1209.    During the surgery, Infuse® was used in Plaintiff Jason St. Pierre off-label in the following manners:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in a posterolateral and posterior surgical approach that was not approved by the FDA.

   c. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space and lateral gutters)

### b. Post-Infuse® Surgery Care and Treatment

1210.    Plaintiff Jason St. Pierre's post-operative period was marked by excruciating pain that

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

radiates from his low back to his bilateral lower extremities. It has necessitated the implantation of a spinal cord stimulator, which failed to improve his symptoms. A CT study, conducted at the Infuse® exposure site on February 16, 2012, reveals there is graft in the disc which bulges posteriorly to the left and results in a very large left paramedian osteophyte markedly narrowing the left exit foramen. This bone growth that emerges from the precise location where Infuse® was applied obliterates the disc space and effectively strangles the nerves that exit the lower lumbar spine. The ectopic bone growth that causes Plaintiff's suffering is neither noted by his surgeon during the initial fusion, nor is it visible on any available preoperative diagnostic imaging studies.

### c. Plaintiff's Current Condition

1211.    After Plaintiff Jason St. Pierre's exposure to Infuse® Bone Morphogenetic Protein, he has gone on to suffer permanent nerve injury that precludes him from performing the most basic activities of daily living that he used to enjoy, pain free, prior to his surgery. It is impossible for him to find lasting comfort as he can neither stand, sit, walk, nor recline for extended periods of time. The functional impairment that Infuse® has caused him has rendered him unemployable. On January 25, 2013, Plaintiff's surgeon observes that Infuse® entirely, unequivocally, substantiates all his pain complaints. He goes on to recommend an aggressive treatment paradigm including epidural selective nerve root bloc and referral to a neurosurgeon for consultation for possible revision. He is in excruciating pain. He sleeps poorly. He has a very poor quality of life. He is left with the prospect of enduring another painful, expensive, and dangerous revision surgery to mitigate the long-term effects of his permanent injury, and is otherwise severely injured, and has otherwise suffered serious injuries.

### 54. April Sterling

1212.    Plaintiff April Sterling is an individual who resides in Springfield Gardens, New York. Plaintiff was born on March 10, 1969. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral spinal fusion surgery for Plaintiff, April Sterling by Plaintiff's physician.

### a. Initial Infuse® Surgery

1213.    On January 19, 2011, Plaintiff April Sterling was admitted to Franklin Northshore

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Medical Center in Valley Stream, New York where Plaintiff's surgeon performed a spine fusion surgery in the Lumbosacral region of her spine in from vertebrae L3 to S1.

1214.    During the surgery, Infuse® was used in Plaintiff April Sterling off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    c.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

    d.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1215.    Plaintiff April Sterling's post-operative period was marked by pain that increased to the point that it is currently intolerable.  Her injury continues to progress, causing chronic and permanent nerve damage.  She has been prescribed high doses of narcotic pain medication with risky and undesirable side effects.

### c. Plaintiff's Current Condition

1216.    Plaintiff April Sterling experiences severe pain as beginning in her low back and radiating down the back of her legs into her left heel. She has begun to feel paresthesias, including numbness and tingling, that are markers of nerve death.  This numbness precludes her from standing up from a chair without excruciating pain, and she worries about how her condition will continue to deteriorate and she suffers from other severe injuries.

### 55. James Strong and Deborah Strong

1217.    Plaintiff James Strong is an individual who resides in Skaneateles, New York.  Plaintiff was born on March 3, 1959.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

### a. Initial Infuse® Surgery

1218.    On November 02, 2006, Plaintiff James Strong was admitted to Crouse Hospital in Syracuse, New York where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff James Strong in the Lumbar region of his spine from vertebrae L5 to S1.

1219.    During the surgery, Infuse® was used in Plaintiff James Strong off-label in the following manners:

   a.  Infuse® was used without the mandatory approved LT-cage

   b.  Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space)

   c.  Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1220.    Plaintiff James Strong's post-operative period was marked by increasingly severe pain, tingling, and weakness that radiated from his low back to his lower extremities.

1221.    A CT study conducted on February 26, 2008 shows that Plaintiff James Strong continues to experience anterior subluxation of the L5 vertebra on S1 and the cage has shifted occupying the left lateral 50% of the intervertebral disc with adjacent bony sclerosis and fusion. The same CT further identifies a large bony spur arising from the posterior and left lateral aspect of the S1 vertebral body and the adjacent L5 vertebral body, projecting into the inferior and posterior aspect of the left L5-S1 neural foramen resulting in severe foraminal stenosis. This heterotopic bone growth emerges from the Infuse® application site and further impinges on the exiting nerve roots. Comparing this region to a preoperative January 10, 2006 MRI study, both the subluxation injury and the ectopic bone growth injury manifested after Plaintiff was exposed to Infuse®.

### c. Plaintiff's Current Condition

1222.    Plaintiff James Strong, who was preoperatively described by his surgeon as a pleasant, extremely athletic 47-year old gentleman has suffered from insidious and inexorable pain that precludes him from enjoying the most basic activities of daily living that he used to enjoy before being exposed to Infuse®. Unrelenting discomfort has caused him to stop working as a research scientist, and his

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

treatment options are both costly and dangerous, and has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1223.    Plaintiff Deborah Strong is an individual who resides in Skaneateles, New York.

1224.    Plaintiff, Deborah Strong, is the spouse of Plaintiff James Strong.

1225.    Plaintiff, Deborah Strong, is bringing a claim for loss of consortium.

### 56. Phyllis Stuiber and Norman Stuiber

1226.    Plaintiff Phyllis Stuiber is an individual who resides in Milwaukee, Wisconsin. Plaintiff was born on July 15, 1951. Plaintiff underwent a spinal fusion surgery in which Infuse®, was used off-label in a Posterolateral surgery for Plaintiff, Phyllis Stuiber by Plaintiff's physician.

### a. Initial Infuse® Surgery

1227.    On January 14, 2008, Plaintiff Phyllis Stuiber was admitted to St. Luke's Medical Center in Milwaukee, Wisconsin where Plaintiff's surgeon performed a spine fusion surgery on her spine from vertebrae L5 to S1.

1228.    During the surgery, Infuse® was used in Plaintiff Phyllis off-label in the following manners:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c. Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1229.    Plaintiff Phyllis Stuiber's post-operative period was marked by increasingly severe and unrelenting pain to her lower extremities. She has been prescribed high doses of narcotic pain medication with risky and undesirable side effects.

### c. Plaintiff's Current Condition

1230.    Plaintiff Phyllis Stuiber has suffered and continues to suffer from chronic pain that prevents her from performing the most basic activities of daily living that she enjoyed preoperatively

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

without excruciating pain, and has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1231.    Plaintiff Norman Stuiber, an individual who resides in Milwaukee, Wisconsin.

1232.    Plaintiff Norman Stuiber, is the spouse of Plaintiff Phyllis Stuiber.

1233.    Plaintiff Norman Stuiber, is bringing a claim for loss of consortium.

### 57. Roger Svare and Joan Elizabeth Svare

1234.    Plaintiff Roger Svare is an individual who resides in Blaine, Minnesota.  Plaintiff was born on August 20, 1956.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1235.    On March 18 2008 Plaintiff Roger Svare was admitted to Unity Hospital, Allina Hospitals & Clinics in Fridley Minnesota where Plaintiff's surgeon performed a spine fusion surgery on Plaintiff Roger Svare in the lumbar region of his spine from vertebrae L4 to L5.

1236.    During the surgery, Infuse® was used in Plaintiff Roger Svare off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used in surgical techniques in which no cage was used and Infuse® was placed in the disk space and lateral gutters.

    c.  Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1237.    Plaintiff Roger Svare's post-operative period was marked with increasingly severe pain, tingling, and numbness, marked by periods of neurologic deficit, which causes him to collapse.

1238.    On June 4, 2009, 63 weeks after his initial surgery using Infuse®, Plaintiff Roger Svare had to undergo a revision surgery.

1239.    Since the revision surgery, Plaintiff Roger Svare continues to suffer significant pain and neurologic deficit whereby his legs cannot reliably support him.

1240.    A lumbar MRI study conducted on April 8, 2008 reveals subsidence of the interbody

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

graft that impinges on the exiting nerve root at the location where Plaintiff was exposed to Infuse®. An aggressive inflammatory response to Infuse® causes the graft to sink, effectively crushing the nerves that exit the spine. This nerve damage is not visible on the preoperative MRI study taken January 9' 2008. Plaintiff's injury correlates with the pain and numbness that the client continues to experience, and was not present preoperatively. As Plaintiff's injury progresses, a lumbar CT study taken June 17, 2008 reveals gasseous degeneration of the L4-5 disc with a moderate bulging disc margin and asymmetric right posterolateral disc protrusion with overall mild central stenosis. This degeneration is a consequence of a delayed-onset infection, an escalation of the immune system's rejection of Infuse®.

### c. Plaintiff's Current Condition

1241. Plaintiff Roger Svare is now faced with the prospect of enduring a painful, risky, and costly revision surgery. He still suffers from severe and unrelenting pain that interferes with his ability to conduct the basic activities of daily living that he enjoyed pre-operatively. As Plaintiff's condition continues to deteriorate, his nerve injury has progressed to the point where he collapses because his legs lose their strength. Plaintiff cannot tolerate standing, sitting, walking, or reclining for more than a few minutes at a time, leaving him in a state of constant discomfort, otherwise, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1242. Plaintiff Joan Elizabeth Svare is an individual who resides in Blaine, Minnesota.

1243. Plaintiff, Joan Elizabeth Svare, is the spouse of Plaintiff Roger Svare.

1244. Plaintiff, Joan Elizabeth Svare, is bringing a claim for loss of consortium.

## 58. Marilyn Swinger

1245. Plaintiff Marilyn Swinger is an individual who resides in Hot Springs, Arkansas. Plaintiff was born on September 11, 1951. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1246. On January 17, 2012 Plaintiff Marilyn Swinger was admitted to Loyola Medicine in Maywood, Illinois where Plaintiff's surgeon performed a spine fusion surgery from vertebrae L4 to L5.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1247.    During the surgery, Infuse® was used in Plaintiff Marilyn Swinger off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used and Infuse® was placed in the disk space or lateral gutters.

    c.    Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1248.    Plaintiff Marilyn Swinger's post-operative period was marked by increasingly severe pain and weakness in her left leg and gastrointestinal problems.

### c. Plaintiff's Current Condition

1249.    Plaintiff Marilyn Swinger suffers from significant pain that affects her everyday living. She has severe pain and weakness in her left leg and has difficulty walking. Plaintiff Marilyn Swinger is in constant pain and discomfort and is unable to find relief sitting in chairs or lying in a bed, and has otherwise suffered serious injuries.

### 59. Deanna Ruth Thomas

1250.    Plaintiff Deanna Ruth Thomas is an individual who resides in Palm Bay, Florida. Plaintiff was born on December 13, 1946. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior spinal fusion surgery.

### a. Initial Infuse® Surgery

1251.    On November 25, 2009, Plaintiff Deanna Ruth Thomas was admitted to Holmes Regional Medical Center in Melbourne, Florida where Plaintiff's surgeon performed a spine fusion surgery in the Lumbar region of her spine from vertebrae L4 to S1.

1252.    During the surgery, Infuse® was used in Plaintiff Deanna Ruth Thomas off-label in the following manners:

    a.    Infuse® was used without the mandatory approved LT-cage.

    b.    Infuse® was used in surgical techniques in which no cage was used and Infuse® was placed in the lateral gutters.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

c. Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

d. Infuse® was used in a Posterior surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1253. Plaintiff Deanna Ruth Thomas' post-operative period was marked by increasingly severe burning pain to her bilateral heels, calves, buttock and increasing leg pain.

1254. A Lumbar MRI study conducted on December 15, 2010 revealed foraminal narrowing mildly leftward L4-L5 effacing the exiting left L4 root and perinueral cyst in the left canal at S1 causing displacement of the left S1 root.

### c. Plaintiff's Current Condition

1255. Plaintiff Deanna Ruth Thomas has experienced an increase in burning pain throughout her lower extremities leading to continual discomfort and difficulty ambulating. She also suffers from gastrointestinal problems and a lack of energy, and has otherwise suffered serious injuries.

### 60. Johanna Wallace and Paul Wallace

1256. Plaintiff Johanna Wallace is an individual who resides in Taylor, Michigan. Plaintiff was born on September 27, 1971. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior Lumbar Interbody Fusion (PLIF) and Posterolateral spinal fusion surgery.

### a. Initial Infuse® Surgery

1257. On November 2, 2010, Plaintiff was admitted to Oakwood Healthcare System in Dearborn, Michigan where Plaintiff's surgeon performed a spine fusion surgery on the Lumbosacral region of her spine from vertebrae L5 to S1.

1258. During the surgery, Infuse® was used in Plaintiff Johanna Wallace off-label in the following manners:

a. Infuse® was used without the mandatory approved LT-cage.

b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

c. Infuse® was used in a PLIF and Posterolateral surgical approach that was not approved

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1259.    Plaintiff Johanna Wallace's post-operative period was marked by increasingly severe back pain with increasing radiating burning leg pain and numbness, and a failed back fusion.

### c. Plaintiff's Current Condition

1260.    After her Infuse® surgery Plaintiff Johanna Wallace experienced increasing pain and disability rather than relief or recovery. While Plaintiff initially felt some relief soon her pain began to increase and radiate into her legs. This excruciating pain gave Plaintiff trouble with her mobility and her legs would often just give out on her. Plaintiff could not walk more than a block or complete basic tasks like going to the supermarket. Eventually the burning pain in Plaintiff's legs transitioned tingling and numbness. The Plaintiff's pain has continued, worsened, and her spinal surgery failed to fuse, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1261.    Plaintiff Paul Wallace is an individual who resides in Taylor, Michigan.

1262.    Plaintiff, Paul Wallace, is the spouse of Plaintiff Johanna Wallace.

1263.    Plaintiff, Johanna Wallace, is bringing a claim for loss of consortium.

### 61. Melanie Weatherall

1264.    Plaintiff Melanie Weatherall is an individual who resides in Paris, Texas. Plaintiff was born on August 9, 1969. Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Extreme Lumbar Interbody Fusion (XLIF) surgery.

### a. Initial Infuse® Surgery

1265.    On February 2, 2012, Plaintiff Melanie Weatherall was admitted to Centennial Medical Center in Nashville, Tennessee where Plaintiff's surgeon performed a spine fusion surgery on the Lumbar region of her spine from vertebrae L4 to L5.

1266.    During the surgery, Infuse® was used in Plaintiff Melanie Weatherall off-label in the following manners:

      a.    Infuse® was used without the mandatory approved LT-cage.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

b. Infuse® was used in an XLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1267.    Plaintiff Melanie Weatherall's post-operative period was marked by initial relief, followed by increasingly severe pain, that eventually developed into paresthesias including numbness and tingling that radiated through her left lower extremity.

### c. Plaintiff's Current Condition

1268.    Plaintiff Melanie Weatherall currently suffers from severe pain that begins in her lower back and radiates to her lower extremities. She suffers from paresthesias including numbness and tingling so severe that her legs give out, and she collapses.  As her nerve injury has progressed, she has started to suffer from episodes of bowel and bladder incontinence, and has otherwise suffered serious injuries.

## 62. Richard West and Karen West

1269.    Plaintiff Richard West is an individual who resides in Belleville, Michigan.  Plaintiff was born on August 7, 1959.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterolateral spinal fusion surgery.

### a. Initial Infuse® Surgery

1270.    On January 16, 2012, Plaintiff Richard West was admitted to Oakwood Hospital and Medical Center in Dearborne, Michigan where Plaintiff's surgeon performed a spine fusion surgery in the Lumbar region of his spine from vertebrae L4 to L5.

1271.    During the surgery, Infuse® was used in Plaintiff Richard West off-label in the following manners:

    a.   Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

    b.   Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1272.    Plaintiff Richard West's post-operative period was marked by increasingly severe back

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

pain radiating to the legs along with foot numbness and epidural fibrosis.

1273.    An MRI study conducted on July 17, 2012 show that Plaintiff Richard West continues to experience low back pain radiating to the left lower extremity.

### c. Plaintiff's Current Condition

1274.    Plaintiff Richard West continues to suffer excruciating and debilitating pain after his Infuse® surgery.  Plaintiff walks with two canes and ambulation is made increasingly difficult by his increasing and severe pain radiating to his les and lower extremities.  This pain is further exacerbated by increasing numbness in both feet, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1275.    Plaintiff Karen West is an individual who resides in Belleville, Michigan.

1276.    Plaintiff, Karen West, is the spouse of Plaintiff Richard West.

1277.    Plaintiff, Karen West, is bringing a claim for loss of consortium.

## 63. John Williams Sr.

1278.    Plaintiff John Williams Sr. is an individual who resides in Wilson, North Carolina. Plaintiff was born on December 9, 1956.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Posterior L4 to S1 spinal fusion surgery.

### a. Initial Infuse® Surgery

1279.    On February 22, 2008, Plaintiff John Williams Sr. was admitted to Pitt County Memorial Hospital in Greenville, North Carolina where Plaintiff's surgeon performed a spine fusion surgery in the lumbar sacral region of his spine in order to attempt to fuse vertebrae L4 to S1.

1280.    During the surgery, Infuse® was used in Plaintiff John Williams Sr. off-label in the following manners:

   a. Infuse® was used without the mandatory approved LT-cage.

   b. Infuse® was used in surgical techniques in which no cage was used (i.e. placed in the disk space or lateral gutters).

   c. Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

d.  Infuse® was used in a Posterior surgical approach that was not approved by the FDA (i.e. it was used in a posterior approach).

### b. Post-Infuse® Surgery Care and Treatment

1281.  Plaintiff John Williams' post-operative period was marked with increasing lower back pain that radiated to his lower extremities

1282.  Plaintiff John Williams relied on a surgically implanted spinal cord stimulator to mitigate his pain symptoms with mixed results

### c. Plaintiff's Current Condition

1283.  After Plaintiff John Williams' Infuse surgery, he continues to experience nerve injury and severe low back pain that radiates into his lower extremities, and has otherwise suffered serious injuries.

### 64. Cynthia Willingham and James Willingham

1284.  Plaintiff Cynthia Willingham is an individual who resides in Kemp, Texas.  Plaintiff was born on November 3, 1957.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in a Transforaminal Lumbar Interbody Fusion (TLIF) surgery.

### a. Initial Infuse® Surgery

1285.  On January 6, 2006, Plaintiff Cynthia Willingham was admitted to Mother Frances Hospital Regional Health Care System in Tyler, Texas where Plaintiff's surgeon performed a spine fusion surgery in the Lumbosacral region of her spine from vertebrae L4 to S1.

1286.  During the surgery, Infuse® was used in Plaintiff Cynthia Willingham off-label in the following manners:

a.  Infuse® was used without the mandatory approved LT-cage.

b.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

c.  Infuse® was used in a TLIF surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1287.  Plaintiff Cynthia Willingham's post-operative period was marked by severe nerve injury

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

such as radiating pain to the legs and inflammatory cystic reactions.

1288.    On November 21, 2011, five years after her initial surgery using Infuse®, Plaintiff Cynthia Willingham had to undergo a risky, costly, and painful revision surgery to remove inflammatory facet cysts.

1289.    Since the revision surgery, Plaintiff Cynthia Willingham continues to suffer significant lower back pain, with severe radiating lower extremity pain to the legs along with inflammatory spinal cysts.

1290.    An MRI study conducted on November 8, 2011 show that Plaintiff Cynthia Willingham continues to experience severe nerve injuries and pain.

### c. Plaintiff's Current Condition

1291.    Following Plaintiff Cynthia Willingham's Infuse® surgery she experienced severe and continuing excruciating lower back pain and was compelled to undergo a risky, costly, and painful revision surgery.  Plaintiff's severe pain radiates to her legs and lower extremities.  She also experienced inflammatory spinal cystic reactions along with surgery to remove a facet cyst. These nerve injuries have caused and continue to cause severe radiating pain to Plaintiff.  This pain continues to debilitate Plaintiff even after her second surgery.  Plaintiff has otherwise suffered serious injuries.

### d. Plaintiff Spouse

1292.    Plaintiff James Willingham is an individual who resides in Kemp, Texas.

1293.    Plaintiff, James Willingham, is the spouse of Plaintiff Cynthia Willingham.

1294.    Plaintiff, James Willingham, is bringing a claim for loss of consortium.

### 65. Mark Willis and Donna Willis

1295.    Plaintiff Mark Willis is an individual who resides in Fairview Heights, Illinois.  Plaintiff was born on May 6, 1959.  Plaintiff underwent a spinal fusion surgery in which Infuse® was used off-label in an Anterior Lumbar Interbody Fusion Surgery and Posterolateral fusion surgery.

### a. Initial Infuse® Surgery

1296.    On December 14, 2011, Plaintiff Mark Willis was admitted to Barnes Jewish Hospital in St. Louis, Missouri where Plaintiff's surgeon performed a spine fusion surgery in the Lumbosacral

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

region of his spine from vertebrae L3 to S1.

1297.    During the surgery, Infuse® was used in Plaintiff Mark Willis off-label in the following manners:

    a.  Infuse® was used without the mandatory approved LT-cage.

    b.  Infuse® was used to fuse more than one level of the spine, which is in violation of the FDA approval.

    c.  Infuse® was used in a Posterolateral surgical approach that was not approved by the FDA.

### b. Post-Infuse® Surgery Care and Treatment

1298.    Plaintiff Mark Willis' post-operative period was marked by increasingly severe radiating back and leg pain.  This pain was so severe it required Plaintiff to make multiple trips to the Emergency Room to address his symptoms.

1299.    Since the revision surgery, Plaintiff continues to suffer significant nerve and low back pain and lumbosacral radiculopathy.

1300.    An MRI study conducted on February 28, 2012 shows that Plaintiff Mark Willis continues to experience radicular pain and bilateral foraminal stenosis at the site of his surgery.

### c. Plaintiff's Current Condition

1301.    Subsequent to Plaintiff Mark Willis' Infuse® surgery he was compelled to undergo a risky, costly, and painful revision surgery and he continues to experience severe and worsening back pain radiating to his legs.  Plaintiff's nerve injuries and increasing complications necessitated multiple visits to the Emergency Room due to Plaintiff's excruciating pain.  Plaintiff's mobility and quality of life have also been negatively impacted and he now finds it very difficult to support his legs adequately, and has otherwise suffered serious injuries.

### d. Plaintiff's Spouse

1302.    Plaintiff Donna Willis is an individual who resides in Fairview Heights, Illinois.

1303.    Plaintiff, Donna Willis, is the spouse of Plaintiff Mark Willis.

1304.    Plaintiff, Donna Willis, is bringing a claim for loss of consortium.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## IX. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES

1305.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1306.    As a result of Medtronic's oppression, fraudulent concealment, wantonness, malice, and reckless disregard for Plaintiffs' safety, Plaintiffs are entitled to punitive or exemplary damages to the fullest extent necessary as plead in detail below.

## X. CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Negligence

1307.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1308.    Plaintiffs underwent spine fusion surgeries where Infuse® was used "off-label".

1309.    Each Plaintiff's surgeon performed these "off-label" spine fusion surgeries and implanted Infuse® into Plaintiffs' vertebrae "off-label".

1310.    Medtronic falsely represented the results of scientific studies regarding Infuse®.

1311.    Medtronic concealed material information related to the safety of "off-label" use of Infuse®.

1312.    Medtronic covertly edited scientific studies to falsely enhance the purported benefits of Infuse®.

1313.    Medtronic deceptively and falsely underreported the dangerous propensities and increased risks of Infuse®.

1314.    The Infuse® that was implanted in Plaintiffs were promoted, distributed, and used in an unapproved, "off-label" manner that is in violation of federal law, including the FDCA, MDA and regulations related thereto as well as parallel state laws.

1315.    Plaintiffs were injured due to an "off-label" use of Infuse® that resulted from Medtronic's practice of promoting such uses.  By engaging in "off-label" promotion, Medtronic caused

the device to be misbranded.[370]

1316.    Advertising Infuse® "in a manner that is inconsistent with any conditions to approval specified in the PMA approval order the device, renders the medical device "misbranded"."[371]

1317.    Medtronic violated federal law by engaging in "off-label" promotion that damaged Plaintiffs.  This "off-label" promotion misbranded Infuse®.[372]

1318.    It was the duty of Medtronic to comply with federal law, the FDCA, the MDA and the regulations, notwithstanding this duty, Medtronic violated federal law, the FDCA, the MDA, and the regulations, including but not limited to, in one or more of the following ways:

a. Medtronic violated federal statute 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

b. Medtronic violated federal statute 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the statute.

c. Medtronic violated federal statute 21 U.S.C. § 352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d. Medtronic violated federal statute 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e. Medtronic violated federal statute 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f. Medtronic violated federal statute 21 C.F.R. § 801.5 because it failed to provide

---

[370] A device is misbranded if its labeling fails to bear "adequate directions for use," 21 U.S.C. § 352(f) (2012), which FDA regulations define as "directions under which the layman can use a device safely and for the purposes for which it is intended," 21 C.F.R. § 801.5 (2012) (emphasis added).  The FDA then defines intended use by reference to "the objective intent of the persons legally responsible for the labeling of devices," which may be demonstrated by, among other evidence, "oral or written statements by such persons or their representatives..." Id. § 801.4 (2012).

[371] 21 U.S.C. § 331 (a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a "device may not be ... advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")

[372] Federal regulations provide that misbranding can also be shown by "the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. § 801.4 (2012).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

adequate directions for the unapproved off-label uses it promoted and distributed

g. Medtronic violated federal statute 21 U.S.C. § 352(q) because it created and distributed false and misleading advertising for Infuse®, which is a "Restricted Device."

h. Medtronic violated federal statute 21 C.F.R. § 801.4 because it promoted new "off-label" intended uses.

i. Medtronic violated federal statute Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j. Medtronic violated federal statute 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k. Medtronic violated federal statutes 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. § 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l. Medtronic violated federal statutes 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m. Medtronic violated federal statute 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n. Medtronic violated federal statutes 21 U.S.C. §§ 360(q); 360(r) because it created and distributed false and misleading advertising.

o. Medtronic violated federal statutes 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p. Medtronic violated federal statute 21 C.F.R. § 820. 198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse.

q. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal statute 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

1319.    As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment. All of these injuries are permanent.

1320.    Medtronic failed to exercise due care and failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter of Infuse®.

1321.    This cause of action is based entirely on the contention that Medtronic violated federal safety statutes and regulations. Plaintiffs do not bring the underlying action as an implied statutory cause of action but rather Plaintiffs are pursuing parallel state common law claims based on Medtronic violations of the applicable federal regulations. Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1322.    Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence in tort under state common law.

1323.    Thus, for violation of federal law including but not limited to the FDCA, the MDA and relevant regulations which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1324.    As a direct result of Infuse® each Plaintiff suffered severe injuries, including intense physical pain and severe mental and emotional distress, as further described in the Plaintiff Party Section of this complaint.

1325.    Medtronic marketed their Infuse® product to and for the benefit of Plaintiffs, and additionally marketed it to Plaintiffs' physicians. Medtronic knew or should have known that Plaintiffs and Plaintiffs' physicians would use their product in the way that they marketed it, including for "off-label" use of spine fusion surgeries.

1326.    Medtronic owed Plaintiffs and Plaintiffs' physicians the duty to exercise reasonable or ordinary care under the circumstances, in light of the generally-recognized and prevailing best scientific knowledge.

1327.    Medtronic had a confidential and special relationship with Plaintiffs due to (a) Medtronic's vastly superior knowledge of the health and safety risks relating to Infuse®, and (b) Medtronic's sole and/or superior knowledge of their dangerous and irresponsible practices of improperly promoting to physicians the "off-label" use of Infuse® for spine fusion surgeries.

1328.    As a result, Medtronic had an affirmative duty to fully and adequately warn Plaintiffs and Plaintiffs' physicians of the true health and safety risks related to the "off-label" use of Infuse®, and Medtronic had a duty to disclose their dangerous and irresponsible practices of improperly promoting to physicians the "off-label" use of Infuse® for spine fusion surgery.  Independent of any special relationship of confidence or trust, Medtronic had a duty not to conceal the dangers of the "off-label" use of Infuse® to Plaintiffs and Plaintiffs' physicians.

1329.    Misrepresentations made by Medtronic about the health and safety of Infuse® independently imposed a duty upon Medtronic to fully and accurately disclose to Plaintiffs and

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Plaintiffs' physicians the true health and safety risks related to Infuse®, and a duty to disclose their dangerous and irresponsible "off-label" promotion and marketing practices.

1330.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Medtronic breached their duties to Plaintiffs and to Plaintiffs' physicians.

1331.    The following sub-paragraphs summarize, *inter alia,* Medtronic's breaches of duties to Plaintiffs and Plaintiffs' physicians and describe categories of acts or omissions constituting breaches of duty by Medtronic. Each and/or any of these acts or omissions establishes an independent basis for these Medtronic's liability in negligence:

a.    Unreasonable and improper promotion and marketing of Infuse® to physicians, including but not limited to the promotion and marketing of Infuse® for "off-label" use in spine fusion surgeries;

b.    Failure to warn physicians and Plaintiffs of the dangers associated with the increased risks and dangers of Infuse® when used "off-label" in posterior-approach lumbar spine surgery including, but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, and poorer global outcomes than alternative treatments; or

c.    Failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of Infuse®.

d.    Failure to remove Infuse® from the marketplace after knowledge and/or notice of the predominance of "off-label" use and the severity of the associated health and safety risks from "off-label" use.

1332.    Medtronic knew, or should have known, that due to their failure to use reasonable care, Plaintiffs and Plaintiffs' physicians would use and did use Infuse®, to the detriment of Plaintiffs' health, safety and well-being.

1333.    As the direct, producing, proximate and legal cause and result of Medtronic's negligence, Plaintiffs suffered severe injuries.

1334.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

with interest thereon and costs.

1335.    Medtronic's conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## SECOND CAUSE OF ACTION

### Negligence Per Se

1336.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1337.    Medtronic violated federal statutes and regulations, including but not limited to 21 C.F.R. § 803, relating to medical devices.

1338.    The Infuse® that was implanted in Plaintiff was promoted, distributed, and used in an unapproved, "off-label" manner that is in violation of federal law, including the FDCA, MDA and regulations related thereto as well as parallel state laws.

1339.    It was the duty of Medtronic to comply with the FDCA and the regulations promulgated pursuant to it, notwithstanding this duty, Medtronic violated the FDCA, including but not limited to, in one or more of the following ways:

a. Medtronic violated federal statute 21 U.S.C. § 360(e) because it failed to submit a PMA Application for the intended uses of Infuse® that it promoted "off-label".

b. Medtronic violated federal statute 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that it promoted as is required by the statute.

c. Medtronic violated federal statute 21 U.S.C. § 352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d. Medtronic violated federal statute 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e. Medtronic violated federal statute 21 U.S.C. § 331(k) because it altered the advertising

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f. Medtronic violated federal statutes 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed.

g. Medtronic violated 21 C.F.R. § 352(q) because it created and distributed false and misleading promotions and advertisements for Infuse® which was approved as a "Restricted Device."

h. Medtronic violated federal statute 21 C.F.R. § 801.4 because it promoted new, "off-label" intended uses.

i. Medtronic violated federal statute Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j. Medtronic violated federal statute 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k. Medtronic violated federal statutes 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. § 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l. Medtronic violated federal statutes 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m. Medtronic violated federal statute 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n. Medtronic violated federal statutes 21 U.S.C. §§ 352(q); 352(r) because it created and distributed false and misleading advertising.

o. Medtronic violated federal statutes 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

2006.

p. Medtronic violated federal statute 21 C.F.R. § 820. 198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse.

q. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal statute 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

1340.	As a direct and proximate result of Medtronic's violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure serious injuries, as defined in 21 C.F.R. § 803.3.

1341.	Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.  All of these injuries are permanent.

1342.	Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1343.	Plaintiffs are not seeking to enforce these provisions in our action.  Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions.  Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1344.    Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence per se in tort under state common law.

1345.    Thus, for violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1346.    Medtronic's violations of these federal statutes and regulations caused Plaintiffs' injuries.

1347.    Plaintiffs' injuries resulting from an occurrence the laws and regulations were designed to prevent.

1348.    Plaintiffs are persons whom these statutes and regulations were meant to protect.

1349.    Medtronic's violation of these statutes or regulations constitutes negligence per se.

## THIRD CAUSE OF ACTION

### Negligence – Misrepresentation

1350.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1351.    Specific defects in the Infuse® product, as specified above in this Complaint, rendered it defective and unreasonably dangerous.

1352.    Medtronic made untrue representations and omitted material information to Plaintiffs and their physicians by sponsoring biased medical trials, reports, and articles that concluded that the dangers inherent to "off-label" use of Infuse® did not exist or were significantly less than the actual dangers.

1353.    Had Medtronic complied with their duties to the FDA as described under the Medical Device Reporting procedure, 21 C.F.R. § 803, the necessary and resultant actions by the FDA and/or appropriate government agencies, would have precluded the use of the product in the surgery giving rise to all causes of action.

1354.    Plaintiffs and their physicians would not have made "off-label" use of Infuse® for

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

posterior-approach lumbar spine fusion surgery had they known of the true safety risks related to Infuse®.

1355.    Medtronic was negligent in making the untrue misrepresentations and omitting material information because Medtronic knew, or had reason to know, of the actual, unreasonable dangers and defects in their Infuse® product.

1356.    Medtronic intended to induce Plaintiffs and their physicians to rely on their misrepresentations and omissions to use Infuse® in an "off-label" manner.

1357.    Plaintiffs and their physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Infuse® in deciding to make "off-label" use of Infuse® for spine fusion surgery.

1358.    Plaintiffs and Plaintiffs physicians were justified in their reliance on Medtronic's representations and marketing. Plaintiffs actually did undergo "off-label" spine fusion surgeries utilizing Infuse® in an "off-label" manner, which caused Plaintiffs serious physical injury.

1359.    In agreeing to undergo a procedure whereby Infuse® was implanted, Plaintiff and Plaintiff's physician justifiably relied on such misrepresentations by Medtronic, the referenced Medtronic employees/agents, including the Medtronic sales representative who sold Plaintiff's physician Infuse®. As the direct, producing, proximate and legal cause and result of Medtronic's misrepresentations, Plaintiffs have suffered severe physical pain, medical and hospital expenses, pain and suffering, and pecuniary loss.

1360.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1361.    Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

//

//

//

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## FOURTH CAUSE OF ACTION

### Strict Liability – Failure To Warn

1362.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1363.    Medtronic at all times herein was a medical device manufacturer and is subject to the Medical Device Reporting regulations under 21 C.F.R. § 803.

1364.    Medtronic had a duty to warn the FDA, about the dangers of all of their Infuse® devices, under 21 C.F.R. § 803.50 (2012), which they knew, or in the exercise of ordinary care, should have known, at the time Infuse® left Medtronic's control.  Medtronic did know of these increased risks and serious dangers of "off-label" use of Infuse®, and breached their duty by failing to warn the FDA of the dangers of the "off-label" use of Infuse®.

1365.    The Infuse® that was implanted in Plaintiffs was promoted, distributed, and used in an unapproved "off-label" manner that is in violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder as well as parallel state laws.

1366.    At the time Infuse® left control of Medtronic when it was implanted into Plaintiffs it was unreasonably dangerous due to non-compliance by Medtronic with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

      a. Medtronic violated federal statute 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

      b. Medtronic violated federal statute 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the statute.

      c. Medtronic violated federal statute 21 U.S.C. § 352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

      d. Medtronic violated federal statute 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

      e. Medtronic violated federal statute 21 U.S.C. § 331(k) because it altered the advertising

and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f. Medtronic violated federal statutes 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed.

g. Medtronic violated federal statute 21 C.F.R. § 352 because it created and distributed false and misleading promotions and advertisements for Infuse® which was a "Restricted Device."

h. Medtronic violated federal statute 21 C.F.R. § 801.4 because it promoted new "off-label intended" uses.

i. Medtronic violated federal statute Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j. Medtronic violated federal statute 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after they had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k. Medtronic violated federal statutes 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. § 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l. Medtronic violated federal statutes 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m. Medtronic violated federal statute 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n. Medtronic violated federal statutes 21 U.S.C. §§ 352(q); 352® because it created and distributed false and misleading advertising.

o. Medtronic violated federal statutes 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

2006.

p. Medtronic violated federal statute 21 C.F.R. § 820.198 (2012) because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse®.

q. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal statute 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

1367.    As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure serious injuries, as defined in 21 C.F.R. § 803.3.  Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.  All of these injuries are permanent.

1368.    Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1369.    Plaintiffs are not seeking to enforce these provisions in this action.  Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions.  Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1370.    Medtronic's violations of the aforementioned federal statutes and regulations establish a

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

*prima facie* case of strict liability in tort under state common law.

1371.    Thus, for violations of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1372.    The warnings accompanying their Infuse® products did not adequately warn Plaintiffs and Plaintiffs' physicians, in light of its scientific and medical knowledge at the time, of the increased risks and serious dangers associated with Infuse® when used "off-label" in Plaintiffs' spinal fusion surgery including, but not limited to, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, neurological injury, and poorer global outcomes than alternative treatments.

1373.    In direct violation of 21 C.F.R. § 803.50 as well as State statutes and/or common law, Medtronic either recklessly or intentionally minimized and/or downplayed the risks of serious side effects related to the "off-label" use of Infuse®, when reporting to the FDA, including but not limited to these risks of ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury.

1374.    The FDA was unaware of Medtronic's omissions and this led to Plaintiffs and Plaintiffs' physicians' reliance on Medtronic's inadequate warnings in deciding to use Infuse® in an "off-label" manner.

1375.    If Medtronic had met their duty under 21 C.F.R. § 803.50, the FDA would have had the information necessary to warn the public of the increased risks and serious dangers associated with the "off-label" use of Infuse®.

1376.    Plaintiffs and Plaintiffs' physicians would not have made "off-label" use of Infuse® for their spine fusion surgeries if the FDA had they been fully and adequately informed of the material and necessary information to be able to communicate the safety risks related to Infuse®.

1377.    As a direct and proximate result of one or more of the above listed dangerous conditions and defects, and of Medtronic's failure to provide adequate warnings about them, as required under 21 C.F.R. § 803.50, Plaintiffs sustained serious injuries of a personal and pecuniary nature.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1378.    Plaintiffs have sustained extreme pain, suffering, and anguish from the date of Plaintiffs' spine fusion surgeries with Infuse® until present and have otherwise suffered serious injuries and damages.

1379.    Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## FIFTH CAUSE OF ACTION

### Strict Liabili–y - Design Defect

1380.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1381.    A design defect cause of action is a claim that the product sold to the plaintiff was defective because the original design was unreasonably dangerous and in its defective condition it caused the Plaintiffs injuries.

1382.    The original design for a Class III medical device is the product that is approved by the FDA. This FDA approval includes not only the physical components of the product, but the labeling, advertising, and intended use of the product as well.

1383.    Under federal regulations, a manufacturer who wants to change the design of a product, including its intended uses, must seek supplemental approval.

1384.    If a manufacturer redesigns a product post approval and does not seek supplemental approval for the new design then not only is it a violation of federal regulations, but the new design has not been determined to be safe and effective by the FDA.

1385.    Without a supplemental approval, the FDA has not approved the product for any expanded intended uses. Therefore, without FDA approval, a product promoted, sold, and/or distributed for use in a new unapproved manner is not protected by any federal regulations.

1386.    Here, Medtronic post approval changed their design of Infuse® by greatly expanding the intended uses of the product. Medtronic never sought a supplemental PMA for the new expanded

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

intended uses of the product. The new intended uses of the product were never approved by the FDA and therefore never determined by the FDA to be safe and effective.

1387.    At all times mentioned herein, Medtronic placed Infuse® on the market.

1388.    At all times mentioned herein, Medtronic supplied the Infuse® used during Plaintiffs' spine fusion surgeries.

1389.    The Infuse® that was implanted in Plaintiffs was promoted, distributed, and used in an unapproved "off-label" manner that is in violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder as well as parallel state laws.

1390.    Defendant's Infuse® device was defectively designed because it was redesigned for sale after its limited FDA approval, to be marketed and intentionally sold for off-label use (including, but not limited to, being used without the required LT-Cage) and by promoting and selling it as such, Medtronic has unlawfully designed, manufactured, marketed and sold a new device for which the FDA never weighed the risk versus the benefit and never approved. Moreover, this new device presents risks and dangers that render it defective.

1391.    Medtronic's Infuse® was defectively designed because the design was unsafe when used in the manner promoted by Medtronic and/or in a manner reasonably foreseeable by Medtronic. The Infuse® product failed to perform as safely as an ordinary consumer would expect when used, as it was promoted by Medtronic for use "off-label."

1392.    At the time Infuse® left control of Medtronic when it was implanted into Plaintiffs it was unreasonably dangerous due to non-compliance by Medtronic with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

   a.  Medtronic violated federal statute 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

   b.  Medtronic violated federal statute 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the statute.

244

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

c.   Medtronic violated federal statute 21 U.S.C. §352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d.   Medtronic violated federal statute 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e.   Medtronic violated federal statute 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

f.   Medtronic violated federal statute 21 C.F.R. § 801.5 because it failed to provide adequate direction for the unapproved off-label uses it promoted and distributed.

g.   Medtronic violated federal statute 21 C.F.R. 352(q) because it created and distributed false and misleading promotions and advertisements for Infuse® which is a "Restricted Device".

h.   Medtronic violated federal statute 21 C.F.R. § 801.4 because it promoted new "off-label" intended uses.

i.   Medtronic violated federal statute Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j.   Medtronic violated federal statute 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k.   Medtronic violated federal statutes 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l.   Medtronic violated federal statutes 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m.   Medtronic violated federal statute 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

n. Medtronic violated federal statutes 21 U.S.C. §§ 352(q); 352(r) because it created and distributed false and misleading advertising.

o. Medtronic violated federal statutes 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p. Medtronic violated federal statute 21 C.F.R. § 820.198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse®.

q. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal statute 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

1393. As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment. All of these injuries are permanent.

1394. Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1395.   Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1396.   Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

1397.   Thus, for violation of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

1398.   The "off-label" use of Infuse® in Plaintiffs' spinal fusion procedure was defective, unreasonably dangerous, unsafe, and ineffective, and Medtronic knew or should have known that it was unsafe and ineffective when used in an "off-label" manner as promoted, instructed, and supplied by Medtronic, and utilized in Plaintiffs' surgery.

1399.   Had Medtronic complied with its duties to the FDA in regards to marketing and distribution as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgery giving rise to all causes action.

1400.   At all times herein mentioned, Medtronic had specific knowledge of the increased risks and dangers involved in the "off-label" use of Infuse® when used in surgery.

1401.   At all times herein mentioned, Plaintiffs relied upon the misrepresentations and omissions of material facts of Medtronic, in and utilized the product in an "off-label" manner as promoted and instructed by Medtronic.

1402.   At all times herein mentioned, the "off-label" use of Infuse® produced serious side effects, including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, and Medtronic knew or should have known that said usage could be unsafe because of said side effects.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1403.    Plaintiffs were given Infuse® in a manner that had been illegally promoted, marketed, and intended by Medtronic.

1404.    Medtronic promoted the "off-label" use of Infuse® with the knowledge of its increased risks and dangers to patients.

1405.    The "off-label" use of Infuse®, as given to Plaintiffs, was ineffective, defective, and unreasonably dangerous when manufactured, designed, promoted, and instructed by Medtronic, who is strictly liable for the injuries arising from its use. The increased risks attendant to the "off-label" use of Infuse® greatly outweighed the benefits to be expected from said use as promoted by Medtronic.

1406.    The "off-label" use of Infuse® failed to perform in a manner that a reasonable consumer would expect it to perform.

1407.    Medtronic knew that Infuse®, when used "off-label" in the manner described above and as promoted and instructed by Medtronic, was defective and dangerous in the manner hereinbefore described; that Medtronic knew that, because said use was dangerous and defective when so used "off-label", the product could not be safely used for the purpose intended; that Medtronic, knowing that said product when used "off-label" was defective and dangerous, acted in conscious disregard of the safety of the public, including Plaintiffs, when it placed the product on the market without warning of the defect, and knew when so placed that it would be used without inspection for defect when so used.

1408.    By placing said product on the market and promoting said "off-label" use, Medtronic impliedly represented it was safe for the purpose intended, and intended that doctors and patients in the general public should rely on their misrepresentations.  Plaintiffs and Plaintiffs' doctors did rely on each of said misrepresentations, all to their damage as hereinabove alleged.

1409.    In doing the things aforementioned, Medtronic is guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitle to recovery of exemplary or punitive damages in the sum according to proof at trial.

//

//

//

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## SIXTH CAUSE OF ACTION

### Strict Liability - Manufacturing Defect

1410.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1411.    A manufacturing defect cause of action is a claim that the product sold to the plaintiff was defective because it deviated from the original design and in its defective condition it caused the Plaintiffs injuries.

1412.    The original design for a Class III medical device is the product that is approved by the FDA.  This FDA approval includes not only the physical components of the product, but the labeling and intended use of the product as well.

1413.    Under federal regulations, a product that does not comply with the FDA approval is considered "adulterated" and/or "misbranded."  Under state law, a product that does not comply with the FDA approval is considered a "manufacturing defect."  Therefore, any product sold that is not in compliance with the FDA approval is both misbranded and/or adulterated under federal law and a manufacturing defect under State common law.  Therefore, the same underlying defect and/or actions of the manufacturer that have given rise to a federal violation are also a parallel state violation.

1414.    There are multiple manufacturing defects of Infuse® that were implanted in the Plaintiffs, including but not limited to:

a. Physical Components: The FDA approval of Infuse® requires that the bone morphogenic protein be used with an approved cage.  Here, for some of the Plaintiffs the manufacturer sold only the bone morphogenic protein without an approved cage.  This is a two-part component and one of the parts was missing from the sale. The product sold to the plaintiff does not comply with the FDA approved original design and therefore is ultimately a manufacturing defect.

b. Labeling: The FDA defines the term "labeling" broadly, so as to include not just the product packaging but also all of the promotional materials and/or efforts for the product as

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

well. Medtronic's promotional campaign for Infuse® included illegal "off-label" uses.[373] These promotions for "off-label" uses are in violation of the original FDA approved design because they are outside of the "intended uses" approved by the FDA. The product sold to the Plaintiffs does not comply with the FDA approved original design because it was over promoted for and used in an "off-label" manner outside of the approved intended uses and therefore is ultimately a manufacturing defect.

c. Reporting Requirements: As part of the FDA approval, a manufacturer must abide by general reporting requirements that are included in the conditions for approval. These conditions include reporting to the FDA any adverse events or new scientific findings about the product that are later learned of. The failure to do so violates the FDA approval. Given the nature of the information that is required to be reported in the conditions of approval and the relationship of the manufacturer to the FDA and ultimately to the consumer, reporting to the FDA provides reasonable assurance that the information will reach those whose safety depends on their having it. Here, not only did Medtronic not report required information, but they actively concealed such relevant safety information from the FDA, the medical community, and consumers, including Plaintiffs and Plaintiffs' physicians. Violating the conditions of approval for the FDA approval is another way of saying that the manufacturer violated the original design of the product and therefore creates a viable manufacturing defect claim.

1415. The Products implanted in Plaintiffs were not reasonably safe for their intended uses and were defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Medtronic's design and manufacturing specifications in such a manner as to pose unreasonable increased risks of serious bodily harm to Plaintiffs.

---

[373] As further discussed herein, Plaintiffs, allege that Medtronic's "off-label" promotional efforts included impermissible acts, including but not limited to, using paid consultants, key opinion leaders, seminars, presentations, in house corporate paid doctors operating phone banks to instruct outside surgeons over the phone when they call Medtronic headquarters on how to perform off label procedures, as well as drafting, editing and ghostwriting the so-called "peer reviewed articles" while paying the listed "authors" (who are acting as agents for the company) millions of dollars without disclosing these efforts or payments within the contents of the articles or anywhere publically, all to actively and consciously over promote the "off-label" uses of Infuse.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1416.    Infuse® was defectively manufactured because it deviated in a material way from the Medtronic's specifications and/or form otherwise identical units manufactured with the same specifications; including but not limited to: the manufacture of Infuse® to be used in conjunction with "off-label" componentry; the manufacturer of Infuse® to be used in/on "off-label" sections of the spine; and the manufacture of Infuse® to be used "off-label" with reduced amounts of rhBMP-2.

1417.    At all times mentioned herein, Medtronic placed Infuse® on the market.

1418.    At all times mentioned herein, Medtronic supplied the Infuse® used during Plaintiffs' spine fusion surgeries.

1419.    The Infuse® that was implanted in Plaintiffs was promoted, distributed, and used in an unapproved "off-label" manner that is in violation of federal law, the FDCA, the MDA, and regulations promulgated thereunder.

1420.    At the time Infuse® left control of Medtronic when it was implanted into Plaintiffs it was unreasonably dangerous due to non-compliance by Medtronic with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

a.  Medtronic violated federal statute 21 U.S.C. § 360e because it failed to submit a PMA Application for the intended uses of Infuse® that they promoted "off-label".

b.  Medtronic violated federal statute 21 C.F.R. § 814.39 because it failed to submit a PMA Supplement for new intended uses for the "off-label" uses of Infuse® that they promoted as is required by the statute.

c.  Medtronic violated federal statute 21 U.S.C. §352 (b) because it promoted for sale misbranded and adulterated products (Infuse®).

d.  Medtronic violated federal statute 21 U.S.C. § 331(a) because it introduced into interstate commerce a medical device (Infuse®) that is misbranded.

e.  Medtronic violated federal statute 21 U.S.C. § 331(k) because it altered the advertising and promotional material for Infuse® while it was being held for sale after shipment in interstate commerce that results in the device being misbranded.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

f.  Medtronic violated federal statute 21 C.F.R. § 801.5 because it failed to provide adequate directions for the unapproved off-label uses it promoted and distributed.

g. Medtronic violated federal statute 21 C.F.R. 352(q) because it created and distributed false and misleading promotions and advertisements for Infuse® which is a "Restricted Device".

h.  Medtronic violated federal statute 21 C.F.R. § 801.4 because it promoted new "off-label" intended uses.

I.  Medtronic violated federal statute Fed. Reg. 14286 (Mar. 16, 2000) because it distributed a product for a use that the FDA has not approved as safe and effective.

j.  Medtronic violated federal statute 21 C.F.R. § 801.4 because it did not provide adequate directions and warnings after it had notice and knowledge that Infuse® was to be used for uses other than the ones for which it was approved for.

k.  Medtronic violated federal statutes 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. 820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a) and 21 C.F.R. § 820.170(a) because it failed to comply the general quality control standards.

l.  Medtronic violated federal statutes 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events.

m.  Medtronic violated federal statute 21 C.F.R. § 814.84(b)(2) because it failed to report new clinical investigations or scientific studies concerning Infuse® about which Medtronic knew or reasonably should have known.

n.  Medtronic violated federal statutes 21 U.S.C. §§ 352(q); 352(r) because it created and distributed false and misleading advertising.

o.  Medtronic violated federal statutes 21 U.S.C. § 360aaa and 21 U.S.C. § 360aaa-1 because its conduct far exceeded the limitations of the safe harbor provisions of providing copies of peer reviewed scientific articles to physicians between 1997 and 2006.

p.  Medtronic violated federal statute 21 C.F.R. § 820.198 because it failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints regarding Infuse®, and other quality problems associated with the Infuse®.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

q. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it failed to appropriately respond to adverse incident reports that strongly indicated the Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

r. Medtronic violated federal statutes 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because it continued to sell Infuse® into the stream of interstate commerce when it knew, or should have known, that Infuse® was Malfunctioning or otherwise not responding to its Design Objective Intent.

s. Medtronic violated federal statute 21 C.F.R. § 814.80 because Infuse® was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

1421. As a direct and proximate result of Medtronic violations of one or more of these federal statutory and regulatory standards of care, Infuse® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment. All of these injuries are permanent.

1422. Medtronic failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

1423. Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these provisions also violates parallel state laws.

1424. Medtronic's violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

1425. Thus, for violations of federal law, including, the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1426.    The "off-label" use of Infuse® in Plaintiffs' spinal fusion procedure was defective, unreasonably dangerous, unsafe, and ineffective, and Medtronic knew or should have known that it was unsafe and ineffective when used in an "off-label" manner as promoted, instructed, and supplied by Medtronic, and utilized in Plaintiffs' surgery.

1427.    Had Medtronic complied with its duties to the FDA in regards to marketing and distribution as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgery giving rise to all causes action.

1428.    At all times herein mentioned, Medtronic had specific knowledge of the increased risks involved in the "off-label" use of Infuse® when used in surgery.

1429.    At all times herein mentioned, Plaintiffs relied upon the misrepresentations of Medtronic, in and utilized the product in an "off-label" manner as promoted and instructed by Medtronic.

1430.    At all times herein mentioned, the "off-label" use of Infuse® produced serious side effects, including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, and Medtronic knew or should have known that said usage could be unsafe because of said side effects.

1431.    Plaintiffs were given Infuse® in a manner that had been illegally promoted, marketed, and intended by Medtronic.

1432.    Medtronic promoted the "off-label" use of Infuse® with the knowledge of its risk to patients.

1433.    The "off-label" use of Infuse®, as given to Plaintiffs, was ineffective, defective, and unreasonably dangerous when manufactured, designed, promoted, and instructed by Medtronic, who is strictly liable for the injuries arising from its use. The increased risks and dangers attendant to the "off-label" use of Infuse® greatly outweighed the benefits to be expected from said use as promoted by Medtronic.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1434.    The "off-label" use of Infuse® failed to perform in a manner that a reasonable consumer would expect it to perform.

1435.    Medtronic knew that Infuse®, when used "off-label" in the manner described above and as promoted and instructed by Medtronic, was defective and unreasonably dangerous in the manner hereinbefore described; that Medtronic knew that, because said use was unreasonably dangerous and defective when so used "off-label", the product could not be safely used for the purpose intended; that Medtronic, knowing that said product when used "off-label" was defective and unreasonably dangerous, acted in conscious disregard of the safety of the public, including Plaintiffs, when it placed the product on the market without warning of the defect, and knew when so placed that it would be used without inspection for defect when so used.

1436.    By placing said product on the market and promoting said "off-label" use, Medtronic impliedly represented it was safe for the purpose intended, and intended that doctors and patients in the general public should rely on their misrepresentations.  Plaintiffs and Plaintiffs' doctors did rely on each of said misrepresentations and material omissions, all to their damage as hereinabove alleged.

1437.    In doing the things aforementioned, Medtronic is guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitle to recovery of exemplary or punitive damages in the sum according to proof at trial.

## SEVENTH CAUSE OF ACTION

### Common Law Fraud

1438.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1439.    Plaintiff brings a claim against Medtronic for knowingly concealing information in "off-label" promotion.

1440.    Medtronic committed fraud by concealing and/or making fraudulent representations during its promotional practices concerning the "off-label" use of Infuse® and concealing its practice of "off-label" promotion.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1441.     In connection with their Infuse® products, Medtronic fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiff and Plaintiff's physicians, all as alleged in this Complaint.  The specifics regarding the content of the misrepresentations, when and where Medtronic made them, and to whom they were made, as well as what aspects of the statements were misleading and why, are alleged above in the body of this Complaint.

1442.     Plaintiff and Plaintiff's physicians would not have decided to use Infuse® "off-label" had they known of the real increased risks and dangers, related to Infuse®.

1443.     Any of the following is sufficient to independently establish Medtronic's liability for fraudulent misrepresentation and/or fraud in the inducement:

    a. Medtronic fraudulently concealed and misrepresented the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the "off-label" use of Infuse®;

    b. Medtronic fraudulently concealed and misrepresented their practice of promoting and marketing to physicians, including Plaintiff's physicians, the "off-label" practice of using Infuse®.

    c. Medtronic fraudulently concealed and misrepresented information about the known increased risks and dangers as well as the limited benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

1444.     As a medical device manufacturer, Medtronic had an affirmative continuing duty to warn the public, including Plaintiffs and Plaintiffs' physicians regarding the increased risks and dangers it knew, learned, or should have known about associated with its medical devices.

1445.     Had Medtronic complied with their duties to the FDA as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgeries giving rise to all causes of action.

1446.     Medtronic omitted material adverse information and provided inaccurate, false, or misleading information which was material to treating surgeons' treatment decisions, which misled

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

surgeons and patients who were relying on those surgeons' professional judgment, including Plaintiffs and their treating surgeons. The misleading information as well as omission of material facts related to Infuse®'s safety and effectiveness caused health care providers, patients and the general public including Plaintiffs and their surgeons to be misled about Infuse®'s increased risks and benefits and deprived surgeons from making a proper risk/benefit assessment as to the use and "off-label" use of Infuse®.

1447.    Through internal adverse event reports and studies, Medtronic knew that the "off-label" use of Infuse® was unreasonably dangerous, and not effective and could lead to serious side effects, including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury. Medtronic failed to take any measures whatsoever to alert surgeons or the public regarding these increased risks and dangers and instead continued to promote the "off-label" use of Infuse® as safe and effective.

1448.    Despite knowing that the "off-label" promotion of Infuse® was illegal, Medtronic, through its sales representatives/consultants and Key Opinion Leaders, promoted the "off-label" use of Infuse® to Plaintiffs and Plaintiffs' physicians and concealed that the "off-label" use of Infuse® could result in injuries including but not limited to ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury.

1449.    Medtronic's sales representatives were intentionally present and in the operating rooms, to "instruct" physicians on the "off-label" use of Infuse®.

1450.    Medtronic made payments to physician authors in excess of $210 million who went on to produce bias and fraudulent studies.

1451.    The above physicians collaborated with Medtronic in publishing biased journal articles. These published journal articles concealed, misrepresented, and omitted the serious increased risks and dangers associated with Infuse® from the public, including Plaintiffs, Plaintiffs' physician, and the medical community.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1452.    As noted in the Senate Finance Committee Report, Medtronic was involved in the drafting, editing, and manipulation of published studies.

1453.    As reported by the United States Senate Committee on Finance, there were several Medtronic employees/agents who provided inaccurate or misleading information. Dr. John Kenneth Burkus, a Medtronic consultant, admitted via email that he expected a Medtronic study to be endorsed by authors who did not author the article. Julie Bearcroft, a Medtronic employee, asked that reports of adverse events associated with Infuse® be omitted. Richard Treharne, a Medtronic employee, admitted via email that he helped author a spinal surgery study, even though he is not a medical doctor. Bill Martin, a Medtronic employee, stated via email that "off-label" surgeries should not be discouraged.

1454.    When Medtronic engaged in this deceptive campaign and made the above representations and/or omissions, they knew those representations and/or omissions to be false, or willfully and wantonly and recklessly disregarded whether the representations and/or omissions were true. These representations and/or omissions were made by Medtronic with the intent of defrauding and deceiving the public, including Plaintiffs, Plaintiffs' physicians, and the medical community.

1455.    Medtronic made the above representations with the intent of inducing surgeons and hospitals to use and recommend the "off-label" use of Infuse®.

1456.    At the time the aforesaid representations and/or omissions were made by Medtronic, Plaintiffs and their medical providers were unaware of the falsity of said representations and/or omissions and reasonably relied upon Medtronic's assertions, promulgated through aggressive sales tactics as set forth herein, that the "off-label" use of Infuse® was safe and effective when in fact, it was neither.

1457.    In reliance upon Medtronic's representations, each Plaintiff's physician used Infuse® in an off-label unapproved manner during each Plaintiff's spine fusion surgery.

1458.    As a direct and proximate result of said misrepresentations and/or material omissions, each Plaintiff's physician used Infuse® in an "off-label" spine fusion surgery.

1459.    Had Plaintiffs' physicians been made fully and adequately aware of the inefficacy and serious increased risks and dangers associated with such use, they would not have used it.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1460. Had Plaintiff known of the actual dangers of and inefficacy of the "off-label" use of Infuse® Plaintiffs would not have consented to its use in their surgeries.

1461. Had the FDA known of the actual dangers of and inefficacy of the "off-label" use of Infuse® they would have initiated a recall of the product, dear doctor letter, or safety signal and/or warned the public of the danger.

1462. Medtronic's motive in failing to advise surgeons, the public, Plaintiffs, and the FDA of these increased risks and inefficacies was for financial gain and fear that, if it provided proper and adequate information, Infuse® would lose sales and market share.

1463. The actions of Medtronic, its agents, servants, and/or employees were wanton, grossly negligent, and reckless and demonstrated a complete disregard and reckless indifference to the safety and welfare of Plaintiffs in particular, and to the public generally, in that Medtronic did willfully and knowingly promote the "off-label" use of Infuse® with specific knowledge that it would be used by surgeons without adequate instructions and without adequate knowledge regarding its efficacy, increased risks, dangers, and serious side effects.

1464. Despite its specific knowledge regarding the increased risks and dangers as set forth above, Medtronic intentionally and deliberately recommended the "off-label" use of Infuse® and promoted it as being safe and effective.

1465. At all times relevant herein, Medtronic's conduct was malicious, fraudulent, and oppressive towards Plaintiffs in particular and the public generally, and Medtronic conducted itself in a willful, wanton, and reckless manner by actively violating federal regulations.

1466. Medtronic is guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitled to recovery of exemplary or punitive damages in sum according to proof at trial.

## EIGHTH CAUSE OF ACTION

### Constructive Fraud

1467. Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1468.    Medtronic marketed its Infuse® product to and for the benefit of Plaintiffs, and marketed it to their physicians, and Medtronic knew or had reason to know of the unreasonable dangers and serious defects in their Infuse® product, and that Plaintiffs and their physicians would use the product.

1469.    Medtronic owed Plaintiffs a duty to exercise reasonable or ordinary care under the circumstances, in light of the generally recognized and prevailing best scientific knowledge, and to produce and market Infuse® in as safe a manner and condition as possible.

1470.    Specific defects, as specified above in this Complaint, in the Infuse® product, rendered it defective and unreasonably dangerous.

1471.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Medtronic breached their duties to Plaintiffs. Such breaches exhibited willful and wanton conduct, and a reckless disregard for the safety of others.

1472.    By breaching their duties to Plaintiffs, Medtronic gained an advantage by wrongfully profiting from the sale of Infuse® for "off-label" use.

1473.    Plaintiffs and their physicians justifiably relied on Medtronic's misrepresentations and material concealment of the actual increased risks and dangers of "off-label" use of Infuse®.

1474.    As the direct, producing, proximate and legal cause and result of Medtronic's breach of their duties, Plaintiffs have suffered severe injuries, great mental and emotional distress, physical pain, pecuniary loss and were otherwise seriously injured and damaged.

1475.    As the direct, producing, proximate and legal cause and result of Medtronic's breach of their duties, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, and pain and suffering.

1476.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1477.    Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

## NINTH CAUSE OF ACTION

### Fraudulent Concealment

1478.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1479.    In connection with their Infuse® products, Medtronic fraudulently and intentionally concealed and suppressed material and important health and safety product risk information from Plaintiffs and Plaintiffs' physicians, all as alleged in this Complaint.  Plaintiffs and Plaintiffs' physician would not have made "off-label" use of Infuse® for spine fusion surgeries had they known of the increased safety risks and dangers related to Infuse®.

1480.    Any of the following is sufficient to independently establish Medtronic's liability for fraudulent concealment:

a.    Medtronic fraudulently concealed and misrepresented the increased health and safety risks, dangers, hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the use of their Infuse® product to physicians, including Plaintiffs' physicians;

b.    Medtronic fraudulently concealed and misrepresented their practice of over-promoting and marketing the "off-label" use of Infuse® to physicians, including Plaintiffs' physicians; and

c.    Medtronic fraudulently concealed and misrepresented material safety information about the known increased risks and dangers of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

1481.    Medtronic knew, or should have known, that they were concealing, suppressing, and misrepresenting true information about the known increased risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

1482.    Medtronic knew that Plaintiffs and Plaintiffs' physicians would regard the matters Medtronic concealed, suppressed, and misrepresented to be important in determining the course of treatment for the Plaintiffs, including Plaintiffs and Plaintiffs' physicians' decision whether or not to use

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Infuse® in Plaintiffs' spine fusion surgeries.

1483.    Medtronic intended to cause Plaintiffs and Plaintiffs' physicians to rely on their concealment of material safety information, suppression, and misrepresentations about the increased risks and dangers related to Infuse®, in order to induce them to use "off-label" Infuse® for spine fusion surgery.

1484.    Plaintiffs and Plaintiffs' physicians were justified in relying, and did rely, on Medtronic's concealment of information and misrepresentations about the increased safety risks and dangers related to Infuse® in deciding to make "off-label" use of Infuse® for spine fusion surgery.

1485.    As a direct and proximate result of Medtronic's fraudulent concealment, suppression, and misrepresentations of material increased health and safety risks and dangers relating to Infuse® and Medtronic's dangerous and irresponsible "off-label" promotion and marketing practices, Plaintiffs suffered injuries and economic loss, and Plaintiffs will continue to suffer injuries, damages and economic loss.

1486.    As the direct, proximate, and legal cause and result of Medtronic's false, deceptive, dangerous and irresponsible marketing and promotion practices related to "off-label" use of Infuse®, Plaintiffs have been injured and have incurred damages, including but not limited to medical and hospital expenses, physical and mental pain and suffering, and loss of the enjoyment of life.

1487.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

1488.    Medtronic's conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights and safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

## TENTH CAUSE OF ACTION

### Breach of Express Warranty

1489.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1490.    Medtronic utilized journal articles, advertising media, sales representatives, and paid Key Opinion Leaders to promote, encourage, and urge the use purchase, and utilization of the "off-label" use of its product, Infuse®, representing the quality to health care professionals, the FDA, Plaintiffs, and the public in such a way as to induce its purchase or use, thereby making an express warranty that Infuse® would conform to the representations. More specifically, Medtronic represented that Infuse® was safe and effective, that it was safe and effective for use by individuals such as Plaintiffs, and/or that it was safe and effective to treat Plaintiffs' condition.

1491.    Medtronic manipulated studies, crafted by both lucratively paid physicians and Medtronic agents/employees, as promotional materials, which created express written representations of Infuse®'s safety and efficacy including that device related adverse events did not exist or were significantly reduced. These specific misrepresentations went beyond mere puffery as they were published in reputable peer-reviewed scientific journals.

1492.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

1493.    Infuse® did not conform to the representations made by Medtronic, as Infuse® was not safe and effective, was not safe and effective for use by individuals such as Plaintiffs, and/or was not safe and effective to treat in individuals, such as Plaintiffs.

1494.    At all relevant times, Plaintiffs used Infuse® for the purpose and in the manner intended by Medtronic.

1495.    Plaintiffs and Plaintiffs' physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its hidden increased risks and it unreasonable dangers.

1496.    Defendants' breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable:

- Ala. Code §§ 7-2-313, 7-2-314 (2013);
- Alaska St. § 45.02.313 (effective 2013);

- Ariz. Rev. Stat. Ann. § 47-2313 (2013);

- Ark. Code Ann. § 4-2-313 (2013);

- Cal. U. Com. Code § 2313(1) (2013); Cal. Civ. Code §1791.2(a) (2013).

- Co. Rev. St. § 4-2-316 (2013);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2013);

- 6 Del. C. § 2-313 (2013);

- D.C. Code Ann. § 28:2-313 (2013);

- Fla. Stat. Ann. § 672.313 (2013);

- O.C.G.A. § 11-2-318 (2013);

- Haw. Rev. Stat. § 490:2-313 (2013);

- Id. Code § 28-2-314(2)(c) (2013).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2013);

- Ind. Code Ann. § 26-1-2-313 (2013);

- Iowa Code Ann. § 554.2313 (2013);

- Kans. Stat. Ann. § 84-2-313 (2013); KRS § 355.2-318 (2013); Kan. Stat. Ann. § 60-3302(c) (2013).

- Ky. Rev. Stat. § 355.2-318 (2013);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2013);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2013); 14 M.R.S. § 221 (2013).

- Md. Code Ann., Com. Law § 2-318 (2013);

- Mass. M.G.L. c. 106, § 2-313 (2013);

- Mich. Comp. Laws Ann. § 440.2313 (2013);

- Minn. Stat. Ann. § 336.2-313 through 315 (2013);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2013);

- Mo. Rev. Stat. Ann. § 400.2-313 (2013);

- Mont. Code Ann. § 30-2-313 (2013);

- Neb. Rev. Stat. U.C.C. § 2-313 *et seq.* (2012)

- Nev. Rev. Stat. U.C.C. § 104.2313, *et seq.* (2012); Nev. Rev. Stat. §§ 104.2312-104.2318 (2012).

- N.H. Rev. Stat. Ann. § 382-A:2-313, *et seq.* (2013);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2013); *see also* UJI 13-1428 to 1433 NRMA.

- N.Y. U.C.C. Law 2-313, *et seq.* (2013);

- N.C. Gen. Stat. Ann. § 25-2-313, *et seq.* (2013);

- N.D. Cent. Code § 41-02-30, *et seq.* (2013);

- Ohio Rev. Code Ann. § 1302.26, *et seq.* (2013);

- Okla. Stat. tit. 12A, § 2-313 *et seq.* (2013);

- Or. Rev. Stat. § 72.3130, *et seq.* (2013);

- 13 Pa. Stat. Ann. § 2313, *et seq.* (2013);

- R.I. Gen. Laws § 6A-2 (2013);

- S.C. Code. Ann. § 36-2-313, *et seq.* (2012);

- S.D. Stat. 57A-2-313, *et seq.* (2013);

- Tenn. Code Ann. § 47-2-313, *et seq.* (2013);

- Tex. Bus. & Com. Code Ann. § 2.313, *et seq.* (2013);

- Ut. Code Ann. § 70A-2-313, *et seq.* (2013);

- Va. Code Ann. § 8.2-318, *et seq.* (2013);

- Vt. Stat. Ann. tit. 9A, § 2-313, *et seq.* (2013);

- Wa. Rev. Code § 62A.2-108, *et seq.* (2013); § 7.72.030(2) (2013);

- W.Va. Code § 46A-6-108, *et seq.* (2013);

- Wis. Stat. Ann. § 402.313, *et seq.* (2013); and

- Wyo. Stat. § 34.1-2-313 through 315 (2013).

1497.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries. As a direct and proximate result of Medtronic's acts and omissions, including their failure to exercise ordinary care in the design, formulation, testing, manufacture, sale, promotion, and distribution of Infuse®, Plaintiff was implanted with Infuse® and suffered severe and debilitating injuries, economic

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury, immobility, pain and suffering, and mental and emotional distress for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranty

1498.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

1499.    Infuse® was not reasonably fit for the ordinary purposes for which such goods are used and did not meet the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manner. Nor was Infuse® minimally safe for its expected purpose.

1500.    At all relevant times, Plaintiffs used Infuse® for the purpose and in the manner intended by Medtronic.

1501.    Plaintiffs and Plaintiffs' physicians, by the use of reasonable care could not have discovered the breached warranty and realized its danger.

1502.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.

1503.    Defendants breached their implied warranty to Plaintiffs in that Medtronic's Infuse® product was not of merchantable quality, safe and fit for its intended use, or adequately tested, in violation of State Common Law principles and the following statutory provisions as applicable:

- Ala. Code §§ 7-2-314, *et seq.* (2013);

- Alaska. Stat. §§ 45.02.314, *et seq.* (2013);

- Ariz. Rev. Stat. Ann. §§ 47-2314, *et seq.* (2013);

- Ark. Code Ann. §§ 4-2-314, *et seq.* (2013);

- Cal. Uniform Comm. Code §§ 2314, e2315; Cal. Civ. Code §§ 1791.1(b), 1792.1, and 1792.2 (2013).

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

- Colo. Rev. Stat. §§ 4-2-316, *et seq.* (2013);

- Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.* (2013);

- Del. Code Ann. tit. 6, §§ 2-314, *et seq.* (2013);

- D.C. Code Ann. §§ 28:2-314, *et seq.* (2013);

- Fla. Stat. Ann. §§ 672.314, *et seq.* (2013);

- O.C.G.A. §§ 11-2-318, *et seq.* (2013);

- Haw. Rev. Stat. §§ 490:2-314, *et seq.* (2013);

- Idaho Code § 28-2-314(2)(c) (2013).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.* (2013);

- Indiana Code Ann. §§ 26-1-2-314, *et seq.* (2013);

- Iowa Code Ann. §§ 554.2314, *et seq.* (2013);

- Kan. Stat. Ann. §§ 84-2-314, *et seq.* (2013); KRS § 355.2-318 (2013); Kan. Stat. Ann. § 60-3302(c) (2013).

- Ky. Rev. Stat. Ann. §§ 355.2-318 (2013), *et seq.*;

- La. Civ. Code Ann. art. 9:2800:58, *et seq.* (2013) and is liable for redhibition under this statute;

- Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq.* (2013); 14 M.R.S. § 221 (2013).

- Md. Code Ann., Com. Law §§ 2-314, *et seq.* (2013);

- Mass. M.G.L. c. 106, § 2-314 (2013);

- Mich. Comp. Laws Ann. §§ 440.2314, *et seq.* (2013);

- Minn. Stat. Ann. §§ 336.2-313 through 315 (2013);

- Miss. Code Ann. §§ 11-1-63(i)(3) and §§ 75-2-313; 75-2-314 (2013);

- Mo. Rev. Stat. Ann. §§ 400.2-314, *et seq.* (2013);

- Mont. Code Ann. §§ 30-2-314, *et seq.* (2013);

- Neb. Rev. Stat. §§ 2-314, *et seq.* and Common Law (2012);

- Nev. Rev. Stat. §§ 104.2312-104.2318 (2012);

- N.H. Rev. Stat. Ann. §§ 382-A:2-314, *et seq.* (2013);

- N.J. Stat. Ann. §§ 12A:2-314, *et seq.* (2013);

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2013); *see also* UJI 13-1428 to 1433 NRMA (2013);

- N.Y. U.C.C. Law §§ 2-314, *et seq.* (2013);

- N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq.* (2013);

- N.D. Cent. Code §§ 41-02-31, *et seq.* (2013);

- Ohio Rev. Code Ann. §§ 1302.27, *et seq.* (2013);

- Okla. Stat. tit. 12A, §§ 2-314 *et seq.* (2013);

- Or. Rev. Stat. §§ 72.3140, *et seq.*; 72.3150 (2013);

- 13 Pa. Stat. Ann. §§ 2314 *et seq.* (2013);

- R.I. Gen. Laws §§ 6A-2-314, *et seq.* (2013);

- S.C. Code Ann. §§ 36-2-314, *et seq.* (2012);

- S.D. Codified Laws §§ 57A-2-314, *et seq.* (2013);

- Tenn. Code Ann. §§ 47-2-314, *et seq.* (2013);

- Tex. Bus. & Com. Code Ann. §§ 2.314, *et seq.* (2013);

- Utah Code Ann. §§ 70A-2-314, *et seq.* (2013);

- Va. Code Ann. §§ 8.2-318, *et seq.* (2013);

- Vt. Stat. Ann. §§ 9A-2-314, *et seq.* (2013);

- Wash. Rev. Code §§ 62A.2-314, *et seq.*; § 7.72.030(2) (2013);

- W.Va. Code §§ 46A-6-108, *et seq.* (2013);

- Wis. Stat. Ann. §§ 402.314, *et seq.* (2013); and

- Wyo. Stat. Ann. §§ 34.1-2-313 through 315 (2013).

1504. As a direct and proximate result of Medtronic's acts and omissions, including their failure to exercise ordinary care in the promotion, marketing, formulation, testing, sale, and distribution of Infuse®, Plaintiffs was implanted with Infuse® and suffered severe and debilitating injuries, economic loss, and other damages, including but not limited to, cost of medical care, rehabilitation, lost income, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, neurological injury, pain and suffering and great

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

emotional and mental distress and anguish for which they are entitled to compensatory, special, and equitable damages in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

### Violation of Consumer Protection Laws

1505. Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1506. Plaintiffs purchased and used the Medtronic Infuse® product for personal use and thereby suffered ascertainable losses as a result of Medtronic's actions in violation of the applicable State consumer protection laws, including but not limited to the following, as applicable:

- Ala. Code §§ 8-19-1 *et seq.* (2013);

- Alaska Stat. §§ 45.50.471 *et seq.* (2013);

- Ariz. Rev. Stat. Ann. §§ 44-1522 *et seq.* (2013);

- Ark. Code Ann. §§ 4-88-101 *et seq.* (2013);

- Cal. Civ. Code §§ 1770 *et seq.* and Cal. Bus. & Prof. Code §§ 17200 *et seq.* (2013);

- Colo. Rev. Stat. §§ 6-1-105 *et seq.* (2013);

- Conn. Gen. Stat. §§ 42-110a *et seq.* (2013);

- Del. Code Ann. tit. 6, §§ 2511 *et seq.* and §§ 2531 *et seq.* (2013);

- D.C. Code Ann. §§ 28-3901 *et seq.* (2013);

- Fla. Stat. Ann. §§ 501.201 *et seq.* (2013);

- O.C.G.A. §§ 10-1-372 *et seq.* (2013);

- Haw. Rev. Stat. §§ 480-1 *et seq.* (2013);

- Id. Code Ann. §§ 48-601 *et seq.* (2013);

- Ill. Comp. Stat. Ann ch. 815, 505/1 *et seq.* (2013);

- Ind. Code Ann. §§ 24-5-0.5-1 *et seq.* (2013);

- Iowa Code Ann. §§ 714.16 *et seq.* (2013);

- Kan. Stat. Ann. §§ 50-623 *et seq.* (2013);

- Ky. Rev. Stat. Ann. §§ 367.170 *et seq.* (2013);

- La. Rev. Stat. Ann. §§ 51:1401 *et seq.* (2012);

- Me. Rev. Stat. Ann. tit. 5, §§ 205A *et seq.* (2013);

- Md. Code Ann., Com. Law §§ 13-101 *et seq.* (2013);

- Mass. Gen. Laws Ann. Ch. 93A *et seq.* (2013);

- Mich. Comp. Laws §§ 445.901 *et seq.* (2013);

- Minn. Stat. §§ 325D.43 *et seq.* and §§ 325F.67 *et seq.* (2013);

- Miss. Code Ann. §§ 75-24-1 *et seq.* (2013);

- Mo. Ann. Stat. §§ 407.010 *et seq.* (2013);

- Mont. Code Ann. §§ 30-14-101 *et seq.* (2013);

- Neb. Rev. Stat. §§ 59-1601 *et seq.* (2012);

- Nev. Rev. Stat. §§ 598.0903 *et seq.* (2012);

- N.H. Rev. Stat. Ann. §§ 358-A:1 *et seq.* (2013);

- N.M. Stat. Ann. §§ 57-12-1 *et seq.* (2013);

- N.Y. Gen. Bus. Law §§ 349 *et seq.* and §§ 350-e *et seq.* (2013);

- N.C. Gen. Stat. §§ 75-1.1 *et seq.* (2013);

- N.D. Cent. Code §§ 51-12-01 *et seq.* and §§ 51-15-01 *et seq.* (2013);

- Ohio Rev. Code Ann. §§ 1345.01 *et seq.* (2013);

- Okla. Stat. tit. 15 §§ 751 *et seq.* (2013);

- Or. Rev. Stat. §§ 646.605 *et seq.* (2013);

- 73 Pa. Stat. §§ 201-1 *et seq.* (2013);

- R.I. Gen. Laws. §§ 6-13.1-1 *et seq.* (2013);

- S.C. Code Ann. §§ 39-5-10 *et seq.* (2012);

- S.D. Codified Laws §§ 37-24-1 *et seq.* (2013);

- Tenn. Code Ann. §§ 47-18-101 *et seq.* (2013);

- Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.* (2013);

- Utah Code Ann. §§ 13-11-1 *et seq.* (2013);

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

- Vt. Stat. Ann. tit. 9, §§ 2451 *et seq.* (2013);

- Va. Code Ann. §§ 59.1-196 *et seq.* (2013);

- Wash. Rev. Code. §§ 19.86.010 *et seq.* (2013);

- W.Va. Code §§ 46A-6-101 *et seq.* (2013);

- Wis. Stat. Ann. §§ 100.20 *et seq.* (2013); and

- Wyo. Stat. Ann. §§ 40-12-101 *et seq.* (2013).

1507.    Had Medtronic not engaged in the deceptive conduct described herein, Plaintiffs physicians could not have used Infuse® and Plaintiffs would not have purchased and/or paid for Medtronic's Infuse® product and would not have incurred related medical costs and injury.

1508.    Medtronic engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiffs for Infuse® that would not have been paid had Medtronic not engaged in unfair and deceptive conduct.

1509.    Unfair methods of competition or deceptive acts or practice that were proscribed by law, including the following:

a.    Representing that goods or services have characteristic ingredients, uses benefits or quantities that they do not have;

b.    Advertising goods or services with the intent not the sell them as advertised; and,

c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

1510.    Medtronic used manipulated studies, crafted by both lucratively paid physicians agents and Medtronic's agents/employees, as promotional materials to aggressively market and misrepresent Infuse®'s efficacy and safety to the Plaintiffs, Plaintiffs' physicians, the public and the medical community.

1511.    Plaintiffs were injured by the cumulative and indivisible nature of Medtronic's conduct. The cumulative effect of Medtronic's conduct directed at patients, physicians and consumers was to create demand for and sell the Medtronic's Infuse® product. Each aspect of Medtronic's conduct combined to artificially create sales of Medtronic's Infuse® product.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1512. Medtronic had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Medtronic's Infuse® product.

1513. Had Medtronic not engaged in the deceptive conduct described above, Plaintiffs' physicians would not have used Infuse® and Plaintiffs would not have purchased and/or paid for Infuse® and would not have incurred related medical costs.

1514. Medtronic's deceptive, unconscionable, and fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiffs, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statute listed.

1515. Medtronic's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, trade practices in violation of the state consumer protection statute listed below.

1516. Medtronic has engaged in unfair competition or unfair or deceptive acts or trade practices or have made faces representations in violation of the above listed consumer fraud statutes.

1517. Under the respective state statutes, including the statute listed above, to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Medtronic is the supplier, manufacturer, advertiser, and seller, who is subject to liability under such legislation for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

1518. Medtronic violated the State statutes that was enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade practices and false advertising, by knowingly and falsely representing that the Medtronic's Infuse® product was fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

1519. The actions and omissions of Medtronic alleged herein are uncured or incurable deceptive acts under the State statutes enacted to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices, and false advertising.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1520.    Medtronic had actual knowledge of the defective and unreasonably dangerous condition of Medtronic's Infuse® product and failed to take any action to cure such defective and dangerous conditions.

1521.    Plaintiffs' physician relied upon Medtronic's misrepresentations and material omissions in determining whether to use Infuse® and the method by which it should be implanted.

1522.    Medtronic's deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

1523.    Medtronic's conduct and acts of unfair competition are ongoing and present a continuing threat of harm to the general public.

1524.    By reason of unlawful acts engaged in by Medtronic, and as a direct and proximate result thereof, Plaintiffs have suffered ascertainable losses and damages.

1525.    As a direct and proximate result of Medtronic's violations of the State's consumer protection laws, Plaintiffs have sustained economic losses and other damages and are entitled to statutory and compensatory, damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### Violation of the Missouri Merchandising Practices Act

1526.    Plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

1527.    The Missouri Merchandising Practices Act ("MMPA"), Mo. Ann. Stat. § 407.020 provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice . . .. Any act, use or employment declared unlawful by this

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

1528.    At all relevant times and as described herein, Medtronic, through their representatives, paid Key Opinion Leaders, agents, servants and/or employees acting within the course and scope of their employment, knowingly directly and indirectly represented to the public, to Plaintiffs, and Plaintiffs' physicians that "off-label" application of Infuse® were safe and effective to treat the Plaintiffs' medical conditions and that, when so used, Infuse® was not defective.

1529.    Medtronic's advertising, promotions, and representations contained therein were false and misleading and constituted unfair or deceptive acts and practices declared unlawful by the MMPA. Medtronic's knowingly made false representations for the purpose of deceiving the Plaintiff and other consumers regarding "off-label" applications of Infuse® in violation of the MMPA.

1530.    In the course of knowingly promoting Infuse® for "off-label" posterior uses, Medtronic failed to fairly and adequately disclose to the public, to the Plaintiffs, and to Plaintiffs' physicians that such uses were ineffective, unreasonably dangers, and defective.

1531.    Medtronic sold Infuse® to Plaintiffs for a fee.

1532.    Had Medtronic disclosed the true facts concerning the increased risks and damages they knew or should have known to be associated with "off-label" applications of Infuse®, Plaintiff and her physicians would not have chosen to purchase and use Infuse®.

1533.    Medtronic engaged in the unlawful practices set forth in this Complaint in the sale of merchandise in trade or commerce.

1534.    Medtronic's concealment, misrepresentations and/or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiffs regarding Medtronic's products.

1535.    In violation of the MMPA, Medtronic employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of Infuse® in the State of Missouri.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1536.    Medtronic engaged in the concealment, suppression, misrepresentations and/or omission of the aforementioned material facts with the intent that others, such as Plaintiffs, their physicians, and/or the general public would rely upon the concealment, suppression, misrepresentation and/or omission of such material facts and purchase Infuse®.

1537.    The concealment, suppression, misrepresentation and/or omission of the aforementioned material facts had the capacity to, was reasonably foreseeable that it would, and did so deceive.

1538.    At all times material hereto, it was reasonably foreseeable that Plaintiffs and/or their physicians would rely on the false and fraudulent promotion, advertising, marketing, and packaging made by Medtronic.  Said reliance has caused Plaintiffs to be damaged.

1539.    Plaintiffs physicians would not have used in Plaintiffs and Plaintiffs would not have purchased Infuse® absent the concealment, suppression, or omission of the aforementioned material facts.

1540.    Plaintiffs suffered actual and ascertainable loss of money and damages as an actual and proximate result of Medtronic's intentional misrepresentation and concealment of material facts.

1541.    Medtronic's conduct described herein actually and proximately caused Plaintiffs to suffer damages as described throughout this Complaint.

1542.    Plaintiffs are entitled to recover their actual damages, attorneys' fees, and other equitable relief, pursuant to Missouri law, including Mo. Ann. Stat. § 407.025.

1543.    Furthermore, Defendants' unlawful conduct set forth in this Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of Medtronic's actions and for the rights of Plaintiffs and warrants an award of punitive damages to deter Medtronic, and others in similar circumstances, from committing such actions in the future.

## FOURTEENTH CAUSE OF ACTION

### Loss of Consortium

1544.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1545.    At all times relevant hereto the Plaintiffs' spouses ("Spouse Plaintiffs"), who are specifically identified in the Plaintiff Party Section of this complaint, have suffered injuries and losses as a result of Plaintiffs' injuries.

1546.    For the reasons set forth herein, Spouse Plaintiffs have necessarily paid and/or have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as approximate result of Medtronic's misconduct.

1547.    For the reason set forth herein, Spouse Plaintiffs have suffered and will continue to suffer damages to and/or the loss of their loved one's support, companionship, services, society, and affection.

1548.    Spouse Plaintiffs have suffered great emotional pain and mental anguish.

1549.    As a direct and proximate result of Medtronic's wrongful conduct and failure to comply with applicable federal standards Spouse Plaintiffs have sustained and will continue to sustain severe emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages in an amount to be proven at trial.  Medtronic is liable to Spouse Plaintiffs for all general and special damages to which Spouse Plaintiffs are entitled by law.

## FIFTEENTH CAUSE OF ACTION

### Gross Negligence/Punitive Damages

1550.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

1551.    At all times material hereto, Defendant knew or should have known that Infuse® was inherently more dangerous with respect to the increased risks and dangers, including but not limited to, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury than alternative spinal fusion procedures available to Plaintiffs and Plaintiffs' physician.

1552.    At all times material hereto, Medtronic attempted to misrepresent and did misrepresent material facts concerning the safety of Infuse®.

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

1553.    Medtronic's misrepresentations included knowingly withholding material information from the medical community and the public, including the Plaintiffs and Plaintiffs' physicians, concerning the safety and efficacy of Infuse®.

1554.    At all times material hereto, Medtronic knew and recklessly disregarded the fact that Infuse® was subject to increased risks and dangers, including but not limited to, ectopic bone growth, inflammatory reaction, non-union, cancer, urogenital injury, gastrointestinal injury, respiratory injury, neuro deficit, nerve injury, and neurological injury than alternative spinal fusion procedures.

1555.    Notwithstanding the foregoing, Medtronic continued to aggressively market Infuse® without disclosing the aforesaid increased risks, dangers and serious side effects when there were safer alternative methods.

1556.    Medtronic knew of Infuse®'s defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, promote, distribute and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiffs, in conscious and/or negligent disregard of the foreseeable harm.

1557.    Medtronic's intentional and/or reckless, fraudulent and malicious failure to disclose material safety information deprived the Plaintiffs and their surgeons of important and necessary information to enable them to weigh the true risks of using the subject product against its benefits.

1558.    As a direct and proximate result of Medtronic's conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiffs, the Plaintiffs suffered severe and permanent physical injuries and great mental and emotional distress and anguish as set forth above.

1559.    The aforesaid conduct of Medtronic was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish Medtronic and deter them from similar conduct in the future.

1560.    Defendants have engaged in conduct entitling Plaintiffs to an award of punitive damages pursuant to State Common Law principles including but not limited to the following statutory provisions as applicable:

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

- Ala. Code §§ 6-11-20 (2013);

- Alaska Stat. § 09.17.020(b) (2013);

- Ark. Code Ann. § 4-2-313; § 16-55-206 (2013);

- Cal. Civ. Code §§ 1770 *et seq.* and Cal. Civ. Code § 3294; Cal. U. Com. Code §§ 2314-2315 (2013).

- Colo. Rev. Stat. § 13-21-102 (2013);

- Conn. Gen. Stat. §§ 52-240b *et seq.* (2013);

- Del. Code Ann. tit. 6, §§ 6855 *et seq.* (2013);

- Fla. Stat. Ann. §§ 768.72 (2013);

- O.C.G.A. §§ 51-12-5.1 (2013);

- Idaho Code § 6-1601(9); § 6-1604 (2013);

- Ill. Comp. Stat. Ann ch. 735, 5/2-604.1 (2013);

- Ind. Code Ann. §§ 34-51-3 *et seq.* (2013);

- Iowa Code Ann. § 668A.1 (2013);

- Kan. Stat. Ann. §§ 60-3702(a) and (e) (2013);

- Ky. Common Law (2013);

- Mass. Gen. Laws Ann. c. 229, § 2; M.G.L. c. 93A, § 9(3) (2013);

- Mich. Comp. Laws (2013);

- Minn. Stat. Ann. § 549.191; § 549.20, subd.1(a); § 549.20, subd. 4 (2013);

- Mo. Rev. Stat. § 510.265 (2013);

- Mont. Code Ann. § 27-1-221(2) (2013);

- Nev. Rev. Stat. § 42.005 (2012);

- N.M. Rules Ann. § 13-1827 and UJI 13-861 (2013);

- N.C. Gen. Stat. §§ 1D-1 *et seq.* (2013);

- N.D. Cent. Code §§ 51-12-01 (2013);

- Ohio Rev. Code Ann. §§ 1345.01 (2013);

- Okla. Stat. tit. 23 § 9.1 (2013);

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

- Or. Rev. Stat. § 30.925 (2013);

- 73 Pa. Stat. §§ 201-1 *et seq.* (2013);

- S.C. Code Ann. §§ 15-33-135 (2013);

- S.D. Codified Laws (2013);

- 2011 Tenn. Public Acts ch. 510 (2013);

- Utah Code Ann. § 78B-8-2-3 (2013); and

- Wis. Stat. Ann. § 895.043 (2013).

1561.    Plaintiffs seek actual and punitive damages from Medtronic as alleged herein.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and each of them, respectfully demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

a. Compensatory damages to Plaintiffs for past, present, and future damages, including, but not limited to, great pain and suffering and emotional distress and anguish, for severe and permanent personal injuries sustained by Plaintiffs, health and medical care costs, together with interest and costs as provided by law;

b. For general damages in a sum exceeding this Court's jurisdictional minimum.

c. For specific damages according to proof;

d. For all ascertainable economic and non-economic damages according to proof in a sum exceeding this Court's jurisdictional minimum;

e. For Restitution and disgorgement of profits;

f. For Punitive and Exemplary damages according to proof;

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

g.    For pre-judgment interest and post-judgment interest as allowed by law;

h.    For reasonable attorneys' fees;

i.    For the costs of these proceedings; and

j.    For such other and further relief as this Court deems just and proper.


Respectfully submitted,

Dated: October 1, 2013


s/ Eric D. Holland
Eric D. Holland  - *(Mo. Bar #39935)*
**HOLLAND, GROVES, SCHNELLER
    & STOLZE, LLC**
300 N Tucker, Suite 801
St. Louis, MO 63101
Tel: (314) 241-8111
Fax: (314) 241-5554
Email:  eholland@allfela.com

Nicholas J. Drakulich, Esq.
*(Pro Hac Vice Applicant Anticipant)*
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio South, Suite 322
San Diego, CA 92108
Tel:  (858) 755-5887
Fax: (858) 755-6456
Email:  njd@draklaw.com

Richard J. Arsenault, Esq.
*(Pro Hac Vice Applicant Anticipant)*
**NEBLETT, BEARD & ARSENAULT**
2220 Bonaventure Court
Alexandria, LA 71309
Tel: (800) 256-1050
Fax: (318) 561-2592
Email:  rarsenault@nbalawfirm.com

Electronically Filed - City of St. Louis - October 01, 2013 - 10:19 AM GMT+00:00

Jerrold S. Parker, Esq.
*(Pro Hac Vice Applicant Anticipant)*
**PARKER WAICHMAN LLP**
3301 Bonita Beach Road
Bonita Springs, Florida 34134
TEL: (239) 390-8610
FAX: (239) 390-0055
jerry@yourlawyer.com

W. Mark Lanier
*(Pro Hac Vice Applicant Anticipant)*
**LANIER LAW FIRM**
6810 FM 1960 West
Houston, Texas
TEL: (713) 659-5200
FAX: (713) 659-2204
wml@lanierlawfirm.com

*Attorneys for Plaintiffs*